UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                        :
E*TRADE FINANCIAL CORPORATION and       :
E*TRADE SECURITIES, LLC,                 :      No. 08 CV 2993 (RJH)
                                        :
            Plaintiffs,                  :
                                        :
      v.                                 :
                                        :
MARCUS J. HERNANDEZ,                     :
SEAN J. GAFFEY and BANC OF               :
AMERICA INVESTMENT                       :
SERVICES, INC.,                          :
                                        :
            Defendants.                  :
                                        :
----------------------------------------x

## DECLARATION OF DOUGLAS P. LOBEL
## IN SUPPORT OF PLAINTIFFS' MOTION FOR
## PRELIMINARY INJUNCTION IN AID OF ARBITRATION

1.      I am a partner at Cooley Godward Kronish LLP, counsel of record in this

action for Plaintiffs E*TRADE Financial Corporation and E*TRADE Securities, LLC (together,

"E*TRADE"). I am admitted to practice before the United States District Court for the Southern

District of New York.

2.      I respectfully submit this declaration to transmit to the Court certain

documents in support of Plaintiffs' Motion for Preliminary Injunction.

3.      Attached to this declaration as **Exhibit 1** is a true and correct copy of Banc

of America's **Complaint** filed on March 2, 2005, in the matter styled *Banc of America*

*Investment Services, Inc. v. Ellis*, Case No. 1:05-cv-02507-NRB, Doc. 1, in the United States

District Court for the Southern District of New York.

4.      Attached to this declaration as **Exhibit 2** is a true and correct copy of Banc of America's **Memorandum Of Law In Support of Plaintiff's Motion For A Temporary Restraining Order And Preliminary Injunction** filed on March 23, 2005, in the matter styled *Banc of America Investment Services, Inc. v. Ellis*, Case No. 1:05-cv-02507-NRB, Doc. 7, in the United States District Court for the Southern District of New York.

5.      Attached to this declaration as **Exhibit 3** is a true and correct copy of Banc of America's **Complaint** filed on February 6, 2008, in the matter styled *Banc of America Investment Services, Inc. v. Harvie et al.*, Case No. 3:08-cv-00097-HEH, Doc. 1, in the United States District Court for the Eastern District of Virginia.

6.      Attached to this declaration as **Exhibit 4** is a true and correct copy of Banc of America's **Memorandum of Law in Support of Motions for Preliminary Injunction and Temporary Restraining Order**, in the matter styled *Banc of America Investment Services, Inc. v. Harvie et al.*, filed on February 6, 2008, Case No. 3:08-cv-00097-HEH, Doc. 7, in the United States District Court for the Eastern District of Virginia.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 25 day of March, 2008, in Reston, Virginia.

_____
Douglas P. Lobel

358039/RE

## CERTIFICATE OF SERVICE

I, Douglas P. Lobel, state that on the 25th day of March, 2008, I served the following by FedEx overnight service:  Declaration of Douglas P. Lobel in Support of Plaintiffs' Motion for Preliminary Injunctive Relief in Aid of Arbitration, to the following parties:

Banc of America Investment Services, Inc.
c/o CT Corporation System, Its Registered Agent
111 Eighth Avenue
New York, New York 10011

Marcus J. Hernandez (home address)          Marcus J. Hernandez (office address)
229 Canterbury Court                        Banc of America Investment Services, Inc.
Blue Bell, Pennsylvania 19422-1279          4 Sentry Parkway
                                            Blue Bell, Pennsylvania 19422

Sean J. Gaffey (home address)               Sean J. Gaffey (office address)
550 Gregory Avenue, Apt. B7                 Banc of America Investment Services, Inc.
Weehawken, New Jersey 07086-6001            400 Kelby Street, 19th Floor
                                            Fort Lee, New Jersey 07024

/s/ Douglas P. Lobel_____
Douglas P. Lobel

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

BANC OF AMERICA INVESTMENT                )
SERVICES, INC.,                           )
                                          )
              Plaintiff,                  )
                                          )     JUDGE BUCHWALD
       v.                                 )     05 CV 2507
                                          )
MICHAEL ELLIS,                            )
                                          )
              Defendant.                  )

RECEIVED
MAR 02 2005
U.S.D.C. S.D. N.Y.
CASHIERS

<u>COMPLAINT</u>

Banc of America Investment Services, Inc. ("BAI"), by its undersigned attorneys,

hereby brings the following Complaint for injunctive relief against Defendant Michael Ellis

("Ellis" or "Defendant") for (i) breach of contract; (ii) conversion and misappropriation of trade

secrets, customer lists, and confidential business information; (iii) breach of the duty of loyalty

and fiduciary duty; (iv) unfair competition; and (v) tortious interference with economic

advantage, and in support thereof avers as follows:

## I. <u>PARTIES</u>

1.      BAI is a financial services firm organized and existing under the laws of

Florida and maintaining its principal place of business in Charlotte, North Carolina. BAI

transacts business in this judicial district.

2.      Defendant Ellis was formerly employed by BAI as a financial advisor in

BAI's New York office. Upon information and belief, Ellis is a citizen of the State of New York,

residing at 271 West 73rd Street, Apartment 2B, New York, New York 10023.

## II. JURISDICTION AND VENUE

3.        Jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. §1332.

The amount in controversy exceeds Seventy Five Thousand Dollars ($75,000), exclusive of

interest and costs, against the Defendant.  Venue is proper in this judicial district as it is the

district in which the conduct complained of arose and the Defendant resides.

## III. FACTS COMMON TO ALL COUNTS

4.        BAI is engaged in the business of, inter alia, providing investment services

to the public at large.

5.        As a registered representative of BAI, Ellis was responsible for servicing

BAI clients with assets under management of approximately **$100 million**.  These client assets

generated approximately **$3.6 million** in gross revenues for BAI in the past twelve months.

6.        As a condition of his employment with BAI, Ellis agreed in writing to

abide by BAI's Series 7 Code of Conduct.  In Section 17 of the Code of Conduct, Ellis agreed

not to solicit clients or employees for one year after the termination of his employment:

> *Non-Solicitation Agreement* – To the fullest extent permitted by
> law, during the associate's employment with the Company, and for
> twelve months after his or her termination (for whatever reason) the
> Associate agrees that he or she will not directly or indirectly, on his
> or her own behalf or on behalf of any other person or entity, solicit or
> recruit any person employed by the Company to leave the employ of
> the Company, or otherwise interfere with the relationship between
> the Company and any of its employees.  The Associate similarly
> agrees that during his or her employment with the Company and for
> twelve months after his or her termination (for whatever reason) he
> or she will not directly or indirectly solicit, invite, encourage or
> request any client or customer of the Company to whom he or she
> was introduced and/or for whom he or she worked, provided service
> or transacted business in the course and scope of his or her
> employment with the Company for the purpose of:  obtaining that
> client or customer's business for himself or herself or any other
> person or entity, causing such client or customer to discontinue

- 2 -

doing business with the Company, or otherwise interfering with the relationship between such clients or customers and the Company. The Associate understands that the Company retains sole discretion to waive or modify these restrictions, and may do so in writing and signed by Senior Management of the Company.

(See Exhibit "A"; Section 17).

7.    In his agreement in Sections 10 and 11, Ellis also agreed to keep confidential all BAI client information, to use this information only for BAI business and to return all such information upon termination of employment. (See Exhibit "A"; Sections 10 and 11).

8.    On Friday, February 25, 2005, Defendant Ellis resigned his employment without any notice from BAI to commence employment at Smith Barney in New York City, a direct competitor of BAI.

9.    BAI alleges, upon information and belief, that Defendant has wrongfully confiscated and utilized BAI records and information in violation of his contractual and other obligations to BAI.

10.    BAI alleges, upon information and belief, that Defendant has violated and/or intends to violate his obligations to BAI by inducing or attempting to induce customers of BAI to discontinue their business with BAI and do business with Smith Barney, as well as soliciting for hire or recruiting BAI employees to work with him at Smith Barney.

11.    BAI also alleges, upon information and belief, that the Defendant has engaged in other acts which constitute unfair competition, and are in violation of Defendant's contractual, trade secret, fiduciary, internal privacy policies as mandated by federal and state law, and/or other legal obligations to BAI (see generally Declaration of John McGuinness).

- 3 -

## COUNT I
## INJUNCTIVE RELIEF

12.    The allegations of Paragraphs 1 through 11 are incorporated by reference herein with the same force and effect as if set forth in full below.

13.    By virtue of the foregoing, BAI has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against the Defendant.

14.    Unless the Defendant is temporarily and preliminarily enjoined from violating the terms of his agreements, misappropriating BAI's trade secrets, and engaging in other acts of unfair competition, BAI will be irreparably harmed by:

(a)  Disclosure of trade secrets, customer lists, and other confidential information which are solely the property of BAI and its clients;

(b)  Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(c)  Loss of personnel, damage to office stability, and a threat to the enforcement of reasonable contracts; and

(d)  Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

15. BAI has no adequate remedy at law.

WHEREFORE, BAI respectfully requests that:

(a) A Temporary Restraining Order and/or a Preliminary Injunction Order issue immediately, enjoining Defendant, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Smith Barney, from:

- 4 -

(i)    Soliciting the business of any customers of BAI whom Defendant serviced or whose names became known to him during his employment with BAI (excluding members of Defendant's family);

(ii)    Soliciting for hire or hiring any persons or employees of BAI;

(iii)    Using, disclosing, or transmitting for any purpose, any records, documents, or information relating in any way to the clients, business or marketing strategies, or business operations of BAI, whether in original, copied, computerized, handwritten, or any other form (hereafter the "Records and Information");

(iv)    Retaining, in any form, including without limitation original, copied, computerized, handwritten or any other form, any Records and Information;

(v)    Any and all other such acts as this Court deems appropriate for injunctive relief.

## COUNT II
## BREACH OF CONTRACT

16.    The allegations of Paragraphs 1 through 15 are incorporated herein by reference with the same force and effect as if set forth in full below.

17.    Upon information and belief, Defendant has violated and/or intends to violate the provisions of his agreement attached hereto as Exhibit "A".

18.    As a consequence of the foregoing, BAI has suffered and will continue to suffer irreparable harm and loss.

- 5 -

## COUNT III
## CONVERSION AND MISAPPROPRIATION OF TRADE SECRETS

19. The allegations of Paragraphs 1 through 18 are incorporated herein by reference with the same force and effect as if set forth in full below.

20.    The books and records of BAI, and the confidential information contained therein, are trade secrets subject to protection under the laws of New York.

21.    This information derives independent economic value by not being accessible, through proper means, to competitors who can profit from its use or disclosure.

22.    BAI has taken reasonable measures under the circumstances to maintain the secrecy of this information.

23.    The foregoing conduct of the Defendant, upon information and belief, constitutes a misappropriation of BAI's confidential, trade secret information.

24.    As a consequence of the foregoing, BAI has suffered and will continue to suffer irreparable harm and loss.

## COUNT IV
## BREACH OF THE DUTY OF LOYALTY AND BREACH OF FIDUCIARY DUTY

25.    The allegations of Paragraphs 1 through 24 are incorporated herein by reference with the same force and effect as if set forth in full below.

26.    Upon information and belief, Defendant has violated his duty of loyalty and his fiduciary duty to BAI including, without limitation, by violating his contractual and trade secret obligations to BAI, and by engaging in other actions contrary to the interests of BAI.

27.    As a consequence of the foregoing, BAI has suffered and will continue to suffer irreparable harm and loss.

## COUNT V
## UNFAIR COMPETITION

28.    The allegations of Paragraphs 1 through 27 are incorporated herein by reference with the same force and effect as if set forth in full below.

29.    Upon information and belief, the Defendant has engaged in acts of unfair competition.

30.    As a consequence of the foregoing, BAI has suffered and will continue to suffer irreparable harm and loss.

## COUNT VI
## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE

31.    The allegations of Paragraphs 1 through 30 are incorporated herein by reference with the same force and effect as if set forth in full below.

32.    Upon information and belief, Defendant has tortiously interfered with the economic advantage of BAI by, inter alia, diverting the clients of BAI to a competing entity, depriving BAI of its trade secrets and confidential and proprietary information, and interfering with and violating the contract rights of BAI.

33.    The Defendant acted without privilege or justification.

34.    As a consequence of the foregoing, BAI has suffered and will continue to suffer irreparable harm and loss.

- 7 -

WHEREFORE, by virtue of the foregoing acts complained of in Counts II, III, IV,

V and VI, BAI demands judgment in its favor and against Defendant for temporary and

preliminary injunctive relief pending expedited arbitration hearings on the merits

before a duly appointed panel of arbitrators to be held pursuant to Rule 10335 of the National

Association of Securities Dealers Code of Arbitration Procedure.

Dated: New York, New York
      March 2, 2005

ZAROFF & HILL LLP
Attorneys for Plaintiff Banc of America Investment
Services, Inc.

By: _____
    Jeffrey A. Hill (JH-8392)

420 Lexington Avenue, Suite 2025
New York, New York 10170
(212) 867-4411

Of Counsel
Thomas J. Momjian, Esq.
Christopher C. Coss, Esq.
Coss & Momjian, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, Pennsylvania 19004
(610) 667-6800

Exhibit A

03/02/2005  09:54    6106676620                    COSSMOMJIAN                    PAGE  02/09
MAR  02  2005  09:52  FR  PRIVATE  BANK/BAINVST            TO  916106676620        P. 02

**Banc of America
Investment Services, Inc.**

# Series 7 Code of Conduct

## Introduction

We must work together as a team, and that demands an environment of honesty and trust. Our customers are entitled to expect uncompromising standards of professional and ethical conduct. Our reputation is a reflection of our adherence to philosophical and ethical principles, which are outlined in our Corporate Vision and Code of Conduct (the "Code").

When giving advice about _any_ investment, it is essential that the client receives oral and written disclosures and understands:

i  The investments are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries;

ii  The investments are not insured by the Federal Deposit Insurance Corporation (FDIC) ; and

iii  The investments involve investment risks, including possible loss of the principal amount invested.

Appropriate disclosure should always be provided:

- At account solicitation or initial sales presentation, either in person or by telephone;

- At any new account opening, by the Investment Consultant by pointing out the written disclosures within the account documentation, and orally providing the disclosures;

- At the time of the first transaction in any account;

- At the time of any subsequent transaction in a different product, including securities within the same mutual fund family; and

- At the time of any transaction occurring six months or more since the last trade.

In conjunction with an account opening, the Investment Consultant must obtain from the customer written acknowledgement of such disclosures.

In addition, our policies require that at the time of any transaction the Investment Consultant ask the customer to confirm that he/she understands the risks associated with the investment.

We evaluate our performance through a variety of mechanisms, including branch office "shopping" sessions. It is important to remember we will follow these guidelines. Any failure to comply with the Code

1

Banc of America
Investment Services, Inc.™

and to properly disclose to our customers, as determined by our evaluations, may result in termination of your employment.

In addition to the standards set forth in the Code, Banc of America Investment Services, Inc. employees must adhere to the Bank of America Corporation Code of Ethics and General Policy on Insider Trading, and any modifications thereof.

Please read the Code and discuss any questions you may have with your manager.

## Code of Conduct

The following Statement of Business Practices ("Statement") seeks to provide practical guidance for application of the Banc of America Investment Services, Inc. Code of Conduct ("Code") and to provide direction for addressing broad operating risk. In addition, Bank of America Corporation Code of Ethics and the General Policy on Insider Trading ("Policy"), are incorporated by reference and set forth additional guidance. More specific or additional direction is provided in the operating manuals and policies and procedures of certain areas because of the area's particular activities, operating risks or individual responsibilities, or in other publications that address Associate conduct. The Code (which includes this Statement), the Policy and any other policies and procedures referred to herein, are collectively called the "Documents."

## Statement of Business Practices

### 1. Responsibilities

The reputation of any financial institution depends upon the conduct and values of its Associates. Building and ensuring an unblemished reputation involves:

* shaping the judgment of each Associate on basic matters of policy;

* providing specific direction for each Associate's approach to a variety of situations;

* accepting responsibility for judgment based on these directions; and

* calling upon each Associate's individual pride and spirit in being recognized as part of a respected professional entity.

The foundation of this Statement consists of basic standards of business practice, as well as professional and personal conduct. Such standards require honesty and candor in our activities, including the observance of the spirit and intent as well as the letter of the law.

2

03/02/2005  09:54    6106676620          COSSMOMJIAN                        PAGE  04/09
MAR 01 2005 09:45 FR PRIVATE BANK/BAINVST
                                                              TO 916106676620         P.10
    FEB 28 2005 10:50 FR PRIVATE BANK-BAINVST 646 313 4753 TO 912122308518      P.08/14

Banc of America
Investment Services, Inc.

Associates are prohibited by law to ask for, receive or agree to receive "anything of value" for themselves or for a family member of the Associate or other third party for, or in connection with, any transaction or business of Banc of America Investment Services, Inc. or its affiliates, either before or after a transaction is discussed or completed.

Customers and vendors are prohibited by the same law from offering "anything of value" as an inducement, reward or compensation to any Associate in connection with the business transaction. Anything of value includes trips, merchandise, meals or entertainment which do not serve demonstrable business purpose and would not ordinarily be reimbursed if not paid by the customer or vendor.

If a third party could perceive a gift as being improper or as compromising the integrity of the individual or Banc of America Investment Services, Inc. and its affiliates, the gift should be respectfully declined. Associates should dedicate the same careful consideration and thought for the appropriateness of gifts to customers or vendors of Banc of America Investment Services, Inc. as we would apply to those gifts received.

Atpa procedure manuals such as your Investment Consultant Compliance Manual have more specific information regarding the appropriateness of gifts, and such manuals should be consulted. Associates must discuss the appropriateness of any gifts with their manager.

## 10. Confidentiality

Confidentiality is a fundamental principle of the financial services business. The principle is particularly applicable to nonpublic information concerning Banc of America Investment Services, Inc. and to information received by Banc of America Investment Services, Inc. from a customer or vendor. It applies with equal force to informal communications as well as to written, printed or computer-generated information.

Specific policies regarding information, such as the General Policy on Insider Trading and the Corporate Information Security Policy, exist to assure adequate control of critical and secured information. Associates must make themselves familiar with such policies that govern the work they perform.

*Third Party Communications* — Nonpublic information regarding Banc of America Investment Services, Inc. should be conveyed to others only when there is a reasonable need to know that furthers a lawful and legitimate purpose of Banc of America Investment Services, Inc., with the express understanding that the information is confidential and is to be used solely for the limited purpose for which it was received and given. Unless otherwise instructed, Associates should treat internal Banc of America Investment Services, Inc. activities and plans as confidential, to be disseminated within the internal structure of Banc of America Investment Services, Inc. only on a need to know basis.

9

PAGE 8/14 * RCVD AT 2/28/2005 10:34:31 AM [Eastern Standard Time] * SVR:CRPNYCRBS00/28 * DNIS:2308518 * CSID:646 313 4753 * DURATION (mm-ss):04-42

--- 55:46 FR PRIVATE BANK/BAINVST

TO 916106676620      P.11

FEB 28 2005 10:50 FR PRIVATE BANK-BAINVST 646 313 4753 TO 912122308518     P.09/14

**Banc of America
Investment Services, Inc.**

*Customer Information* — Confidential information obtained from or about a customer which is specifically identifiable to that customer (such as customer account numbers, customer account balances and transaction information, financial condition, anticipated changes in management, business plan or projections) must be accorded a high level of confidentiality. We provide information to other companies only in order to conduct our business, comply with applicable law, protect against fraud or other suspected illegal activity, or help us meet customer needs or when the customer specifically consents or has been given an opportunity to request that the information not be shared. Any information shared will be limited to that needed or legally required and may be subject to confidentiality agreements. In addition, Associates are only authorized to access customer information for legitimate business purposes of Banc of America Investment Services, Inc. or its affiliates on a need to know basis.

*Vendor Information* — Confidential competitive information submitted to Banc of America Investment Services, Inc. in connection with the purchase of equipment, supplies or services, must be maintained in strictest confidence in order to avoid giving or receiving any improper competitive advantage with respect to any of several vendors.

## 11. Proper Use of Company Assets

Proper use of Company Assets and proper recording of such use is essential to the financial soundness and integrity of Banc of America Investment Services, Inc. Misuse or unauthorized removal of furnishings, equipment or supplies from any facility of Banc of America Investment Services, Inc. or Bank of America Corporation affiliate is prohibited.

This policy applies equally to property created, obtained or copied by Banc of America Investment Services, Inc. for its use (such as client lists, files, reference materials, reports, computer software, manuals, data processing systems, data bases and the like). Neither originals nor copies may be removed from Banc of America Investment Services, Inc. premises or affiliate of Bank of America Corporation, or used for purposes other than Banc of America Investment Services, Inc. business without the express permission of management.

Furthermore, the assets and the tangible contributions an Associate makes, whether directly or indirectly, while employed by Banc of America Investment Services, Inc. are Banc of America Investment Services, Inc.'s property and remain its property even if the Associate leaves Banc of America Investment Services, Inc.'s employ.

"Company Assets" include, but are not limited to, all originals and copies of: manuals, books and records; planners; holding book or customer book pages; account information and "positions" of customers; customer names, addresses and account numbers; all files and computers including hardware and software used in the course of business.

10

03/02/2005  09:54  6106676620

THR 01 2005 10:05 FR BANK OF AMERIKA

COSSMOMJIAN
6463134759 TO 916106676620

PAGE  06/09

P. 12/24

FEB 28 2005 10:51 FR PRIVATE BANK-BAINUST 646 313 4753 TO 912122308518    P. 10/14

Banc of America
Investment Services, Inc.

No Banc of America Investment Services, Inc. Associate may remove Company Assets from the premises unless specifically authorized. When an Associate separates from the Company for any reason, the former Associate must immediately cease use of all company records, proprietary information and assets, and return to the company all records and assets in his or her possession or control.

*Misappropriation* — Anyone who embezzles, steals or willfully misappropriates any monies, funds, or anything of value of Banc of America Investment Services, Inc. may be subject to termination, fine, imprisonment, restitution, payments, and other such actions confirmed by law and Company policy.

## 12. Relationship to Governmental Authorities

*Regulatory Obligations* — Banc of America Investment Services, Inc. functions in one of the most heavily regulated businesses in our economic system. There are multiple layers of governmental and self-regulatory organizations which supervise and police our activities. These include securities and banking regulators, both federal and state (i.e., SEC, NASD, MSRB, OCC, FDIC, Federal Reserve, etc.). It is the responsibility of our Associates to master the particular regulatory obligations imposed upon their phase of our business and to adhere strictly to those obligations. In dealing with the regulatory authorities, Banc of America Investment Services, Inc.'s policy mandates that each Associate observe the highest standards of professional conduct.

*Political Contributions* — Federal and State laws prohibit corporations from making contributions directly or indirectly through the use of company funds, services, property or other resources on behalf of any political party, campaign, candidate for public elective office, or political committee. Associates may elect to endorse or contribute to political parties or candidates of their choice. Banc of America Investment Services, Inc. encourages informed participation in governmental, regulatory and elective processes. Associates may do so on their own or with others. In either case, however, Banc of America Investment Services, Inc. will not directly or indirectly reimburse Associates for their individual political contributions or in any way influence or pressure an Associate in his or her choice of to whom and in what amount a political contribution is made. Political contributions should be in compliance with applicable laws, including but not limited to, Municipal Securities Rule Making Board Rule G-37. Questions about political contributions should be directed to your manager.

*Reporting of Convictions Pursuant to Federal Securities Laws* — Associates are reminded of their continuing obligation to report any injunction or conviction against them to their supervisor and to the Compliance Department. This reporting obligation applies to matters that arise from activities outside Banc of America Investment Services, Inc. business, as well as matters related to our business.

Banc of America
Investment Services, Inc.

## 16. Anti-Money Laundering

With the view to ensuring that the financial system is not used as a channel for criminal funds, Associates will make reasonable efforts to determine the true identity for all customers requesting Banc of America Investment Services, Inc. services. Significant business transactions will not be conducted with customers who fail to provide evidence of their identity. Associates will conduct business in conformity with high ethical standards and will adhere to laws and regulations pertaining to financial transactions.

As a Company, Banc of America Investment Services, Inc. will cooperate fully with federal law enforcement authorities to the extent permitted by law. Banc of America Investment Services, Inc. will avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading financial information. Where Banc of America Investment Services, Inc. becomes aware of facts which lead it to the reasonable presumption that proceeds were derived from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures consistent with the law will be taken including, for example, denial of assistance to the customer, severing relations with the customer, closing or freezing accounts, and filing reports with governmental authorities.

## 17. Relationship with our Competitors

In order to effectively and fairly compete in the marketplace with our many competitors, Banc of America Investment Services, Inc. must remain alert to changes in services and products offered to the public by our competitors; it is inappropriate, however, for Banc of America Investment Services, Inc. Associates to seek to improperly gain from this information. For example, it is unethical and may be illegal to hire an Associate of a competitor to gain access to that competitor's trade secrets or proprietary information. Similarly, it is improper for an Associate of Banc of America Investment Services, Inc. to provide such confidential information to our competitors.

Both federal and state law prohibits conspiracies or agreements that unreasonably restrain trade. Formal or informal understandings or agreements between competitors concerning the pricing of services may not be discussed by any Associate with any competitor.

There are many instances where close cooperation between Banc of America Investment Services, Inc. and competitors is permissible and necessary. Common objectives of education and regulation are pursued through membership on and participation in committees organized from time to time by government agencies, self-regulatory agencies and organizations such as the Securities Industry Association. (If an Associate is in doubt as to proper course of action, supervisory personnel should be consulted.)

