UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
E*TRADE FINANCIAL CORPORATION and   :
E*TRADE SECURITIES LLC,   :
  :
      Plaintiffs,   :
  :
     v.   :    No. 08 CV 2993 (RJH)
  :
MARCUS J. HERNANDEZ,   :
SEAN J. GAFFEY, and   :
BANC OF AMERICA   :
INVESTMENT SERVICES, INC.   :
  :
      Defendants.   :
------------------------------------------------------------ x


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTIVE RELIEF IN AID OF ARBITRATION**


COOLEY GODWARD KRONISH LLP

Douglas P. Lobel (DL-3894)
Robert T. Cahill
David Vogel
11951 Freedom Drive
Reston, Virginia 20190
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100

Laura Grossfield Birger (LB-3031)
1114 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

FACTS .......................................................................................................................2

I.    E*TRADE HAS VALUABLE TRADE SECRETS AND CONFIDENTIAL
      INFORMATION THAT IT PROTECTS THROUGH EXTENSIVE EFFORTS .............3

II.   HERNANDEZ AND GAFFEY AGREED TO PROTECT AND NOT MISUSE
      E*TRADE'S TRADE SECRETS........................................................................4

      A.    The Employment Agreements .............................................................5

      B.    E*TRADE's Code Of Professional Conduct.........................................6

III.  DEFENDANTS MISAPPROPRIATE E*TRADE'S CONFIDENTIAL
      INFORMATION AND TRADE SECRETS .......................................................8

IV.   DEFENDANTS USE E*TRADE'S CONFIDENTIAL INFORMATION TO
      SOLICIT E*TRADE'S CUSTOMERS FOR BOA...........................................9

V.    DEFENDANTS INTENTIONALLY MISREPRESENT E*TRADE'S
      FINANCIAL VIABILITY AND THE SAFETY OF E*TRADE'S CUSTOMER
      ACCOUNTS TO POACH THOSE CUSTOMERS FOR THE USE AND
      BENEFIT OF BOA......................................................................................10

VI.   E*TRADE HAS SUFFERED, AND WILL CONTINUE TO SUFFER,
      IRREPARABLE HARM IF DEFENDANTS' WRONGFUL CONDUCT IS NOT
      ENJOINED ...............................................................................................11

PROCEDURAL POSTURE ......................................................................................12

STANDARD OF REVIEW .......................................................................................13

ARGUMENT...........................................................................................................13

I.    E*TRADE HAS BEEN IRREPARABLY HARMED BY DEFENDANTS'
      THEFT AND MISUSE OF E*TRADE'S CUSTOMER INFORMATION.....................13

II.   E*TRADE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS...............16

      A.    Breach Of Contract ...........................................................................16

      B.    Breach Of Fiduciary Duty And Duty Of Loyalty ..................................17

      C.    Misappropriation Of Trade Secrets.....................................................18

      D.    Unfair Competition ...........................................................................19

E.      Tortious Interference With Business Relations .......................................................20

F.      Federal Computer Fraud And Abuse Act .............................................................21

III.   EVEN IF E*TRADE IS NOT "LIKELY TO SUCCEED," THE BALANCE OF
       INTERESTS TIPS IN E*TRADE'S FAVOR ....................................................................22

CONCLUSION...........................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir. 1985)................................................. 16

*Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.*,
522 N.Y.S. 2d 287 (N.Y. App. Div. 1987) .................................................................. 19

*Byrne v. Barrett*, 268 N.Y. 199, 197 N.E. 217 (1935) .................................................. 17

*Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139 (E.D.N.Y. 2007).............................. 20

*Credit Suisse Securities (USA) LLC v. Ebling*, No 06-11339, 2006 WL 3457693
(S.D.N.Y. Nov. 27, 2006) ............................................................... 12, 13, 14, 17, 18, 19

*D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006)............. 13, 22

*Ecolab Inc. v. Paolo*, 753 F. Supp. 1100 (E.D.N.Y. 1991)........................................... 20

*Euro Brokers Capital Markets, Inc. v. Flinn*, No. 93 civ 3785, 1993 WL 213026
(S.D.N.Y. June 16, 1993)............................................................................................ 13, 18

*First Empire Securities, Inc. v. Miele*, No. 20247-2007, 2007 WL 2894245
(N.Y. Sup. Aug. 10, 2007) .......................................................................................... 12

*FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd*, 730 F.2d 61 (2d Cir. 1984)...................... 15

*Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477 (S.D.N.Y. 1997).................. 21

*George S. May Intern. Co. v. Hostetler*, No. 04-1606, 2004 WL 1197395
(N.D. Ill. May 28, 2004) .............................................................................................. 21

*Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179 (N.D.N.Y. 2005) ..................... 15

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525 (S.D.N.Y. 2004) ........ 15

*Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133 (1936)............................... 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985) ........... 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F. Supp. 2d 425
(S.D.N.Y. 1999) .......................................................................................... 13, 14, 18

*MONY Group, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138 (2d Cir. 2004) ................ 13

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999)................................. 15, 18

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)................ 16

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504
(3d Cir. 2005) ........................................................................................................... 21

*Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188
(E.D. Wash. 2003) ................................................................................................... 21

*Panther Systems II, Ltd. v. Panther Computer Sys., Inc.*, 783 F. Supp. 53 (E.D.N.Y. 1991)....... 20

*Paz Systems, Inc. v. Dakota Group Corp.*, 514 F. Supp. 2d 402 (E.D.N.Y. 2007) ............... 18, 19

*Prudential Ins. Co. of America v. Barone*, No. 98-0272 E(SC), 1998 WL 269065
(W.D.N.Y. May 19, 1998) ........................................................................................ 15

*Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211 (2d Cir. 2003) ........................ 20

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121
(W.D. Wash. 2000) ............................................................................................. 21, 22

*State Chemical Mfg. Co. v. Tuckman*, No. 92 civ 9213, 1993 WL 43482
(S.D.N.Y. Feb. 18, 1993) ......................................................................................... 14

*Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408 (S.D.N.Y. 1999) .............................. 13, 15, 23

*Velo-Bind v. Scheck*, 485 F. Supp. 102 (S.D.N.Y. 1979) .......................................... 14

**STATUTES**

18 U.S.C. § 1030(a)(4) ...................................................................................................... 21

18 U.S.C. § 1030(g) ......................................................................................................... 21

**RULES**

Fed. R. Civ. P. 65(a) ......................................................................................................... 1

FINRA Procedural Rule 13200 ...................................................................................... 12

FINRA Procedural Rule 13804(a)(1) ............................................................................ 12

## INTRODUCTION

Plaintiffs E*TRADE Financial Corporation and its wholly owned subsidiary E*TRADE Securities LLC (jointly "E*TRADE") move pursuant to Fed. R. Civ. P. 65(a) for a preliminary injunction against Defendants Marcus J. Hernandez ("Hernandez"), Sean J. Gaffey ("Gaffey") and their current employer, Banc of America Investment Services, Inc. ("BOA").

