UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E*TRADE FINANCIAL CORPORATION and
E*TRADE SECURITIES LLC,

                Plaintiffs,

-against-

MARCUS HERNANDEZ, et al.,

                Defendants.

Civil Action No. 08 CV 2993 (RJH)

---

## DECLARATION OF MARCUS HERNANDEZ

**MARCUS HERNANDEZ**, pursuant to 28 U.S.C. § 1746:

1. I have knowledge of all facts contained in this Declaration and can testify truthfully to those facts if called upon as a witness under oath.

2. I am a Financial Advisor currently working in the Blue Bell, Pennsylvania office of Banc of America Investment Services, Inc. ("BAI"). I previously worked at E*Trade as a financial advisor in its King of Prussia, Pennsylvania office until I resigned in January of this year. This Declaration is made in opposition to Plaintiffs' Motion for a Preliminary Injunction.

3. At the outset, I emphasize that although many securities firms require their employees to sign agreements prohibiting the solicitation of clients, <u>I never signed such an agreement with E*Trade</u>. My E*Trade employment agreement, which was drafted entirely by E*Trade and expressly governed by California law, does not contain a non-solicitation of clients provision. (<u>See</u> Exhibit 5 to the Declaration of Jeffrey Wimer). Nevertheless, after my resignation of employment, I contacted clients to inform them of my change of employment and to provide them with my contact information, which California law permits me to do even if I

#1298303 v1
105839-62783

had signed a non-solicitation agreement. If a client requested a transfer of his or her account, I provided the client with an account transfer form. Moreover, in accordance with my obligations, I have not misused any client or other information.

4. Jeffrey Wimer's Declaration references my transfer from E*Trade's New York City office to its King of Prussia, Pennsylvania office. Although my first day in E*Trade's Pennsylvania office was on November 20, 2007, I made my final decision to transfer to E*Trade's Pennsylvania office in or around early September 2007. My wife, who is pregnant, is from Pennsylvania and her family members all reside in Pennsylvania. Moreover, I have known the current manager of E*Trade's Pennsylvania office, Matthew Ellis, for approximately two years; we had worked together servicing several clients while he was located in E*Trade's Washington, D.C. office. After he became the manager in Pennsylvania about a year ago, Mr. Ellis and I often discussed my transferring from New York City to Pennsylvania. Further, high-level executives at E*Trade were encouraging me to move to its Pennsylvania office.

5. In his Declaration, Mr. Wimer accuses me of wrongly e-mailing certain client and other information to my personal e-mail account on November 19, 2007. He claims "[t]here was no legitimate reason for Hernandez to email proprietary information to his personal email account." Wilmer Declaration at para. 34. This statement is completely inaccurate. As E*Trade itself admits, at the time I emailed the information to my personal account, I was literally in the middle of transferring from E*Trade's New York office to its Pennsylvania office. My first day of work at E*Trade's Pennsylvania office was on November 20, 2007.

6. The materials I emailed consisted primarily of client information I had personally spent countless hours compiling and had saved to my desktop work computer at E*Trade in its

#1298303 v1
105839-62783

New York office.[1] I used much of this material at E*Trade on a daily basis to service E*Trade accounts. Upon transferring to E*Trade's Pennsylvania office from New York City, I was concerned about my immediate computer and e-mail access. As a precaution, I simply emailed all of the materials that were saved on my work desktop to my E*Trade e-mail address with a copy to my personal e-mail account. Contrary to statements made by E*Trade, it is not a violation of any Firm policy to e-mail such materials to a personal e-mail account for work purposes. As it turns out, I do not recall ever opening any of these materials from my personal e-mail account, and I never opened them at any time upon or after my resignation from E*Trade.

7. On February 1, 2008, E*Trade's in-house counsel, John Bersin, federal expressed to me a letter wherein he brought to my attention the materials I had e-mailed to my personal account in November 2007. (See Exhibit "A" hereto). I promptly forwarded this letter to my attorney, who then attempted to contact Mr. Bersin to explain why I had e-mailed this material to my personal e-mail account. Although my attorney left Mr. Bersin a voicemail, Mr. Bersin never called my attorney back. My attorney called Mr. Bersin a second time and left another voice mail. Mr. Bersin did not return that telephone call either.

