UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E*TRADE FINANCIAL CORPORATION and E*TRADE SECURITIES LLC,

        Plaintiffs,

-against-

MARCUS HERNANDEZ, et al.,

        Defendants.

Civil Action No. 08 CV 2993 (RJH)

---

### DECLARATION OF SEAN GAFFEY

**SEAN GAFFEY**, pursuant to 28 U.S.C. § 1746:

1. I have knowledge of all facts contained in this Declaration and can testify truthfully to those facts if called upon as a witness under oath.

2. I am a Financial Advisor currently working in the Fort Lee, New Jersey office of Banc of America Investment Services, Inc. ("BAI"). I previously worked at E*Trade as a financial advisor in its New York City office until I resigned on or about February 22, 2008. This Declaration is made in opposition to Plaintiffs' Motion for a Preliminary Injunction.

3. My E*Trade employment agreement, which was drafted entirely by E*Trade, is expressly governed by California law. (See Exhibit "13" to the Declaration of Jeffrey Wimer). After my resignation of employment from E*Trade, I contacted clients to inform them of my change of employment and to provide them with my contact information, which California law permits me to do even though I signed a non-solicitation of clients provision. If a client requested a transfer of his or her account, I provided the client with an account transfer form. Moreover, I have not misused any client or other information in accordance with my obligations.

4.      I must also note that Jeffrey Wimer's Declaration is very insincere. First, as the Branch Manager of E*Trade's New York City office, Mr. Wimer was encouraging me to leave the firm with him, discussed with me the fact that I would need to transfer my clients to any new firm and discussed the fact that I would need to retain client information in any anticipated move. I took away from my discussions with E*Trade's own Branch Manager that it was entirely proper to contact clients in the event that I resigned. Second, in a text message to me after I resigned, Mr. Wimer stated: "You should get every account you want with no problem this place is a joke." I believe I have abided by my legal obligations, but I think it is also important for the Court to take into consideration all of the circumstances giving rise to this lawsuit.

5.      E*Trade contends that I solicited clients by telling them that E*Trade had "solvency issues." Wimer Declaration at paras. 54, 55. This is false. Months before I even resigned from E*Trade, numerous clients raised the issue of E*Trade's financial stability with me. Since the summer of 2007, it has been widely reported in the media that E*Trade has had massive sub-prime exposure, and its stock has since been in a steep decline. In fact, in early or mid-November 2007, an analyst at Citigroup reported that there was a chance E*Trade could become <u>insolvent</u>.

6.      In November and December 2007, approximately $200 million in client assets serviced by me – approximately 30% of the total assets serviced by me at E*Trade – transferred out to other firms. The assets that transferred out represented approximately 50% of my gross revenues. Clients by the scores were asking me about E*Trade's solvency issues, including clients with whom I spoke after I resigned. I consistently told clients that even assuming a worst case scenario of bankruptcy, they would still be able to transfer out their monies to another firm.

7.  E*Trade completely ignores the fact that, before I resigned from E*Trade, I was doing everything in my power on behalf of the Company to retain clients. Unfortunately, clients were leaving by the droves, which ultimately forced me to look for another job.

8.  Further, E*Trade's own Form 10-K filed with the SEC in February 2008 states, in part, that : "During November 2007, well-publicized concerns about the Bank's holding of asset-backed securities led to widespread concerns about our continued viability. . . .Many of the [client] accounts that were closed belonged to sophisticated and active customers with large cash and securities balances. Concerns about our viability may recur, which could lead to destabilization and asset and customer attrition. . . . The operating environment during 2007, particularly during the second half of the year, was extremely challenging as our exposure to the crisis in the residential real estate and credit markets adversely impacted our financial performance and led to a disruption in our customer base." (Exhibit "A" hereto) (emphasis added). E*Trade's 10-K confirms that clients of E*Trade are leaving not because of my departure or alleged conduct, but because of E*Trade's "exposure to the crisis in the residential real estate and credit markets."