13

03/02/2005  09:54    6106676620                    COSSMOMJIAN                      PAGE  08/09
MAR 01 2005 09:47 FR PRIVATE BANK/BAINVST                    TO 916106676620        P.15

   FEB 28 2005 10:52 FR PRIVATE BANK-BAINVST 646 313 4753 TO 912122308518      P.13/14

Banc of America
Investment Services, Inc.

*Non-Solicitation Agreement* — To the fullest extent permitted by law, during the Associate's employment with the Company, and for twelve months after his or her termination (for whatever reason) the Associate agrees that he or she will not directly or indirectly, on his or her own behalf or on behalf of any other person or entity, solicit or recruit any person employed by the Company to leave the employ of the Company, or otherwise interfere with the relationship between the Company and any of its employees. The Associate similarly agree that during his or her employment with the Company and for twelve months after his or her termination (for whatever reason) he or she will not directly or indirectly solicit, invite, encourage or request any client or customer of the Company to whom he or she was introduced and/or for whom he or she worked, provided service or transacted business in the course and scope of his or her employment with the Company for the purpose of, obtaining that client or customer's business for himself or herself or any other person or entity, causing such client or customer to discontinue doing business with the Company, or otherwise interfering with the relationship between such clients or customers and the Company. The Associate understands that the Company retains the sole discretion to waive or modify these restrictions, and may do so if in writing and signed by Senior Management of the Company.

## 18. General Suitability

Each customer's needs and objectives are different. In addition to standard suitability guidelines, Associates must follow firm policies including but not limited to firm solicitation policy.

## 19. Disclosure Obligations

In giving advice about any investment, it is essential the client receives oral and written disclosures and understand:

a) The investments are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc. or any of their affiliates or subsidiaries;

b) The investments are not insured by the Federal Deposit Insurance Corporation (FDIC); and

c) The investments involve investment risks, including possible loss of the principal amount invested.

In addition, where appropriate, clients should understand investments are sponsored by third parties not connected with any Bank of America affiliated Bank.

Due to the relationship between Banc of America Investment Services, Inc. and any Bank of America affiliated bank, Associates must make an effort to see that the customer is made aware of these facts, orally and in writing, early in any sales presentation and prior to the purchase of the investment. Careful adherence to these policies at the time of sale will prevent an unfortunate misunderstanding later.

14

PAGE 13/14 * RCVD AT 2/28/2005 10:34:01 AM [Eastern Standard Time] * SVR:CRPHYCRBS00/28 * DNIS:2308518 * CSID:646 313 4753 * DURATION (mm-ss):04-42

**Banc of America**
**Investment Services, Inc.**

# Series 7 Code of Conduct

## Certification and agreement

I have read and understand the Banc of America Investment Services, Inc. Code of Conduct (the "Code") and will comply with the policies explained in the Code and any manuals or firm publication that affect my work. Within its meaning, express or implied, I am not and have not been aware of any circumstance or activity of a personal or family nature (involving me or any other Associate) which would conflict with the Code. I also acknowledge that I have read, understand and agree to the non-solicitation agreement as set forth in Section 17 and the agreement regarding use of company assets as stated in Section 11. If I have executed or later execute another non-compete or non-solicitation agreement, I agree that the more restrictive agreement shall be binding upon me.

I understand any failure on my part to comply with the Code, including failure to properly disclose to our customers, as stated in Section 19, that investments offered by Banc of America Investment Services, Inc. (i) are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries; (ii) are not insured by the Federal Deposit Insurance Corporation (FDIC); and (iii) involve investment risks, including possible loss of the principal amount invested, may result in termination of my employment.

## Accepted and agreed

Name/title (please print)  Michael Ellis  U.P.

Associate signature  [signature]    Date  10-1-03

## Instructions

After signing, include this page in the enclosed envelope. Keep the remaining copy for your files.

Rev. 2
SER.7, CODE
22006A (01/02)    16

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|                                                          |   |                      |
| -------------------------------------------------------- | - | -------------------- |
| BANC OF AMERICA<br>INVESTMENT SERVICES, INC.,            | ) |                      |
|                                                          | ) |                      |
|       Plaintiff,           | ) |                      |
|                                                          | ) |                      |
| v.                                                       | ) | C.A.: 3:08cv097      |
|                                                          | ) |                      |
| J. CHRIS HARVIE,<br>  a/k/a JOHN C. HARVIE,    | ) |                      |
|                                                          | ) |                      |
| and                                                      | ) |                      |
|                                                          | ) |                      |
| HEATHER E. LAMBERT,                                      | ) |                      |
|                                                          | ) |                      |
|       Defendants.          | ) |                      |

**MEMORANDUM IN SUPPORT OF MOTIONS
FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Plaintiff, Banc of America Investment Services, Inc. ("BAI"), by counsel, for its

Memorandum in Support of Motions for Preliminary Injunction and Temporary Restraining

Order (the "Motions"), states as follows:

### I.    Summary

In this case, two financial advisors, J. Chris Harvie, a/k/a John C. Harvie ("Harvie"), and

Heather E. Lambert f/k/a Heather Edmiston ("Lambert"), hired for the purpose of developing,

maintaining and servicing BAI's customer accounts, have terminated their employment and

solicited BAI customers in violation of agreements they each signed not to do so.  In

consideration of their employment with BAI, Harvie and Lambert each executed agreements and

policy requirements, each of which included a provision prohibiting the solicitation of BAI

customers, and the use of confidential account and contact information for unauthorized use.

Harvie's and Lambert's use of confidential information they obtained by virtue of their

employment with BAI to actively solicit BAI's customers for their benefit is in disregard of their

contractual obligations. Such conduct is routinely enjoined by this Court pursuant to controlling

law.

## II.    Statement of Facts

Defendants' Employment with BAI and Their Contractual Obligations

BAI is a full-service investment firm. It is registered with the United States Securities

and Exchange Commission and is a member of the Financial Industry Regulatory Authority

("FINRA"). Harvie and Lambert are securities brokers registered with FINRA.

In connection with their employment, Harvie and Lambert executed various agreements.

They governed the terms of their employment, including provisions continuing after the

termination of their employment with BAI. Each of these agreements prohibited Harvie and

Lambert from using confidential information to which they had access by virtue of their

employment, for purposes other than BAI's interest. Additionally, each prohibited Harvie and

Lambert from soliciting or attempting to solicit any securities-related business, directly or

indirectly, from BAI's customers they served, or whose names had been known to them while in

the employ of BAI.

The Series 7 Agreement

One of the agreements signed by each Defendant was a BAI Series 7 Agreement (the "Series 7 Agreement"). Complaint Exhibit A. Harvie signed the Series 7 Agreement on October 18, 1999 and Lambert signed on July 30, 2001. See Exhibit A. In doing so, Harvie and Lambert acknowledged that they would be given access to confidential and proprietary information, including the BAI customer names, addresses, and account numbers. Id. at Section 11. They acknowledged they would use this information only in furtherance of BAI's interests. "Neither originals nor copies may be removed from [BAI] premises…or used for purposes other than [BAI] business without the express permission of management." Id.

The obligation to use confidential information only for BAI's purposes extended to former employees. Additionally, when Defendants left BAI they had an affirmative duty not to use confidential information for any purpose. "When an associate separates from the Company for any reason, the former Associate must immediately cease use of all company records, proprietary information and assets, and return to the Company all records and assets in his possession or control." Id.

In addition to their duty not to use confidential information for any purpose other than to further BAI's interests, Defendants had an obligation not to solicit BAI customers they serviced or became aware of while employed by BAI for one year after termination of their employment. Section 17 of the Series 7 Agreements states "[s]hould an Associate separate from [BAI] whether voluntarily or involuntarily, the former Associate agrees that for a period of one year, the Associate may not and will not solicit or attempt to solicit any securities related business, directly or indirectly, from any [BAI] customers who were served by or whose names became known to the Associate while in the employ of [BAI]."

3

BAI Code of Ethics Certification and Agreement

In addition to the Series 7 Agreements, Defendants each executed the BAI Code of Ethics Certification and Agreement in which they acknowledged and became bound by the BAI Code of Ethics (the "BAI Code of Ethics Certification"). Complaint Exhibit B. Lambert executed the BAI Code of Ethics on January 18, 2005 and Harvie executed the BAI Code of Ethics on January 4, 2005. See Exhibit B. In signing the BAI Code of Ethics Certification, Defendants expressly agreed to not use any confidential information, including company records, for any purpose after their employment terminated for any reason. Section 12 of the BAI Code of Ethics Certification stated, "[w]hen an associate separates from the Company for any reason, the former associate must immediately cease use of all company records, proprietary information and assets, and return to the company all records and assets in his or her possession or control."

Besides agreeing not to use confidential information, including company records, after their employment with BAI terminated, Defendants also expressly agreed in the BAI Code of Ethics Certification to not solicit BAI customers with whom they worked or learned of while employed by BAI for 12 months after their employment terminated:

> The employee…agrees that during his or her employment with the Company and for twelve months after his or her termination (for whatever reason), he or she will not directly or indirectly solicit, invite, encourage or request any client or customer of the Company to whom he or she was introduced and/or for whom he or she worked, provided service or transacted business in the course and scope of his or her employment with the Company, for the purpose of: obtaining that client or customer's business for himself or herself or any other person or entity, causing such client or customer to discontinue doing business with the Company, or otherwise interfering with the relationship between such clients or customers and the Company.

Id. at Section 19.

4

Harvie's and Lambert's Violation of Their Contractual Obligations

On January 28, 2008, Harvie and Lambert were allowed to resign after a compliance investigation. Shortly thereafter, representatives of BAI began calling BAI customers with whom Harvie and Lambert had worked to inform them of their departure. Sparks Aff. ¶ 9 (Complaint Exhibit C). Several of the customers contacted already knew of Harvie's and Lambert's departure. Sparks Aff. ¶ 10. Harvie and Lambert had already called many of the customers with whom they worked, including customers assigned to them by BAI. Harvie and Lambert had informed customers that they had resigned, that they would soon be employed, and they would like to continue to discuss with them their new employer and its services. Sparks Aff. ¶ 11. Upon information and belief, Harvie and Lambert are using confidential customer information, including contact and financial data, to accomplish this scheme.

### III. **Argument**

A.    Injunctive Relief is Authorized Pending Arbitration

Harvie, Lambert and BAI have contracted to submit their disputes to arbitration. Furthermore, both are subject to and bound by the rules of conduct promulgated by FINRA, including the FINRA Code of Arbitration Procedure. Under the FINRA Code of Arbitration Procedure, Harvie, Lambert and BAI are required to submit for final and binding arbitration the disputes described herein arising out of Harvie's and Lambert's employment with BAI and the termination of their employment. FINRA Code of Arbitration Procedure Rule 10335 expressly provides that parties may seek preliminary injunctive relief from a court of competent jurisdiction while submitting the merits of the dispute to arbitration before FINRA for final determination. BAI is filing a Statement of Claim in Support of Arbitration with FINRA in

accordance with its obligations and to allow FINRA to adjudicate this dispute after this Court has

entertained this Motion for injunctive relief.

Moreover, the Fourth Circuit has recognized that a district court has the authority to grant

interim relief in an arbitrable dispute. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,

756 F.2d 1048 (4th Cir. 1984).


B.      The test for preliminary injunction relief is overwhelmingly met.

        1)      Generally.

Rule 65 of the Federal Rules of Civil Procedure allows this Court to enter injunctive

relief in this case. The purpose of a preliminary injunction is to "maintain the *status quo ante*

*litem*, provided that it can be done without imposing too excessive an interim burden upon the

defendant." Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 195 (4th Cir. 1977).

Here, there is <u>no</u> burden on Defendants from an injunction, as demonstrated below.

The decision to grant or deny preliminary injunctive relief rests within the sound

discretion of the Court. James A. Merit & Sons v. Marsh, 791 F.2d 328 (4th Cir. 1986); Virginia

Chapter, Associated General Contractors of America, Inc. v. Krep, 444 F. Supp. 1167, 1180

(W.D. Va. 1978). The standard for issuance of a preliminary injunction and temporary

restraining order is "the balance of hardship test." Blackwelder, 550 F.2d at 196 (preliminary

injunction); Doe v. Shenandoah County School Bd., 737 F. Supp. 915-16 (E.D. Va. 1990). This

test requires consideration of four factors "in flexible interplay" in determining whether to issue a

preliminary injunction:

> 1. the likelihood of irreparable harm to the plaintiff without the requested relief;
>
> 2. the likelihood of harm to the defendant by an injunction;

6

      3.     the plaintiff's likelihood of success on the merits; and,

      4.     the public interest.

<u>Id</u>. at 194-96.  There is a "sliding scale" relationship between the harm to the plaintiff and the

necessity of showing a likelihood of success on the merits:

> The first step of the court's analysis requires a balancing of the
> likelihood of irreparable harm to the plaintiffs without an
> injunction against the likelihood of harm to the defendant with an
> injunction.  If a decided imbalance of hardship should appear in
> plaintiff's favor, it is enough that grave or serious questions are
> presented, and plaintiffs do not have to show a likelihood of
> success on the merits.  These are the two most important factors
> and the need for plaintiffs to show likelihood of success on the
> merits increases as the probability of irreparable injury to plaintiffs
> without an injunction decreases.  Also, if the plaintiffs have a
> strong probability of success on the merits, even a "possible"
> irreparable injury will suffice to warrant injunctive relief.

<u>Hanky v. City of Richmond</u>, 532 F. Supp. 1298, 1301 (E.D. Va. 1982); <u>see</u> <u>Doe</u>, 737 F. Supp. at

916.  The "balance of hardship" test correctly emphasizes that, where *serious* issues are before

the court, it is a sound idea to maintain the *status quo ante litem*, provided that it can be done

without imposing too excessive an interim burden upon the defendant.  <u>Blackwelder</u>, 550 F.2d at

194-95 (emphasis in original); <u>American Angus Ass'n v. Sysco Corp.</u>, 829 F. Supp. 807, 815

(E.D. Va. 1992).

      Under <u>Blackwelder</u>, "if a decided imbalance of hardship should appear in plaintiff's

favor," then the plaintiff need <u>not</u> show a likelihood of success on the merits.  <u>Blackwelder</u>, 550

F.2d at 195.  It 'is enough to say that [plaintiff] has not embarked on frivolous litigation, and

thus interlocutory relief is not improper if [plaintiff] can also show a need for protection which

outweighs any probable injury to the defendant.'"  <u>Id</u>. at 195-96 [quoting <u>West Virginia</u>

<u>Conservancy v. Island Creek Coal Co.</u>, 441 F.2d 232, 235 (4th Cir. 1971)].

7

2)       Application.

a.)       The "balance of hardship" is overwhelmingly in favor of BAI.

Applying the "balance of the hardship" test here, BAI clearly faces irreparable harm without an injunction. Its customer data, which includes contact and financial information, and its customer relationships, are its lifeblood. They were generated through great effort and expense by BAI over a number of years. Once a client moves an account, it is extremely difficult to regain it. This is particularly true if the client loses confidence in a company's ability to keep his or her financial and personal information confidential. Should Harvie and Lambert continue to solicit BAI customers, this irreparable harm will continue. By contrast, there is no likelihood of harm to Harvie or Lambert should an injunction be granted. Harvie and Lambert are free to work for other employers in any manner and are free to compete as long as they are not soliciting customers of BAI whom they serviced while employed with BAI or whose names became known to them during their employment with BAI and are not using any confidential information made available to them by BAI such as customer lists. This Court should not sanction such willful and intentional disregard of contractual and common law obligations to BAI.

The Fourth Circuit has recognized the harm caused by breach of non-solicitation clauses and, thus, authorized injunctive relief in similar instances. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048 (4th Cir. 1985). The facts in Bradley, including the contractual provisions at issue, are remarkably similar to those in the case at bar. In Bradley the defendant was hired by Merrill Lynch as an account director and stock broker. He signed documents whereby he agreed that if he left Merrill Lynch, he would not take any customer information with him and that for one year following his departure, he would not solicit business

8

from any Merrill Lynch client whom he served during his tenure with Merrill Lynch or of whom

he learned while at Merrill Lynch. Id. at 1048.

After several years at Merrill Lynch, the defendant resigned and began working with

another firm. Immediately thereafter, he began soliciting business from his Merrill Lynch

customers. Id. Thus, Merrill Lynch sought injunctive relief. The District Court granted the

injunction and this was upheld by the Fourth Circuit. Id. at 1053. The court stated that the

injunction was particularly appropriate in such a situation because,

> [w]hen an account executive breaches his former employment
> contract by soliciting his former employer's customers, a
> nonsolicitation clause requires immediate application to have any
> effect. An injunction even a few days after solicitation has begun
> in unsatisfactory because the damage is done. The customers
> cannot be "unsolicited."

Id. This is precisely the same situation. Harvie and Lambert have used confidential customer

data made available to them as a result of their employment with BAI for their own benefit to the

detriment of BAI. Furthermore, they are using this data to explicitly solicit BAI customers to

terminate the customers' relationship with BAI – something they explicitly agreed not to do in

multiple documents signed by them. Thus, they are in breach of their contracts with BAI. If

allowed to continue the actions they have already taken, the damage they will do cannot be

undone by an arbitration award: the clients cannot be "unsolicited." Thus, injunctive relief is

necessary to maintain the status quo until the matter can be arbitrated.

   b.) <u>BAI is likely to be successful on the merits of its claim for breach
of contract</u>.

Under <u>Blackwelder</u>, "if a decided imbalance of hardship should appear in plaintiff's

favor," then the plaintiff need not show a likelihood of success on the merits. <u>Blackwelder</u>, 550

F.2d at 195. It "'is enough to say that [plaintiff] has not embarked on frivolous litigation, and thus interlocutory relief is not improper if [plaintiff] can also show a need for protection which outweighs any probable injury to the defendant.'" Id. at 195-96 (quoting West Virginia Conservancy v. Island Creek Coal Co., 441 F.2d 232, 235 (4th Cir. 1971)). Because BAI has demonstrated that the imbalance of hardship favors granting preliminary injunction, it need not show a likelihood of success on the merits.

Regardless, BAI is likely to be successful in its claim for breach of contract against Harvie and Lambert. First, Harvie and Lambert agreed that they would not solicit business from clients with whom they worked while at BAI or whose identity became known to them while employed by BAI for twelve months following their departure. Second, they agreed to use all confidential information made available to them by BAI only in furtherance of BAI's business and to cease using such information upon termination of employment. It is clear that Harvie and Lambert are in breach of their contracts with BAI. Numerous BAI customers have said that Harvie or Lambert contacted them within days of their termination and asked the customers to consider transferring their accounts to the Defendants' new employer. They did this using confidential customer data. Thus, BAI is likely to prevail on its breach-of-contract action particularly since Virginia law generally recognizes and enforces anti-solicitation clauses which "reasonably protect the employer's business and are incident and ancillary to the contract of employment and limited as to area and duration..." Worrie v. Boze, 191 Va. 916, 926, 62 S.E.2d 876 (1951); see also New River Media Group, Inc. v Knighton, 245 Va. 367, 429 S.E.2d 25 (1993); Blue Ridge Anesthesia and Critical Care, Inc. v. Gidick, 239 Va. 369, 389 S.E.2d 467 (1990); Paramount Termite Control v. Rector, 238 Va. 171, 380 S.E.2d 922 (1989).

c.)    Public interest favors the injunctive relief sought by BAI

In addition to the balance of hardship being in BAI's favor, the public interest also favors granting the preliminary injunction. The public has an interest in generally enforcing reasonable contractual agreements reached through arms-length negotiation. Second, the public has an interest in protecting individual privacy concerns, particularly related to financial information. When a customer entrusts their financial information to a financial services entity, they should be able to know that the information will not be disclosed to third parties for someone else's financial gain. When Harvie and Lambert use customer contact information they acquired as a result of their employment with BAI for their personal benefit and that of their new employer, they are disclosing customer data to third parties. In other words, customers' personal information is being used for purposes other than that for which they entrusted it to BAI – actions clearly in violation of the public interest.

## IV.  **Conclusion**

For all the foregoing reasons, BAI respectfully requests that this Court grant its motions for preliminary injunction and for a temporary restraining order.


**BANC OF AMERICA INVESTMENT**
**SERVICES, INC.**


By: /s/ Kevin J. Funk
Counsel

11

James C. Cosby (VSB No. 25992)
Kevin J. Funk (VSB No. 65465)
Cantor Arkema, P.C.
Bank of America Center
1111 East Main Street, 16th Floor (23219)
**Mailing Address:**     Post Office Box 561
                         Richmond, Virginia  23218-0561
Telephone:  (804) 644-1400
Telecopier:  (804) 225-8706
kfunk@cantorarkema.com

      Counsel for Plaintiff

## CERTIFICATE OF SERVICE

      I hereby certify under penalty of perjury that, on February 6, 2008 a true copy of the foregoing document was served via hand-delivery and first-class mail on the following:

      Mr. J. Chris Harvie
      3111 Summerhurst Drive
      Midlothian, Virginia  23113

      Mrs. Heather E. Lambert
      14313 Brading Court
      Midlothian, Virginia  23112

                          _____/s/ Kevin J. Funk_____

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BANC OF AMERICA INVESTMENT )
SERVICES, INC., )
)
)
Plaintiff, )
)
v. )    05 Civ. 2507 (NRB)
)    ECF CASE
MICHAEL ELLIS, )
)
────────────────Defendant. )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.    PRELIMINARY STATEMENT OF FACTS

Plaintiff Banc of America Investment Services, Inc. ("BAI") submits this Memorandum of Law in support of its Motion for a Temporary Restraining Order and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendant Michael Ellis from violating his contractual, trade secret, fiduciary and other obligations to Plaintiff.

On Friday, February 25, 2005, Defendant resigned his employment from BAI's New York City office and subsequently commenced employment with Smith Barney, a competitor of BAI in New York City. At the time of his resignation, Defendant Ellis serviced BAI clients whose assets under management totaled over $100 million. These BAI customer assets generated approximately $3.6 million in gross revenues for the prior twelve months alone.

Defendant has wrongfully confiscated and utilized records and information of BAI in violation of his contractual and other obligations to BAI. He also has violated his agreement

with BAI by soliciting the business of clients and employees of BAI on behalf of Smith Barney. In fact, as discussed below, Defendant's new employer, Smith Barney, <u>routinely enforces its contractual and trade secret rights</u> when its employees leave, solicit Smith Barney clients, and take Smith Barney client information.

As a condition of his employment with BAI, Ellis agreed in writing to abide by BAI's Series 7 Code of Conduct. In Section 17 of the Code of Conduct, Ellis agreed not to solicit clients or employees for one year after the termination of his employment:

> *Non-Solicitation Agreement* – To the fullest extent permitted by law, during the associate's employment with the Company, and for twelve months after his or her termination (for whatever reason) the Associate agrees that he or she will not directly or indirectly, on his or her own behalf or on behalf of any other person or entity, solicit or recruit any person employed by the Company to leave the employ of the Company, or otherwise interfere with the relationship between the Company and any of its employees. The Associate similarly agrees that during his or her employment with the Company and for twelve months after his or her termination (for whatever reason) he or she will not directly or indirectly solicit, invite, encourage or request any client or customer of the Company to whom he or she was introduced and/or for whom he or she worked, provided service or transacted business in the course and scope of his or her employment with the Company for the purpose of: obtaining that client or customer's business for himself or herself or any other person or entity, causing such client or customer to discontinue doing business with the Company, or otherwise interfering with the relationship between such clients or customers and the Company. The Associate understands that the Company retains sole discretion to waive or modify these restrictions, and may do so in writing and signed by Senior Management of the Company.

(<u>See</u> Exhibit "A" to the Complaint; Section 17).

In his agreement in Sections 10 and 11, Ellis also agreed to keep confidential all BAI client information, to use this information only for BAI business and to return all such information upon termination of employment. (<u>See</u> Exhibit "A" to the Complaint; Sections 10

2

and 11).

As set forth in the accompanying affidavit, Defendant has breached his basic obligations to BAI by confiscating records and information of BAI and soliciting clients and employees of BAI.

**B.**    **BAI IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF**

It is well settled that a district court has "broad discretion" in granting interim injunctive relief if a movant can establish "both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor." See Charles of the Ritz Group, Ltd. V. Quality King Distrib., 832 F.2d 1317, 1320 (2d Cir. 1987); Ecolab, Inc. v. K.P. Laundry Machinery, Inc., 656 F. Supp. 894, 899 (S.D.N.Y. 1987). As set forth below, BAI easily meets these requirements.

**1.**    **BAI Can Demonstrate A Likelihood of Success on the Merits**

BAI is entitled to a temporary restraining order and preliminary injunctive relief to enforce Defendant's contract with BAI and to prevent against the further misappropriation and misuse of BAI's trade secret customer list.

**a.**    **Violation of Defendant's Agreement with BAI**

BAI's right to relief is clearly set forth in the express language of Defendant's agreement, which contain his written promise not to confiscate BAI's customer information and not to solicit clients of BAI. These obligations are clearly enforceable under New York law. See, e.g, Banc of America Investment Services, Inc. v. Brownlee, No. 04-8698 (S.D.N.Y. 2004);

3

(Exhibit "A" hereto); Quick & Reilly, Inc. v. Bondea, No. 04-6628 (S.D.N.Y. 2004) (Exhibit

"B" hereto); Banc of America Investment Services, Inc. v. Giordano, No. 03-7780 (RMB)

(S.D.N.Y. 2003) (Exhibit "C" hereto); Banc of America Investment Services, Inc. v. Sawyer,

No. 03-7769 (VM) (S.D.N.Y. 2003) (Exhibit "D" hereto); Alliance Capital Management, L.P. v.