Until recently, Hernandez and Gaffey were both long-time employees of E*TRADE, subject to employment agreements forbidding using or taking proprietary information for personal use. Before they resigned, they took E*TRADE's confidential and trade secret customer information, and then they used this information to solicit E*TRADE's customers for BOA, their new employer. Hernandez and Gaffey coerced some E*TRADE customers to transfer their accounts using fear tactics, telling them that E*TRADE was failing and that their assets were at risk.

E*TRADE has direct evidence that Hernandez and Gaffey took E*TRADE's secrets. From his E*TRADE work computer, Hernandez forwarded to his home e-mail address a spreadsheet containing highly confidential customer information -- including customer names, contact information, and financial information. After Hernandez and Gaffey resigned from E*TRADE, they used this information to systematically contact E*TRADE's customers and solicit their business for BOA, using false statements to instill fear in E*TRADE's customers.

Hernandez and Gaffey's conduct breached their written employment agreements with E*TRADE, as well as federal and state laws. While E*TRADE believes it will clearly prevail on its numerous claims for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, etc., the merits of E*TRADE's suit (and E*TRADE's right to a permanent injunction) must be resolved in an arbitration before the Financial Industry Regulatory Authority ("FINRA"). Concurrent with filing this lawsuit, E*TRADE filed a Statement of Claim against

Defendants at FINRA.  Consequently, in this action E*TRADE only seeks a preliminary injunction from the Court, prohibiting Defendants from using E*TRADE's proprietary information pending the outcome of the arbitration Hearing.

Without a preliminary injunction, E*TRADE will continue to suffer irreparable harm because competitor BOA will continue using E*TRADE's confidential information to solicit E*TRADE's customers, causing loss of assets and goodwill.  Conversely, an injunction will impose no burdens on Defendants, who remain free to market their services, but without using the information they wrongfully took from E*TRADE.  Finally, any injunction would be short lived -- industry rules specify that an expedited arbitration at FINRA must begin within 15 days after the Court issues a preliminary injunction.

BOA is in no position to disagree.  BOA has filed almost 20 substantively identical lawsuits in the last five years (including three in this Court) seeking exactly this kind of relief.  In these cases, BOA, like E*TRADE here, sought preliminary injunctions pending FINRA arbitrations against former employees who allegedly stole BOA's customer information and trade secrets, then used it to compete with BOA.

This Motion is straightforward, and the evidence is clear.  The Court should enter the preliminary injunctive relief requested in E*TRADE's complaint.

## FACTS

E*TRADE is a leading online brokerage firm that also provides financial and investment counseling services to individual investors.  Hernandez and Gaffey were "financial advisors" who provided investment advice to E*TRADE's customers.  In early 2008, each abruptly resigned and immediately started working at BOA.  The evidence proves that they took E*TRADE's proprietary customer information to BOA and have used it to steal away

E*TRADE's customers.  *See generally* Declaration of Jeffrey Wimer ("Wimer Decl."), ¶¶ 30, 31, 45-46, 49-56.[1]

## I.      E*TRADE HAS VALUABLE TRADE SECRETS AND CONFIDENTIAL INFORMATION THAT IT PROTECTS THROUGH EXTENSIVE EFFORTS

A critical part of E*TRADE's business is its customer financial information and trade secrets (defined as "Confidential Information").  This information includes:  E*TRADE's customer prospect lists; customer account and personal financial information; and internal strategic business, marketing, and financial plans.  *Id.* ¶ 13.  To cultivate and maintain its customer base, E*TRADE engages in extensive and costly advertising in various media.  As a direct result of E*TRADE's marketing efforts, it has developed extensive customer lists that contain detailed personal financial information about its customers.  *Id.* ¶ 14.

E*TRADE vigorously maintains the secrecy of its Confidential Information.  E*TRADE maintains its Confidential Information only on its internal, proprietary E*TRADE computer databases.  *Id.* ¶ 16.  E*TRADE prohibits non-E*TRADE individuals from accessing the information.  *Id.*  All access to the information requires specific user passwords, and E*TRADE constantly monitors these networks for unauthorized access.  *Id.*  E*TRADE instructs its employees not to release Confidential Information outside of E*TRADE.  *Id.* ¶ 17.

E*TRADE restricts access to its Confidential Information to those employees having a "need to know", and it requires these employees to sign agreements protecting the confidentiality of this information.  *Id.* ¶ 16.  Furthermore, E*TRADE maintains an internal written policy regarding employee access to and use of E*TRADE's confidential customer and account information, called the "Code of Professional Conduct."  *Id.* ¶ 18 & *Ex.* 3.

---

[1]     Exhibits to the Weimer Declaration are cited as "*Ex.* ___."

When a financial advisor's employment with E*TRADE ends, regardless of the reason, E*TRADE follows certain procedures to secure and guard its Confidential Information. Before leaving the building on the last day of employment, a financial advisor must submit to a reasonable search to verify that he or she is not removing Confidential Information. *Id.* ¶ 20.

E*TRADE's Confidential Information would be extremely valuable to competitors like BOA, and would provide E*TRADE's competitors with an unfair commercial advantage. The Confidential Information reflects each customer's unique situation, financial needs, and account history, so that competitors could solicit E*TRADE's customers using a "sales pitch" specifically tailored to that customer. *Id.* ¶ 15.