8. E*Trade contends that I solicited clients by making disparaging remarks about E*Trade. This is not true. Months before I even resigned from E*Trade, clients, by the dozens, raised the issue of E*Trade's financial stability with me. Since the summer of 2007, it has been widely reported in the media that E*Trade has had massive sub-prime exposure, and its stock has since been in a steep decline. In fact, in early to mid November 2007, an analyst at Citigroup reported that there was a chance E*Trade could become insolvent. The very day this analyst

---

[1] Mr. Wimer also makes reference to a report detailing the gross production of all E*Trade financial advisors. E*Trade provided this report to me to show me my ranking in the Company.

made this statement, I was out of the office. When I returned, I had received about 40 voicemails from clients and about 100 missed calls were reported on my work telephone. Since the first reports of massive sub-prime exposure at E*Trade and before I resigned from E*Trade, approximately $150-200 million in client assets I serviced at E*Trade transferred out to other firms, as much as 30% of the total amount of assets I serviced at E*Trade. Many of my other clients were threatening to leave E*Trade if the proverbial "other shoe was to drop." Clients were constantly raising with me the issue of the possibility of E*Trade filing for bankruptcy <u>before and after</u> I resigned, including the clients referenced at paras. 50-52 of the Wimer Declaration.

9. While E*Trade wrongly contends that I disparaged it, in actuality, E*Trade was disparaging me. Geoff Greenfield, a financial advisor at E*Trade, told at least one client that I had "illegally contacted" the client.

10. E*Trade also ignores the fact that, before I resigned from E*Trade, I was doing everything in my power on behalf of the Company to retain the clients. Unfortunately, clients were leaving by the droves, which ultimately forced me to look for another job.

11. Further, E*Trade's own Form 10-K filed with the SEC in February 2008 states, in part, that : "<u>During November 2007, well-publicized concerns about the Bank's holding of asset-backed securities led to widespread concerns about our continued viability</u>. . . .Many of the [client] accounts that were closed belonged to sophisticated and active customers with large cash and securities balances. Concerns about our viability may recur, which could lead to destabilization and asset and customer attrition. . . . <u>The operating environment during 2007, particularly during the second half of the year, was extremely challenging as our exposure to the crisis in the residential real estate and credit markets adversely impacted our financial</u>

4

performance and led to a disruption in our customer base." (Exhibit **"B"** hereto) (emphasis added). E*Trade's 10-K confirms that clients of E*Trade are leaving not because of my departure or alleged conduct, but because of E*Trade's "exposure to the crisis in the residential real estate and credit markets."

12. Finally, although E*Trade brings this action against me, I note that it has been delinquent in paying me and other advisors our proper compensation. For example, for many years, we did not receive certain compensation - 12(b)(1) fees - to which we were clearly entitled. When E*Trade finally purported to pay this compensation to us, it provided us with no accounting, and we received no interest. To this day, I do not believe I have been paid everything to which I am entitled.

13. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 8, 2008

_____
Marcus Hernandez

# EXHIBIT A

**E✷TRADE FINANCIAL®**

(610) 667-6620 -

E✷TRADE FINANCIAL Corporation
905 Highland Point Drive
Suite 150
Roseville CA 95678

etrade.com

February 1, 2008

**By Federal Express**
Mr. Marcus Hernandez
229 Canterbury Court
Blue Bell, PA 19422

Re: <u>Unauthorized use of E*TRADE Financial Proprietary Information</u>

Dear Mr. Hernandez,

    I write on behalf of E*TRADE Financial Corporation, which has recently learned that you have been in communication with one or more E*TRADE customers after you voluntarily terminated your employment with E*TRADE on January 18, 2008. Such contact was in violation of your legal obligations as an E*TRADE employee that survive the end of your employment. It is clear that you contacted E*TRADE customers using information, such as lists of customer names, phone numbers and/or e-mail addresses, that you acquired in the course of your employment. In fact, we have discovered evidence that on or about November 19, 2007, you e-mailed an Excel spreadsheet containing customer contact information to yourself at your home e-mail account, in direct violation of Company policy as well as E*TRADE Financial's proprietary information agreement, signed by you at the commencement of your employment.