9.  Finally, although E*Trade brings this action against me, I note that it has been delinquent in paying me and other advisors our proper compensation. For example, for many years, we did not receive certain compensation - 12(b)(1) fees - to which we were entitled. When E*Trade finally paid this compensation to us, it provided us with no accounting, and we received no interest. To this day, I do not believe I have been paid everything to which I am entitled.

3

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 09, 2008

_____
Sean Gaffey

#1298328 v1
105839-62783

# EXHIBIT A

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

*(Mark One)*

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007.

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM _____ TO _____.

Commission File Number 1-11921

# E*TRADE Financial Corporation
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 94-2844166 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

135 East 57th Street, New York, New York 10022
(Address of Principal Executive Offices and Zip Code)

(646) 521-4300
(Registrant's Telephone Number, including Area Code)

**Securities Registered Pursuant to Section 12(b) of the Act:**
(Title of each class and Name of exchange on which registered)
Common Stock—$0.01 par value—NASDAQ
Mandatory Convertible Notes

**Securities Registered Pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasonal issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☒ | Accelerated filer ☐ |
|---|---|
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

At June 30, 2007, the aggregate market value of voting stock, comprised of the registrant's common stock and shares exchangeable into common stock, held by nonaffiliates of the registrant was approximately $7.4 billion (based upon the closing price for shares of the registrant's common stock as reported by the NASDAQ Global Select Market on that date).

Shares of common stock held by each officer, director and holder of 5% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

Number of shares outstanding of the registrant's common stock as of February 22, 2008: 461,992,712

**DOCUMENTS INCORPORATED BY REFERENCE**

Definitive Proxy Statement relating to the Company's Annual Meeting of Shareholders to be filed hereafter (incorporated into Part III hereof).

Table of Contents

ITEM 1A.  RISK FACTORS
*Risks Relating to the Nature and Operation of Our Business*
*We have incurred significant losses and cannot assure that we will be profitable*

We incurred a net loss of $1.4 billion, or $3.40 per share, for the year ended December 31, 2007, due primarily to losses in our home equity loan and asset-backed securities portfolios. We also experienced a substantial diminution of customer assets and accounts as a result of the losses experienced in our institutional business segment. It may require a substantial period of time to restore asset quality at the Bank, rebuild our retail franchise and return to profitability.

*We will continue to experience losses in our mortgage loan portfolio*

At December 31, 2007, the principal balance of our home equity loan portfolio was $11.9 billion. During 2007, the allowance for loan losses in this portfolio increased by $427.5 million to $459.2 million, primarily due to a rapid deterioration in performance in the second half of the year. As the crisis in the residential real estate and credit markets continues, we expect to experience cumulative losses between $1.0 and $1.5 billion in our home equity loan portfolio over the next three years. There can be no assurance that our provision for loan losses will be adequate if the residential real estate and credit markets continue to deteriorate. We may be required under such circumstances to further increase our provision for loan losses, which could have an adverse effect on our regulatory capital position and our results of operations in future periods.

*Losses of customers and assets will result in lower revenues in future periods*

During November 2007, well-publicized concerns about the Bank's holdings of asset-backed securities led to widespread concerns about our continued viability. From the beginning of this crisis through December 31, 2007 when the situation had stabilized, customers withdrew approximately $5.6 billion of net cash and approximately $12.2 billion of net assets from our bank and brokerage businesses. Many of the accounts that were closed belonged to sophisticated and active customers with large cash and securities balances. Concerns about our viability may recur, which could lead to destabilization and asset and customer attrition. In addition, as a result of our recent losses of customers and assets, we expect the revenues generated by trading and lending activity to be significantly reduced from the levels experienced in the first three quarters of 2007. There can be no assurance that we will successfully rebuild our franchise by reclaiming customers and growing assets. If we are not successful, our revenues and earnings in future periods will be lower than we have experienced historically.