McCool, Index No. 107804/04 (N.Y. Sup. June 1, 2004) (Exhibit "E" hereto).

   In fact, federal and state courts in New York routinely have upheld far more

restrictive prohibitions than those at issue here. See, e.g., Ticor Title Ins. Co. v. Cohen, 173 F.

3d 63 (2d Cir. 1999) (enforcing 6 month non-compete provision); BDO Seidman v. Hirshberg,

712 N.E.2d 1220 (N.Y. 1999) (enforcing 18 month restrictive covenant prohibiting defendant

from servicing clients of former employer).  There simply is no doubt that BAI is entitled to

temporary injunctive relief enforcing the prohibition against soliciting customers of BAI

contained in Defendant's agreement.  See Merrill Lynch v. Rahn, 73 F. Supp. 2d 425, 429

(S.D.N.Y. 1999) (granting preliminary injunction, enforcing non-solicitation agreement, and

noting that the similar relief requested here is "consistently granted").

   The prohibition against soliciting employees or representatives of BAI is likewise

enforceable. See, e.g., Veraldi v. American Analytical Laboratories, 706 N.Y.S.2d 158, 160

(N.Y. App. Div. 2000) (prohibition against soliciting employees "does not violate public policy

and, therefore, is enforceable."); see also Smith Barney v. Robinson, 12 F.3d 515, 519 (5th Cir.

1994) (enforcing one year non-solicitation of employees provision; "the Agreement does not

restrain Robinson from exercising a lawful profession, trade or business . . . . Robinson is free to

recruit stockbrokers or employees for Morgan Keegan - - anywhere, any time, and from any

organization - - save only that small class comprising Smith Barney's employees, a class which

4

he willingly agreed not to solicit.").

In <u>Pace Securities v. Pollack</u>, 550 N.Y.S.2d 299 (N.Y. App. Div. 1990), the First

Department affirmed the lower court's grant of preliminary injunctive relief to an employer to

protect its confidential customer information:

> This action concerns the alleged improper acquisition and use by defendants of Pace Securities' confidential customer information. Plaintiffs seek a preliminary injunction restraining defendants from using this information pending a determination of their legal action. **Plaintiffs have clearly demonstrated their likelihood of success on the merits, that they will be irreparably injured absent the issuance of a preliminary injunction and that the balance of equities lies in their favor.** Trial term's injunction, far from being overbroad, is narrowly drawn to prevent defendants from reaping the fruits of their improper conduct, while still allowing them to compete freely in the general market place.

550 N.Y.S.2d at 300 (emphasis added); <u>see also</u> <u>Chernoff Diamond & Co.</u>, 651 N.Y.S.2d 504,

505 (N.Y. App. Div. 1996) (enforcing restrictive covenant which prohibited employee from

soliciting, providing services to or advising any of his former employer's clients for a period of

two years and holding that restrictive covenants are enforceable if they are "reasonable in scope,

duration and geographical area and either necessary to protect the employer from unfair

competition that stems from the employee's use or disclosure of trade secrets or confidential

customer lists . . . .") (citations omitted).

BAI seeks only to enjoin Defendant from unfairly competing with BAI by

violating his agreement not to solicit customers – relief consistently sought by Defendant's new

employer when enforcing its own non-solicitation agreement with its brokers. <u>See</u> <u>generally</u>

Affidavit of John Palazzeti in <u>Salomon Smith Barney v. Neuman</u>, No. 00-3446 (D.N.J. 2000)

5

(Exhibit "F" hereto). Indeed, BAI's injunction will not prevent Defendant from working for Smith Barney. Defendant is also free to accept business from any clients (including clients of BAI) who approach him in the future without any solicitation by the Defendant. An injunction merely will serve to protect BAI's basic contract and trade secret rights and ensure that its clients are not unlawfully solicited away.

       **b.**   **<u>Misappropriation And Misuse Of BAI's Trade Secret Customer List And Customer Information</u>**

A temporary restraining order and preliminary injunctive relief prohibiting further solicitation of customers of BAI is also necessary to protect BAI's trade secret customer list and customer information from further misappropriation and misuse for Defendant's own personal use and for the benefit of a BAI competitor.

New York courts uniformly have held that injunctive relief is appropriate to protect a trade secret customer list from misappropriation and misuse by a former representative or employee who seeks to wrongfully solicit business for a competitor. In <u>Town & Country House & Home Serv. v. Newberry</u>, the New York Court of Appeals held that former employees should be enjoined from soliciting their former employer's customers under similar circumstances:

> The only trade secret which could be involved in this business is plaintiff's list of customers. Concerning that, even where a solicitor of business does not operate fraudulently under the banner of his former employer, he **still may not solicit the latter's customers who are not openly engaged in business in advertised locations or whose availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and**

> **the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up'.**
>
> \* \* \*
>
> The testimony in the instant record shows that the customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or by going to any advertised locations, but had to be screened from among many other housewives who did not wish services such as respondent and appellants were equipped to render, but preferred to do their own housework.
>
> \* \* \*
>
> **So there appears to be no question that plaintiff is entitled to enjoin defendants from further solicitation of its customers . . . .**

170 N.Y.S.2d 328, 331-33 (N.Y. 1958) (emphasis added). See also Props for Today, Inc. v. Kaplan, 558 N.Y.S.2d 38, 39 (N.Y. App. Div. 1990) (affirming "preliminary injunction to the extent of enjoining defendants from soliciting any of plaintiff's customers" because "defendant Kaplan misappropriated confidential information concerning photography stylists and prop masters who particularly favor renting [plaintiff's products]" and holding that "[c]ases in which customer lists are publicly available are distinguishable, since although defendants have shown that general lists of photo stylists and prop masters are available to the public, they have not, however, refuted plaintiff's showing that only it has listings of those clients interested in its specialized inventory . . . .") (citations omitted); Gillman & Ciocia, Inc. v. Reid, 545 N.Y.S.2d 387, 388 (N.Y. App. Div. 1989) ("The plaintiff, in its motion, demonstrated a prima facie right to permanent injunctive relief based on allegations that the defendant had misappropriated customer lists compiled by the plaintiff, and that she had used those lists for her own benefit in violation of her contractual and fiduciary obligations to the plaintiff.").

7

Likewise, in Arnold's Ice Cream Co. v. Carlson, 330 F. Supp. 1138 (E.D.N.Y.

1971), the United States District Court for the Eastern District of New York granted the plaintiff

a preliminary injunction barring solicitation of the plaintiff's customers solely on trade secret

grounds and held that a contract was not even necessary to obtain injunctive relief:

> **Customer lists are entitled to the protection accorded
> trade secrets if the names were built up over a period of
> time by substantial business effort, advertising, and
> expenditures of time and money. It is no defense to an
> action by an employer against an employee using such a
> trade secret that there was no contract or restrictive
> covenant in force between the employer and employee
> explicitly prohibiting this conduct.** Nor does the fact that
> the employees are serving at the will of the employer justify
> a conspiracy to use an employer's trade secret in direct
> competition with the employer. It is not necessary that the
> trade secret or customer lists be impossible to duplicate,
> only that the list be used by a former employee in violation
> of his responsibility not to use his employer's efforts to
> benefit himself at the employer's expense.

330 F. Supp. at 1187 (citations omitted) (emphasis added).

In Velo-Bind, Inc. v. Scheck, 485 F. Supp. 102 (S.D.N.Y. 1979), the Court

similarly held that the former employee must be enjoined from soliciting the clients of her former

employer even in the absence of any post-employment restrictive covenant:

> The evidence in this case does establish, however, that
> immediately after Scheck left the employ of Velo-Bind, she
> commenced, and has proceeded on a systematic and continuing
> basis, to solicit Velo-Bind's (former) New York supply customers
> for the benefit of defendant Elliegraphics. Plaintiff has shown that
> the customers solicited include some which were among its best
> customers.
>
> * * *
>
> **The key question to us becomes whether Plaintiff's
> customer list is entitled to protection as a trade secret.
> This Court finds that it is, since plaintiff has proven, by**

8

**a fair preponderance of the credible evidence, that the list could not have been discovered or duplicated by anyone not privy to it.** Defendants' argument that the list was culled from public sources such as Martindale-Hubbel's directory of law firms and the financial list, is unpersuasive on these facts. The truth of the matter is that Velo-Bind's supply customers consisted exclusively of owners of Velo-Bind machines. Thus, although all of their names might appear in the publicly available directories, they were nowhere denominated as Velo-Bind machine owners except on the customer lists maintained by Velo-Bind . . . .

\* \* \*

Furthermore, defendant's argument that she cannot be enjoined from soliciting plaintiff's customers in the absence of a valid non-competitive covenant also must fail. **Appropriation of a former employer's customer list is a violation of the fiduciary obligation inherent in the employer/employee relationship where the customer list is protectible as a trade secret.**

486 F. Supp. at 106-109 (S.D.N.Y. 1979) (Motley, J.) (emphasis added); see also Webcraft

Tech., Inc. v. McCaw, 674 F. Supp. 1039, 1047 (S.D.N.Y. 1987) (deliberate theft of trade secrets

warrants enjoining competition "even if there were no covenant not to compete"); Churchill

Commun. Corp. v. Demyanovich, 668 F. Supp. 207, 211 (S.D.N.Y. 1987) ("Of course, an

employee's use of an employer's trade secrets or confidential customer information can be

enjoined even in the absence of a restrictive covenant . . . ."); Panther Systems II v. Panther

Computer Sys., 784 F. Supp. 53, 65 (E.D.N.Y. 1991) (same).

In this case, the value of BAI's trade secret customer list is immeasurable. BAI's

trade secret customer list is not known to, and is not readily ascertainable by proper means by,

any competitor who could profit from knowledge of this information. In addition, BAI goes to

extensive lengths to protect the secrecy of its customer list and information, including by having

9

Defendant agree to comply with agreements confirming the confidentiality of this type of information. (See Complaint).

Finally, Smith Barney, in enforcing its own trade secret rights in cases such as this, concedes that the client information at issue here is trade secret under New York law. In fact, Smith Barney labels the misappropriation of its own client information as "stealing." For example, in a case filed by Smith Barney in the New York Supreme Court, Smith Barney claimed in its Memorandum of Law that "[r]espondents have wrongfully misappropriated Smith Barney's trade secrets. Upon information and belief, Respondents stole the names, addresses, confidential brokerage records and other information relating to the Smith Barney customers they handled, all of which they know to be confidential, proprietary information of Smith Barney." See Salomon Smith Barney, Inc. v. Colby, et al., No. 99-016913 (N.Y. Sup. Ct. 1999), Memorandum of Law at 20 (Exhibit "G" hereto); see also Affidavit of John Palazzetti at 10, 13, paras. 10,29 ("I understand that the courts of this state [New Jersey] recognize that client lists and information about those clients in this industry are trade secrets . . . ."; and referencing departing broker's conduct -- the taking of Smith Barney client names and other information -- as "stealing").

### c.    Unfair Competition Through Use of Another's Confidential Business Information For Competitive Advantage.

BAI is also entitled to immediate injunctive relief on another separate ground: unfair competition. New York courts have held that taking or copying files, customer lists, or other confidential information gives rise to a claim for unfair competition. See Advanced Magnification v. Minuteman Optical Corp., 522 N.Y.S. 2d 287, 289-90 (N.Y. App. Div. 1987). In Advanced Magnification, the Third Department reversed dismissal of a complaint for unfair

10

competition and explained the claim as follows:

> An employee's right to compete with his former employer is indeed protected, but this protection does not extend so far that an employee can, with impunity, unlawfully seize his employer's property, in this case, customer information not easily obtainable elsewhere and which the employer has apparently gone to considerable expense and effort to create. That kind of employee conduct disadvantages the employer in a manner that is patently unfair, the crux of an action for unfair competition. In short, an employee's illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition.

Id. (citations omitted).

The physical misappropriation or copying of a customer list -- even if it would not otherwise qualify as a trade secret because, for instance, the names are readily ascertainable from other sources, requires an injunction against solicitation to remedy the unfair competition. See Panther Systems, 783 F.Supp. at 66-67; see also Ecolab Inc. v. Paolo, 753 F.Supp. 1100, 1111 (E.D.N.Y. 1991) ("Moreover, even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition.").

In sum, BAI clearly is entitled to preliminary injunctive relief to enforce Defendant's agreement, to prevent further conversion, misappropriation and misuse of BAI's trade secret customer list, and to protect BAI against unfair competition.

2.    **BAI Has No Adequate Remedy At Law**

BAI will suffer irreparable harm in the absence of injunctive relief.  In BDO Seidman, the New York Court of Appeals found that the harm imposed from violation of a

11

covenant not to solicit customers is likely to be unquantifiable:

> The damages here are sufficiently difficult to ascertain to satisfy the first requirement of a valid liquidated damages provision. Because of the inability to project with any degree of certainty how long a given client would have remained with BDO if Defendant had not made himself available as an alternative source of accounting services, BDO's actual lost profits from Defendant's breach would be impossible to determine with any precision.

712 N.E.2d at 1227 (1999). See also Leake v. Merrill Lynch, 623 N.Y.S.2d 220, 221 (N.Y. App. Div. 1995) ("[T]he trial court erred by not entertaining, and granting, Merrill Lynch's application for a preliminary injunction due to . . . . **the prejudice which would flow from denying this relief.**") (citations omitted) (emphasis added); Pace Securities v. Pollack, 550 N.Y.S.2d at 300 (by showing "the alleged improper acquisition and use by defendants of Pace Securities' confidential customer information . . . Plaintiffs have clearly demonstrated . . . that they will be irreparably injured absent the issuance of a preliminary injunction."); Merrill Lynch v. Rahn, 73 F. Supp. 2d at 428 ("By attempting to solicit and 'siphon off' these clients, Defendants threaten the 'lifeblood of [Plaintiff's] business.' Plaintiff will suffer irreparable harm absent a preliminary injunction.") (citation omitted). In fact, the harm to BAI from violation of Defendant's agreement is irreparable on at least three different levels.

### a.     **Unquantifiable Damages**

First, BAI's damages from Defendant's breaches are impossible to determine with any degree of certainty. The Second Circuit in Ticor held that "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminable amount of business in years to come." 173 F.3d at 69. See also BDO Seidman, 712 N.E.2d at 1227 ("BDO's actual lost profits from defendant's

breach would be impossible to determine with any precision"); Merrill Lynch v. Stidham, 658 F.2d 1098, 1102 (5th Cir. 1981) ("The injury here is such that damages could not adequately compensate. Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us."); Ecolab v. K.P. Laundry Machinery, 656 F. Supp. 894, 899-900 (S.D.N.Y. 1987) ("Ecolab has demonstrated that it will suffer irreparable harm absent preliminary relief. There is a substantial showing that Ecolab can lose a great deal of business and profits if it is not accorded enforcement of its contractual covenant with its employees. The extent of its loss may be very difficult to measure to the point that Ecolab might not be fairly compensated if left to a damage remedy.").

        **b.**     **Loss of Confidentiality**

Second, irreparable harm lies in the fact that BAI clients expect their financial information, their market transactions, and their investment assets to be known only to themselves, BAI and the representatives of BAI. As one court observed, "[i]rreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch." Merrill Lynch v. Kramer, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992).

        **c.**     **Threat to Office Stability**

Third, immediate injunctive relief is necessary to protect the stability of BAI and to discourage competitor firms from conspiring with and inducing representatives of BAI to breach their contracts and divert BAI's trade secret customer list to a competitor. See

13

Merrill Lynch v. Patinkin, 1991 WL 83163 at *6 (N.D. Ill. 1991) ("The Court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is enormous.").

### 3.    Granting Injunctive Relief Outweighs Denial and Is In the Public Interest

The benefit of injunctive relief to BAI far outweighs any detriment to the Defendant. On the one hand, an injunction would protect BAI's goodwill, business reputation, trade secrets, methods of business operation, and contract rights. Most importantly, however, an injunction would protect BAI's highly sought after client list and the confidentiality of those clients' records.

Indeed, the United States Supreme Court explicitly has recognized the importance of protecting trade secret customer lists. In Kewanee Oil Co. v. Bicron Corp., the Supreme Court emphasized the negative costs to society resulting from the conversion of a company's valuable trade secret customer list and ruled as follows:

> The necessity of good faith and honest, fair dealing is the very life and spirit of the commercial world. **It is hard to see how the public would be benefited by disclosure of customer lists . . . .**
>
> In addition to the increased costs for protection from burglary, wiretapping, bribery, and other means used to misappropriate trade secrets, **there is the inevitable cost to the basic decency of society when one firm steals from another.** A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengable.

416 U.S. 470 (1974) (emphasis added).

14

By contrast, Defendant has deliberately breached his contractual commitments to BAI and has misappropriated BAI's trade secrets. Moreover, Defendant will not be precluded from engaging in his chosen profession.

In addition, as a court in Illinois observed in a similar case involving contractual and trade secret obligations, "[t]he public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of financial records." IDS Life Insurance Co. v. Sun America, 958 F. Supp. 1258, 1282 (N.D. Ill. 1997), aff'd in part, vac. in part, 136 F.3d 537 (7th Cir. 1998). "Consequently," the court explained, "the public's interest has been disserved by defendants' actions" because "[t]he public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior." Id. (emphasis added).

## D. EVEN WHEN ARBITRATION IS REQUIRED, BAI IS ENTITLED TO INJUNCTIVE RELIEF PENDING ARBITRATION

Even where, as here, a dispute is ultimately resolved in arbitration before the National Association of Securities Dealers ("NASD"), BAI is still entitled to injunctive relief pending the outcome in arbitration. In fact, Rule 10335 of the NASD Code of Arbitration Procedure expressly permits a party to seek temporary injunctive relief in Court pending the resolution on the merits before the NASD. Moreover, a party to an arbitration agreement has always been permitted to seek temporary and preliminary injunctive relief in court pending arbitration to preserve the status quo and to prevent the arbitration from being rendered a "hollow formality". See, e.g., Blumenthal v. Merrill Lynch, 910 F.2d 1049, 1053 (2nd Cir. 1990) ("Arbitration can become a hollow formality if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute. A district court must ensure

15

that the parties get what they bargained for - a meaningful arbitration of the dispute.") (citations omitted).

## E.    CONCLUSION

For all of the foregoing reasons, BAI respectfully requests that its Motion for a Temporary Restraining Order and Preliminary Injunctive Relief be granted.

Dated: New York, New York
      March 2, 2005

Respectfully submitted,

ZAROFF & HILL LLP
Attorneys for Plaintiff

By: _____
     Jeffrey A. Hill (JH-8392)

420 Lexington Avenue, Suite 2025
New York, New York 10170
(212) 867-4411

Of Counsel
Thomas J. Momjian, Esq.
Christopher C. Coss, Esq.
Coss & Momjian, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, Pennsylvania 19004
(610) 667-6800

**EXHIBIT A**

NOV 04 2004  11:17          JUDGE VICTOR MARRERO                   212 805 6382      P.02

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

04 CV  8698

-------------------------------------x

BANC OF AMERICA INVESTMENT
SERVICES, INC.,

                    Plaintiff,

        -against-

RONALD K. BROWNLEE

                    Defendant.

-------------------------------------x

04 Civ. 8698
Corrected
ORDER TO SHOW CAUSE
FOR PRELIMINARY
INJUNCTION AND
TEMPORARY
RESTRAINING ORDER

Upon reading and filing the declaration of James Pappas III dated November 4, 2004 and the exhibits annexed thereto, the declaration of Jeffrey A. Hill, Esq. dated November 4, 2004 and the complaint filed in this action by plaintiff Banc of America Investment Services, Inc. ("BAI"), it is

ORDERED, that the above named defendant show cause before a motion term of this Court, at Room 905, United States Courthouse, ~~500 Pearl Street~~ 40 Centre Street, in the City, County and State of New York, on Nov. 12, 2004, at 12:30 o'clock in the after noon thereof, or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure immediately enjoining and restraining defendant, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee, and/or representative of Wachovia Securities, until further Order of this Court, from doing any of the following:

(i)     Soliciting the business of any customers of BAI and/or its affiliated entities whom defendant serviced or whose names became known to him during his employment with BAI and/or its affiliated entities (excluding members of defendant's immediate family);

(ii)    Soliciting for hire or hiring any persons or employees of BAI who were employed by BAI as of defendant's date of resignation;

(iii)    Using, disclosing, or transmitting for any purpose, any records, documents, or information relating in any way to the clients, business or marketing strategies, or business operations of BAI, whether in original, copied, computerized, handwritten, or any other form (hereafter the "Records and Information");

(iv)    Retaining, in any form, including without limitation original, copied, computerized, handwritten or any other form, any Records and Information;

(v)    Any and all other such acts as this Court deems appropriate for injunctive relief; and it is further

ORDERED, that defendant, and anyone acting in concert or participation with defendant, including any agent, employee, officer or representative of Wachovia Securities, are further ordered to return to BAI all records, documents, and information pertaining to the clients, business or marketing strategies, or business operations of BAI, whether in original, copied, computerized, handwritten or any other form, and to purge any such information from their possession, custody, or control after providing all such information to plaintiff's counsel, within twenty-four (24) hours of notice to defendant or his counsel of the terms of the Court's Order; and it is further

ORDERED, that this Order shall remain in full force and effect until such time as this Court specifically orders otherwise; and it is further

ORDERED, that BAI is the parties are granted leave to commence discovery, including depositions, immediately in aid of preliminary injunction proceedings before this Court; and it is further

ORDERED, that pending a preliminary injunction hearing before this Court, and pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties are directed to proceed toward expedited arbitration hearings on the merits before a

2

duly appointed panel of arbitrators pursuant to Rule 10335 of the NASD Code of Arbitration

Procedure; and it is further

ORDERED, that sufficient reason having been shown therefor, pending the hearing of

plaintiff's application for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of

Civil Procedure, defendant is temporarily restrained and enjoined from any of the conduct listed

in subparagraphs (i) through (v) above; and it is further

ORDERED, that security in the amount of $ _20,000_ be posted by plaintiff prior to

_Nov. 8_, 2004, at _5:00_ o'clock in the _after_ noon of that day; and it is further

ORDERED, that personal service of a copy of this Order and the documents in support

thereof upon defendant or his counsel on or before _Nov. 5_, 2004, shall be deemed good and

sufficient service thereof; _and it is Further_

Dated: New York, New York
November 4, 2004

V.M.

_ORDERED that Defendant shall serve its
response brief on Plaintiff and file it with the
Court by Nov. 9, 2004, and Plaintiff shall serve
its reply brief on Defendant and file it with
the Court by Nov. 11, 2004._

SO ORDERED:

_ISSUED: November 4, 2004_

United States District Judge
Victor Marrero

3

**EXHIBIT B**

11/03/2004  13:30     6106676628                    COSSMOMJIAN                                    PAGE  03/21

# JUDGE KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

QUICK & REILLY, INC.

          Plaintiff,

    v.

JOHN O. BONDEA,

        Defendant.

**04 CV**

Civil Action No. **6628**

**ORDER** To Show. Cause

AND NOW, this __16__ day of August, 2004 upon consideration of the Complaint of Quick & Reilly, Inc. ("Quick & Reilly"), and having determined that:

1.    The rights of Quick & Reilly with respect to its property, proprietary and confidential information, competitive interests, and contracts with Defendant John Bondea are being and will continue to be violated by Defendant unless Defendant is restrained therefrom;

2.    Quick & Reilly will suffer irreparable harm and loss if Defendant is permitted to convert the property of Quick & Reilly to his own personal use and benefit, and that of his new employer, Wachovia Securities and solicit Quick & Reilly accounts, clients, and customers;

3.    Quick & Reilly has no adequate remedy at law;

4.    Greater injury will be inflicted upon Quick & Reilly by the denial of preliminary injunctive relief than would be inflicted upon Defendant by the granting of such relief; and

5.    The issuance of injunctive relief will not disserve the public interest.

COSSMOMJIAN                                    PAGE 04/21

## IT IS HEREBY ORDERED AND DECREED THAT:

1.    A Temporary Restraining Order issue immediately and that security in the amount of $ 10,000    be posted no later than the 17 day of August , 2004;

2.    Defendant is immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee, and/or representative of Wachovia Securities, until further Order of this Court, from doing any of the following:

(i)    Soliciting the business of any customers of Quick & Reilly whom Defendant serviced or whose names became known to him during his employment with Quick & Reilly (excluding members of Defendant's family);

(ii)    Soliciting for hire or hiring any persons or employees of Quick & Reilly who were employed by Quick & Reilly as of Defendant's date of resignation;

(ii)    Using, disclosing, or transmitting for any purpose, any records, documents, or information relating in any way to the clients, business or marketing strategies, or business operations of Quick & Reilly, whether in original, copied, computerized, handwritten, or any other form (hereafter the "Records and Information");

2

(iv)    Retaining, in any form, including without limitation original, copied, computerized, handwritten or any other form, any Records and Information;

(v)    Any and all other such acts as this Court deems appropriate for injunctive relief.