## II.    HERNANDEZ AND GAFFEY AGREED TO PROTECT AND NOT MISUSE E*TRADE'S TRADE SECRETS

As E*TRADE employees, Hernandez and Gaffey had access to E*TRADE's Confidential Information, and thus were required to protect it, as described below.

Hernandez started working in E*TRADE's New York office as a financial advisor in October 2003; Gaffey in October 2004. *Id.* ¶¶ 22, 36.[2] Hernandez signed an "Employment Agreement, Proprietary Information and Inventions and Arbitration of Employment Disputes" when he started. *Id.* ¶ 24 & *Ex.* 5. Gaffey signed a similar "Agreement Regarding Employment and Proprietary Information and Inventions." *Id.* ¶ 37 & *Ex.* 13. E*TRADE will refer to these two contracts as the "Employment Agreements." The Employment Agreements expressly (and by incorporating E*TRADE's Code of Professional Conduct) imposed numerous obligations on

---

[2]    Hernandez and Gaffey provided personalized investment strategies and advice to customers, but they were ***E*TRADE*** customers, not ***their*** customers. E*TRADE's business model is different from most brokerage firms. Typically in the large brokerage firms like Merrill Lynch, financial advisors are expected to generate customers and then retain the customers as their own personal clients throughout their career at the firm, and the customers often follow the advisors when they change firms. *Id.* ¶ 11. E*TRADE is different. E*TRADE obtains new customers through marketing and cross-selling in its other business lines; the financial advisors ***are not*** expected to solicit customers. *Id.* ¶¶ 11-12. E*TRADE assigns each customer a financial advisor so that the customer has a consistent point of contact with E*TRADE. *Id.* ¶ 12. However, E*TRADE can, and does, change assignments of customers to financial advisors from time to time. *Id.*

Hernandez and Gaffey to protect E*TRADE's Confidential Information and not use it contrary

to E*TRADE's interests.

A.    **The Employment Agreements**

The Employment Agreement contained express restrictions on Hernandez and Gaffey's

access to and use of E*TRADE's Confidential Information.  Each employee expressly

acknowledged that he understood "that [E*TRADE] possesses and will possess Proprietary

Information which is important to its business."  *Id.* ¶¶ 25-26, 38-39 & *Exs.* 5 & 13.  Proprietary

Information is "information that was developed, created, or discovered by or on behalf of

[E*TRADE] . . . which has commercial value in [E*TRADE's] business."  This definition

includes customer lists and other information that concern E*TRADE's actual or anticipated

business.  *Ex.*5, ¶ A & *Ex.* 13, ¶ A.

Hernandez and Gaffey expressly agreed not to remove any Company Documents and

Materials from E*TRADE:

> I agree that during my employment by the Company, I will not
> remove any Company Documents and Materials from the business
> premises of the Company or deliver any Company Documents and
> Materials to any person or entity outside the Company . . . .

*Ex.* 5, ¶ C & *Ex.* 13, ¶ D.  In the same provision, they both expressly agreed to return all

Company Documents and Materials to E*TRADE upon termination of his employment:

> I further agree that, immediately upon the termination of my
> employment by me or by the Company for any reason, or during
> my employment if so requested by the Company, I will return all
> Company Documents and Materials, apparatus, equipment and
> other physical property, or any reproduction of such property . . . .

*Id.*

In addition, Gaffey's agreement contained a "non-solicitation" provision that prohibited Gaffey from soliciting E*TRADE's customers for two years after termination of this employment:

> During the term of my employment and for two (2) years thereafter, ***I will not, on behalf of myself or anyone else, directly or indirectly encourage or solicit or attempt to encourage or solicit any customers, clients, partners or affiliates of [E\*TRADE] to terminate or diminish their relationship with [E\*TRADE].*** I understand that I have an obligation not to use any customer lists or information from customer lists (which are included in the definition of Proprietary Information above) to directly or indirectly solicit business from any [E*TRADE] customer, whether for myself or anyone else.

*Ex.* 13, ¶ H.  (Emphasis added).

**B.    E*TRADE's Code Of Professional Conduct**

In addition to their Employment Agreements, Hernandez and Gaffey agreed to abide by their restrictions described in E*TRADE's Code of Professional Conduct (the "Code").  Wimer Decl. ¶¶ 25-26, 38-39 & *Ex. 3.*  The Code was part of the terms and conditions of Hernandez's and Gaffey's terms of employment.  *Ex. 3* at p. 4.

The Code required Hernandez and Gaffey to maintain the confidentiality of E*TRADE's proprietary information, which includes customer lists.  *Id.* at 24, 33.  The Code bluntly states that E*TRADE's "employees are required as a term of their employment to agree to maintain the confidentiality of sensitive nonpublic customer."  *Id.* at 14.  The Code also expressly forbids Hernandez and Gaffey from using E*TRADE's Confidential Information for any purposes other than company business:

> In general, you must use [E*TRADE] assets solely for the benefit of [E*TRADE] or its customers.
>
> * * *
>
> Any systems to which you are provided access are to be used for Company business purposes. You must adhere to all Company

> policies and any policies that your business unit or department may
> set governing such usage.  Generally, you should use
> [E*TRADE's] systems only for Company business. You may use
> the systems for limited personal use in accordance with
> [E*TRADE] policies governing communications and conduct
> generally. However, any use for personal profit or contrary to law
> or Company policies is prohibited.
>
> * * *
>
> Use proprietary or confidential information solely to perform your
> duties for [E*TRADE] and not for your own personal benefit.

*Id*. at 24, 24-25 & 35.

The Code also requires Hernandez and Gaffey not to remove E*TRADE's Confidential

Information from E*TRADE's premises, nor to disclose it to third parties:

> Do not remove proprietary or confidential information from
> Company premises unless absolutely necessary. . . .  If you take
> such information out of the office for business purposes, keep it on
> your person or in a secure place at all times and return it promptly
> to Company premises.
>
> * * *
>
> Do not disclose proprietary or confidential information to any
> person outside [E*TRADE] (including family members), or use it
> or permit any third party to use it without first obtaining Legal and
> Compliance approval.