    On October 7, 2003, you signed an Employment Agreement with E*TRADE in which you expressly agreed not to use any E*TRADE proprietary information or company documents and materials after the termination of your employment. All Proprietary Information is the sole property of E*TRADE. All Company Documents and Materials are the exclusive property of E*TRADE.

    In signing the Employment Agreement, a copy of which is attached, you agreed that:

> "during my employment by [E*TRADE], I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in

1

**E✱TRADE FINANCIAL®**

E✱TRADE FINANCIAL Corporation
905 Highland Point Drive
Suite 150
Roseville, CA 95678

etrade.com

connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or during my employment if so requested by the Company, I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement." See, ¶C of the Employment Agreement.

The definition of "Company Documents" specifically includes "customer lists." See, ¶A(3) of the Employment Agreement.

Accordingly, E✱TRADE hereby demands that you immediately cease and desist contacting or soliciting any E✱TRADE customer or client whose contact information you obtained from E✱TRADE or during your employment by E✱TRADE. In addition, E✱TRADE hereby demands that you immediately return to the undersigned all E✱TRADE proprietary customer lists, writings, and other things currently in your possession before E✱TRADE suffers any further injury or harm.

This is a very serious matter that requires your immediate attention. E✱TRADE will not allow confidential customer information to remain outside its control. In the event that you do not immediately comply with your obligations as set forth above, E✱TRADE is fully prepared to seek a restraining order and or other relief authorized by law. Please be advised that this matter is completely separate and independent from any other open issues or disputes that may exist between yourself and E✱TRADE.

Thank you for your anticipated cooperation.

Very truly yours,

*/s/ John E. Bersin*

John E. Bersin
Assistant General Counsel
866-789-0736 x. 1003

2

# EMPLOYMENT AGREEMENT
# PROPRIETARY INFORMATION AND INVENTIONS
# AND ARBITRATION OF EMPLOYMENT DISPUTES

The following Agreement confirms certain terms of my employment with E*TRADE Group, Inc. (hereafter referred to as "the Company"), which is a material part of the consideration for my employment by the Company and the compensation received by me from the Company from time to time. The headings contained in this Agreement are for convenience only, have no legal significance, and are not intended to change or limit this Agreement in any matter whatsoever.

## PROPRIETARY INFORMATION AND INVENTIONS

### A. Definitions

**1. The "Company"**

As used in this Agreement, the "Company" refers to E*TRADE Group, Inc. and each of its subsidiaries or affiliated companies. I recognize and agree that my obligations under this Agreement and all terms of this Agreement apply to me regardless of whether I am employed by or work for E*TRADE Group, Inc. or any other subsidiary or affiliated company of E*TRADE Group, Inc. Furthermore, I understand and agree that the terms of this Agreement will continue to apply to me even if I transfer at some time from one subsidiary or affiliate of the Company to another.

**2. "Proprietary Information"**

I understand that the Company possesses and will possess Proprietary Information which is important to its business. For purposes of this Agreement, "Proprietary Information" is information that was developed, created, or discovered by or on behalf of the Company, or which became or will become known by, or was or is conveyed to the Company, which has commercial value in the Company's business.

"Proprietary Information" includes, but is not limited to, software programs and subroutines, source and object code, algorithms, trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formulas, business and product development plans, customer lists, terms of compensation and performance levels of Company employees, and other information concerning the Company's actual or anticipated business, research or development, or which is received in confidence by or for the Company from any other person.

I understand that my employment creates a relationship of confidence and trust between the Company and me with respect to Proprietary Information.

**3. "Company Documents and Materials"**

I understand that the Company possesses or will possess "Company Documents and Materials" which are important to its business. For purposes of this Agreement, "Company Documents and Materials" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents, media or items have been prepared by me or by others.

"Company Documents and Materials" include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes or printouts, sound recordings and other printed, typewritten or handwritten documents, sample products, prototypes and models.

### B. Assignment of Rights

All Proprietary Information and all patents, patent rights, copyrights, trade secret rights, trademark rights and other rights (including, without limitation, intellectual property rights) anywhere in the world in connection therewith is and shall be the sole property of the Company. I hereby assign to the Company any and all rights, title and interest I may have or acquire in such Proprietary Information.