*We have a large amount of debt*

We incurred a substantial amount of new debt in connection with the Citadel transaction in which we issued approximately $1.8 billion of springing lien notes. Following Citadel's investment, our total long-term debt is $3.0 billion and the expected annual interest cash outlay is approximately $365 million. Our ratio of debt (our senior debt and term loans but excluding $445.6 million in mandatorily convertible notes) to equity (expressed as a percentage) was 93% at December 31, 2007. The degree to which we are leveraged could have important consequences, including (i) a substantial portion of our cash flow from operations will be dedicated to the payment of principal and interest on our indebtedness, thereby reducing the funds available for other purposes; (ii) our ability to obtain additional financing for working capital, capital expenditures, acquisitions and other corporate needs will be limited; and (iii) our substantial leverage may place us at a competitive disadvantage, hinder our ability to adjust rapidly to changing market conditions and make us more vulnerable in the event of a downturn in general economic conditions or our business. In addition, a significant reduction in revenues could materially adversely affect our ability to satisfy our obligations under our debt securities.

7

Table of Contents

- Total nonperforming loans receivable as a percentage of gross loans receivable is an indicator of the performance of our total loan portfolio.
- Allowance for loan losses is an estimate of the losses inherent in our loan portfolio as of the balance sheet date.
- Allowance for loan losses as a percentage of nonperforming loans is a general indicator of the adequacy of our allowance for loan losses. Changes in this ratio are also driven by changes in the mix of our loan portfolio.

*Significant Events in 2007*

*Citadel Investment of $2.5 Billion Including Sale of Asset-Backed Securities Portfolio*

The operating environment during 2007, particularly during the second half of the year, was extremely challenging as our exposure to the crisis in the residential real estate and credit markets adversely impacted our financial performance and led to a disruption in our customer base. As a result, we believe it was necessary to obtain a significant infusion of cash, which would in turn stabilize our balance sheet and our customer base.

On November 29, 2007, we entered into an agreement to receive a $2.5 billion cash infusion from Citadel. In consideration for the cash infusion, Citadel received three primary items: substantially all of our asset-backed securities portfolio, 84.7 million shares of common stock [1] in the Company and approximately $1.8 billion in 12 1/2% springing lien notes[2]. We believe this transaction provided timely stability for our business and helped alleviate customer concerns.

*Developed a Plan to Restore Customer Confidence and Return to Growth*

We developed a plan focused on resolving the risks in our balance sheet and returning our primary focus to the retail investor. Our plan contains three core goals: reduce credit risk in our loan portfolio, reduce our level of corporate debt and reduce operating expenses to allow us to reinvest in growth initiatives within the core retail franchise. We believe the successful execution of this plan will restore customer confidence and return the Company back to a path of financial growth.

*Launch of Global Trading Platform*

We launched our Global Trading Platform, which provides the ability to buy, sell and hold foreign equities in local currencies to investors who seek liquidity and diversity in their portfolios. Our U.S. customers now have access to foreign stocks and currencies in six major international markets: Canada, France, Germany, Hong Kong, Japan and the United Kingdom.

*International Expansion*

We continued our expansion into international markets with the launch of operations in Norway, the Netherlands and Singapore. In Norway, we now offer online trading of all Norwegian stocks registered on the Norwegian exchange Oslo Børs, as well as stocks from Scandinavian markets in Sweden, Denmark, Finland, and the American markets. In the Netherlands and Singapore, we offer Dutch and Singapore investors direct access to the US stock markets through our Global Trading Platform.

---

[1] The 84.7 million shares of common stock were issued in increments: 14.8 million upon initial closing in November 2007; 23.2 million upon Hart-Scott-Rodino Antitrust Improvements Act approval in December 2007; and 46.7 million shares are expected to be issued in the first quarter of 2008 as the Company has received all necessary regulatory approvals.

[2] Included in the $1.8 billion issuance is $186 million of 12 1/2% springing lien notes in exchange for $186 million of the Company's senior notes that were owned by Citadel. The $1.8 billion in 12 1/2% springing lien notes includes $100 million in notes issued to BlackRock in connection with the transaction. The $1.8 billion in 12 1/2% springing lien notes represents the amount outstanding as of December 31, 2007 and does not include the additional $150 million of springing lien notes issued in January 2008 in accordance with the terms of the agreement with Citadel.

24