3.    Defendant, and anyone acting in concert or participation with Defendant, including any agent, employee, officer or representative of Wachovia Securities, are further ordered to return to Quick & Reilly all records, documents, and information pertaining to the clients, business or marketing strategies, or business operations of Quick & Reilly, whether in original, copied, computerized, handwritten or any other form, and to purge any such information from their possession, custody, or control after providing all such information to Plaintiff's counsel, within twenty-four (24) hours of notice to Defendant or his counsel of the terms of the Court's Order;

4.    This Order shall remain in full force and effect ~~until such time as this Court specifically orders otherwise;~~ for 10 business days.

5.    Quick & Reilly is granted leave to commence discovery, including depositions, immediately in aid of preliminary injunction proceedings before the Court;

~~6.    Pending a preliminary injunction hearing before this Court, and pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties are directed to proceed toward expedited arbitration hearings on the merits before a duly appointed panel of arbitrators pursuant to Rule 10335 of the NASD Code of Arbitration Procedure; and~~

3

7.    Defendant shall show cause before this Court on the 25 day of August 2004 at 10:30 a.m/p.m., or as soon thereafter as counsel may be heard, why ~~a Preliminary Injunction should not be ordered according to the terms and conditions set forth above.~~

SO ORDERED.

August 16, 2004 at 3:30 a.m/p.m.

the TRO
should not be
extended for
another 10
business days
until a
preliminary
Injunction
hearing may
be held before
Judge Kaplan.

BY THE COURT:

Richard Conway

U.S.D.J.

4

**EXHIBIT C**

COSSMOMJIAN

Beaman J

**MEMO ENDORSED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANC OF AMERICA INVESTMENT -----------x
SERVICES, INC.,
                                                :
                        Plaintiff,              :      03 Civ. 7780 (RMB)
                                                :
            -against-                           :      ORDER TO SHOW CAUSE
                                                :      FOR PRELIMINARY
MARK GIORDANO ,                                 :      INJUNCTION AND
                                                :      TEMPORARY
                        Defendant.              :      RESTRAINING ORDER
-----------------------------------x

Upon reading and filing the declaration of John McGuinness dated October 3, 2003, the declaration of Michael Ellis dated October 2, 2003, the declaration of Jeffrey A. Hill dated October 3, 2003 and the exhibits annexed thereto, and the complaint filed in this action by plaintiff Banc of America Investment Services, Inc. ("BAI"), it is

ORDERED, that the above named defendant show cause before a motion term of this Court, at Room __706__, United States Courthouse, __40 Gnttro St__ 500 Pearl Street, in the City, County and State of New York, on __Oct. 7__, 2003, at __2:30__ o'clock in the __After__ noon thereof, or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure immediately enjoining and restraining defendant, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee, and/or representative of Smith Barney, until further Order of this Court, from doing any of the following:

RMB

    (i)    Soliciting the business of any customers of BAI and/or its affiliated entities whom defendant serviced or whose names became known to him during his employment with BAI and/or its affiliated entities (excluding members of defendant's immediate family and those customers whom he serviced as a registered representative prior to his employment with BAI and/or its

affiliated or predecessor entities, provided that defendant first shows BAI demonstrable evidence of such prior service);

(ii)    Soliciting or recruiting any persons or employees of BAI and/or its affiliated entities to leave the employ of BAI;

(iii)   Using, disclosing, or transmitting for any purpose, any records, documents, or information relating in any way to the clients, business or marketing strategies, or business operations of BAI and/or its affiliates, whether in original, copied, computerized, handwritten, or any other form (hereafter the "Records and Information");

(iv)    Retaining, in any form, including without limitation original, copied, computerized, handwritten or any other form, any Records and Information;

(v)     Any and all other such acts as this Court deems appropriate for injunctive relief; and it is further

ORDERED, that defendant, and anyone acting in concert or participation with defendant, including any agent, employee, officer or representative of Smith Barney, are further ordered to return to BAI all records, documents, and information pertaining to the clients, business or marketing strategies, or business operations of BAI and/or its affiliated entities or partners, whether in original, copied, computerized, handwritten or any other form, and to purge any such information from their possession, custody, or control after providing all such information to plaintiff's counsel, within twenty-four (24) hours of notice to defendant or his counsel of the terms of the Court's Order; and it is further

ORDERED, that this Order shall remain in full force and effect until such time as this Court specifically orders otherwise; and it is further

ORDERED, that the parties are granted leave to commence discovery, including depositions, ~~immediately~~ in aid of preliminary injunction proceedings before this Court; and it is

2

further

ORDERED, that pending a preliminary injunction hearing before this Court, and pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties are directed to proceed toward expedited arbitration hearings on the merits before a duly appointed panel of arbitrators pursuant to Rule 10335 of the NASD Code of Arbitration Procedure; and it is further

ORDERED, that sufficient reason having been shown therefor, pending the hearing of plaintiff's application for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, defendant is temporarily restrained and enjoined from any of the conduct listed in subparagraphs (i) through (v) above; and it is further

ORDERED, that security in the amount of $ _15,000_ be posted by plaintiff prior to _3:00 P.M._, 2003, _ON 10/6/03_ at _____ o'clock in the _____ noon of that day; and it is further

ORDERED, that personal service of a copy of this Order and the documents in support thereof upon defendant or his counsel on or before _Oct. 6_ , 2003, _by 11:00AM._ shall be deemed good and sufficient service thereof.

Dated: New York, New York
       October 3, 2003

SO ORDERED:

_RMB_
_____
United States District Judge
RICHARD M. BERMAN

3

EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANC OF AMERICA INVESTMENT                    ·······x
SERVICES, INC.,

                    Plaintiff,                        03 Civ. 7769 (VM)

          -against-                                   ORDER TO SHOW CAUSE
                                                      FOR PRELIMINARY
MICHAEL SAWYER,                                       INJUNCTION AND
                                                      TEMPORARY
                    Defendant.                        RESTRAINING ORDER
·······················································x

Upon reading and filing the declaration of John McGuinness dated October 2, 2003 and

the exhibits annexed thereto, the declaration of Jeffrey A. Hill, Esq. dated October 2, 2003 and

the complaint filed in this action by plaintiff Banc of America Investment Services, Inc. ("BAI"),

it is

ORDERED, that the above named defendant show cause before a motion term of this

Court, at Room 905, United States Courthouse, 500 Pearl Street, in the City, County and

State of New York, on Oct.16, 2003, at 4pm o'clock in the _____ noon thereof, or

as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule

65 of the Federal Rules of Civil Procedure immediately enjoining and restraining defendant,

directly or indirectly, and whether alone or in concert with others, including any officer, agent,

employee, and/or representative of Smith Barney, until further Order of this Court, from doing

any of the following:

(i)      Soliciting the business of any customers of BAI and/or its
affiliated entities whom defendant serviced or whose names
became known to him during his employment with BAI and/or its
affiliated entities (excluding members of defendant's immediate
family and those customers whom he serviced as a registered
representative prior to his employment with BAI and/or its

affiliated or predecessor entities, provided that defendant first shows BAI demonstrable evidence of such prior service);

(ii)    Soliciting or recruiting any persons or employees of BAI and/or its affiliated entities to leave the employ of BAI;

(iii)    Using, disclosing, or transmitting for any purpose, any records, documents, or information relating in any way to the clients, business or marketing strategies, or business operations of BAI and/or its affiliates, whether in original, copied, computerized, handwritten, or any other form (hereafter the "Records and Information");

(iv)    Retaining, in any form, including without limitation original, copied, computerized, handwritten or any other form, any Records and Information;

(v)    Any and all other such acts as this Court deems appropriate for injunctive relief; and it is further

ORDERED, that defendant, and anyone acting in concert or participation with defendant, including any agent, employee, officer or representative of Smith Barney, are further ordered to return to BAI all records, documents, and information pertaining to the clients, business or marketing strategies, or business operations of BAI and/or its affiliated entities or partners, whether in original, copied, computerized, handwritten or any other form, and to purge any such information from their possession, custody, or control after providing all such information to plaintiff's counsel, within twenty-four (24) hours of notice to defendant or his counsel of the terms of the Court's Order; and it is further

ORDERED, that this Order shall remain in full force and effect until such time as this Court specifically orders otherwise; and it is further

ORDERED, that ~~BAI is~~ the parties are granted leave to commence discovery, including depositions, immediately in aid of preliminary injunction proceedings before this Court; and it is further

2

**ORDERED**, that pending a preliminary injunction hearing before this Court, and pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties are directed to proceed toward expedited arbitration hearings on the merits before a duly appointed panel of arbitrators pursuant to Rule 10335 of the NASD Code of Arbitration Procedure; and it is further

**ORDERED**, that sufficient reason having been shown therefor, pending the hearing of plaintiff's application for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, defendant is temporarily restrained and enjoined from any of the conduct listed in subparagraphs (i) through (v) above; and it is further

**ORDERED**, that security in the amount of $ 15,000 be posted by plaintiff prior to Oct 8, 2003, at 5:00 o'clock in the _____ noon of that day; and it is further

**ORDERED**, that personal service of a copy of this Order and the documents in support thereof upon defendant or his counsel on or before Oct 3, 2003, shall be deemed good and sufficient service thereof; and it is further

ORDERED, that Defendant Shall serve its response brief + file it with the Court by Wednesday, October 8, 2003 by 5:00pm on Plaintiff/ Plaintiff shall serve its reply brief on Defendant and serve it with the Court by Friday, October 10, 2003 by 5:00p.m.

Dated: New York, New York
October 2, 2003

**SO ORDERED:**

_____
United States District Judge

**EXHIBIT E**

11/03/2004  13:30    6186576520                    COSSMOMJIAN                           PAGE  16/21

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    SHEILA ABDUS-SALAAM
                                                                    PART   13
                            Justice

Alliance Capital Management L.P.

                                                    INDEX NO.      107804/04

                                                    MOTION DATE    5/27/04

Charles E. McCool                                   MOTION SEQ. NO.   001

                                                    MOTION CAL. NO.

The following papers, numbered 1 to ___ were read on this motion to/for ___

                                                        | PAPERS NUMBERED |
Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...
Answering Affidavits — Exhibits
Replying Affidavits

Cross-Motion:    ☐ Yes    ☐ No

Upon the foregoing papers, it is ordered that this motion by petitioner for an order pursuant to CPLR §§ 6301, 6311 and 7502, granting petitioner a preliminary injunction enjoining respondent, a former employee, from inter alia, using or disclosing any client information, or from soliciting business of any customers of petitioner whom respondent serviced, is granted.

Respondent Charles McCool was formerly a Financial Advisor in petitioner Alliance's New York office. Alliance is a firm that manages investment portfolios for clients including individuals, partnerships, charitable foundations and corporations. In connection with his employment, respondent entered into a confidentiality and non-solicitation agreement. In that agreement, he acknowledged that all clients are clients of the firm, and not his personally, and he agreed that for a period of two years following termination of his employment, he would not directly or indirectly solicit any clients, other than his spouse, his family, a trust of which he is a trustee, or any estate of which he is an executor or administrator.

Respondent resigned from his position with petitioner on May 7, 2004, and accepted a position with Morgan Stanley, DW Inc., a competitor of petitioner's. Respondent states that after resigning, he sent announcement cards to hundreds of

contacts that he had in his palm pilot. He claims that the information in his palm pilot (he purchased the palm pilot with his own funds) was contact information which Alliance had downloaded onto its computer system, and that during the course of his employment he routinely synchronized his palm pilot with his Alliance computer, with the knowledge and consent of Alliance. He further states that the contact information does not have any financial information, social security numbers or account numbers for Alliance customers.

Petitioner seeks injunctive relief pending arbitration of this dispute before the NASD. In support of the motion for preliminary injunctive relief, petitioner argues that justices of this court have repeatedly granted injunctive relief to securities firms under similar factual scenarios (see e.g. Salomon Smith Barney Inc. v. Niles, Sup Ct. New York County, June 8, 2000, Kapnick, J., Index No. 107282/00; Dean Witter Reynolds, Inc. v. DeMay, Sup Ct. New York County, September 12, 2000, Figueroa, J., Index No. 117648/00; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Fishman, Sup Ct. New York County, Oct. 27, 2000, Solomon, J., Index No. 121006/00; Salomon Smith Barney, Inc. v. Buentel, Sup Ct. New York County, Oct. 30, 2000, Branston, J., Index No. 122180/00). Petitioner also cites to the First Department's decision in Leake v. Merrill Lynch, Pierce, Fenner & Smith (213 AD2d 155) in which that court found that the trial court had erred in not entertaining and granting petitioner's application for a preliminary injunction pursuant to CPLR 7502 (c), due to the likelihood of the respondent's success on the merits, given the nature of the employment and non-solicitation agreements, the waiver signed by the petitioner, and the prejudice which would flow from denying this relief. (213 AD2d at p. 156).

As was noted by the First Department in Leake, Id., and was held by the Second Circuit in SG Cowan Securities Corporation v. Messih (224 F.3d 79 [2d. Cir. 2000], when a party seeks a preliminary injunction pursuant to 7502 (c) on the ground that the arbitration award may be rendered ineffectual without the injunctive relief, the movant must meet the traditional criteria for the granting of temporary relief as is required by Article 63 of the CPLR, in addition to showing that the arbitration award may be rendered ineffectual in the absence of such relief.

11/03/2004  13:30    6106676520    COSSMOMJIAN    PAGE  18/21

In opposition papers to the motion, respondent has submitted a recent decision rendered by the NASD in an arbitration entitled Sanford Bernstein & Co., LLC v. Wittenstein et al., which denied the claimant a permanent injunction preventing former employees from soliciting clients or from using customer names. In that decision, rendered on January 21, 2004, the NASD panel found that respondents had improperly taken confidential trade secret information belonging to Sanford Bernstein, including customer names and other relevant financial information, and that respondents had also violated the restrictive covenants clauses in their employment contract by improperly soliciting clients. However, the panel, in applying New York law and the parties' agreement, in balancing all equities and the public interest, declined to permanently enjoin respondents, rather, the panel ordered the arbitration proceedings to continue to assess the amount of damages resulting from respondent's conduct.

Petitioner has responded to this submission by reference to a June 9, 2003 determination by a different NASD panel that reached a contrary result in a matter entitled Merrill Lynch et al. v. Richard G. Haussler and Smith Barney. In that case, the individual respondent had not answered claimant's allegations that he had, inter alia, breached his contract with them by soliciting and contacting customers. The NASD granted a permanent injunction enjoining the former employee from directly or indirectly soliciting or otherwise initiating any further contact with any Merrill Lynch customer.

Thus, as is illustrated by the two NASD decisions that have been submitted by counsel, one by respondent's counsel to show that the NASD has denied permanent injunctive relief under similar circumstances, and the other by petitioner's counsel to show that the NASD has also granted permanent injunctive relief, the NASD may, or may not, grant petitioner a permanent injunction in arbitration. Nevertheless, as is noted by petitioner, in the case of Morgan Stanley v. Rothe (150 F. Supp.2d 67 (D.D.C. 2001)), the federal court held that the issue for the court in determining whether to grant preliminary injunctive relief is not whether

---

As is set forth in the petition, respondent McCool had been previously employed by Sanford C. Bernstein & Co. until its combination with Alliance on October 2, 2000 when he became employed by Alliance in Sanford Bernstein Investment Research & Management, Inc.

the NASD will do so at the arbitration hearing, but whether petitioner "has sufficiently met its burden of showing potential actions by the defendant that would violate the terms of the Agreement, thereby justifying the granting of the temporary restraining order to prevent any irreparable harm to the plaintiff in the interim period until the NASD arbitration hearing can occur." (150 F. Supp. 2d at p. 75; see also IDS v. SunAmerica, 136 F.3d 537, where the Seventh Circuit observed that "*** [arbitrators' decisions are not intended to have precedential effect even in arbitration (unless given that effect by contract), let alone in the courts (citations omitted)." (136 F.3d at p. 543).

In opposition to this motion, respondent has referred to a regulation that was implemented by the NASD on February 11, 2002, regarding customers' requests to transfer their accounts in connection with the change in employment of the customer's representative. The regulation notes that firms alleging that a former employee has breached an employment contract have obtained court orders directing the new employer to reject customer account transfers. The regulation provides that it is inconsistent with just and equitable principles of trade for a member to interfere with a customer's request to transfer an account.

Significantly, the regulation also notes that it shall not affect the ability of firms to use employment agreements to prevent solicitation of customers, or to pursue other remedies that the firms may have arising from employment disputes with former registered representatives.

While petitioner has made a showing that respondent has violated the terms of his employment agreement, respondent McCool's affidavit in opposition to petitioner's motion does not indicate that he is not in violation of the agreement, but establishes that he has in fact violated the agreement. Mr. McCool's assertion that prior to his employment with Alliance he had contacts with numerous individuals who became clients or referral sources for him when he was a financial advisor at Alliance, is inconsequential. The non-solicitation agreement signed by respondent includes an acknowledgment by him that "all our clients are clients of the firm and not yours personally, and were developed and maintained for our benefit and through our financial and other support." (¶ 4 (b)). The agreement also states that Mr. McCool agrees that for a period of two years following termination

of employment, he will not, *in any manner*, directly or indirectly, solicit any client ***" (¶ 4 [c], emphasis supplied). Furthermore, the names and addresses of clients, even without any additional information such as social security numbers or account numbers, is covered by the confidentiality agreement signed by respondent, in that it includes names, addresses, telephone numbers, facsimile numbers and email addresses (¶ 3 [a] [i]). Nor is it of any relevance that Mr. McCool has now taken this information with him to his new employer via a palm pilot that he purchased with his own funds. Additionally, this court is unpersuaded by respondent's argument that the sending of announcements to customers notifying them of his new job at Merrill Lynch is not a form of solicitation of these customers, a solicitation which he agreed not to engage in when he became an employee of Alliance.

Although respondent has cited to decisions issued by Justices of this court denying preliminary injunctive relief against former employees, those cases are distinguishable from the situation here. In Salomon Smith Barney, Inc. v. Hunter (Sup Ct. New York County, Nov. 1, 2000, Freidman, J., 121077/00), the court found that respondents were not subject to a restrictive covenant, whereas respondent here has signed such a restrictive covenant which includes his consent to injunctive relief in the event that he breaches the confidentiality and non-solicitation provisions of the employment agreement. In Smith Barney v. Heins (Sup Ct. New York County, Dec. 24, 2003, Goodman, J., Index No. 122015/03), the court denied a temporary restraining order where, unlike the situation here, the petitioner had not adequately shown that respondent had violated the agreement. Finally, the decision in Smith Barney v. Cappiello (Sup Ct. New York County, July 30, 1998, Huff, J., Index No. 603446/98) was based upon American Express Financial Advisors v. Thorley (971 F. Supp. 780), which was later vacated and remanded for a decision on the merits of the application for preliminary injunctive relief (147 F.3d 229 [2d. Cir. 1998]).

Finally, petitioner has shown that absent the granting of preliminary injunctive relief, it may suffer irreparable injury such as the loss of its customers (see Morgan Stanley DW Inc., v. Rothe, supra) and that "arbitration of this dispute would be a hollow formality absent preliminary relief" (Merrill Lynch v. Bradley, 756 F.2d 1048, 1055 [4th Cir. 1985]).

Based upon the foregoing, the motion is granted. Petitioner is granted the injunctive relief as requested in the order to show cause. Pending a signing of the order granting injunctive relief, the temporary restraining order contained in the order to show cause, which was not initially granted by this court, is hereby granted.

SETTLE ORDER, supported by affirmations on the issue of the appropriate amount of the undertaking.

Dated:  June 1, 2004

_____
J.S.C.

Check one:   ☒ FINAL DISPOSITION    ☐ NON-FINAL DISPOSITION
Check if appropriate:   ☐ DO NOT POST

-5-

# EXHIBIT 3.A



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| BANC OF AMERICA INVESTMENT SERVICES, INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) C.A.:  |
| J. CHRIS HARVIE, a/k/a JOHN C. HARVIE, | ) ) ) |
| Serve: 3111 Summerhurst Drive Midlothian, Virginia 23113 | ) ) ) |
| and | ) ) |
| HEATHER E. LAMBERT, | ) ) ) |
| Serve: 14313 Brading Court Midlothian, Virginia 23112 | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT – PRELIMINARY INJUNCTION DEMANDED

Plaintiff, Banc of America Investment Services, Inc. ("BAI"), by counsel, for its

Complaint against J. Chris Harvie ("Harvie") and Heather E. Lambert ("Lambert"), states as

follows:

### Summary of Case

This case involves the clear and unquestioned breach of Harvie's and Lambert's

contractual obligations to their employer, BAI. In connection with their employment, Harvie and

Lambert executed separate agreements, each of which prohibited them from soliciting any

customers they serviced while employed by BAI or whose identity became known to them while employed by BAI. Each of these agreements also included a prohibition on using confidential information made available to them for any purpose other than furthering BAI's business. Harvie and Lambert were asked to resign after a compliance investigation. Within days of the termination of their employment with BAI, Harvie and Lambert began contacting BAI's customers to solicit them to move their accounts away from BAI to a new employer. Such actions have and will continue to harm BAI in a manner that is impossible to quantify and, therefore, warrants injunctive relief.

### Parties

1.    Plaintiff, Banc of America Investment Services, Inc., is a Florida corporation with its principal place of business in Charlotte, North Carolina. BAI is authorized to conduct business in the Commonwealth of Virginia. BAI is a FINRA member broker-dealer, conducting business throughout Virginia from its office located at 1111 East Main Street, Richmond, Virginia 23219, among other locations.

2.    Defendant J. Chris Harvie, a/k/a John C. Harvie ("Harvie") is a resident of the Commonwealth of Virginia, currently residing at 3111 Summerhurst Drive, Midlothian, Virginia 23113. Harvie was employed by BAI as a financial advisor in its branch office located in Richmond until January 28, 2008, when his employment was terminated.

3.    Defendant Heather E. Lambert f/k/a Heather Edmiston ("Lambert") is a resident of the Commonwealth of Virginia, residing at 14313 Brading Court, Midlothian, Virginia 23112. Lambert was employed by BAI as a financial advisor in its branch office located in Richmond until January 28, 2008, when her employment was terminated.

2

### **Subject Matter Jurisdiction**

4. Paragraphs 1 through 3 are incorporated herein as if set forth in full.

5. There is complete diversity of citizenship among the parties to this action, and the amount or value in controversy exceeds $75,000.00, exclusive of interest and costs. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

6. BAI and Defendants are subject to and bound by the rules of conduct promulgated by the Financial Industry Regulatory Authority ("FINRA"), including the FINRA Code of Arbitration Procedure. Under the FINRA Code of Arbitration Procedure, BAI and Defendants are required to submit for final and binding arbitration the disputes described herein arising out of Defendants' employment with BAI and their termination of employment. However, FINRA Code of Arbitration Procedure Rule 10335 expressly provides that the parties may seek preliminary injunctive relief from a court of competent jurisdiction while submitting the merits of the dispute to arbitration before FINRA for a final determination of permanent relief.

7. BAI brings this Complaint to obtain preliminary injunctive relief pending final adjudication by FINRA. BAI is filing a Statement of Claim in Support of Arbitration with FINRA consistent with its obligations under the Code of Arbitration Procedure and to allow the arbitration panels of FINRA to adjudicate this dispute after this Court has entered this request for injunctive relief.

**Venue**

8.      Paragraphs 1 through 7 are incorporated herein as if set forth in full.

9.      Harvie and Lambert reside in this judicial district and division. Venue is therefore proper in this district pursuant to 28 USC § 1391(d) and in this division pursuant to Rule 3(C) of the Rules of the U.S. District Court for the Eastern District of Virginia.

**Facts**

**Employment of Defendants by BAI and Their Agreements with BAI.**

10.      Paragraphs 1 through 9 above are incorporated herein as if set forth in full.

11.      In connection with their employment, Defendants each signed multiple agreements with BAI.

The Series 7 Agreement

12.      Defendants each executed a BAI Series 7 Code of Conduct Certification and Agreement in which they acknowledged having reviewed the Code of Conduct (the "Series 7 Agreement"). The Series 7 Agreement set forth the terms on which Defendants would be given access to certain confidential and proprietary information. Harvie executed the Series 7 Agreement on October 18, 1999. Lambert executed the Series 7 Agreement on July 30, 2001. A true copy of each of the Series 7 Agreements are attached hereto as **Exhibit A**.

13.      In Sections 10 and 11 of the Series 7 Agreement, Defendants acknowledged that they would receive confidential customer information and that such information could only be used for BAI's purposes. "Neither originals nor copies may be removed from [BAI]

4

premises...or used for purposes other than [BAI] business without the express permission of management."

14.     The obligation not to misuse BAI's confidential information extended to former employees. "When an associate separates from the Company for any reason, the former Associate must immediately cease use of all company records, proprietary information and assets, and return to the Company all records and assets in his possession or control."

15.     The Series 7 Agreement also prohibited former employees from soliciting customers with whom they worked at BAI for one year from the date of termination of employment. Section 17 states, "Should an Associate separate from [BAI] whether voluntarily or involuntarily, the former Associate agrees that for a period of one year, the Associate may not and will not solicit or attempt to solicit any securities related business, directly or indirectly, from any [BAI] customers who were served by or whose names became known to the Associate while in the employ of [BAI]."

BAI Code of Ethics Certification and Agreement

16.     Defendants each executed a BAI Code of Ethics Certification and Agreement ("BAI Code of Ethics Certification") in which they acknowledged their obligation to comply with the BAI Code of Ethics, including the Code's provisions on confidential information and non-solicitation of customers.  Lambert executed the BAI Code of Ethics on January 18, 2005. Harvie executed the BAI Code of Ethics on January 4, 2005. A true copy of each of the BAI Code of Ethics Certifications and the Code are attached hereto as **Exhibit B**.