*Id.* at 36, 37.

Finally, the Code explains that these restrictions continue ***after Hernandez and Gaffey's***

***employment terminated:***

> You must continue after the end of your employment to abide by
> [E*TRADE's] policies concerning the handling of proprietary and
> confidential information, the treatment of inside information and
> the handling of privileged materials, as outlined in this Code and in
> any specific policies of your business unit or department. If you
> have downloaded such information onto any personal computer
> equipment, including a personal digital assistant, you are required
> to delete that information permanently from the equipment.
>
> * * *

> You may not disclose proprietary or confidential information of
> [E*TRADE] or any third party outside of [E*TRADE] at any time,
> including after termination of employment. You may not take such
> proprietary or confidential information when leaving [E*TRADE]
> or use or disclose such information for your own personal benefit
> or for the benefit of your new employer or prospective new
> employer. You may not permit its disclosure or use by any third
> party.

*Id.* at 27, 38.

## III.    DEFENDANTS MISAPPROPRIATE E*TRADE'S CONFIDENTIAL INFORMATION AND TRADE SECRETS

By November 2007, Hernandez had become interested in leaving E*TRADE and obtaining employment with an E*TRADE competitor.  On November 19, 2007, Hernandez accessed E*TRADE's confidential database and uploaded *eight* computerized spreadsheets ("Spreadsheets"), and then e-mailed them to his home e-mail account.  Wimer Decl., ¶ 31 & *Ex.* 9.[3]

The Spreadsheets contained highly sensitive and Confidential Information, including:

- A client list containing personal information for 257 E*TRADE clients, including their names, addresses, telephone numbers and account numbers.  *Ex.* 9.

- For 2006, a monthly and quarterly breakdown of the gross monetary production report for all E*TRADE financial advisors, including a detailed breakdown of how much each financial advisor sold in each type of financial product (such as mutual funds, CDs, and bonds).  Hernandez was E*TRADE's top producer and Gaffey was the fifth highest producer.  *Id.*

- For 2003-2006, a monthly breakdown of sales transactions categorized by date of transaction, type of investment sold, buy/sell information, and account information.  These spreadsheets also contained monthly summaries regarding

---

[3]      Given the volume and highly sensitive nature of the information in the Spreadsheets, E*TRADE has attached redacted excerpts of the information contained therein so that the Court can view the nature of the information Hernandez misappropriated.  These redacted excerpts do not contain any Confidential Information or customer specific information.  *Id.*

gross/net sales figures, mutual fund trailers, Nuveen, and points.  *Id.*

- A spreadsheet containing account numbers and other information concerning E*TRADE's bond clients.  *Id.*

On January 18, 2008, Hernandez resigned from E*TRADE without warning, effective immediately.[4]  That same day, Hernandez became an employee of BOA.  Wimer Decl., ¶¶ 5, 29.

On February 22, 2008, Gaffey resigned from E*TRADE without warning, effective immediately.  That same day, Gaffey became a Vice President at BOA.  *Id.* ¶¶ 5, 42.

## IV.    DEFENDANTS USE E*TRADE'S CONFIDENTIAL INFORMATION TO SOLICIT E*TRADE'S CUSTOMERS FOR BOA

Immediately after resigning from E*TRADE, Hernandez flagrantly breached his duties to E*TRADE by using E*TRADE's Confidential Information to solicit E*TRADE's high-net-worth customers to transfer their accounts from E*TRADE to BOA.  Many of these customers reported to E*TRADE that Hernandez contacted them by telephone to solicit their business for BOA, and that he also mailed these customers letter solicitations and account transfer forms that they never requested.  *Id.* ¶¶ 46-47.

Gaffey also violated his confidentiality and non-solicitation obligations to E*TRADE.  After resigning from E*TRADE, Gaffey solicited numerous E*TRADE clients by telephone to transfer their accounts to BOA.  Gaffey could have only obtained these customers' identities, contact information, and detailed private financial information using E*TRADE's Confidential Information.  *Id.* ¶¶ 53-56.

BOA directly benefited from Hernandez and Gaffey's wrongful conduct because they were successful in convincing some E*TRADE customers to transfer their accounts to BOA.  Moreover, BOA seems complicit -- when E*TRADE sent a cease-and-desist letter to Hernandez,

---

[4]    In late November, after sending the Spreadsheets to his personal e-mail account, Hernandez transferred to an E*TRADE office outside of Philadelphia.  Wimer Decl., ¶ 28.

he referred E*TRADE to a BOA lawyer who filed a virtually identical lawsuit in this District

against a former BOA employee accused of stealing customer information (a case discussed at

length later in this memorandum).  BOA and Hernandez are already bunkering down together.

**V.    DEFENDANTS INTENTIONALLY MISREPRESENT E*TRADE'S FINANCIAL
       VIABILITY AND THE SAFETY OF E*TRADE'S CUSTOMER ACCOUNTS TO
       POACH THOSE CUSTOMERS FOR THE USE AND BENEFIT OF BOA**

Hernandez and Gaffey did not merely steal Confidential Information to solicit

E*TRADE's customers.  They also engaged in scare tactics to coerce customers to transfer their

accounts from E*TRADE to BOA.

As discussed above, customers open E*TRADE accounts because they wish to utilize

E*TRADE's services; customers are generated by E*TRADE, not by financial advisors.

Financial advisors service the accounts once the firm generates them, but the customers are

E*TRADE's customers.  Thus, when Hernandez and Gaffey left E*TRADE, it was far from

certain that any E*TRADE customer would follow them to BOA.  *Id.*, ¶¶ 9-12.

Consequently, Hernandez and Gaffey knew they needed leverage to persuade

E*TRADE's customers to leave E*TRADE for BOA.  As a result, they engaged in a coordinated

campaign of fear, telling E*TRADE's customers that E*TRADE was possibly insolvent.  Worse,

they outright lied to the customers by claiming that, in the event of insolvency, their assets were

at risk.  Hernandez and Gaffey knew this was false because E*TRADE has multiple layers of

insurance to protect their customers' assets.  However, they misrepresented the safety of

customer accounts because they needed to create anxiety in these customers to pry them away

from E*TRADE.  *Id.*, ¶ 47.