At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company, except as may be necessary in the ordinary course of performing my duties to the Company.

### C. Maintenance and Return of Company Documents and Materials

I agree to make and maintain adequate and current written records, in a form specified by the Company, of all inventions, trade secrets and works of authorship assigned or to be assigned to the Company pursuant to this Agreement. All Company Documents and Materials are and shall be the sole property of the Company.

I agree that during my employment by the Company, I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or during my employment if so requested by the Company, I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement.

### D. Disclosure of Inventions to the Company

I will promptly disclose in writing to my immediate supervisor or to such other person designated by the Company all "Inventions," which includes, without limitation, all software programs or subroutines, source or object code, algorithms, improvements, inventions, works of authorship, trade secrets, technology, designs, formulas, ideas, processes, techniques, know-how and data, whether or not patentable, made or discovered or conceived or reduced to practice or developed by me, either alone or jointly with others, during the term of my employment.

I will also disclose to the President of the Company all Inventions made, discovered, conceived, reduced to practice, or developed by me within six (6) months after the termination of my employment with the Company which resulted, in whole or in part, from my prior employment by the Company. Such disclosures shall be received by the Company in confidence (to the extent such Inventions are not assigned to the Company pursuant to Section (E) below) and do not extend the assignment made in Section (E) below.

### E. Right to New Ideas

#### 1. Assignment of Inventions to the Company

I agree that all Inventions which I make, discover, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my employment shall be the sole property of the Company to the maximum extent permitted by Section 2870 of the *California Labor Code* or any like statute of any other state. Section 2870 provides as follows:

    a. Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

        (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

        (2) Result from any work performed by the employee for his employer.

    b. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

This assignment shall not extend to Inventions, the assignment of which is prohibited by *Labor Code Section 2870*.

#### 2. Works Made for Hire

The Company shall be the sole owner of all patents, patent rights, copyrights, trade secret rights, trademark rights and all other intellectual property or other rights in connection with Inventions that are the sole property of the Company. I further acknowledge and agree that such Inventions, including, without limitation, any computer programs, programming documentation, and other works of authorship, are "works made for hire" for purposes of the Company's rights under copyright laws. I hereby assign to the Company any and all rights, title and interest I may have or acquire in such Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or machine a prior invention owned by me or in which I have interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, sublicensable, worldwide license to make, have made, modify, use, market, sell and distribute such prior invention as part of or in connection with such product, process or machine.

#### 3. Best Efforts

I agree to perform, during and after my employment, all acts deemed necessary or desirable by the Company to permit and assist it, at the Company's expense, in further evidencing and perfecting the assignments made to the Company under this Agreement and in obtaining, maintaining, defending and enforcing patents, patent rights, copyrights, trademark rights, trade secret rights or any other rights in connection with such Inventions and improvements thereto in

any and all countries. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorney-in-fact to act for and on my behalf and instead of me, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth above in this subsection (3), including, without limitation, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such inventions and improvements thereto with the same legal force and effect as if executed by me.

**4. Assignment or Waiver of Moral Rights**
Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights"). To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

**5. List of Inventions**
I have attached hereto as Exhibit A, a complete list of all Inventions or improvements to which I claim ownership and that I desire to remove from the operation of this Agreement, and I acknowledge and agree that such list is complete. If no such list is attached to this Agreement, I represent that I have no such inventions and improvements at the time of signing this Agreement.

### F. Non-Solicitation of Company Employees
During the term of my employment and for one (1) year thereafter, I will not encourage or solicit any employee of the Company to leave the Company for any reason or to accept employment with any other company. As part of this restriction, I will not interview or provide any input to any third party regarding any such person during the period in question. However, this obligation shall not affect any responsibility I may have as an employee of the Company with respect to the bona fide hiring and firing of Company personnel.