17.     Section 12 of the BAI Code of ethics expressly forbids former employees from using any records belonging to BAI. "When an associate separates from the Company for any

5

reason, the former associate must immediately cease use of all company records, proprietary

information and assets, and return to the company all records and assets in his or her possession

or control."

18.    Section 19 of the BAI Code expressly prohibits former employees from soliciting

customers with whom they worked while employed by BAI for 12 months after their

employment is terminated:

> The employee...agrees that during his or her employment with the
> Company and for twelve months after his or her termination (for
> whatever reason), he or she will not directly or indirectly solicit,
> invite, encourage or request any client or customer of the Company
> to whom he or she was introduced and/or for whom he or she
> worked, provided service or transacted business in the course and
> scope of his or her employment with the Company, for the purpose
> of: obtaining that client or customer's business for himself or
> herself or any other person or entity, causing such client or
> customer to discontinue doing business with the Company, or
> otherwise interfering with the relationship between such clients or
> customers and the Company.

**Defendants' Violations of Their Contractual Obligations**

19.    Defendants' employment was terminated on January 28, 2008.

20.    Since then, BAI clients have informed BAI that they already had been contacted

by Harvie or Lambert by telephone, and that Harvie or Lambert had attempted to discuss with

them, or make plans to discuss with them, their new employment status and further discussions

regarding their new employer, when their employment was finalized. Such calls were made to

solicit the clients to move their accounts.

6

21.     Such actions described above flatly violate the Series 7 Agreement and the BAI Code of Ethics Certification (the "Employment Agreements") which prohibited solicitation of any BAI customers.

22.     Defendants' direct phone solicitation of BAI customers, including those assigned to them by BAI, within days of the termination of their employment with BAI is a clear and unquestioned breach of the Employment Agreements' provisions prohibiting their solicitation of BAI customers for twelve months after termination.

23.     Defendants' use of confidential customer data, made available to them by virtue of their employment, to solicit customers for their and their new employer's benefit, constitutes a clear breach of the Employment Agreements' confidentiality provisions.

24.     Defendants violations of their contractual obligations have and will continue to damage BAI.

25.     Based upon the commissions generated by Defendants in the previous 12 months, the financial loss to BAI caused by Defendants' willful violations of the Employment Agreements will far exceed $75,000.00.

26.     An affidavit of Rex Sparks, Market Director, Premier Banking and Investments and Defendants' prior supervisor, attesting to these violations of the Employment Agreements is attached heret **Exhibit C.**

27.     On February 1, 2008, counsel for BAI notified Defendants in writing of their contractual obligations and demanded that they cease all such activities. Defendants ignored this demand and have refused to respond.

### Count I – Injunctive Relief

28.     Paragraphs 1 through 27 are incorporated herein as if set forth in full.

29.     By virtue of the foregoing, BAI has demonstrated the likelihood of irreparable harm to it; lack of harm to Defendants; likelihood of success on the merits; that the public interest is in its favor; and that a balancing of the equities favors the issuance of a preliminary injunction against Defendants.

30.     Unless Defendants are preliminarily and permanently enjoined from the foregoing conduct, BAI will be irreparably harmed by:

  a)     Disclosure and misappropriation of confidential information, including customer data;

  b)     Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable;

  c)     Loss of market share, customers and other valuable assets.

31.     BAI has no adequate remedy at law regarding the unlawful solicitation and misuse of customer information.


  WHEREFORE, BAI demands a Preliminary Injunction Order issue immediately enjoining Defendants, directly or indirectly, and whether alone or in concert with others, until a hearing and thereafter until further Order of this Court, from:

  a)     Continuing to solicit or attempting to solicit by any means, directly or indirectly, any of BAI's clients Defendants served or whose name became known to Defendants as a result of their employment with BAI;

8

b) Using, disclosing, or transmitting for any purpose, including solicitation of said customers, any confidential information, or any information contained therein, or in the records of BAI, and that all original records and copies and/or other reproductions thereof, in whatever form, be returned to BAI immediately;

c) Retaining any accounts or business obtained on account of any solicitation by Defendants made in the course of or as the result of any wrongdoing set forth herein;

d) Continuing to utilize BAI's confidential information, including its customer lists, data, customer account information or other confidential information, and requiring the return of all such information without retaining any copies, including deleting all such information from the computers and records of Defendants and any future employer and any other third-party recipient;

e) Directing Defendants to identify all BAI customers that they have solicited since terminating their employment with BAI, or while in possession of BAI's confidential information, or during the course of any wrongdoing set forth herein;

f) Continuing to violate the Employment Agreements;

g) Awarding damages, costs and attorneys' fees; and

h) Such other and further relief as may be provided at law and equity.

### Count II – Breach of Contract - Covenants

32. Paragraphs 1 through 27 are incorporated herein as if set forth in full.

33. The actions set forth above constitute violations of the Employment Agreements, specifically, their confidentiality and non-solicitation provisions.

9

WHEREFORE, BAI requests the Court enter an order permanently enjoining Defendants from violating the Employment Agreements; granting judgment in an amount sufficient to compensate BAI for Defendants' violations of the Employment Agreements – an amount to be proved at trial; and granting any further relief the Court deems proper.

WHEREFORE, BAI requests the Court enter an order granting the relief requested.

**BANC OF AMERICA INVESTMENT SERVICES, INC.**

By: _Kevin J. Fl_
     Counsel

James C. Cosby (VSB No. 25992)
Kevin J. Funk (VSB No. 65465)
Cantor Arkema, P.C.
Bank of America Center
1111 East Main Street, 16th Floor
Post Office Box 561
Richmond, Virginia  23218-0561
Telephone:  (804) 644-1400
Telecopier:  (804) 225-8706
kfunk@cantorarkema.com

Counsel for Plaintiff

A

JAN 30 2008 15:47 FR BHI    NORFOLK    N904 441 4958 TO RICHMOND    P.17/20

## Banc of America

## Investment Services, Inc.

### Series 7 Code of Conduct

### Certification and Agreement

I have read and understand the Banc of America Investment Services, Inc. Code of Conduct (the "Code") and will comply with the policies explained in the Code and any manuals or firm publication that affect my work. Within its meaning, express or implied, I am not and have not been aware of any circumstance or activity of a personal or family nature (involving me or any other Associate) which would conflict with the Code except as indicated below. (See "Circumstances or Activity" area below.) I also acknowledge that I have read, understand and agree to the non-solicitation agreement as set forth in Section 17 and the agreement regarding use of company assets as stated in Section 11. If I have executed or later execute another non-compete or non-solicitation agreement, I agree that the more restrictive agreement shall be binding upon me.

*I understand any failure on my part to comply with the Code, including failure to properly disclose to our customers, as stated in Section 19, that investments offered by Banc of America Investment Services, Inc. (i) are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries; (ii) are not insured by the Federal Deposit Insurance Corporation (FDIC); and (iii) involve investment risks, including possible loss of the principal amount invested, may result in termination of my employment.*

_____    W26  962    10/18/99
Associate Signature          Office # and Rep #    Today's Date

J. Chris HARVIE SVP          VA2-310-070
Name/Title (Please Print)    Interoffice Mail Code

## Circumstances or Activity

I wish to report the following circumstances or activity. (If nothing to report, please write "None.")

NONE

Instructions:

- Return the signed original to BAISI Registration Department, mailcode NC1-002-11-24
- Return a signed photocopy to your Series 7 Market Executive

*Edition – August, 1999*

http://nbii.nbam.com/shared/sales_salesadmin/Series7/S7Code_CA.html

EXHIBIT

exhibitsticker.com

A

10/18/1999

**Banc of America**
**Investment Services, Inc.**

# Series 7 Code of Conduct

Certification and agreement

I have read and understand the Banc of America Investment Services, Inc. Code of Conduct (the "Code") and will comply with the policies explained in the Code and any manuals or firm publication that affect my work. Within its meaning, express or implied, I am not and have not been aware of any circumstance or activity of a personal or family nature (involving me or any other Associate) which would conflict with the Code except as indicated below. (See "Circumstances or Activity" area below.) I also acknowledge that I have read, understand and agree to the non-solicitation agreement as set forth in Section 17 and the agreement regarding use of company assets as stated in Section 11. If I have executed or later execute another non-compete or non-solicitation agreement, I agree that the more restrictive agreement shall be binding upon me.

I understand any failure on my part to comply with the Code, including failure to properly disclose to our customers, as stated in Section 19, that investments offered by Banc of America Investment Services, Inc. (i) are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries; (ii) are not insured by the Federal Deposit Insurance Corporation (FDIC); and (iii) involve investment risks, including possible loss of the principal amount invested, may result in termination of my employment.

Associate signature  *Heather J. Edmisten*

Office # and Rep #  *W26*

Date  *7/30/01*

Name/title (please print)  *Registered Sales Assistant*

Interoffice mail code  *VA2 300 14-24*

Circumstances or activity

I wish to report the following circumstances or activity. (If nothing to report, please write "None.")

_____

_____

_____

_____

_____

_____

Instructions

Return the signed original to BAISI Registration Department, mailcode NC1-001-17-11

Return a signed photocopy to your Series 7 Market Executive

Edition – August 1999
SER.7CODE
201101 (12/00)

**For internal use only**

Code of Conduct

# *Banc of America*

# *Investment Services, Inc.*

### *Series 7 Code of Conduct*

**August, 1999**

## Introduction

We must work together as a team, and that demands an environment of honesty and trust. Our customers are entitled to expect uncompromising standards of professional and ethical conduct. Our reputation is a reflection of our adherence to philosophical and ethical principles, which are outlined in our Corporate Vision and Code of Conduct (the "Code").

When giving advice about _any_ investment, it is essential that the client receives oral and written disclosures and understand:

i    The investments are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries;

ii   The investments are not insured by the Federal Deposit Insurance Corporation (FDIC) ; and

iii  The investments involve investment risks, including possible loss of the principal amount invested.

Appropriate disclosure should always be provided:

- At account solicitation or initial sales presentation, either in person or by telephone;

- At any new account opening, by the Investment Consultant by pointing out the written disclosures within the account documentation, and orally providing the disclosures;

- At the time of the first transaction in any account;

- At the time of any subsequent transaction in a different product, including securities within the same mutual fund family; and

- At the time of any transaction occurring six months or more since the last trade.

In conjunction with an account opening, the Investment Consultant must obtain from the customer written acknowledgement of such disclosures.

In addition, our policies require that at the time of any transaction the Investment Consultant ask the customer to confirm that he/she understands the risks associated with the investment.

We evaluate our performance through a variety of mechanisms, including branch office "shopping" sessions. It is important to remember we will follow these guidelines. Any failure to comply with the Code and to properly disclose to our customers, as determined by our evaluations, may result in termination of your employment.

In addition to the standards set forth in the Code, Banc of America Investment Services, Inc. employees must adhere to the Bank of America Corporation Code of Ethics and General Policy on Insider Trading, and any modifications thereof.

Please read the Code and discuss any questions you may have with your manager.

# Code of Conduct

The following Statement of Business Practices ("Statement") seeks to provide practical guidance for application of the Banc of America Investment Services, Inc. Code of Conduct ("Code") and to provide direction for addressing broad operating risk. In addition, Bank of America Corporation Code of Ethics and the General Policy on Insider Trading ("Policy"), are incorporated by reference and set forth additional guidance. More specific or additional direction is provided in the operating manuals and policies and procedures of certain areas because of the area's particular activities, operating risks or individual responsibilities, or in other publications that address Associate conduct. The Code (which includes this Statement), the Policy and any other policies and procedures referred to herein, are collectively called the "Documents."

## *Statement of Business Practices*

## 1. Responsibilities

The reputation of any financial institution depends upon the conduct and values of its Associates. Building and ensuring an unblemished reputation involves:

- shaping the judgment of each Associate on basic matters of policy;

- providing specific direction for each Associate's approach to a variety of situations;

- accepting responsibility for judgment based on these directions; and

- calling upon each Associate's individual pride and spirit in being recognized as part of a respected professional entity.

The foundation of this Statement consists of basic standards of business practice, as well as professional and personal conduct. Such standards require honesty and candor in our activities, including the observance of the spirit and intent as well as the letter of the law.

All Banc of America Investment Services, Inc. Associates have specific duties under this Statement. As an Associate with Banc of America Investment Services, Inc., you must:

- be thoroughly familiar with the Code, any area manuals and policies and procedures that affect your work and other publications that address Associate conduct;

- periodically review your own understanding of the Documents, area manuals and policies and procedures and other publications that address Associate conduct;

- be sensitive to situations which could result in inadvertent actions by yourself or your Associates which could appear to be or are directly in violation of the Documents, Banc of America Investment Services, Inc. policy, other publications that address Associate conduct or any law or regulation;

- help us all assure that we uphold the highest ethical standards;

- seek counsel regarding ethical issues through your manager, your Personnel generalist, or designated Personnel representative or Compliance; and

- maintain a working environment that is supportive of your responsibilities described in the Documents and elsewhere.

## 2. Escalation Path

An Associate may have difficulty recognizing the differences between ethical issues that can be resolved with counseling, those that involve "gray areas" where specific direction is not available, and those that involve great risk to Banc of America Investment Services, Inc. In the event specific direction is not available in the Documents or other publications regarding a particular situation, or in the case of actions that appear to be or are in direct violation of an ethics-related policy, in most situations an Associate should first contact his or her manager. If the situation cannot be resolved and it is a Personnel-related matter, the Associate should escalate the matter to his or her Personnel generalist or designated Personnel representative. Associates should contact Compliance on all other matters, or if the Personnel generalist or designated Personnel representative is unable to resolve the issue.

## 3. Discipline and Enforcement

Violation of policies and procedures that address Associate conduct constitutes grounds for disciplinary action, which may include termination. Such conduct may also involve legal action, depending on the nature of the violation.

## 4. Compliance with Law

Associates will not take any action, either personally or on behalf of the Company that will violate any law, regulation or internal policy.

## 5. Conflicts of Interest

Associates must avoid conflicts between personal interests and the interests of the Company, or even the appearance of such conflicts. No Associate may act on behalf of the Company in any transaction involving persons or organizations with which such Associate, or a member of his or her family, has any financial or residual interest, other than through a compensation or similar plan sponsored by the Company. (As used in the Code, family member means your spouse or domestic partner, child, parent, grandparent, sibling or parent-in-law. Family member may be defined differently in other policies that are incorporated into the Code.) Actions, interests or associations which are adverse to the interest of our customers or the Company are prohibited.

The appearance of a conflict of interest can often be as detrimental as a conflict itself. Associates should exercise sound judgment before committing to any activity or participating in any transaction that could potentially be a conflict.

Defined broadly, a conflict of interest includes any situation in which an Associate is engaged in two or more activities or relationships that, to some degree, are incompatible. Such situations might include activities, conduct or investments that could conflict with the Associate's duty to the Company, or that could adversely affect judgment or job performance. Associates may not use their position, or Company property, services, information or influence for personal gain or for another's advantage.

Associates should consider the following factors to avoid conflict of interest situations:

- *Perception:* Could the activity or transaction be perceived as a conflict of interest or a potential conflict by others, including Associates, customers, vendors, competitors, regulators or the public? If all the facts of the activity or transaction were made public, would you or the Company be embarrassed?

- *Intent:* Is the activity or transaction being offered in an attempt to influence your judgment?

- *Impact:* Will the Company be disadvantaged if you participate in the activity or transaction?

- *Objectivity* Will participation in the activity or transaction in any way affect your ability to be objective with regard to any decision concerning a customer, Associate or vendor?

Code of Conduct

- **Time Considerations :** Will the time required for the activity or transaction interfere with your ability to effectively carry out your job responsibilities at the Company?

Questions should be directed to your manager and/or the Compliance Department.

In addition to the foregoing, it is specifically prohibited:

a) for any Associate to directly or indirectly buy, sell or lease any kind of goods, services or real property to or from Banc of America Investment Services, Inc. without the knowledge and written consent of Senior Management or its delegate(s);

b) for any Associate to accept commissions, payments, loans (other than with banks or financial institutions in the ordinary course of business), services, excessive entertainment or travel payments or gifts of more than nominal value from any organization or individual doing business or seeking to do business with Banc of America Investment Services, Inc.

c) for any Associate to have a direct or indirect beneficial interest in any organization which has business dealings with Banc of America Investment Services, Inc., except where such interest comprises widely-held securities which are quoted and sold on an open market; or

d) for any Associate to secure or permit to continue the employment of a dependent by an independent contractor or vendor doing business with Banc of America Investment Services, Inc. in an area over which the Associate has direct supervision or otherwise exercises influence

## 6. Relationships to Customers

Serving customers effectively and fairly is our most important goal. Information gathered by Banc of America Investment Services, Inc. is intended for the benefit of customers and no Associate is permitted to gain personal benefit from the advance knowledge of such information.

It has been and remains Banc of America Investment Services, Inc.'s policy that the customer's interest comes first. Our customers trust us not only with their money, investments and other tangible assets, but also with confidential and personal information. Banc of America Investment Services, Inc. respects the privacy of customer records, and access to personal information should be restricted to a business need-to-know basis. Absent the customer's consent, Associates should not disclose personal information to non-affiliated third parties, except to the extent required by law or customer agreements.

Associates have a responsibility to ensure any advice given to customers concerning securities is both suitable and appropriate for that customer, given their financial situation, investment objectives, tolerance for risk and financial sophistication.

Many Associates are engaged in corporate activities which may provide them with advance knowledge which might affect the price of securities or market trends. Associates must not only refrain from using this information to their own advantage but they must not disclose it to others, be it a spouse, relative, friend or select customer, or anyone else before it is generally available to the public. At times, this may mean that Associates are at an actual disadvantage in the marketplace and, because of their access to non-public information, some Associates may never be able to affect transactions in areas of specialization.

## 7. Outside Directorship and Management Participation

No officer or Associate of Banc of America Investment Services, Inc. may hold a position of trust, such as directorship in any outside entity that would conflict with the Associate's functions for Banc of America Investment Services, Inc. In addition to this Company policy, there are a number of statutes which prohibit officers or Associates from serving as directors or management officials of business entities outside Banc of America Investment Services, Inc. Therefore, any such proposed participation must be presented to the Compliance Department for prior approval.

## 8. Personal Conduct

Because a company is judged by the collective performance and public perception of its Associates, each of us has a responsibility to act in a manner that merits public trust and confidence.

- Associates must not take any action, either personally or on behalf of the Company that will violate any law or regulation affecting our business.

- Associates must perform their assigned duties to the best of their ability and in the best interest of the Company and its customers.

- Associates must avoid all circumstances that could produce conflicts or the appearance of conflicts between personal interests and those of the Company.

- Associates must adhere to and fully comply with the General Policy on Insider Trading, which is incorporated herein by reference.

- Associates must respect the confidentiality of information obtained in the course of business, whether related to the financial affairs of customers or the value of any investment.

- Associates must exercise absolute candor in providing the facts and information requested by Company management or other authorized officials.

- Associates must not use corporate resources or their corporate position in pursuit of personal interests in violation of any law or regulation, or in violation of any documents or non-solicitation agreement.

*Financial Conduct* - Associates should conduct their financial affairs in a responsible and prudent manner, so as to be above criticism. Due to the nature of the securities industry, the standard of financial responsibility for Associates is higher than that applicable to the general public.

*Borrowing* - No Associate may personally borrow money from or lend to vendors, customers or other Associates. This does not apply to loans to or from family members who may also be vendors, customers or Associates, or to loans from institutions normally in the business of lending, if there is no conflict of interest. You may make an occasional loan of nominal value (i.e., for lunch) to another Associate as long as no interest is charged.

*Investments* - Associates are encouraged to manage and develop their personal financial resources responsibly within their means and to maintain a sound financial condition. Associates must never engage in investment practices that by nature or practice are, or appear to be, inconsistent with the Bank of America Corporation Code of Ethics and General Policy on Insider Trading, other Insider Trading policies set forth in the policies and procedures of Banc of America Investment Services, Inc., illegal, improper, unethical, or are, or appear to be a conflict of interest. Associates must never make changes in their personal investments (or otherwise make investments) on the basis of confidential information relating to Banc of America Investment Services, Inc., any of its affiliates or any of its customers.

*Business Expenses* - All Associates who are authorized to incur expenses are responsible for the accurate and timely reporting of such expenses. All expenditures must be ordinary and necessary to accomplish expected business purposes, include required approvals, and be in accordance with existing expense policies.

*Personal Fees* - No Associate may accept personal fees or commissions in connection with any transactions on behalf of Banc of America Investment Services, Inc., unless specifically authorized by Banc of America Investment Services, Inc.

*Drug-Free Workplace* - Any Associate reasonably suspected of using, possessing, selling or transferring illegal drugs or mishandling legal drugs or alcohol, or otherwise violating the Drug-Free Workplace Policy at any time or place will be subject to disciplinary actions up to and including termination. Associates are required to become thoroughly familiar with the Drug-Free Workplace Policy, which is available through your supervisor, Personnel Generalist or designated Personnel representative.

MAY 07 2004 16:41 FR LEGAL          704 386 8021 TO 914155221549          P.07/13

*Outside Activities* -   Should Associates elect to pursue additional employment, engage in an independent business venture or perform services for another business, civic or charitable organization during non-Banc of America Investment Services, Inc. hours, they must not allow such outside activity to interfere with their job performance, or affect their physical or mental effectiveness. Associates must obtain approval of all such outside activities by completing an outside Activity Approval Request Form available through their manager or the Compliance Department.

Associates may not be engaged in any other financial, securities, or kindred businesses, or be connected by employment or otherwise with any other company or person engaged in such businesses at any time. This prohibition includes, but is not limited to, employment with investment companies and/or investment advisors.

A conflict of interest may exist when an Associate, or one of the Associate's close relatives, serves directly or indirectly, as a director, officer, associate, consultant, or agent of an organization which is a competitor, or which has current or prospective business with the Company as a supplier, customer, or contractor. Associates will assure that such outside activities do not conflict with or impair their ability to perform their responsibilities for the Company and do not adversely affect its integrity or public goodwill.

Also under federal law, any crime against a financial institution must be reported to its regulators. Associates should be alert to situations that could constitute criminal wrongdoing of which Banc of America Investment Services, Inc. may be the victim, and have a responsibility to identify and report the relevant facts to Corporate Security.

## 9. Gifts

Associates may not solicit, and are discouraged from accepting, gifts from current or prospective customers or vendors who are not family members. Gifts valued in excess of $100 may not be accepted. Gifts of money, in any amount, may not be accepted. Associates may accept gifts valued at $100 or less, if declining the gift would damage the relationship, and the circumstances are appropriate when the conflict of interest factors enumerated herein are taken into consideration, and the Associate has not accepted gifts from the same source within the previous 12 months. Under no circumstance, however, may Associates receive gifts or anything of value from current or prospective customers or vendors if there is a corrupt intent. Associates are also prohibited, on behalf of the Company, from giving, offering or promising anything of value to an employee of another financial institution in connection with any business of the financial institution if there is a corrupt intent.

An Associate or any member of an Associate's family may not accept a bequest or legacy from a customer unless the customer is a relative of the Associate.

Associates are prohibited by law to ask for, receive or agree to receive "anything of value" for themselves or for a family member of the Associate or other third party for, or in connection with, any transaction or business of Banc of America Investment Services, Inc. or its affiliates, either before or after a transaction is discussed or completed.

Customers and vendors are prohibited by the same law from offering "anything of value" as an inducement, reward or compensation to any Associate in connection with the business transaction. Anything of value includes trips, merchandise, meals or entertainment which do not serve demonstrable business purpose and would not ordinarily be reimbursed if not paid by the customer or vendor.

If a third party could perceive a gift as being improper or as compromising the integrity of the individual or Banc of America Investment Services, Inc. and its affiliates, the gift should be respectfully declined. Associates should dedicate the same careful consideration and thought for the appropriateness of gifts to customers or vendors of Banc of America Investment Services, Inc. as we would apply to those gifts received.

Area procedure manuals such as your Investment Consultant Compliance Manual have more specific information regarding the appropriateness of gifts, and such manuals should be consulted. Associates must discuss the appropriateness of any gifts with their manager.

## 10. Confidentiality

Confidentiality is a fundamental principle of the financial services business. The principle is particularly applicable to nonpublic information concerning Banc of America Investment Services, Inc. and to information

Case 1:08-cv-02993-RJH     Document 4-4     Filed 03/25/2008     Page 21 of 24

received by Banc of America Investment Services, Inc. from a customer or vendor. It applies with equal force to informal communications as well as to written, printed or computer-generated information.

Specific policies regarding information, such as the General Policy on Insider Trading and the Corporate Information Security Policy, exist to assure adequate control of critical and secured information. Associates must make themselves familiar with such policies that govern the work they perform.

**Third Party Communications** - Nonpublic information regarding Banc of America Investment Services, Inc. should be conveyed to others only when there is a reasonable need to know that furthers a lawful and legitimate purpose of Banc of America Investment Services, Inc., with the express understanding that the information is confidential and is to be used solely for the limited purpose for which it was received and given. Unless otherwise instructed, Associates should treat internal Banc of America Investment Services, Inc. activities and plans as confidential, to be disseminated within the internal structure of Banc of America Investment Services, Inc. only on a need to know basis.