After joining BOA, both Hernandez and Gaffey called numerous E*TRADE customers

and tried to scare them into transferring their accounts to BOA.  For example, Hernandez told

E*TRADE customer Jerry R. that E*TRADE was "unstable" and that its "financial picture was

bleak." *Id*. ¶ 51. Gaffey told E*TRADE customer Ira C. that E*TRADE was having "solvency

issues." *Id*. ¶ 54. Hernandez told E*TRADE customer Frederick K. that "E*TRADE was not

secure" in its assets and that if E*TRADE went out of business, the customer's assets would be

"in jeopardy." *Id*. ¶ 50. Hernandez knew this was false because E*TRADE's insurance would

protect the assets and deposits of these customers. *Id.*, ¶ 47.

## VI.    E*TRADE HAS SUFFERED, AND WILL CONTINUE TO SUFFER, IRREPARABLE HARM IF DEFENDANTS' WRONGFUL CONDUCT IS NOT ENJOINED

Because of Defendants' actions, some E*TRADE customers have transferred their

accounts to BOA. E*TRADE's damages are unascertainable at this time, and its future losses

are incalculable. Other E*TRADE clients that Hernandez and Gaffey solicited might not have

transferred their accounts to BOA, but their wrongful conduct has had serious, far-reaching

effects on E*TRADE that cannot be measured monetarily:

- Loss of confidentiality of customer information, loss of confidentiality of customers' dealings with E*TRADE, loss of confidence and trust of customers; and

- Loss of valuable existing and prospective customer relationships, destruction of E*TRADE's goodwill, and loss of business reputation.

*Id.*, ¶¶ 57-59.

If the Court does not issue an injunction, Defendants' wrongful actions will continue:

- Defendants will continue to have possession or control of E*TRADE's Confidential Information, E*TRADE's proprietary information, and E*TRADE trade secrets;

- Defendants will continue to use confidential customer information to solicit E*TRADE accounts to divert the business of E*TRADE customers to BOA; and

- Defendants will otherwise continue to engage in acts constituting a breach of the terms of the their employment agreements; breaches of their fiduciary duty; and other

- 11 -

> tortious conduct, including misappropriation of trade
> secrets, and tortious interference with business relations.

*Id.*

## PROCEDURAL POSTURE

Because all the parties in this case are FINRA members, E*TRADE must obtain a permanent injunction and damages through mandatory arbitration. FINRA Procedural Rule 13200. However, only this Court can provide preliminary injunctive relief. FINRA Procedural Rule 13804(a)(1). In these situations, courts routinely enter preliminary injunctions to freeze the *status quo* pending the outcome of FINRA arbitrations.[5]

BOA has often used these same procedures to protect its confidential information. In the last five years, BOA has filed almost 20 actions for preliminary injunctions against former employees whom it accused of stealing confidential information, including three in this District and one in Virginia. *See, e.g., Bank of America Investmt. Servs., Inc. v. Ellis*, 05 Civ. 2507 (NRB) (S.D.N.Y.), Motion for Preliminary Injunction (filed March 2, 2005) ("*Ellis*"); *Banc of America Investmt. Servs., Inc. v. Harvie*, No. 3:08-cv-97-HEH (E.D. Va.), Motion for Preliminary Injunction (filed Feb. 6, 2008) ("*Harvie*"). BOA argued that "injunction relief is authorized pending arbitration." Declaration of Douglas P. Lobel, *Ex.* 2 at p. 15 ("Lobel Decl."); *Ellis* BOA Mem. in Supt. of Mo. for Prelim. Inj. at 15-16 ("BOA *Ellis* Mem."); Lobel Decl., *Ex.* 4; *Harvie*, BOA Mem. in Supt. of Mo. for Prelim. Inj. at 5-6 ("BOA *Harvie* Mem."). In each

---

[5]    *See Credit Suisse Securities (USA) LLC v. Ebling*, No 06-11339, 2006 WL 3457693, *3 (S.D.N.Y. Nov. 27, 2006) ("Without a preliminary injunction, the harm that Petitioner seeks to address via arbitration will occur before the arbitrator can render a decision, and Petitioner will lose its right to meaningfully resolve these employment disputes via arbitration."); *First Empire Securities, Inc. v. Miele*, No. 20247-2007, 2007 WL 2894245 at *3 (N.Y. Sup. Aug. 10, 2007) ("The Court is cognizant that this matter will proceed to arbitration, but the rules of FINRA . . . f/k/a NASD (National Association of Securities Dealers) specifically refer to the possibility that in an appropriate situation the Court may issue an injunction that could be subsequently addressed in the FINRA/NASD forum by both parties during arbitration.").

case, BOA asked for a preliminary injunction pending BOA's arbitration at FINRA against its former employee.  *See id.*

## STANDARD OF REVIEW

To obtain preliminary injunctive relief, E*TRADE must demonstrate:  (1) the likelihood of irreparable harm in the absence of an injunction; "and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor."  *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), *quoting MONY Group, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 143 (2d Cir. 2004).

## ARGUMENT

Courts in this District routinely grant preliminary injunctions when employees join competitors and, in breach of employment agreements and common law, steal customer lists or other trade secrets.[6]  Here, the standard for preliminary injunctive relief is easily met.  This relief is particularly appropriate because FINRA will conduct an expedited hearing within 15 days of the Court granting the relief.