### G. Company Authorization for Publication
Prior to my submitting or disclosing for possible publication or dissemination outside the Company any material prepared by me that incorporates information that concerns the Company's business or anticipated research, I agree to deliver a copy of such material to an officer of the Company for his or her review. Within twenty (20) days following such submission, the Company agrees to notify me in writing whether the Company believes such material contains any Proprietary Information or Inventions, and I agree to make such deletions and revisions as are reasonably requested by the Company to protect its Proprietary Information and Inventions. I further agree to obtain the written consent of the Company prior to any review of such material by persons outside the Company.

### H. Duty of Loyalty
I agree that, during my employment with the Company, I will not provide consulting services to or become an employee of, any other firm or person engaged in a business in any way competitive with the Company or involved in the design, development, marketing, sale or distribution of any networking or software products, without first informing the Company of the existence of such proposed relationship and obtaining the prior written consent of my manager and the Human Resource Manager responsible for the organization in which I work.

### I. Former Employer Information
I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment by the Company, and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employers or others. I have not entered into and I agree I will not enter into any agreement, either written or oral, in conflict herewith or in conflict with my employment with the Company. I further agree to conform to the rules and regulations of the Company.

### J. At-Will Employment
I agree and understand that employment with the Company is "at-will," meaning that it is not for any specified period of time and can be terminated by me or by the Company at any time, with or without advance notice, and for any or no particular reason or cause. I agree and understand that it also means that job duties, title and responsibility and reporting level, compensation and benefits, as well as the Company's personnel policies and procedures, may be

changed at any time at-will by the Company. I understand and agree that nothing about the fact or the content of this Agreement is intended to, nor should be construed to, alter the at-will nature of my employment with the Company.

I understand and agree that this Agreement is the complete agreement between the Company and me regarding the nature of my employment with the Company. I also understand and agree that the at-will nature of employment with the Company can only be changed by the Company President in an express writing signed and dated by him or her and by me.

### K. Severability

I agree that if one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

### L. Authorization to Notify New Employer

1. I hereby authorize the Company to notify my new employer about my rights and obligations under this Agreement following the termination of my employment with the Company.

2. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us, including but not limited to any and all statements made by any officer, employee or representative of the Company regarding the Company's financial condition or future prospects. I understand and acknowledge that, except as set forth in this Agreement and in the offer letter from the Company to me, (i) no other representation or inducement has been made to me, (ii) I have relied on my own judgment and investigation in accepting my employment with the Company, and (iii) I have not relied on any representation or inducement made by any officer, employee or representative of the Company. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the President of the Company and me. I understand and agree that any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

### M. Effective Date

This Agreement shall be effective as of the first day of my employment with the Company and shall be binding upon me, my heirs, executor, assigns and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

### N. Governing Law

Although I may work for the Company outside of California or the United States, I understand and agree that this Agreement shall be interpreted and enforced in accordance with the laws of the State of California.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

_____          10/7/03
Employee's Signature                      Date

MARCUS J. Hernandez
Employee's Name - Printed

# EXHIBIT A

1. The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or discovered or conceived or first reduced to practice by me or jointly with others prior to my employment by the Company that I desire to remove from the operation of the Company's Proprietary Information and Inventions Agreement:

   No inventions or improvements.
   See below: Any and all inventions regarding:
   Additional sheets attached.

2. I propose to bring to my employment the following materials and documents of a former employer:
   No materials or documents
   See below:

   _____          10/4/__
   Employee's Signature                      Date

## AGREEMENT TO ARBITRATE EMPLOYMENT DISPUTES

I agree that any existing or future dispute or controversy arising out of my employment with the Company or the termination thereof, or arising under the terms of this Agreement shall be resolved by binding arbitration in accordance with the "*National Rules for the Resolution of Employment Disputes*" of the American Arbitration Association ("AAA") then in effect.