**Customer Information** - Confidential information obtained from or about a customer which is specifically identifiable to that customer (such as customer account numbers, customer account balances and transaction information, financial condition, anticipated changes in management, business plan or projections) must be accorded a high level of confidentiality. We provide information to other companies only in order to conduct our business, comply with applicable law, protect against fraud or other suspected illegal activity, or help us meet customer needs or when the customer specifically consents or has been given an opportunity to request that the information not be shared. Any information shared will be limited to that needed or legally required and may be subject to confidentiality agreements. In addition, Associates are only authorized to access customer information for legitimate business purposes of Banc of America Investment Services, Inc. or its affiliates on a need to know basis.

**Vendor Information** - Confidential competitive information submitted to Banc of America Investment Services, Inc. in connection with the purchase of equipment, supplies or services, must be maintained in strictest confidence in order to avoid giving or receiving any improper competitive advantage with respect to any of several vendors.

## 11. Proper Use of Company Assets

Proper use of Company Assets and proper recording of such use is essential to the financial soundness and integrity of Banc of America Investment Services, Inc. Misuse or unauthorized removal of furnishings, equipment or supplies from any facility of Banc of America Investment Services, Inc. or Bank of America Corporation affiliate is prohibited.

This policy applies equally to property created, obtained or copied by Banc of America Investment Services, Inc. for its use (such as client lists, files, reference materials, reports, computer software, manuals, data processing systems, data bases and the like). Neither originals nor copies may be removed from Banc of America Investment Services, Inc. premises or affiliate of Bank of America Corporation, or used for purposes other than Banc of America Investment Services, Inc. business without the express permission of management.

Furthermore, the assets and the tangible contributions an Associate makes, whether directly or indirectly, while employed by Banc of America Investment Services, Inc. are Banc of America Investment Services, Inc.'s property and remain its property even if the Associate leaves Banc of America Investment Services, Inc.'s employ.

"Company Assets" include, but are not limited to, all originals and copies of: manuals, books and records; planners; holding book or customer book pages; account information and "positions" of customers; customer names, addresses and account numbers; all files and computers including hardware and software used in the course of business.

No Banc of America Investment Services, Inc. Associate may remove Company Assets from the premises unless specifically authorized. When an Associate separates from the Company for any reason, the former Associate must immediately cease use of all company records, proprietary information and assets, and return to the company all records and assets in his or her possession or control.

**Misappropriation** - Anyone who embezzles, steals or willfully misappropriates any monies, funds, or anything of value of Banc of America Investment Services, Inc. may be subject to termination, fine, imprisonment, restitution, payments, and other such actions conferred by law and Company policy.

## 12. Relationship to Governmental Authorities

***Regulatory Obligations*** - Banc of America Investment Services, Inc. functions in one of the most heavily regulated businesses in our economic system. There are multiple layers of governmental and self-regulatory organizations which supervise and police our activities. These include securities and banking regulators, both federal and state (i.e., SEC, NASD, MSRB, OCC, FDIC, Federal Reserve, etc.). It is the responsibility of our Associates to master the particular regulatory obligations imposed upon their phase of our business and to adhere strictly to those obligations. In dealing with the regulatory authorities, Banc of America Investment Services, Inc.'s policy mandates that each Associate observe the highest standards of professional conduct.

***Political Contributions*** - Federal and State laws prohibit corporations from making contributions directly or indirectly through the use of company funds, services, property or other resources on behalf of any political party, campaign, candidate for public elective office, or political committee. Associates may elect to endorse or contribute to political parties or candidates of their choice. Banc of America Investment Services, Inc. encourages informed participation in governmental, regulatory and elective processes. Associates may do so on their own or with others, however, Banc of America Investment Services, Inc. will not directly or indirectly reimburse Associates for their individual political contributions or in any way influence or pressure an Associate in his or her choice of to whom and in what amount a political contribution is made. Political contributions should be in compliance with applicable laws, including but not limited to, Municipal Securities Rule Making Board Rule G-37. Questions about political contributions should be directed to your manager.

***Reporting of Convictions Pursuant to Federal Securities Laws*** - Associates are reminded of their continuing obligation to report any injunction or conviction against them to their supervisor and to the Compliance Department. This reporting obligation applies to matters that arise from activities outside Banc of America Investment Services, Inc. business, as well as matters related to our business.

Pursuant to the terms of the federal securities laws, any Associate whom:

i    has been enjoined from acting as an Associate of any bank, insurance company, investment advisor or broker-dealer, or from engaging in or continuing any conduct in connection with those activities or in connection with the purchase or sale of any security; or

ii   within the last ten (10) years has been convicted of (a) any felony of any kind, or, (b) a misdemeanor involving the purchase or sale of a security or arising from the Associate's conduct as an Associate of any bank, insurance company, investment advisor or broker-dealer;

may not become or remain an Associate unless regulatory procedures are fully satisfied.

This is only a summary of the regulatory provision. Questions should be directed to the Compliance Department.

## 13. Bribes and Other Improper Payments

No Associate may utilize, either directly or indirectly, Banc of America Investment Services, Inc.'s funds or property for any unlawful or improper use. Accordingly, no bribes, kickbacks or other similar unlawful or improper remuneration shall be given by an Associate to any person or entity, or shall be accepted by any Associate from any person or entity, to obtain or retain business or for any other reason whatsoever.

This policy should not be construed to limit the use of Banc of America Investment Services, Inc. funds and other assets in the ethical pursuit of acquiring additional business for Banc of America Investment Services, Inc. in the normal course.

## 14. Accounting

Banc of America Investment Services, Inc. has established internal accounting and operating controls to ensure that its accounting records and operational procedures are complete, accurate and in reasonable detail. Associates are expected to maintain and adhere to these controls and policies so that all underlying transactions, both with Banc of America Investment Services, Inc. and with third parties, are properly documented, recorded and reported.

### 15. Official Documentation

It is inappropriate for an Associate to use official Banc of America Investment Services, Inc. or affiliated institution stationery or other official documentation, or to use the name Banc of America Investment Services, Inc. or any affiliate, for any personal or non-official purpose, since such use implies endorsement by Banc of America Investment Services, Inc. or the affiliate.

### 16. Anti-Money Laundering

With the view to ensuring that the financial system is not used as a channel for criminal funds, Associates will make reasonable efforts to determine the true identity for all customers requesting Banc of America Investment Services, Inc. services. Significant business transactions will not be conducted with customers who fail to provide evidence of their identity. Associates will conduct business in conformity with high ethical standards and will adhere to laws and regulations pertaining to financial transactions.

As a Company, Banc of America Investment Services, Inc. will cooperate fully with federal law enforcement authorities to the extent permitted by law. Banc of America Investment Services, Inc. will avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading financial information. Where Banc of America Investment Services, Inc. becomes aware of facts which lead it to the reasonable presumption that proceeds were derived from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures consistent with the law will be taken including, for example, denial of assistance to the customer, severing relations with the customer, closing or freezing accounts, and filing reports with governmental authorities.

### 17. Relationship with our Competitors

In order to effectively and fairly compete in the marketplace with our many competitors, Banc of America Investment Services, Inc. must remain alert to changes in services and products offered to the public by our competitors; it is inappropriate, however, for Banc of America Investment Services, Inc. Associates to seek to improperly gain from this information. For example, it is unethical and may be illegal to hire an Associate of a competitor to gain access to that competitor's trade secrets or proprietary information. Similarly, it is improper for an Associate of Banc of America Investment Services, Inc. to provide such confidential information to our competitors.

Both federal and state law prohibits conspiracies or agreements that unreasonably restrain trade. Formal or informal understandings or agreements between competitors concerning the pricing of services may not be discussed by any Associate with any competitor.

There are many instances where close cooperation between Banc of America Investment Services, Inc. and competitors is permissible and necessary. Common objectives of education and regulation are pursued through membership on and participation in committees organized from time to time by government agencies, self-regulatory agencies and organizations such as the Securities Industry Association. (If an Associate is in doubt as to proper course of action, supervisory personnel should be consulted.)

*Non-Solicitation Agreement* - Should an Associate separate from Banc of America Investment Services, Inc., whether voluntarily or involuntarily, the former Associate agrees that, for a period of one year, the Associate may not and will not solicit or attempt to solicit any securities related business, directly or indirectly, from any of Banc of America Investment Services, Inc.'s customers who were served by or whose names became known to the Associate while in the employ of Banc of America Investment Services, Inc.

### 18. General Suitability

Each customer's needs and objectives are different. In addition to standard suitability guidelines, Associates must follow firm policies including but not limited to firm solicitation policy.

### 19. Disclosure Obligations

In giving advice about *any* investment, it is essential the client receives oral and written disclosures and understand:

Code of Conduct

a)   The investments are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank. Banc of America Investment Services, Inc. or any of their affiliates or subsidiaries;

b)   The investments are not insured by the Federal Deposit Insurance Corporation (FDIC); and

c)   The investments involve investment risks, including possible loss of the principal amount invested.

In addition, where appropriate, clients should understand investments are sponsored by third parties not connected with any Bank of America affiliated Bank.

Due to the relationship between Banc of America Investment Services, Inc. and any Bank of America affiliated bank, Associates must make an effort to see that the customer is made aware of these facts, orally and in writing, early in any sales presentation and prior to the purchase of the investment. Careful adherence to these policies at the time of sale will prevent an unfortunate misunderstanding later.

### Conclusion

This Code of Conduct is meant to outline the standards of ethical and professional conduct expected of Banc of America Investment Services, Inc. Associates. Nothing contained in this document should be construed as a guarantee of continued employment. Rather, an Associate's employment is on an at will basis.

### Next Step

Now that you have read the Banc of America Investment Services, Inc. Series 7 Code of Conduct, please carefully read and sign the Certification and Agreement contract. After you read the contract, sign and date it, and then return the original to the Registration Department. Additionally, send a photocopy to your Series 7 Branch Manager. To obtain a copy of the Certification and Agreement contract, click here.

# EXHIBIT 3.B

## BAI Code of Ethics Certification and Agreement

I have read and understand the Banc of America Investment Services, Inc. Code of Ethics (the "Code") and will comply with the policies explained in the Code and any manuals or firm publication that affect my work. Within it's meaning, express or implied; I am not and have not been aware of any circumstance or activity of a personal or family nature (involving me or any other Covered Person), which would conflict with the Code.

I understand any failure on my part to comply with the Code, including failure to properly disclose to our customers, as stated in Section 21, that Investments offered by Banc of America Investment Services, Inc. (i) are not deposits or obligations of, or guaranteed by, any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries; (ii) are not insured by the Federal Deposit Insurance Corporation (FDIC), and (iii) involve investment risks, including possible loss of the principal amount invested, may result in termination of my employment.

Applicable to BAI employees: I also acknowledge that I have read, understand and agree to the Non-Solicitation Agreement as set forth in Section 19 and the agreement regarding use of company assets as stated in Section 12. If I have executed or later execute another Non-Compete or Non-Solicitation Agreement, I agree that the more restrictive agreement shall be binding upon me.

☑ I acknowledge and agree

Please print and maintain a copy of this Acknowledgement for your records.
All Covered Persons are encouraged to click on the following link
http://digitalasset.bankofamerica.com/Procurement/dal/dalibrary.nsf/(LinkToItemByNumber)?
OpenAgent&00-25-3536NSB to print a copy of the BAI Code of Ethics.

### For Registered Associates ONLY:

In addition to submitting the electronic acknowledgement above, Registered Associates are required to print this certification page, sign and date it, and submit it to his/her manager by the required deadline.

Accepted and Agreed

_____     1/4/2025
Signature                            Date

J. Chris Haans          BAI
Print Name              Department or Line of Business

**EXHIBIT**

**B**

## BAI Code of Ethics Certification and Agreement

I have read and understand the Banc of America Investment Services, Inc. Code of Ethics (the "Code") and will comply with the policies explained in the Code and any manuals or firm publication that affect my work. Within it's meaning, express or implied; I am not and have not been aware of any circumstance or activity of a personal or family nature (involving me or any other Covered Person), which would conflict with the Code.

I understand any failure on my part to comply with the Code, including failure to properly disclose to our customers, as stated in Section 21, that investments offered by Banc of America Investment Services, Inc. (i) are not deposits or obligations of, or guaranteed by, any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries; (ii) are not insured by the Federal Deposit Insurance Corporation (FDIC), and (iii) involve investment risks, including possible loss of the principal amount invested, may result in termination of my employment.

Applicable to BAI employees: I also acknowledge that I have read, understand and agree to the Non-Solicitation Agreement as set forth in Section 19 and the agreement regarding use of company assets as stated in Section 12. If I have executed or later execute another Non-Compete or Non-Solicitation Agreement, I agree that the more restrictive agreement shall be binding upon me.

☑ I acknowledge and agree

Please print and maintain a copy of this Acknowledgement for your records.
All Covered Persons are encouraged to click on the following link
http://digitalasset.bankofamerica.com/Procurement/dai/dailibrary.nsf/(LinkToItemBy Number)?OpenAgent&00-25-3536NSB to print a copy of the BAI Code of Ethics.

### For Registered Associates ONLY:

In addition to submitting the electronic acknowledgement above, Registered Associates are required to print this certification page, sign and date it, and submit it to his/her manager by the required deadline.

Accepted and Agreed

_Heather J. Lambert_    _1/18/2005_
Signature                     Date

_Heather J. Lambert_
Print Name                    Department or Line of Business



## Banc of America Investment Services, Inc. Code of Ethics

### Introduction

The Banc of America Investment Services, Inc. Code of Ethics (formerly "Code of Conduct") sets forth the general standards of conduct for BAI Covered Persons.

All BAI associates and other individuals within Bank of America Corporation that BAI, at its discretion, deems subject to the Code ("Covered Persons") are provided with a copy of this Code and any amendments initially upon becoming a Covered Person and annually thereafter. Covered Persons are required to read the Code, discuss any questions they may have with their manager, and provide acknowledgment of their receipt and understanding of, and agreement to comply with, the Code of Ethics.

Certain individuals deemed to be Covered Persons under the BAI Code of Ethics may also be Covered Persons of an affiliate's Code of Ethics. This may be attributed to a number of factors, including having job responsibilities or performing functions on behalf of both entities. In these situations, the Covered Person must comply with, and provide acknowledgement of, both Codes of Ethics.

Please refer to the BAI Code of Ethics Policies and Procedures tab of the BAI intranet at http://bai.bankofamerica.com/compliance/S72204_Ethics.doc for detailed information regarding procedures for acknowledging the Code of Ethics.

A copy of the BAI Code of Ethics should be promptly furnished to any client or prospective client upon request.

### General Standards of Business Conduct

We must work together as a team, and that demands an environment of honesty and trust. Our customers are entitled to expect uncompromising standards of professional and ethical conduct. Our reputation is a reflection of our adherence to philosophical and ethical principles, which are outlined in our Corporate Vision and Code of Ethics.

When giving advice about any investment, it is essential that the client receives oral and written disclosures and understands that:

i. the investments are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries;
ii. the investments are not insured by the Federal Deposit Insurance Corporation (FDIC); and,
iii. the investments involve investment risks, including possible loss of the principal amount invested.

Appropriate disclosure should always be provided:
♦ at account solicitation or initial sales presentation, either in person or by telephone;
♦ at any new account opening, by the Registered Representative pointing out the written disclosures within the account documentation, and orally providing the disclosures;
♦ at the time of the first transaction in any account;
♦ at the time of any subsequent transaction in a different product, including securities within the same mutual fund family; and
♦ at the time of any transaction occurring six months or more since the last trade.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

In addition, our policies require that at the time of any transaction, the Registered Representative must ask the customer to confirm that he/she understands the risks associated with the investment.

We evaluate our performance through a variety of mechanisms, including branch office "shopping" sessions. It is important to remember that we will follow these guidelines. Any failure to comply with the Code and to properly disclose to our customers, as determined by our evaluations, may result in disciplinary action, up to and including termination of your employment.

In addition to the standards set forth in the Code, Banc of America Investment Services, Inc. Covered Persons must adhere to the Bank of America Corporation Code of Ethics and General Policy on Insider Trading, and any modifications thereof.

Please read the Code and discuss any questions you may have with your manager.

---

The following Statement of Business Practices ("Statement") seeks to provide practical guidance for application of the BAI Code of Ethics and to provide direction for addressing broad operating risk. In addition, Bank of America Corporation Code of Ethics and the General Policy on Insider Trading ("Policy") are incorporated by reference and set forth additional guidance. More specific or additional direction is provided in the operating manuals and policies and procedures of certain areas because of the area's particular activities, operating risks or individual responsibilities, or in other publications that address Covered Person conduct. The Code (which includes this Statement), the Policy and any other policies and procedures referred to herein, are collectively called the "Documents."

---

### Statement of Business Practices

1. Responsibilities

The reputation of any financial institution depends upon the conduct and values of its Associates. Building and ensuring an unblemished reputation involves:
- shaping the judgment of each Associate on basic matters of policy;
- providing specific direction for each Associate's approach to a variety of situations;
- accepting responsibility for judgment based on these directions; and
- calling upon each Associate's individual pride and spirit in being recognized as part of a respected professional entity.

The foundation of this Statement consists of basic standards of business practice, as well as professional and personal conduct. Such standards require honesty and candor in our activities, including the observance of the spirit and intent as well as the letter of the law.

All Covered Persons have specific duties under this Statement. As a Covered Person with Banc of America Investment Services, Inc., you must:
- be thoroughly familiar with the Code, any area manuals and policies and procedures that affect your work and other publications that address Covered Person conduct;

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

♦ periodically review your own understanding of the Documents, area manuals and policies and procedures and other publications that address Covered Person conduct;
♦ be sensitive to situations that could result in inadvertent actions by yourself or your Covered Persons which could appear to be or are directly in violation of the Documents, Banc of America Investment Services, Inc. policy, other publications that address Covered Person conduct or any law or regulation;
♦ help us all ensure that we uphold the highest ethical standards; (Seek counsel regarding ethical issues through your manager, your Personnel generalist, or designated Personnel representative or Compliance; and (Maintain a working environment that is supportive of your responsibilities described in the documents and elsewhere.

2. Escalation Path

Violations or suspected violations of the Code of Ethics must be promptly reported to the Covered Person's manager. The Covered Person's manager is then responsible for promptly reporting the situation to the BAI Compliance Department.

If an individual feels uncomfortable reporting to his/her manager, he/she may call the Corporate Ethic and Compliance Helpline at 1888-411-1744 (toll free) for callers in the United States, Canada, Puerto Rico and U.S. Virgin Islands. All other international callers may reach the Helpline by placing a collect call to 1.770.613.6334. To call toll free while remaining anonymous, callers outside the United States, Canada, Puerto Rico and U.S. Virgin Islands can call collect, using the name Mr. or Ms. Banks. This Helpline is maintained by an independent third party, The Network, Inc., to ensure anonymity and confidentiality. You may also report such activity confidentially and anonymously through accessing the Audit Investigations Web site at http://cre.bankofamerica.com/web/investigations.nsf.

With respect to the resolution of any particular issue, the Ethics and Compliance Helpline will:

• Coordinate the involvement of the appropriate internal teams (such as Compliance, Corporate Audit, Corporate Security, Personnel, Risk Management, executive management, internal legal counsel and/or the Ethics Oversight Committee), as needed.

• Serve as a necessary step in the escalation path for the resolution of major deviations from policy, including the responsibility to promptly report significant matters to the appropriate internal team, as needed

All Covered Persons are bound by both law and policy not to retaliate in any way against an individual who, in good faith, reports information in accordance with this policy.

A Covered Person may have difficulty recognizing the differences between ethical issues that can be resolved with counseling, those that involve "gray areas" where specific direction is not available, and those that involve great risk to Banc of America Investment Services, Inc. In the event specific direction is not available in the Documents or other publications regarding a particular situation, or in the case of actions that appear to be or are in direct violation of an ethics-related policy, in most situations a Covered Person should first contact his or her manager. If the situation cannot be resolved and it is a Personnel-related matter, the Covered Person should escalate the matter to his or her Personnel generalist or designated Personnel representative. Covered Persons should contact Compliance on all other matters, or if the Personnel generalist or designated Personnel representative is unable to resolve the issue.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

### 3. Discipline and Enforcement

Violation of policies and procedures that address Covered Person conduct constitutes grounds for disciplinary action, which may include termination. Such conduct may also involve legal action, depending on the nature of the violation.

### 4. Compliance with Law

Covered Persons will not take any action, either personally or on behalf of the Company that will violate any law, regulation or internal policy.

♦ *Trading in mutual fund securities.* The fundamental principles of honesty, truthfulness, good judgment and high ethical standards contained in our Code apply without exception across our organization, including all areas touching upon mutual fund practices. Further to these principles, Banc of America Investment Services, Inc. prohibits mutual fund market timing, late trading and the unauthorized dissemination of confidential information concerning mutual fund portfolio positions. These prohibitions apply whether Banc of America Investment Services, Inc. Covered Persons are engaged in a personal securities transaction or one on behalf of others, including trading for proprietary or fiduciary accounts of the Corporation. Further, these prohibitions apply to trading in Bank of America proprietary funds as well as third-party mutual funds. In addition to the principles set forth herein, Banc of America Investment Services, Inc. Covered Persons also must adhere to Bank of America Corporation's Mutual Fund Share Trading Policy that Banc of America Investment Services, Inc. Associate Covered Persons can access at <u>Bank of America Corporation Code of Ethics and General Policy on Insider Trading</u>.

♦ *Market timing.* Banc of America Investment Services, Inc. Covered Persons must comply with each fund's disclosed market timing policy. Banc of America Investment Services, Inc. believes that the interests of a mutual fund's long-term shareholders and the ability of a mutual fund to manage its investments may be adversely affected when fund shares are repeatedly bought and sold (or exchanged) by any individual or entity within short periods of time to take advantage of short-term differentials in the net asset values of such funds. This practice, known as "market timing," can occur in several ways: in direct purchases and sales of mutual fund shares, through rapid reallocations of funds held in 401(k) or similarly structured retirement or other accounts invested in mutual fund assets, or through the rapid reallocation of funds held in variable annuity and variable life policies invested in mutual fund assets.

Banc of America Investment Services, Inc. Covered Persons may not participate in any capacity in the market timing of mutual funds, variable products or other investment holdings. This prohibition applies to direct investments as well as to allocation decisions involving mutual funds held through retirement plans or the investment sub-accounts of variable annuities and variable life insurance policies. In addition, Banc of America Investment Services, Inc. Covered Persons may not knowingly allow or fail to immediately notify their manager if they become aware of a client who has engaged, or attempted to engage, or intends to engage in market timing.

Market timing is generally defined as repeatedly purchasing and selling shares or units (or exchanging) to exploit short-term differentials in the share or unit price. In addition, the rapid reallocation of investment sub-accounts held in variable annuities or life insurance products constitutes market timing. Individual product prospectuses may further define what constitutes market timing.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

Banc of America Investment Services, Inc. Covered Persons are prohibited from any market timing activities, including, but not limited to, the following:
· Opening accounts known to be for the purpose of market timing
· Providing services to known market timers
· Accepting orders known to be for the purpose of market timing
· Failing to take appropriate steps to deter market timing
· Disclosing portfolio holdings that have not been publicly disseminated or any other information that may give an advantage to certain shareholders over others
· Engaging in market timing in their personal accounts or accounts under their control
· Failing to notify their manager in the event they become aware of any market timing activities

*Late Trading*. Late trading of mutual funds is illegal. Banc of America Investment Services, Inc. Covered Persons must not knowingly accept any mutual fund order for a specific trading date's closing price when such order was submitted after the specified trading deadline established by the fund to receive that day's closing price. Banc of America Investment Services, Inc. Covered Persons are prohibited from entering into any late trading agreements with clients, engaging in late trading, or entering into agreements with any clients to facilitate late trading, by executing a client's order after the 4:00 P.M. closing time, or at net asset value (NAV) for the previous trading day. These orders include orders for mutual funds, as well as for the investment sub-accounts of variable annuities and variable life insurance policies.

*Dissemination of Portfolio Holdings Information*. Banc of America Investment Services, Inc. Covered Persons must not disclose any mutual fund portfolio holdings information unless such information has been derived from information publicly disseminated in accordance with the disclosure policies and procedures of the pertinent mutual fund. Banc of America Investment Services, Inc. believes that all mutual fund shareholders are entitled to a "level playing field" with regard to portfolio holdings information. Selective disclosure or portfolio holdings information can facilitate market timing or other improper trading by giving an advantage to certain shareholders over others. It can also damage the funds by revealing proprietary portfolio management to competitors.

*Personal Investing*. The prohibitions on market timing and late trading apply to direct investments in mutual fund shares as well as to allocation decisions involving investments in mutual fund shares held in 401(k) savings plans, excess benefit plans, variable annuity and variable life insurance policies, or other retirement, insurance, deferred compensation or similar investment vehicle. In addition, these prohibitions apply to both Bank of America proprietary mutual funds and to any and all third-party sponsored mutual funds.

*Reporting*. If Banc of America Investment Services, Inc. Covered Persons become aware of any activity inconsistent with the foregoing policies on mutual fund trading, Banc of America Investment Services, Inc. Covered Persons should immediately report such activity to their manager, who will be responsible for taking appropriate follow-up action and notifying the BAI Compliance Department.

5. Conflicts of Interest

Covered Persons must avoid conflicts between personal interests and the interests of the Company, or even the appearance of such conflicts. No Covered Person may act on

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

behalf of the Company in any transaction involving persons or organizations with which such Covered Person, or a member of his or her family, has any financial or residual interest, other than through a compensation or similar plan sponsored by the Company. (As used in the Code, family member means your spouse or domestic partner, child, parent, grandparent, sibling or parent-in-law. Family member may be defined differently in other policies that are incorporated into the Code.) Actions, interests or associations which are adverse to the interest of our customers or the Company are prohibited.