**I.      E*TRADE HAS BEEN IRREPARABLY HARMED BY DEFENDANTS' THEFT AND MISUSE OF E*TRADE'S CUSTOMER INFORMATION**

Defendants' conduct irreparably harmed E*TRADE as a matter of law.  In *Credit Suisse Securities (USA) LLC v. Ebling*, No 06-11339, 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006), this Court granted a preliminary injunction pending a FINRA arbitration between a brokerage firm and its former employee.  The court identified two types of irreparable harm that exist without

---

[6]      Among numerous cases granting preliminary injunctions under facts substantially identical to those present here:  *Credit Suisse Securities (USA) LLC v. Ebling*, No 06-11339, 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F. Supp. 2d 425 (S.D.N.Y. 1999); *Tradescape.com*, 77 F. Supp. 2d at 410-11 (S.D.N.Y. 1999); *Euro Brokers Capital Markets, Inc. v. Flinn*, No. 93 civ. 3785, 1993 WL 213026 (S.D.N.Y. June 16, 1993).

injunctive relief:  (1) the inability to obtain a meaningful result in the FINRA arbitration in this

situation, and (2) further potential loss of customers and goodwill:

> Without a preliminary injunction, the harm that Petitioner seeks to
> address via arbitration will occur before the arbitrator can render a
> decision, and Petitioner will lose its right to meaningfully resolve
> these employment disputes via arbitration. This constitutes
> irreparable harm. Further, Petitioner faces immediate and real harm
> without a preliminary injunction preventing Respondent from
> soliciting Credit Suisse's clients and employees. . . . Without a
> preliminary injunction, Credit Suisse faces losses of clients,
> employees, and goodwill -- harm that cannot be compensated by
> money damages.

*Ebling*, 2006 WL 3457693, *3.  These statements apply equally in this case.

The Defendants' "siphoning" of customers from E*TRADE causes irreparable harm

because it is a continuing threat that is also difficult to quantify and thus rarely compensable in

monetary damages.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048,

1055 (4th Cir. 1985) ("Merrill Lynch faced irreparable, noncompensable harm in the loss of its

customers"), *followed by Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F. Supp. 2d

425, 428-29 (S.D.N.Y. 1999); *Velo-Bind v. Scheck*, 485 F. Supp. 102, 109 (S.D.N.Y. 1979)

("[b]y siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a

definite possibility of irreparable harm, which increases as long as it continues unrestrained");

*State Chemical Mfg. Co. v. Tuckman*, No. 92 civ. 9213, 1993 WL 43482 at *4 (S.D.N.Y. Feb. 18,

1993) ("State has shown that it will be harmed irreparably if defendants are not enjoined.

Neither the loss of goodwill nor the disclosure of an employer's confidential customer

information can be compensated by money damages.").

Where the siphoning of customers arises from the theft of trade secrets, courts are even

more likely to find that irreparable harm exists.  *Innoviant Pharmacy, Inc. v. Morganstern*, 390

F. Supp. 2d 179, 188-89 (N.D.N.Y. 2005) (courts take "relaxed" approach to test for "irreparable

harm" where "a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information"); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) ("Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm."); *Prudential Ins. Co. of America v. Barone*, No. 98-0272 E(SC), 1998 WL 269065 at *2 (W.D.N.Y. May 19, 1998) (defendants' possession and use of plaintiffs' proprietary customer lists "threatens to diminish [plaintiff's] goodwill and to devalue its trade secrets. Such harms are irreparable.").[7]

Under virtually identical circumstances, BOA argued that irreparable injury is present as matter of law. BOA *Ellis* Mem. at 11-14; BOA *Harvie* Mem. at 8. In *Ellis*, BOA sued a broker who left BOA, allegedly taking BOA's confidential customer information with him. In seeking a preliminary injunction against the use of that information, BOA identified three separate kinds of irreparable harm: (1) indeterminable damages from the loss of customer relationships that might have been profitable for "years to come" (BOA *Ellis* Mem. at 12); (2) customers' loss of "trust and confidence" when their financial services firm appears to have lost their highly confidential information (*id.* at 13); and (3) the "threat to office stability," that is, the threat of other firms being encouraged to poach more employees and steal yet more customer information (*id.* at 13-14). Similarly, BOA argued in the *Harvie* case two months ago -- where two employees allegedly left with BOA customer information -- that irreparable harm is present when a former

---

[7]        In fact, Defendants' theft of E*TRADE's trade secret **alone** constitutes irreparable harm. *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ('loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever') (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd*, 730 F.2d 61, 63 (2d Cir. 1984)); *FMC Corp.*, 730 F.2d at 63("The district court correctly found that the information in question is of great value to FMC, and it is clear that the loss of trade secrets cannot be measured in money damages."); *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 410-11 (S.D.N.Y. 1999) (presumption of irreparable harm "usually can be said of misappropriation of trade secrets").

employee takes "customer data, which includes contact and financial information."  BOA *Harvie* Mem. at 8.  BOA further stated, "Once a client moves an account, it is extremely difficult to regain it.  This is particular true if the client loses confidence in a company's ability to keep his or her financial and personal information confidential."  *Id.* at 8.

No meaningful dispute exists that E*TRADE will suffer irreparable harm absent the injunctive relief it seeks here.

## II.    E*TRADE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

E*TRADE has raised numerous causes of action, but the Court need only find ***one*** of these causes of action is "likely" to succeed.  To establish a reasonable likelihood of success on the merits, a party seeking a preliminary injunction need not show that success is an absolute certainty; rather, the moving party only need show that its probability of success is "better than fifty percent" despite the fact that "considerable room for doubt" may remain about the ultimate outcome of the case.  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), overruled on unrelated grounds, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

### A.    Breach Of Contract

Defendants Hernandez and Gaffey breached their written agreements with E*TRADE.  Complaint Count I, ¶¶ 69-75.  Both Defendants promised not to remove E*TRADE's customer lists from E*TRADE and not to solicit E*TRADE customers after resigning.  The trail of calls they made after they left E*TRADE shows that, in fact, both Defendants contacted E*TRADE customers to recruit them to BOA.  *See* Facts, Part IV, *supra*.  This would only be possible if they possessed E*TRADE's confidential customer information.  In fact, E*TRADE has direct evidence that Hernandez sent Confidential Information to his home e-mail account.  *See* Facts, Part III, *supra*.

Under essentially identical facts, BOA argued in its *Ellis* and *Harvie* lawsuits that it was "likely to succeed on the merits" of its claims against former employees. The employees had similar restrictions as Defendants here -- commitments not to solicit BOA's customers after they left, and promises not to take customer information from BOA. BOA *Ellis* Mem. at 2; BOA *Harvie* Mem. at 2-3. BOA provided numerous New York authorities that enjoined former employees' violations of these kinds of contractual obligations. BOA *Ellis* Mem. at 3-6. Likewise, in the Virginia action, BOA showed that both defendants breached these obligations, and argued this constituted a "likelihood of success on the merits" of BOA's lawsuit authorizing preliminary injunctive relief. BOA *Harvie* Mem. at 10.