### Scope of Disputes and Claims to Be Arbitrated

Notwithstanding the at-will nature of employment with the Company, I understand and agree that this *Agreement* shall apply to any and all disputes and claims arising from and relating to my employment with the Company, whether the dispute or claim arises in tort or contract, pursuant to statute, regulation or otherwise, now in existence or which may in the future be enacted, amended or judicially recognized, including without limitation disputes and claims arising from and relating to this *Agreement* and:

- claims for breach of contract or contractual obligation whether such alleged contract or obligation be oral or written, or express or implied by fact or law;
- claims of wrongful termination, including violation of public policy and constructive discharge;
- claims of non-payment or incorrect payment of wages, commissions, bonuses, severance, employee fringe benefits, and the like whether such claims be pursuant to alleged express or implied contract or obligation, equity, the *California Labor Code*, the Fair Labor Standards Act, the Employee Retirement Income Securities Act, and any other local, state or federal law concerning wages, compensation or employee benefits;
- claims of discrimination under the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Family and Medical Care Leave Act, the Employee Retirement Income Securities Act, the California Fair Employment and Housing Act, the California Family Rights Act, the *California Labor Code* and any other local, state or federal law concerning employment discrimination;
- claims for infliction of emotional distress, misrepresentation, interference with contract or prospective economic advantage, violation of public policy, defamation, and any other tort or tort-like causes of action relating to or arising from the employment relationship or termination thereof;

I understand and agree that arbitration of such disputes and claims shall be the sole and exclusive mechanism for resolving any and all existing and future disputes or controversies arising out of my employment with the Company or the termination thereof, with the following exceptions which will be resolved as required by law then in effect:

- claims for benefits under the workers' compensation, unemployment insurance and state disability insurance laws.

### Decision of Arbitrator Binding; Waiver of Trial Before Court, Jury or Government Agency

I understand and agree that this *Agreement* provides that arbitration shall be instead of a trial before a court or jury, or a hearing before a government agency. I understand and agree that the decision of the arbitrator shall be final and binding on both myself and the Company, it shall provide the exclusive remedy(ies) for resolving any and all disputes between myself and the Company arising from our employment relationship, and it shall be enforceable by any court have proper jurisdiction thereof.

I understand and agree that by signing this *Agreement* and accepting employment with the Company, I am expressly waiving any and all rights and benefits conferred on me by federal, state or local law to a trial before a court or jury or before a government agency regarding any dispute and claim which I now have (whether or not known or suspected) or which I may in the future have with the Company.

### Initiating Arbitration; Time Limitation

I understand and agree that within one year of the occurrence of the event, act or omission giving rise to a dispute or the dispute, itself, whichever occurs later, either I or the Company may initiate arbitration under this *Agreement* by giving written notice to the other. Failure to initiate arbitration within this one year time period shall constitute a waiver of any and all claims arising from the event, act, omission or dispute which shall then be forever barred.

### Place of Arbitration

I understand and agree that arbitration of disputes arising from my employment with the Company shall take place within the County of Santa Clara, State of California.

**Costs of Arbitration**
I understand and agree that both I and the Company shall share equally the cost of the arbitration filing and hearing fees, and the cost of the arbitrator. I understand and agree that I and the Company shall bear our own attorneys' fees incurred in connection with the arbitration, and that the arbitrator will not have authority to award attorneys fees unless a statute at issue in the dispute authorizes the award of attorneys fees to the prevailing party, in which case the arbitrator shall have the authority to make an award of attorneys fees to the extent and as permitted by the applicable statute.

**Governing Law**
I understand and agree that this *Agreement* and its validity, construction and performance shall be governed in all respects by the laws of the State of California, without giving effect to its conflict of laws principles. Further, the arbitration shall be conducted in accordance with the rules and procedures of *California Code of Civil Procedure* Section 1280 et seq. ("C.C.P.") and, unless in conflict with the C.C.P. or as provided herein, the "National Rules for the Resolution of Employment Disputes" of the AAA in effect at the time the dispute arises.

**Severability**
I understand and agree that if any term, or portion thereof, of this *Agreement* shall for any reason be held to be invalid or unenforceable or to be contrary to public policy or any law, then the remainder of this *Agreement* shall not be affected by such invalidity or unenforceability, but shall remain in full force and effect as if the invalid or unenforceable term, or portion thereof, had not existed within this *Agreement*.

**Complete Agreement**
I understand and agree that this *Agreement* contains the complete agreement between the Company and me regarding all subjects covered herein; that it supersedes and any all prior representations and agreements, if any; and that it may be modified only in a writing, expressly referencing this *Agreement* and me by full name, and signed by the President of the Company.

**Knowing and Voluntary Agreement**
I acknowledge that I have been advised to consult with an attorney of my own choosing before signing this *Agreement*, and that I have had an opportunity to do so.