The appearance of a conflict of interest can often be as detrimental as a conflict itself. Covered Persons should exercise sound judgment before committing to any activity or participating in any transaction that could potentially be a conflict.

Defined broadly, a conflict of interest includes any situation in which a Covered Person is engaged in two or more activities or relationships that, to some degree, are incompatible. Such situations might include activities, conduct or investments that could conflict with the Covered Person's duty to the Company, or that could adversely affect judgment or job performance. Covered Persons may not use their position, or Company property, services, information or influence for personal gain or for another's advantage.

Covered Persons should consider the following factors to avoid conflict of interest situations:

*Perception:* Could the activity or transaction be perceived as a conflict of interest or a potential conflict by others, including Covered Persons, customers, vendors, competitors, regulators or the public? If all the facts of the activity or transaction were made public, would you or the Company be embarrassed?

*Intent:* Is the activity or transaction being offered in an attempt to influence your judgment?

*Impact:* Will the Company be disadvantaged if you participate in the activity or transaction?

*Objectivity:* Will participation in the activity or transaction in any way affect your ability to be
objective with regard to any decision concerning a customer, Covered Person or vendor?

*Time considerations:* Will the time required for the activity or transaction interfere with your ability to effectively carry out your job responsibilities at the Company?

Questions should be directed to your manager and/or the BAI Compliance Department.

In addition to the foregoing, it is specifically prohibited:
    a) for any Covered Person to directly or indirectly buy, sell or lease any kind of goods, services or real property to or from Banc of America Investment Services, Inc. without the knowledge and written consent of Senior Management or its delegate(s);
    b) for any Covered Person to accept commissions, payments, loans (other than with banks or financial institutions in the ordinary course of business), services, excessive entertainment or travel payments or gifts of more than nominal value from any organization or individual doing business or seeking to do business with Banc of America Investment Services, Inc.
    c) for any Covered Person to have a direct or indirect beneficial interest in any organization which has business dealings with Banc of America Investment Services,

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

Inc., except where such interest comprises widely held securities which are quoted and sold on an open market; or,

d) for any Covered Person to secure or permit to continue the employment of a dependent by an independent contractor or vendor doing business with Banc of America Investment Services, Inc. in an area over which the Covered Person has direct supervision or otherwise exercises influence.

### 6. Relationships to Customers

Serving customers effectively and fairly is our most important goal. Information gathered by Banc of America Investment Services, Inc. is intended for the benefit of customers and no Covered Person is permitted to gain personal benefit from the advance knowledge of such information.

It has been and remains Banc of America Investment Services, Inc.'s policy that the customer's interest comes first. Our customers trust us not only with their money, investments and other tangible assets, but also with confidential and personal information. Banc of America Investment Services, Inc. respects the privacy of customer records, and access to personal information should be restricted to a business need-to-know basis. Absent the customer's consent, Covered Persons should not disclose personal information to nonaffiliated third parties, except to the extent required by law or customer agreements.

Covered Persons have a responsibility to ensure any advice given to a customer concerning securities is both suitable and appropriate for that customer, given his/her financial situation, investment objectives, tolerance for risk and financial sophistication.

Certain Covered Persons may be engaged in corporate activities that may provide them with advance knowledge which might affect the price of securities or market trends. Covered Persons must not only refrain from using this information to their own advantage but they must not disclose it to others, be it a spouse, relative, friend or select customer or anyone else, before it is generally available to the public. At times, this may mean that Covered Persons are at an actual disadvantage in the marketplace and, because of their access to nonpublic information, some Covered Persons may never be able to affect transactions in areas of specialization.

### 7. Personal Securities Transactions

All Covered Persons are responsible for complying with Bank of America policy, as stated in the Bank of America Corporation Code of Ethics and Policy on Insider Trading, concerning their personal securities transactions (See the <u>Bank of America Corporation Code of Ethics and General Policy on Insider Trading</u> booklet). In addition, BAI has developed guidance for all Covered Persons in conducting personal securities transactions, including Bank of America (BAC) securities. Guidance is located in the BAI Compliance and Supervisory Manuals, the BAI Code of Ethics Policies and Procedures tab of the BAI intranet, and the <u>Bank of America Corporation Code of Ethics and General Policy on Insider Trading</u> booklet.

All Covered Persons must comply with the following principles of personal conduct:

- Covered Persons must not take any action, either personally or on behalf of BAI, which will violate any law or regulation affecting our business.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

- Covered Persons must perform their assigned duties to the best of their ability and in the best interests of BAI, it's customers, associates and shareholders.

- Covered Persons must respect the confidentiality of information obtained in the course of business, including information related to the financial affairs of customers or to the investment value of any business enterprise.

- Covered Persons must not use Bank of America corporate resources in pursuit of personal interests that violate the Documents or any law or regulation.

- Covered Persons must place the interest of BAI client accounts first when engaging in personal investment or trading activity.

- Covered Persons must conduct their personal investment and trading activity in a manner that will minimize potential conflict of interest or the appearance of conflict of interest between the Covered Person's interests and those of BAI account owner.

- Covered Persons must honor their position of trust and responsibility with BAI by refraining from making in appropriate use of any proprietary or other confidential information the Covered Person may acquire in the course of his/her employment here.

a) Initial Public Offering/Private Placement

**UNDER NO CIRCUMSTANCES MAY COVERED PERSONS OF BAI, INCLUDING OFFICERS AND DIRECTORS PURCHASE NEW ISSUE EQUITIES IN INITIAL PUBLIC OFFERINGS OR FOLLOW ON OFFERINGS FROM BAI OR ANY OTHER BROKER/DEALER FOR THEIR OWN ACCOUNT OR FOR THE ACCOUNT OF AN IMMEDIATE FAMILY MEMBER.**

Participation in a limited offering or private placement requires manager pre-approval.

b) Short-Term Trading

BAI encourages long-term investment strategies that entail an appropriate level of risk. Short-term speculative trading could detract from time that should be spent on the Covered Person's duties as an employee. Short-term trading of mutual funds is strictly prohibited unless such funds are designed to permit such trading, such as money market funds, certain short-term fixed income funds and exchange-trades funds.

8. Outside Directorship and Management Participation

No officer or associate of Banc of America Investment Services, Inc. may hold a position of trust, such as directorship in any outside entity that would conflict with the associate's functions for Banc of America Investment Services, Inc. In addition to this Company policy, there are a number of statutes which prohibit officers or associates from serving as directors or management officials of business entities outside Banc of America Investment Services, Inc. Therefore, any such proposed participation must be presented to the associate's manager for prior approval.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

### 9. Personal Conduct

Because a company is judged by the collective performance and public perception of its associates, each of us has a responsibility to act in a manner that merits public trust and confidence. Covered Persons must not take any action, either personally or on behalf of the Company that will violate any law or regulation affecting our business. Covered Persons must perform their assigned duties to the best of their ability and in the best interest of the Company and its customers.

♦ Covered Persons must avoid all circumstances that could produce conflicts or the appearance of conflicts between personal interests and those of the Company.
♦ Covered Persons must adhere to and fully comply with the General Policy on Insider Trading, which is incorporated herein by reference.
♦ Covered Persons must respect the confidentiality of information obtained in the course of business, whether related to the financial affairs of customers or the value of any investment.
♦ Covered Persons must exercise absolute candor in providing the facts and information requested by Company management or other authorized officials.
♦ Covered Persons must not use corporate resources or their corporate position in pursuit of personal interests in violation of any law or regulation, or in violation of any documents or Non-solicitation Agreement.

Financial conduct — Covered Persons should conduct their financial affairs in a responsible and prudent manner, so as to be above criticism. Due to the nature of the securities industry, the standard of financial responsibility for Covered Persons is higher than that applicable to the general public.

Borrowing — No Covered Person may personally borrow money from or lend to vendors, customers or other Covered Persons. This does not apply to loans to or from family members who may also be vendors, customers or Covered Persons, or to loans from institutions normally in the business of lending, if there is no conflict of interest. You may make an occasional loan of nominal value (i.e., for lunch) to another Covered Person as long as no interest is charged.

Investments — Covered Persons are encouraged to manage and develop their personal financial resources responsibly within their means and to maintain a sound financial condition. Covered Persons must never engage in investment practices that by nature or practice are, or appear to be, inconsistent with the BAI Code of Ethics or the Bank of America Corporation Code of Ethics. General Policy on Insider Trading or other Insider Trading policies set forth in the policies and procedures of Banc of America Investment Services, Inc., that are illegal, improper, unethical, or are or appear to be, a conflict of interest should be avoided. Covered Persons must never make changes in their personal investments (or otherwise make investments) on the basis of confidential information relating to Banc of America Investment Services, Inc., any of its affiliates or any of its customers.

Business expenses — All Covered Persons who are authorized to incur expenses are responsible for the accurate and timely reporting of such expenses. All expenditures must be ordinary and necessary to accomplish expected business purposes, include required approvals, and be in accordance with existing expense policies.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

Personal fees — No Covered Person may accept personal fees or commissions in connection with any transactions on behalf of Banc of America Investment Services, Inc., unless specifically authorized by Banc of America Investment Services, Inc.

Drug-free workplace — Any Covered Person reasonably suspected of using, possessing, selling or transferring illegal drugs or mishandling legal drugs or alcohol, or otherwise violating the Drug-Free Workplace Policy at any time or place, will be subject to disciplinary actions up to and including termination. Covered Persons are required to become thoroughly familiar with the Drug-Free Workplace Policy, which is available through your manager, Personnel generalist or designated Personnel representative.

Outside activities — Should Covered Persons elect to pursue additional employment, engage in an independent business venture or perform services for another business, civic or charitable organization during non-Banc of America Investment Services, Inc. hours, they must not allow such outside activity to interfere with their job performance, or affect their physical or mental effectiveness. Covered Persons must obtain approval of all such outside activities by completing a BAI Outside Activity Approval Request Form available through their manager or the BAI Compliance Department.

Covered Persons may not be engaged in any other financial, securities, or kindred businesses, or be connected by employment or otherwise with any other company or person engaged in such businesses at any time. This prohibition includes, but is not limited to, employment with investment companies and/or investment advisors.

A conflict of interest may exist when a Covered Person, or one of the Covered Person's close relatives, serves directly or indirectly, as a director, officer, Covered Person, consultant, or agent of an organization which is a competitor, or which has current or prospective business with the Company as a supplier, customer or contractor. Covered Persons will assure that such outside activities do not conflict with or impair their ability to perform their responsibilities for the Company and do not adversely affect the Company's integrity or public goodwill.

Also under federal law, any crime against a financial institution must be reported to its regulators. Covered Persons should be alert to situations that could constitute criminal wrongdoing of which Banc of America Investment Services, Inc. may be the victim, and have a responsibility to identify and report the relevant facts to Corporate Security.

### 10. Gifts

Covered Persons may not solicit, and are discouraged from accepting, gifts from current or prospective customers or vendors who are not family members. Gifts valued in excess of $100 may not be accepted. Gifts of money, in any amount, may not be accepted. Covered Persons may accept gifts valued at $100 or less, if declining the gift would damage the relationship, and the circumstances are appropriate when the conflict of interest factors enumerated herein are taken into consideration, and the Covered Person has not accepted gifts from the same source within the previous 12 months. Under no circumstance, however, may Covered Persons receive gifts or anything of value from current or prospective customers or vendors if there is a corrupt intent. Covered Persons are also prohibited, on behalf of the Company, from giving, offering or promising anything of value to an employee of another financial institution in connection with any business of the financial institution if there is a corrupt intent.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

A Covered Person or any member of a Covered Person's family may not accept a bequest or legacy from a customer unless the customer is a relative of the Covered Person.

Covered Persons are prohibited by law to ask for, receive or agree to receive "anything of value" for themselves or for a family member of the Covered Person or other third party for, or in connection with, any transaction or business of Banc of America Investment Services, Inc. or its affiliates, either before or after a transaction is discussed or completed.

Customers and vendors are prohibited by the same law from offering "anything of value" as an inducement, reward or compensation to any Covered Person in connection with the business transaction. Anything of value includes trips, merchandise, meals or entertainment, which do not serve a demonstrable business purpose and would not ordinarily be reimbursed if not paid by the customer or vendor.

If a third party could perceive a gift as being improper or as compromising the integrity of the individual or Banc of America Investment Services, Inc. and its affiliates, the gift should be respectfully declined. Covered Persons should dedicate the same careful consideration and thought for the appropriateness of gifts to customers or vendors of Banc of America Investment Services, Inc. as we would apply to those gifts received.

Area procedure manuals, such as the BAI Compliance Manual, have more specific information regarding the appropriateness of gifts, and such manuals should be consulted. Covered Persons must discuss the appropriateness of any gifts with their manager.

11. Confidentiality

Confidentiality is a fundamental principle of the financial services business. The principle is particularly applicable to nonpublic information concerning Banc of America Investment Services, Inc., and to information received by Banc of America Investment Services, Inc. from a customer or vendor. Confidentiality applies with equal force to informal communications as well as to written, printed or computer-generated information.

Specific policies regarding information, such as the General Policy on Insider Trading and the Corporate Information Security Policy, exist to assure adequate control of critical and secured information. Covered Persons must make themselves familiar with such policies that govern the work they perform.

Third-party communications — Nonpublic information regarding Banc of America Investment Services, Inc. should be conveyed to others only when there is a reasonable need to know and that furthers a lawful and legitimate purpose of Banc of America Investment Services, Inc., with the express understanding that the information is confidential and is to be used solely for the limited purpose for which it was received and given. Unless otherwise instructed, Covered Persons should treat internal Banc of America Investment Services, Inc. activities and plans as confidential, to be disseminated within the internal structure of Banc of America Investment Services, Inc. only on a need-to-know basis.

Customer information — Confidential information obtained from or about a customer, which is specifically identifiable to that customer (such as customer account numbers, customer account balances and transaction information, financial condition, anticipated

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

changes in management, business plan or projections) must be accorded a high level of confidentiality. We provide information to other companies only in order to conduct our business, comply with applicable law, protect against fraud or other suspected illegal activity, or help us meet customer needs, or when the customer specifically consents or has been given an opportunity to request that the information not be shared. Any information shared will be limited to that needed or legally required and may be subject to confidentiality agreements. In addition, Covered Persons are only authorized to access customer information for legitimate business purposes of Banc of America Investment Services, Inc. or its affiliates on a need-to-know basis.

Vendor information — Confidential, competitive information submitted to Banc of America Investment Services, Inc. in connection with the purchase of equipment, supplies or services, must be maintained in strictest confidence in order to avoid giving or receiving any improper competitive advantage with respect to any of several vendors.

12. Proper Use of Company Assets

Proper use of Company Assets and proper recording of such use is essential to the financial soundness and integrity of Banc of America Investment Services, Inc. Misuse or unauthorized removal of furnishings, equipment or supplies from any facility of Banc of America Investment Services, Inc. or Bank of America Corporation affiliate is prohibited.

This policy applies equally to property created, obtained or copied by Banc of America Investment Services, Inc. for its use (such as client lists, files, reference materials, reports, computer software, manuals, data processing systems, databases and the like). Neither originals nor copies may be removed from Banc of America Investment Services, Inc. premises or from affiliates of Bank of America Corporation, or used for purposes other than Banc of America Investment Services, Inc. business without the express permission of management.

Furthermore, the assets and the tangible contributions a Covered Person makes, whether directly or indirectly, while employed by or associated with Banc of America Investment Services, Inc., are Banc of America Investment Services, Inc.'s property and remain its property even if the Covered Person leaves Banc of America Investment Services, Inc.'s employ.

"Company Assets" include, but are not limited to, all originals and copies of: manuals, books and records; planners; holding book or customer book pages; account information and "positions" of customers; customer names, addresses and account numbers; all files and computers including hardware and software used in the course of business.

No Banc of America Investment Services, Inc. Covered Person may remove Company Assets from the premises unless specifically authorized. When an associate separates from the Company for any reason, the former associate must immediately cease use of all company records, proprietary information and assets, and return to the company all records and assets in his or her possession or control.

Misappropriation — Anyone who embezzles, steals or willfully misappropriates any monies, funds, or anything of value from Banc of America Investment Services, Inc., may be subject to termination, fine, imprisonment, restitution, payments, and other such actions conferred by law and Company policy.



## Banc of America Investment Services, Inc. Code of Ethics

13. Relationship to Governmental Authorities

Regulatory obligations — Banc of America Investment Services, Inc. functions in one of the most heavily regulated businesses in our economic system. There are multiple layers of governmental and self-regulatory organizations which supervise and police our activities. These include securities and banking regulators, both federal and state (i.e., SEC, NASD, MSRB, OCC, FDIC, Federal Reserve, etc.). It is the responsibility of our Covered Persons to master the particular regulatory obligations imposed upon their phase of our business and to adhere strictly to those obligations. In dealing with the regulatory authorities, Banc of America Investment Services, Inc.'s policy mandates that each Covered Person observe the highest standards of professional conduct.

It is the responsibility of each Covered Person to drive a culture of compliance with the laws and regulations in pursuit of the highest ethical standards for our customers, Covered Persons and the shareholders of Bank of America Corporation.

Political contributions — Federal and state laws prohibit corporations from making contributions directly or indirectly through the use of company funds, services, property or other resources on behalf of any political party, campaign, candidate for public elective office or political committee. Covered Persons may elect to endorse or contribute to political parties or candidates of their choice. Banc of America Investment Services, Inc. encourages informed participation in governmental, regulatory and elective processes. Covered Persons may do so on their own or with others. In either case, however, Banc of America Investment Services, Inc. will not directly or indirectly reimburse Covered Persons for their individual political contributions or in any way influence or pressure an Covered Person in his or her choice of to whom and in what amount a political contribution is made. Political contributions should be in compliance with applicable laws including, but not limited to, Municipal Securities Rule Making Board Rule G-37. Questions about political contributions should be directed to your manager.

Reporting of Convictions Pursuant to Federal Securities Laws — Covered Persons are reminded of their continuing obligation to report any injunction or conviction against them to their manager and to the BAI Compliance Department. This reporting obligation applies to matters that arise from activities outside Banc of America Investment Services, Inc. business, as well as matters related to our business.

Pursuant to the terms of the federal securities laws, any Covered Person who:
    i. has been enjoined from acting as an Covered Person of any bank, insurance company, investment advisor or broker-dealer, or from engaging in or continuing any conduct in connection with those activities or in connection with the purchase or sale of any security; or
    ii. within the last ten (10) years has been convicted of (a) any felony of any kind, or (b) a misdemeanor involving the purchase or sale of a security or arising from the Covered Person's conduct as an Covered Person of any bank, insurance company, investment advisor or broker dealer; may not become or remain an Covered Person unless regulatory procedures are fully satisfied.

This is only a summary of the regulatory provision. Questions should be directed to the BAI Compliance Department.



## Banc of America Investment Services, Inc. Code of Ethics

### 14. U-4 Amendments

Pursuant to Section 2.5 of the BAI Compliance Manual, the BAI Registration Department ("Registration") is responsible for filing a Form U-4 ("U-4") on behalf of each Covered Person required to be registered with BAI. BAI Registered Covered Persons are responsible for notifying their manager immediately after learning of facts or circumstances that may require an amendment to his/her U-4 or that would render the current U-4 inaccurate. The manager is responsible for immediately notifying Registration. Such facts and circumstances include, but are not limited to:

- Customer complaints, arbitrations, and civil litigation related to securities and commodities transactions;

- Regulatory investigations (including any investigations or inquiries by the NASD, SEC, or state securities regulators); and

- Criminal investigations or proceedings, felony charges, or misdemeanor charges involving crimes of moral turpitude (fraud, false statements, wrongful taking of property, bribery, perjury, forgery, counterfeiting, or conspiracy to commit any of these offenses).

BAI Registered associates are required to provide Registration with any supporting documentation that describes the above-referenced events. This production would include any criminal complaints, court information or indictments, judgments of conviction, sentencing documents, and/or any other documents or information requested by Registration in connection with said events. BAI Registered associates are responsible for providing these documents **as soon as practically possible,** as Registration must amend a U-4 **within 30 days** after learning of facts or circumstances that require an amendment or that would render the current U-4 inaccurate. Registration will submit amendments to U-4s via Web CRD.

**Failure to notify Registration of an event that requires the filing of an amended U-4, or failure to provide documentation in a timely fashion in connection with filing an amended U-4, may result in disciplinary action, up to and including termination of all registrations and/or termination of employment.**

### 15. Bribes and Other Improper Payments

No Covered Person may utilize, either directly or indirectly, Banc of America Investment Services, Inc.'s funds or property for any unlawful or improper use. Accordingly, no bribes, kickbacks or other similar unlawful or improper remuneration shall be given by a Covered Person to any person or entity, or shall be accepted by any Covered Person from any person or entity, to obtain or retain business or for any other reason whatsoever.

This policy should not be construed to limit the use of Banc of America Investment Services, Inc. funds and other assets in the ethical pursuit of acquiring additional business for Banc of America Investment Services, Inc. in the normal course.

### 16. Accounting

Banc of America Investment Services, Inc. has established internal accounting and operating controls to ensure that its accounting records and operational procedures are



## Banc of America Investment Services, Inc. Code of Ethics

complete, accurate and in reasonable detail. Covered Persons are expected to maintain and adhere to these controls and policies so that all underlying transactions, both with Banc of America Investment Services, Inc. and with third parties, are properly documented, recorded and reported.

### 17. Official Documentation

It is inappropriate for a Covered Person to use official Banc of America Investment Services, Inc. or affiliated institution stationery or other official documentation, or to use the name Banc of America Investment Services, Inc. or name of any affiliate, for any personal or nonofficial purpose, since such use implies endorsement by Banc of America Investment Services, Inc. or the affiliate.

### 18. Anti-Money Laundering

With the view to ensuring that the financial system is not used as a channel for criminal funds, Covered Persons will make reasonable efforts to determine the true identity for all customers requesting Banc of America Investment Services, Inc. services. Significant business transactions will not be conducted with customers who fail to provide evidence of their identity. Covered Persons will conduct business in conformity with high ethical standards and will adhere to laws and regulations pertaining to financial transactions.

As a Company, Banc of America Investment Services, Inc. will cooperate fully with federal law enforcement authorities to the extent permitted by law. Banc of America Investment Services, Inc. will avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading financial information. Where Banc of America Investment Services, Inc. becomes aware of facts which lead it to the reasonable presumption that proceeds were derived from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures consistent with the law will be taken including, for example, denial of assistance to the customer, severing relations with the customer, closing or freezing accounts, and filing reports with governmental authorities.

### 19. Relationship with Our Competitors

In order to effectively and fairly compete in the marketplace with our many competitors, Banc of America Investment Services, Inc. must remain alert to changes in services and products offered to the public by our competitors; it is inappropriate, however, for Banc of America Investment Services, Inc. Covered Persons to seek to improperly gain from this information. For example, it is unethical and may be illegal to hire an associate of a competitor to gain access to that competitor's trade secrets or proprietary information. Similarly, it is improper for an associate of Banc of America Investment Services, Inc. to provide such confidential information to our competitors.

Both federal and state law prohibit conspiracies or agreements that unreasonably restrain trade. Formal or informal understandings or agreements between competitors concerning the pricing of services may not be discussed by any Covered Person with any competitor.

There are many instances where close cooperation between Banc of America Investment Services, Inc. and competitors is permissible and necessary. Common objectives of education and regulation are pursued through membership on and participation in committees organized from time to time by government agencies, self-regulatory



## Banc of America Investment Services, Inc. Code of Ethics

agencies and organizations such as the Securities Industry Association. (If a Covered Person is in doubt as to proper course of action, supervisory personnel should be consulted.)

BAI Employee Non-Solicitation Agreement — To the fullest extent permitted by law, during a BAI employee's employment with the Company, and for twelve months after his or her termination (for whatever reason), the employee agrees that he or she will not directly or indirectly, on his or her own behalf or on behalf of any other person or entity, solicit or recruit any person employed by the Company to leave the employ of the Company, or otherwise interfere with the relationship between the Company and any of its employees. The employee similarly agrees that during his or her employment with the Company and for twelve months after his or her termination (for whatever reason), he or she will not directly or indirectly solicit, invite, encourage or request any client or customer of the Company to whom he or she was introduced and/or for whom he or she worked, provided service or transacted business in the course and scope of his or her employment with the Company, for the purpose of: obtaining that client or customer's business for himself or herself or any other person or entity, causing such client or customer to discontinue doing business with the Company, or otherwise interfering with the relationship between such clients or customers and the Company. The employee understands that the Company retains the sole discretion to waive or modify these restrictions, and may do so if in writing and signed by Senior Management of the Company.

### 20. General Suitability

Each customer's needs and objectives are different. In addition to standard suitability guidelines, Covered Persons must follow firm policies including but not limited to firm solicitation policy.

### 21. Disclosure Obligations

In giving advice about any investment, it is essential the client receives oral and written disclosures and understands that:

a) the investments are not deposits or obligations of, or guaranteed by any Bank of America affiliated bank, Banc of America Investment Services, Inc. or any of their affiliates or subsidiaries;
b) the investments are not insured by the Federal Deposit Insurance Corporation (FDIC); and,
c) the investments involve investment risks, including possible loss of the principal amount invested.

In addition, where appropriate, clients should understand that investments are sponsored by third parties not connected with any Bank of America affiliated bank.