## B.    Breach Of Fiduciary Duty And Duty Of Loyalty

Hernandez and Gaffey also breached their fiduciary duties to E*TRADE. *See* Complaint Count II, ¶¶ 76-81. In New York, an employee "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936). As another court described it, an employee has a duty "not to use confidential knowledge acquired in his employment in competition with his principal . . . ." *Byrne v. Barrett*, 268 N.Y. 199, 206, 197 N.E. 217, 218 (1935).

Financial advisors owe these fiduciary duties to brokerage firms like E*TRADE. *See Credit Suisse Securities (USA) LLC v. Ebling*, No 06-11339, 2006 WL 3457693 at *3 (S.D.N.Y. Nov. 27, 2006) (holding a brokerage firm was likely to succeed on a claim of breach of fiduciary duty against a former-employee who solicited customers to switch transfer their accounts to a new brokerage). Hernandez and Gaffey breached these duties by obtaining E*TRADE's Confidential Information during their employment, and then later using that information to compete against E*TRADE. *See* Facts, Parts D, G, *supra*. The breach has harmed E*TRADE,

including loss of customers.  *See* Facts, Part H, *supra*.  E*TRADE is likely to succeed on this claim as well.

      **C.**      **Misappropriation Of Trade Secrets**

      E*TRADE is also likely to succeed on its allegations that Defendants misappropriated E*TRADE's trade secrets.  Complaint Count III, ¶¶ 82-87.  To prove this claim, E*TRADE must demonstrate that (1) it possessed a trade secret; and (2) Defendants used that trade secret in breach of an agreement, confidential relationship, or duty, or as a result of improper means.  *North Atlantic Instr.*, 188 F.3d at 43-44.

      First, E*TRADE's customer list qualifies as a "trade secret."  Numerous courts recognize that the identities of a brokerage firm's individual customers are trade secrets.  *See generally Ebling*, 2006 WL 3457693; *Rahn*, 73 F. Supp. 2d 425; *Euro Brokers Capital Mkts., Inc.*, 1993 WL 213026.  E*TRADE has developed its customer lists through years of expensive marketing efforts, and E*TRADE assiduously keeps the identities of its customers confidential.  *See* Facts, Parts A, B, *supra*.

      The evidence shows that Hernandez and Gaffey, and thus their employer BOA, have misused E*TRADE's confidential customer lists without authorization.  *See* Facts, Parts D, G, *supra*.  This misuse directly violates Hernandez and Gaffey's written agreements with E*TRADE.  *See* Facts, Parts C, F, *supra*.

      Under similar facts, Courts routinely find that former employees have engaged in misappropriation when they take customer lists from the plaintiffs and then solicit those customers at their new employers, using those lists.  *See Paz Systems, Inc. v. Dakota Group Corp.*, 514 F. Supp. 2d 402, 407-09 (E.D.N.Y. 2007) (holding that a former employee and his new employer were liable for misappropriation of trade secrets where the employee took customer lists and other secret information while employed by the plaintiff); *Ebling*, 2006 WL

3457693 at *3 (finding that plaintiff was likely to succeed on the merits for a claim of misappropriation of trade secrets where former-employee took confidential customer information to a competitor). BOA is also liable for misappropriation, as the third-party beneficiary of Hernandez and Gaffey's misappropriation of the customer lists and as their employer when they misused the information. *E.g., Paz Systems*, 514 F. Supp. 2d at 407-09 (new employer liable for misappropriation where plaintiff's former employee brought customer lists to his new employer).

BOA has made the same argument. In the *Ellis* case, BOA provided several pages of extensive arguments that New York misappropriation laws protect a company's customer lists when an employee steals them to go into business against the company. BOA *Ellis* Mem. at 6-10. The Court can follow BOA's argument and conclude E*TRADE is likely to prevail on its misappropriation claim.

### D.    Unfair Competition

E*TRADE also will prevail on its unfair competition claim. Complaint Count V, ¶¶ 96-100. New York courts have held that taking confidential information such as customer lists gives rise to a claim for unfair competition. *See Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.*, 522 N.Y.S. 2d 287, 289-90 (N.Y. App. Div. 1987). In that case, the Third Department reversed dismissal of a complaint for unfair competition and explained that an employee cannot "unlawfully seize his employer's property in this case . . . customer information . . . . That kind of employee conduct disadvantages the employer in a manner that is patently unfair . . . the crux of an action for unfair competition." *Id.*

Thus, even if E*TRADE's customer list does not rise to the level of a protectable "trade secret," E*TRADE can still prevail on a claim of unfair competition under New York law. *Panther Systems II, Ltd. v. Panther Computer Sys., Inc.*, 783 F. Supp. 53, 66-67 (E.D.N.Y. 1991); *accord Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991) ("Moreover, even

where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition.").

      **E.**      **Tortious Interference With Business Relations**

      E*TRADE is also likely to show that Defendants are liable for tortious interference with business relations.  Complaint Count VI, ¶¶ 101-107.  E*TRADE will prevail if it can show that (1) it had business relationships with third parties; (2) Defendants interfered with those relationships; (3) for a "wrongful purpose" or using "dishonest, unfair, or improper means;" and (4) these actions injured E*TRADE's relationships.  *Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).

      E*TRADE is likely to prove all these elements.  E*TRADE had valuable relationships with hundreds of customers.  *See* Facts, Part A, *supra*.  Hernandez and Gaffey, on behalf of BOA, "interfered" with those relationships by soliciting E*TRADE customers to transfer their accounts from E*TRADE.  Defendants used "dishonest, unfair and improper means" by, among other things, using the personal and financial information for these customers from E*TRADE, and then lying to the customers about E*TRADE's financial health and the stability of deposits at E*TRADE.  *See* Facts, Parts, E, G, *supra*.  These actions plainly have harmed E*TRADE's relationships with the customers.  *See* Facts, Parts E, G, H, *supra*.  Because E*TRADE is likely to prove these facts, it will prevail on this claim.  *See Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 153 (E.D.N.Y. 2007) (holding that an employee tortiously interfered with his employer's prospective advantage by using employer's specialized software to run a competing business and steal customers); *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 483-84

(S.D.N.Y. 1997) (stating that obtaining a customer list by wrongful means can establish the "improper means" requirement of a tortious interference with prospective advantage claim).