I acknowledge that I have read this *Agreement* and I understand its terms and that, by signing it and accepting employment with the Company, I am acknowledging at-will employment and am waiving all rights to a trial before a court or jury of any and all disputes and claims regarding my employment with the Company or the termination thereof, except as otherwise noted herein, that now exist or may in the future exist or be known or suspected by me.

_____     10/7/03
Employee's Signature                 Date

MARCUS J. Hernandez
Employee's Name - Printed

Rev. 6/2003, Page 7         E*TRADE FINANCIAL Confidential         Employee Agreement 2003.doc

# EXHIBIT B

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

*(Mark One)*

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007.

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM _____ TO _____.

Commission File Number 1-11921

# E*TRADE Financial Corporation
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **94-2844166** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

135 East 57th Street, New York, New York 10022
(Address of Principal Executive Offices and Zip Code)

(646) 521-4300
(Registrant's Telephone Number, including Area Code)

Securities Registered Pursuant to Section 12(b) of the Act:
(Title of each class and Name of exchange on which registered)
Common Stock—$0.01 par value—NASDAQ
Mandatory Convertible Notes
Securities Registered Pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasonal issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒                                  Accelerated filer ☐
Non-accelerated filer ☐ (Do not check if a smaller reporting company)    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

At June 30, 2007, the aggregate market value of voting stock, comprised of the registrant's common stock and shares exchangeable into common stock, held by nonaffiliates of the registrant was approximately $7.4 billion (based upon the closing price for shares of the registrant's common stock as reported by the NASDAQ Global Select Market on that date).

Shares of common stock held by each officer, director and holder of 5% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

Number of shares outstanding of the registrant's common stock as of February 22, 2008: 461,992,712

**DOCUMENTS INCORPORATED BY REFERENCE**

Definitive Proxy Statement relating to the Company's Annual Meeting of Shareholders to be filed hereafter (incorporated into Part III hereof).

Table of Contents

## ITEM 1A. RISK FACTORS

### Risks Relating to the Nature and Operation of Our Business

*We have incurred significant losses and cannot assure that we will be profitable*

We incurred a net loss of $1.4 billion, or $3.40 per share, for the year ended December 31, 2007, due primarily to losses in our home equity loan and asset-backed securities portfolios. We also experienced a substantial diminution of customer assets and accounts as a result of the losses experienced in our institutional business segment. It may require a substantial period of time to restore asset quality at the Bank, rebuild our retail franchise and return to profitability.

*We will continue to experience losses in our mortgage loan portfolio*

At December 31, 2007, the principal balance of our home equity loan portfolio was $11.9 billion. During 2007, the allowance for loan losses in this portfolio increased by $427.5 million to $459.2 million, primarily due to a rapid deterioration in performance in the second half of the year. As the crisis in the residential real estate and credit markets continues, we expect to experience cumulative losses between $1.0 and $1.5 billion in our home equity loan portfolio over the next three years. There can be no assurance that our provision for loan losses will be adequate if the residential real estate and credit markets continue to deteriorate. We may be required under such circumstances to further increase our provision for loan losses, which could have an adverse effect on our regulatory capital position and our results of operations in future periods.

*Losses of customers and assets will result in lower revenues in future periods*

During November 2007, well-publicized concerns about the Bank's holdings of asset-backed securities led to widespread concerns about our continued viability. From the beginning of this crisis through December 31, 2007 when the situation had stabilized, customers withdrew approximately $5.6 billion of net cash and approximately $12.2 billion of net assets from our bank and brokerage businesses. Many of the accounts that were closed belonged to sophisticated and active customers with large cash and securities balances. Concerns about our viability may recur, which could lead to destabilization and asset and customer attrition. In addition, as a result of our recent losses of customers and assets, we expect the revenues generated by trading and lending activity to be significantly reduced from the levels experienced in the first three quarters of 2007. There can be no assurance that we will successfully rebuild our franchise by reclaiming customers and growing assets. If we are not successful, our revenues and earnings in future periods will be lower than we have experienced historically.