Due to the relationship between Banc of America Investment Services, Inc. and any Bank of America affiliated bank, Covered Persons must make an effort to see that the customer is made aware of these facts, orally and in writing, early in any sales presentation and prior to the purchase of the investment. Careful adherence to these policies at the time of sale will prevent an unfortunate misunderstanding later.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

22. Additional Standards/Obligations of Access Persons

Certain Covered Persons may be designated as "Access Persons" pursuant to Rule 204A-1 of the Investment Advisers Act. For purposes of illustration only, and without meaning to exhaustively describe all Covered Persons who may be deemed to be Access Persons, an Access Person is generally a supervised person who has access to nonpublic information regarding clients' purchase or sale of securities, is involved in making securities recommendations to clients or who has access to such recommendations that are nonpublic. This may include administrative, technical, or clerical associates if their functions or duties give them access to nonpublic information.

The Covered Person and his/her manager will be notified by the BAI Compliance Department if he/she is deemed to be an Access Person, and must comply with the following in addition to all other provisions of the Code.

- Provide an Initial and Annual Holding Report to the BAI Compliance Department no later than 10 days after the person becomes an Access Person and at least once a year thereafter.

- Provide Quarterly Transaction Report to the BAI Compliance Department no later than 10 days after the end of each calendar quarter.

- Maintain all Covered Person and Covered Person-related securities accounts with BAI. Securities accounts are accounts that are capable of trading securities, including, but not limited to accounts held at broker-dealers, Banks (including Bank of America and its affiliates), Investment Management Companies, and other financial institutions.

- Arrange to have duplicate copies of trade confirmations and periodic account statements timely forwarded to his/her manager.

- Avoid profiting from short-term trades in Reportable Securities and in Reportable Mutual funds. All securities are Reportable Securities, with the following five exceptions:
  - ➤ Direct obligations of the Government of the United States;
  - ➤ Bankers' acceptances, bank certificates of deposit, commercial paper, repurchase agreements, and other high quality short-term debt instruments;
  - ➤ Shares issued by money market funds;
  - ➤ Shares issued by open-end funds other than reportable funds; and
  - ➤ Shares issued by unit investment trust that are invested exclusively in one or more open-end funds other than reportable funds.

Reportable mutual fund means any fund for which the Access Person serves as an investment adviser; or any fund whose investment adviser or principal underwriter controls the Access Person, is controlled by the Access Person, or is under common control with the Access Person.

- Avoid trading in a reportable security the same day when a BAI client account has pending an order to trade the same or similar security.

00-25-3536NSB 01-2005



## Banc of America Investment Services, Inc. Code of Ethics

### a) Trading Restrictions

Certain Access Persons may be subject to any or all of the following trading restrictions, depending on the Access Person's particular situation:

- Pre-clearance of all personal trades
- A blackout period during which an Access Person may not trade in a particular security; and/or,
- A minimum holding period, during which an Access Person may not buy or sell a particular security.

The BAI Code of Ethics Policies and Procedures located on the BAI intranet http://bai.bankofamerica.com/compliance/S72204_Ethics.doc provides detailed information regarding the trading restrictions for Access Person.

### b) Monitoring Access Persons' Personal Securities Transactions

The BAI Compliance Department will review personal securities transactions, holding reports, and quarterly transaction reports of all Access Persons. Any transactions that that are identified as potentially being in violation of this Code will be escalated and resolved as appropriate.

In situations where a BAI Access Person is also an Access Person pursuant to an affiliate's Code of Ethics, he/she must acknowledge and comply with the BAI Code of Ethics; however, where practical, BAI will coordinate with the applicable affiliate to leverage their existing procedures to satisfy the Access Person requirements of the BAI Code. These particular BAI Access Persons will receive specific instructions regarding their responsibilities. Please refer to the BAI Code of Ethics Policies and Procedures on the BAI intranet for more information.

### Conclusion

This Code of Ethics is meant to outline the standards of ethical and professional conduct expected of Banc of America Investment Services, Inc. Covered Persons. Nothing contained in this document should be construed as a guarantee of continued employment. Rather, a Covered Person's employment is on an at-will basis.



## Banc of America Investment Services, Inc. Code of Ethics

### Certification and Agreement

I have read and understand the Banc of America Investment Services, Inc. Code of Ethics (the "Code") and will comply with the policies explained in the Code and any manuals or firm publication that affect my work. Within it's meaning, express or implied; I am not and have not been aware of any circumstance or activity of a personal or family nature (involving me or any other Covered Person), which would conflict with the Code.

I understand any failure on my part to comply with the Code, including failure to properly disclose to our customers, as stated in Section 21, that investments offered by Banc of America Investment Services, Inc. (i) are not deposits or obligations of, or guaranteed by, any Bank of America affiliated bank, Banc of America Investment Services, Inc., or any of their affiliates or subsidiaries; (ii) are not insured by the Federal Deposit Insurance Corporation (FDIC), and (iii) involve investment risks, including possible loss of the principal amount invested, may result in termination of my employment.

Applicable to BAI employees: I also acknowledge that I have read, understand and agree to the Non-Solicitation Agreement as set forth in Section 19 and the agreement regarding use of company assets as stated in Section 12. If I have executed or later execute another Non-Compete or Non-Solicitation Agreement, I agree that the more restrictive agreement shall be binding upon me.

Accepted and agreed

_____

Name/title (please print)

_____                        _____

Covered Person's signature                                            Date

_____

Line of Business or Department

_____

00-25-3536NSB 01-2005



## AFFIDAVIT OF REX SPARKS

COMMONWEALTH OF VIRGINIA;

CITY OF RICHMOND, to wit:

    This day personally appeared before me Rex Sparks, Market Director, Southern Virginia Premier Banking and Investments, Banc of America Investment Services, Inc. ("BAI"), and after being duly sworn, made oath as follows:

    1.    I am Rex Sparks, an adult resident of the Commonwealth of Virginia, and am competent to make this affidavit and the statements herein.

    2.    I have first-hand knowledge of the facts set forth herein.

    3.    In the course of my duties, I work with financial advisors at Banc of America Investment Services, Inc. ("BAI"). Together with the financial advisor, we jointly service customer accounts.

    4.    One of the financial advisors whom I have supervised is J. Chris Harvie ("Harvie"), the individual named as "Defendant" in this action. His Registered Sales Assistant was Defendant Heather E. Lambert.

    5.    When Harvie became employed by BAI, BAI assigned certain customer accounts to him for the purpose of managing the customer relationship.

    6.    By virtue of his employment, Harvie and Lambert had access to large amounts of client data, including financial and contact information.

    7.    Harvie and Labmert were given access to this data for the purpose of furthering BAI's relationship with its customers.

    8.    Harvie's and Lambert's employment was terminated on January 28, 2008.

EXHIBIT

C

9.    BAI representatives began calling BAI customers with whom Harvie and Lambert had worked to inform them their employment had ended and to make sure their needs would continue to be served.

10.    Persons whom I supervise have informed me that several BAI customers had already been contacted by Harvie or Lambert. Many of these customers were assigned to Harvie and Lambert by BAI.

11.    Specifically, within days of Defendants' employment being terminated, customers informed my employees that Harvie or Lambert contacted them to inform the customer that they had resigned, that they would soon be employed, and they would like to continue to discuss with them their new employer and its services.

12.    I can provide the court with specific names of customers who have informed my office of this and further details.

13.    I could and would testify consistent with the contents herein.

And further the affiant saith not.

REX SPARKS

Subscribed and sworn to before me this 5th day of February, 2008.

My commission expires  5/31/2011 .

NOTARY PUBLIC

ID No. 7067895

2

Williams (P)
3:08CV047

**JS 44** (Rev. 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Banc of America Investment Services, Inc.

### DEFENDANTS
J. Chris Harvie, aka John C. Harvie
Heather E. Lambert

**(b)** County of Residence of First Listed Plaintiff  Charlotte, NC
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Chesterfield, VA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
James L. Cosby (Cantor Arkema, PC)
P. O. Box 561, Richmond, VA  23218-0561
804-644-1400

Attorneys (If Known)
Unknown

RECEIVED
FEB - 6 2008
CLERK, U.S. DISTRICT C...
RICHMOND, VA

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332
Brief description of cause:
Breach of employment contracts

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
Preliminary Injunction

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE                          DOCKET NUMBER

DATE
February 5, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 3
Receipt Number: 300003809
Cashier ID: lbreeden
Transaction Date: 02/06/2008
Payer Name: CANTOR ARKEMA PC

CIVIL FILING FEE
 For: CANTOR ARKEMA PC
 Amount:        $350.00

CHECK
 Check/Money Order Num: 34648
 Amt Tendered:  $350.00

Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00

#3:08-CV-097

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |  |
|---|---|---|
| BANC OF AMERICA<br>INVESTMENT SERVICES, INC., | )<br>)<br>)<br>) |  |
| Plaintiff, | )<br>) |  |
| v. | )<br>) | C.A.: 3:08cv097 |
| J. CHRIS HARVIE,<br>a/k/a JOHN C. HARVIE, | )<br>)<br>) |  |
| and | )<br>) |  |
| HEATHER E. LAMBERT, | )<br>) |  |
| Defendants. | )<br>) |  |

**MEMORANDUM IN SUPPORT OF MOTIONS**
**FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Plaintiff, Banc of America Investment Services, Inc. ("BAI"), by counsel, for its

Memorandum in Support of Motions for Preliminary Injunction and Temporary Restraining

Order (the "Motions"), states as follows:

## I.    Summary

In this case, two financial advisors, J. Chris Harvie, a/k/a John C. Harvie ("Harvie"), and

Heather E. Lambert f/k/a Heather Edmiston ("Lambert"), hired for the purpose of developing,

maintaining and servicing BAI's customer accounts, have terminated their employment and

solicited BAI customers in violation of agreements they each signed not to do so.  In

consideration of their employment with BAI, Harvie and Lambert each executed agreements and

policy requirements, each of which included a provision prohibiting the solicitation of BAI customers, and the use of confidential account and contact information for unauthorized use. Harvie's and Lambert's use of confidential information they obtained by virtue of their employment with BAI to actively solicit BAI's customers for their benefit is in disregard of their contractual obligations. Such conduct is routinely enjoined by this Court pursuant to controlling law.

## II.    Statement of Facts

Defendants' Employment with BAI and Their Contractual Obligations

BAI is a full-service investment firm. It is registered with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority ("FINRA"). Harvie and Lambert are securities brokers registered with FINRA.

In connection with their employment, Harvie and Lambert executed various agreements. They governed the terms of their employment, including provisions continuing after the termination of their employment with BAI. Each of these agreements prohibited Harvie and Lambert from using confidential information to which they had access by virtue of their employment, for purposes other than BAI's interest. Additionally, each prohibited Harvie and Lambert from soliciting or attempting to solicit any securities-related business, directly or indirectly, from BAI's customers they served, or whose names had been known to them while in the employ of BAI.

2

The Series 7 Agreement

One of the agreements signed by each Defendant was a BAI Series 7 Agreement (the "Series 7 Agreement"). Complaint Exhibit A. Harvie signed the Series 7 Agreement on October 18, 1999 and Lambert signed on July 30, 2001. See Exhibit A. In doing so, Harvie and Lambert acknowledged that they would be given access to confidential and proprietary information, including the BAI customer names, addresses, and account numbers. Id. at Section 11. They acknowledged they would use this information only in furtherance of BAI's interests. "Neither originals nor copies may be removed from [BAI] premises…or used for purposes other than [BAI] business without the express permission of management." Id.

The obligation to use confidential information only for BAI's purposes extended to former employees. Additionally, when Defendants left BAI they had an affirmative duty not to use confidential information for any purpose. "When an associate separates from the Company for any reason, the former Associate must immediately cease use of all company records, proprietary information and assets, and return to the Company all records and assets in his possession or control." Id.

In addition to their duty not to use confidential information for any purpose other than to further BAI's interests, Defendants had an obligation not to solicit BAI customers they serviced or became aware of while employed by BAI for one year after termination of their employment. Section 17 of the Series 7 Agreements states "[s]hould an Associate separate from [BAI] whether voluntarily or involuntarily, the former Associate agrees that for a period of one year, the Associate may not and will not solicit or attempt to solicit any securities related business, directly or indirectly, from any [BAI] customers who were served by or whose names became known to the Associate while in the employ of [BAI]."

3

BAI Code of Ethics Certification and Agreement

In addition to the Series 7 Agreements, Defendants each executed the BAI Code of Ethics

Certification and Agreement in which they acknowledged and became bound by the BAI Code

of Ethics (the "BAI Code of Ethics Certification"). Complaint Exhibit B. Lambert executed the

BAI Code of Ethics on January 18, 2005 and Harvie executed the BAI Code of Ethics on January

4, 2005. See Exhibit B. In signing the BAI Code of Ethics Certification, Defendants expressly

agreed to not use any confidential information, including company records, for any purpose after

their employment terminated for any reason. Section 12 of the BAI Code of Ethics Certification

stated, "[w]hen an associate separates from the Company for any reason, the former associate

must immediately cease use of all company records, proprietary information and assets, and

return to the company all records and assets in his or her possession or control."

Besides agreeing not to use confidential information, including company records, after

their employment with BAI terminated, Defendants also expressly agreed in the BAI Code of

Ethics Certification to not solicit BAI customers with whom they worked or learned of while

employed by BAI for 12 months after their employment terminated:

> The employee...agrees that during his or her employment with the
> Company and for twelve months after his or her termination (for
> whatever reason), he or she will not directly or indirectly solicit,
> invite, encourage or request any client or customer of the Company
> to whom he or she was introduced and/or for whom he or she
> worked, provided service or transacted business in the course and
> scope of his or her employment with the Company, for the purpose
> of: obtaining that client or customer's business for himself or
> herself or any other person or entity, causing such client or
> customer to discontinue doing business with the Company, or
> otherwise interfering with the relationship between such clients or
> customers and the Company.

Id. at Section 19.

4

Harvie's and Lambert's Violation of Their Contractual Obligations

On January 28, 2008, Harvie and Lambert were allowed to resign after a compliance investigation. Shortly thereafter, representatives of BAI began calling BAI customers with whom Harvie and Lambert had worked to inform them of their departure. Sparks Aff. ¶ 9 (Complaint Exhibit C). Several of the customers contacted already knew of Harvie's and Lambert's departure. Sparks Aff. ¶ 10. Harvie and Lambert had already called many of the customers with whom they worked, including customers assigned to them by BAI. Harvie and Lambert had informed customers that they had resigned, that they would soon be employed, and they would like to continue to discuss with them their new employer and its services. Sparks Aff. ¶ 11. Upon information and belief, Harvie and Lambert are using confidential customer information, including contact and financial data, to accomplish this scheme.

### III. Argument

A.     Injunctive Relief is Authorized Pending Arbitration

Harvie, Lambert and BAI have contracted to submit their disputes to arbitration. Furthermore, both are subject to and bound by the rules of conduct promulgated by FINRA, including the FINRA Code of Arbitration Procedure. Under the FINRA Code of Arbitration Procedure, Harvie, Lambert and BAI are required to submit for final and binding arbitration the disputes described herein arising out of Harvie's and Lambert's employment with BAI and the termination of their employment. FINRA Code of Arbitration Procedure Rule 10335 expressly provides that parties may seek preliminary injunctive relief from a court of competent jurisdiction while submitting the merits of the dispute to arbitration before FINRA for final determination. BAI is filing a Statement of Claim in Support of Arbitration with FINRA in

accordance with its obligations and to allow FINRA to adjudicate this dispute after this Court has entertained this Motion for injunctive relief.

Moreover, the Fourth Circuit has recognized that a district court has the authority to grant interim relief in an arbitrable dispute. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley</u>, 756 F.2d 1048 (4th Cir. 1984).

B.    The test for preliminary injunction relief is overwhelmingly met.

    1)    Generally.

Rule 65 of the Federal Rules of Civil Procedure allows this Court to enter injunctive relief in this case. The purpose of a preliminary injunction is to "maintain the *status quo ante litem*, provided that it can be done without imposing too excessive an interim burden upon the defendant." <u>Blackwelder Furniture Co. v. Seilig Mfg. Co.</u>, 550 F.2d 189, 195 (4th Cir. 1977). Here, there is <u>no</u> burden on Defendants from an injunction, as demonstrated below.

The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the Court. <u>James A. Merit & Sons v. Marsh</u>, 791 F.2d 328 (4th Cir. 1986); <u>Virginia Chapter, Associated General Contractors of America, Inc. v. Krep</u>, 444 F. Supp. 1167, 1180 (W.D. Va. 1978). The standard for issuance of a preliminary injunction and temporary restraining order is "the balance of hardship test." <u>Blackwelder</u>, 550 F.2d at 196 (preliminary injunction); <u>Doe v. Shenandoah County School Bd.</u>, 737 F. Supp. 915-16 (E.D. Va. 1990). This test requires consideration of four factors "in flexible interplay" in determining whether to issue a preliminary injunction:

    1.    the likelihood of irreparable harm to the plaintiff without the requested relief;

    2.    the likelihood of harm to the defendant by an injunction;

3.    the plaintiff's likelihood of success on the merits; and,

4.    the public interest.

Id. at 194-96. There is a "sliding scale" relationship between the harm to the plaintiff and the

necessity of showing a likelihood of success on the merits:

> The first step of the court's analysis requires a balancing of the
> likelihood of irreparable harm to the plaintiffs without an
> injunction against the likelihood of harm to the defendant with an
> injunction. If a decided imbalance of hardship should appear in
> plaintiff's favor, it is enough that grave or serious questions are
> presented, and plaintiffs do not have to show a likelihood of
> success on the merits. These are the two most important factors
> and the need for plaintiffs to show likelihood of success on the
> merits increases as the probability of irreparable injury to plaintiffs
> without an injunction decreases. Also, if the plaintiffs have a
> strong probability of success on the merits, even a "possible"
> irreparable injury will suffice to warrant injunctive relief.

Hanky v. City of Richmond, 532 F. Supp. 1298, 1301 (E.D. Va. 1982); see Doe, 737 F. Supp. at

916. The "balance of hardship" test correctly emphasizes that, where *serious* issues are before

the court, it is a sound idea to maintain the *status quo ante litem*, provided that it can be done

without imposing too excessive an interim burden upon the defendant. Blackwelder, 550 F.2d at

194-95 (emphasis in original); American Angus Ass'n v. Sysco Corp., 829 F. Supp. 807, 815

(E.D. Va. 1992).

Under Blackwelder, "if a decided imbalance of hardship should appear in plaintiff's

favor," then the plaintiff need not show a likelihood of success on the merits. Blackwelder, 550

F.2d at 195. It 'is enough to say that [plaintiff] has not embarked on frivolous litigation, and

thus interlocutory relief is not improper if [plaintiff] can also show a need for protection which

outweighs any probable injury to the defendant.'" Id. at 195-96 [quoting West Virginia

Conservancy v. Island Creek Coal Co., 441 F.2d 232, 235 (4th Cir. 1971)].

7

2)    Application.

a.)    The "balance of hardship" is overwhelmingly in favor of BAI.

Applying the "balance of the hardship" test here, BAI clearly faces irreparable harm without an injunction. Its customer data, which includes contact and financial information, and its customer relationships, are its lifeblood. They were generated through great effort and expense by BAI over a number of years. Once a client moves an account, it is extremely difficult to regain it. This is particularly true if the client loses confidence in a company's ability to keep his or her financial and personal information confidential. Should Harvie and Lambert continue to solicit BAI customers, this irreparable harm will continue. By contrast, there is no likelihood of harm to Harvie or Lambert should an injunction be granted. Harvie and Lambert are free to work for other employers in <u>any</u> manner and are free to compete as long as they are not soliciting customers of BAI whom they serviced while employed with BAI or whose names became known to them during their employment with BAI and are not using any confidential information made available to them by BAI such as customer lists. This Court should not sanction such willful and intentional disregard of contractual and common law obligations to BAI.

The Fourth Circuit has recognized the harm caused by breach of non-solicitation clauses and, thus, authorized injunctive relief in similar instances. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley</u>, 756 F.2d 1048 (4th Cir. 1985). The facts in <u>Bradley</u>, including the contractual provisions at issue, are remarkably similar to those in the case at bar. In <u>Bradley</u> the defendant was hired by Merrill Lynch as an account director and stock broker. He signed documents whereby he agreed that if he left Merrill Lynch, he would not take any customer information with him and that for one year following his departure, he would not solicit business

8

from any Merrill Lynch client whom he served during his tenure with Merrill Lynch or of whom he learned while at Merrill Lynch. Id. at 1048.

After several years at Merrill Lynch, the defendant resigned and began working with another firm. Immediately thereafter, he began soliciting business from his Merrill Lynch customers. Id. Thus, Merrill Lynch sought injunctive relief. The District Court granted the injunction and this was upheld by the Fourth Circuit. Id. at 1053. The court stated that the injunction was particularly appropriate in such a situation because,

> [w]hen an account executive breaches his former employment contract by soliciting his former employer's customers, a nonsolicitation clause requires immediate application to have any effect. An injunction even a few days after solicitation has begun in unsatisfactory because the damage is done. The customers cannot be "unsolicited."

Id. This is precisely the same situation. Harvie and Lambert have used confidential customer data made available to them as a result of their employment with BAI for their own benefit to the detriment of BAI. Furthermore, they are using this data to explicitly solicit BAI customers to terminate the customers' relationship with BAI – something they explicitly agreed not to do in multiple documents signed by them. Thus, they are in breach of their contracts with BAI. If allowed to continue the actions they have already taken, the damage they will do cannot be undone by an arbitration award: the clients cannot be "unsolicited." Thus, injunctive relief is necessary to maintain the status quo until the matter can be arbitrated.

### b.)   BAI is likely to be successful on the merits of its claim for breach of contract.

Under Blackwelder, "if a decided imbalance of hardship should appear in plaintiff's favor," then the plaintiff need not show a likelihood of success on the merits. Blackwelder, 550

9

F.2d at 195. It "'is enough to say that [plaintiff] has not embarked on frivolous litigation, and thus interlocutory relief is not improper if [plaintiff] can also show a need for protection which outweighs any probable injury to the defendant.'" Id. at 195-96 (quoting West Virginia Conservancy v. Island Creek Coal Co., 441 F.2d 232, 235 (4th Cir. 1971)). Because BAI has demonstrated that the imbalance of hardship favors granting preliminary injunction, it need not show a likelihood of success on the merits.

Regardless, BAI is likely to be successful in its claim for breach of contract against Harvie and Lambert. First, Harvie and Lambert agreed that they would not solicit business from clients with whom they worked while at BAI or whose identity became known to them while employed by BAI for twelve months following their departure. Second, they agreed to use all confidential information made available to them by BAI only in furtherance of BAI's business and to cease using such information upon termination of employment. It is clear that Harvie and Lambert are in breach of their contracts with BAI. Numerous BAI customers have said that Harvie or Lambert contacted them within days of their termination and asked the customers to consider transferring their accounts to the Defendants' new employer. They did this using confidential customer data. Thus, BAI is likely to prevail on its breach-of-contract action particularly since Virginia law generally recognizes and enforces anti-solicitation clauses which "reasonably protect the employer's business and are incident and ancillary to the contract of employment and limited as to area and duration..." Worrie v. Boze, 191 Va. 916, 926, 62 S.E.2d 876 (1951); see also New River Media Group, Inc. v Knighton, 245 Va. 367, 429 S.E.2d 25 (1993); Blue Ridge Anesthesia and Critical Care, Inc. v. Gidick, 239 Va. 369, 389 S.E.2d 467 (1990); Paramount Termite Control v. Rector, 238 Va. 171, 380 S.E.2d 922 (1989).

c.)    Public interest favors the injunctive relief sought by BAI

In addition to the balance of hardship being in BAI's favor, the public interest also favors granting the preliminary injunction. The public has an interest in generally enforcing reasonable contractual agreements reached through arms-length negotiation. Second, the public has an interest in protecting individual privacy concerns, particularly related to financial information. When a customer entrusts their financial information to a financial services entity, they should be able to know that the information will not be disclosed to third parties for someone else's financial gain. When Harvie and Lambert use customer contact information they acquired as a result of their employment with BAI for their personal benefit and that of their new employer, they are disclosing customer data to third parties. In other words, customers' personal information is being used for purposes other than that for which they entrusted it to BAI – actions clearly in violation of the public interest.

## IV. Conclusion

For all the foregoing reasons, BAI respectfully requests that this Court grant its motions for preliminary injunction and for a temporary restraining order.

**BANC OF AMERICA INVESTMENT SERVICES, INC.**

By: /s/ Kevin J. Funk
　　　　　Counsel

11

James C. Cosby (VSB No. 25992)
Kevin J. Funk (VSB No. 65465)
Cantor Arkema, P.C.
Bank of America Center
1111 East Main Street, 16th Floor (23219)
**Mailing Address:**    Post Office Box 561
                        Richmond, Virginia  23218-0561
Telephone:  (804) 644-1400
Telecopier:  (804) 225-8706
kfunk@cantorarkema.com

   Counsel for Plaintiff

## CERTIFICATE OF SERVICE

   I hereby certify under penalty of perjury that, on February 6, 2008 a true copy of the foregoing document was served via hand-delivery and first-class mail on the following:

     Mr. J. Chris Harvie
     3111 Summerhurst Drive
     Midlothian, Virginia  23113

     Mrs. Heather E. Lambert
     14313 Brading Court
     Midlothian, Virginia  23112

        ___/s/ Kevin J. Funk_____