### F.        Federal Computer Fraud And Abuse Act

Finally, E*TRADE is likely to prevail on its claim against Defendant Hernandez under the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  *See* Complaint Count VII, ¶¶ 108-114.[8]  A claim exists under the CFAA if:  (1) defendants accessed E*TRADE's "protected computer;" (2) without authorization or exceeding their authorization; (3) "knowingly" and with an "intent to defraud;" and (4) as a result have "further[ed] the intended fraud and obtain[ed] anything of value."  18 U.S.C. § 1030(a)(4); *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).  Courts interpret "fraud" in the CFAA to mean "wrongdoing," and "defraud" to mean "wronging one of his property rights by dishonest methods or schemes."  *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125-26 (W.D. Wash. 2000).

Former employees are liable under the CFAA to their former employers where the employees access computer systems to steal trade secrets, such as customer lists, and use that information in competition against the former employers.  *George S. May Intern. Co. v. Hostetler*, No. 04-C-1606, 2004 WL 1197395, at *3 (N.D. Ill. May 28, 2004) (valid CFAA claim stated where an employee removed a company's protected materials from the computer system for the benefit of himself and a competitor); *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195-96 (E.D. Wash. 2003) (noting that the CFAA is routinely applied where trade secrets or customer lists are inappropriately taken by former employees); *Shurgard Storage Ctrs., Inc.*, 119 F. Supp. 2d at 1128-29 (valid CFAA claim stated where an employee e-mailed trade secrets to a competitor).

---

[8]         The CFAA provides for a private right of action.  18 U.S.C. § 1030(g).

E*TRADE is likely to prevail on its claim under the CFAA. First, its computer systems are highly protected, and employees are authorized to access the system strictly for purposes of their obligations to E*TRADE. *See* Facts, Part I *supra*. Second, E*TRADE has the "smoking gun" showing that Hernandez accessed the system to send E*TRADE's proprietary customer list to his home address, which was expressly outside the scope of his authorization. *See* Facts, Part D, *supra*. Third, Hernandez did so knowingly (as he sent the e-mail to himself), with the intention to use the information in competition against E*TRADE. *Id*. Finally, he "obtained something of value" -- the profitable relationships with E*TRADE's customers, whom he stole using the pilfered information. *See* Facts, Parts A, E, *supra*.

## III.    EVEN IF E*TRADE IS NOT "LIKELY TO SUCCEED," THE BALANCE OF INTERESTS TIPS IN E*TRADE'S FAVOR

For these reasons, E*TRADE is likely to succeed on its causes of action. However, E*TRADE need only show "sufficiently serious questions going to the merits of the case to make it a fair ground for litigation," and that "a balance of hardships tip[s] decidedly in its favor." *V.D.*, 465 F.3d at 510. E*TRADE easily meets this alternative formulation too.

The evidence and arguments discussed above show that E*TRADE has raised "serious questions" on the merits of its claims. In addition, the "balance of hardships" lies entirely in E*TRADE's favor. Without an injunction, E*TRADE faces the irreparable harm of the loss of its confidential trade secrets used in competition against E*TRADE. On the other hand, if the Court issues an injunction, Defendants face ***no*** harm. They are still free to market BOA's services, so long as they do not use E*TRADE's Confidential Information. Furthermore, the preliminary injunction would only be in place ***for a matter of days or few weeks***, until FINRA issues its decision in E*TRADE's arbitration. The injunction would barely constitute an inconvenience or nuisance to Defendants. As BOA argued in its lawsuits in New York and

Virginia against its former employees, "The 'balance of hardships' is overwhelmingly in favor of [BOA]."  *Harvie* Mem. at 8; *see also* BOA *Ellis* Mem. at 12-13; *Tradescape.com*, 77 F. Supp. 2d at 411-12 (holding "the balance of hardships tips decidedly in plaintiff's favor" because plaintiffs faced irreparable harm from potential loss of customers, whereas defendants did not have a meaningful harm to counterbalance plaintiffs' interests.)

<u>**CONCLUSION**</u>

For these reasons, the Court should grant E*TRADE's motion for preliminary injunction. E*TRADE provides the specific language of the appropriate relief in its proposed Order granting the motion for preliminary injunction filed concurrently with this Memorandum.

Dated:  March 25, 2008

Respectfully submitted,

COOLEY GODWARD KRONISH LLP

/s/ Douglas P. Lobel
Douglas P. Lobel (DL-3894)
Robert T. Cahill
David A. Vogel
One Freedom Square
11951 Freedom Drive
Reston, Virginia 20190-5655
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100

Laura Grossfield Birger (LB-3031)
1114 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275

*Counsel for Plaintiffs E*TRADE Financial Corporation and E*TRADE Securities LLC*

358019 v1/RE

- 23 -

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas P. Lobel, state that on the 25th day of March, 2008, I served the following by FedEx overnight service:  Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunctive Relief in Aid of Arbitration to the following parties:

Banc of America Investment Services, Inc.
c/o CT Corporation System, Its Registered Agent
111 Eighth Avenue
New York, New York 10011

Marcus J. Hernandez (home address)       Marcus J. Hernandez (office address)
229 Canterbury Court                 Banc of America Investment Services, Inc.
Blue Bell, Pennsylvania 19422-1279      4 Sentry Parkway
                                        Blue Bell, Pennsylvania 19422


Sean J. Gaffey (home address)         Sean J. Gaffey (office address)
550 Gregory Avenue, Apt. B7          Banc of America Investment Services, Inc.
Weehawken, New Jersey 07086-6001    400 Kelby Street, 19th Floor
                                        Fort Lee, New Jersey 07024

/s/ Douglas P. Lobel
Douglas P. Lobel