*We have a large amount of debt*

We incurred a substantial amount of new debt in connection with the Citadel transaction in which we issued approximately $1.8 billion of springing lien notes. Following Citadel's investment, our total long-term debt is $3.0 billion and the expected annual interest cash outlay is approximately $365 million. Our ratio of debt (our senior debt and term loans but excluding $445.6 million in mandatorily convertible notes) to equity (expressed as a percentage) was 93% at December 31, 2007. The degree to which we are leveraged could have important consequences, including (i) a substantial portion of our cash flow from operations will be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available for other purposes; (ii) our ability to obtain additional financing for working capital, capital expenditures, acquisitions and other corporate needs will be limited; and (iii) our substantial leverage may place us at a competitive disadvantage, hinder our ability to adjust rapidly to changing market conditions and make us more vulnerable in the event of a downturn in general economic conditions or our business. In addition, a significant reduction in revenues could materially adversely affect our ability to satisfy our obligations under our debt securities.

7

Table of Contents

- Total nonperforming loans receivable as a percentage of gross loans receivable is an indicator of the performance of our total loan portfolio.
- Allowance for loan losses is an estimate of the losses inherent in our loan portfolio as of the balance sheet date.
- Allowance for loan losses as a percentage of nonperforming loans is a general indicator of the adequacy of our allowance for loan losses. Changes in this ratio are also driven by changes in the mix of our loan portfolio.

*Significant Events in 2007*

*Citadel Investment of $2.5 Billion Including Sale of Asset-Backed Securities Portfolio*

The operating environment during 2007, particularly during the second half of the year, was extremely challenging as our exposure to the crisis in the residential real estate and credit markets adversely impacted our financial performance and led to a disruption in our customer base. As a result, we believe it was necessary to obtain a significant infusion of cash, which would in turn stabilize our balance sheet and our customer base.

On November 29, 2007, we entered into an agreement to receive a $2.5 billion cash infusion from Citadel. In consideration for the cash infusion, Citadel received three primary items: substantially all of our asset-backed securities portfolio, 84.7 million shares of common stock [1] in the Company and approximately $1.8 billion in 12 1/2% springing lien notes[2]. We believe this transaction provided timely stability for our business and helped alleviate customer concerns.

*Developed a Plan to Restore Customer Confidence and Return to Growth*

We developed a plan focused on resolving the risks in our balance sheet and returning our primary focus to the retail investor. Our plan contains three core goals: reduce credit risk in our loan portfolio, reduce our level of corporate debt and reduce operating expenses to allow us to reinvest in growth initiatives within the core retail franchise. We believe the successful execution of this plan will restore customer confidence and return the Company back to a path of financial growth.

*Launch of Global Trading Platform*

We launched our Global Trading Platform, which provides the ability to buy, sell and hold foreign equities in local currencies to investors who seek liquidity and diversity in their portfolios. Our U.S. customers now have access to foreign stocks and currencies in six major international markets: Canada, France, Germany, Hong Kong, Japan and the United Kingdom.

*International Expansion*

We continued our expansion into international markets with the launch of operations in Norway, the Netherlands and Singapore. In Norway, we now offer online trading of all Norwegian stocks registered on the Norwegian exchange Oslo Børs, as well as stocks from Scandinavian markets in Sweden, Denmark, Finland, and the American markets. In the Netherlands and Singapore, we offer Dutch and Singapore investors direct access to the US stock markets through our Global Trading Platform.

---

[1] The 84.7 million shares of common stock were issued in increments: 14.8 million upon initial closing in November 2007; 23.2 million upon Hart-Scott-Rodino Antitrust Improvements Act approval in December 2007; and 46.7 million shares are expected to be issued in the first quarter of 2008 as the Company has received all necessary regulatory approvals.

[2] Included in the $1.8 billion issuance is $186 million of 12 ½% springing lien notes in exchange for $186 million of the Company's senior notes that were owned by Citadel. The $1.8 billion in 12 ½% springing lien notes includes $100 million in notes issued to BlackRock in connection with the transaction. The $1.8 billion in 12 ½% springing lien notes represents the amount outstanding as of December 31, 2007 and does not include the additional $150 million of springing lien notes issued in January 2008 in accordance with the terms of the agreement with Citadel.

24