UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
E*TRADE FINANCIAL CORPORATION and  :
E*TRADE SECURITIES LLC,            :
                                   :
            Plaintiffs,            :
                                   :
    v.                             :        No. 08 CV 2993 (RJH)
                                   :
MARCUS J. HERNANDEZ,               :
SEAN J. GAFFEY, and                :
BANC OF AMERICA                    :
INVESTMENT SERVICES, INC.          :
                                   :
            Defendants.            :
------------------------------------------------------------ x

# E*TRADE'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF IN AID OF ARBITRATION

COOLEY GODWARD KRONISH LLP
Douglas P. Lobel (DL-3894)
Robert T. Cahill
David Vogel
11951 Freedom Drive
Reston, Virginia 20190
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100

Laura Grossfield Birger (LB-3031)
1114 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**I.** CLIENT TESTIMONY PROVES THAT
DEFENDANTS' SWORN STATEMENTS ARE FALSE ................................................. 1

    **A.** Defendants Solicited Dozens Of E*TRADE's Clients Using A "Hard Sell" ......... 2

    **B.** Hernandez Took Proprietary Information
In Blatant Violation Of E*TRADE Policies ............................................. 4

    **C.** Defendants Disparaged E*TRADE And
Falsely Stated That Clients' Assets Were At Risk ................................... 5

**II.** DEFENDANTS MISSTATE THE APPLICABLE LAW ................................. 6

    **A.** California Law Does Not Apply ...................................................... 6

    **B.** E*TRADE's Client Information Constitutes Protected Trade Secrets .................. 8

    **C.** Defendants Solicited E*TRADE Clients In Violation Of The Law .................... 10

**III.** DEFENDANTS FALSELY ARGUE THAT
E*TRADE "DELAYED" THIS LAWSUIT ................................................ 13

**IV.** DEFENDANTS' OTHER EXCUSES TO
AVOID INJUNCTIVE RELIEF ARE WITHOUT MERIT ............................. 15

## INDEX OF ABBREVIATIONS AND CITATIONS

**Def. Mem.**:     Defendants' Memorandum of Law in Opposition to Plaintiffs' Application for a Preliminary Injunction (April 10, 2008), Docket No. 11.

**Def. Ex. B**:     Exhibit B to Defendants' Memorandum of Law in Opposition to Plaintiffs' Application for a Preliminary Injunction (April 10, 2008), Docket No. 11-3 (*A.G. Edwards & Sons, Inc. v. Slayden*, No. 07-02897 (November 2007)).

**Gaffey Decl.**:     Declaration of Sean Gaffey (April 10, 2008), Docket No. 13.

**Hernandez Decl.**:     Declaration of Marcus Hernandez (April 10, 2008), Docket No. 12.

**Meehan Decl.**:     Declaration of Paul Meehan in support of E*TRADE's Reply Memorandum.

**Miner Decl.**:     Declaration of Edward Miner in support of E*TRADE's Reply Memorandum.

**Miner Ex. 1**:     Exhibit 1 to Declaration of Edward Miner (Transcript of Telephonic Conversation with E*TRADE Client xxxx-2528).

**Miner Ex. 2**:     Exhibit 2 to Declaration of Edward Miner (Transcript of Telephonic Conversation with E*TRADE Client xxxx-3460).

**Miner Ex. 3**:     Exhibit 3 to Declaration of Edward Miner (Transcript of Telephonic Conversation with E*TRADE Client xxxx-7400).

**Miner Ex. 4**:     Exhibit 4 to Declaration of Edward Miner (Transcript of Telephonic Conversation with E*TRADE Client xxxx-0977).

**Miner Ex. 5**:     Exhibit 5 to Declaration of Edward Miner (Transcript of Telephonic Conversation with E*TRADE Client xxxx-6453).

**Pl. Mem**.:     Memorandum of Law in support of Plaintiffs' Motion for Preliminary Injunctive Relief in aid of Arbitration (March 25, 2008), Docket No. 6.

**Wimer**:     Jeffrey A. Wimer, E*TRADE employee.

**Wimer Decl.**:     Declaration of Jeffrey A. Wimer in further support of E*TRADE's Reply Memorandum.

**Wimer Ex. 1**:     E*TRADE Financial Corp., *Corporate Information Security: Information Security ALL USERS' Policy* (relevant sections).

**Wimer 3/25/2008 Decl.**:     Declaration of Jeffrey A. Wimer in support of E*TRADE's Memorandum in Support of Plaintiffs' Motion for Preliminary Injunctive Relief in aid of Arbitration (March 25, 2008), Docket No. 5.

Defendants have not been candid with this Court. They have misrepresented the facts and misstated the law. On the facts, for example, Defendants claim they only "announced" their departures, but deny they ever "solicited" E*TRADE's clients. Dozens of E*TRADE clients disagree. One told E*TRADE:

> *"[Gaffey] was calling to basically try to incent me to . . . move my accounts to his company. . . . And he was pretty hard about it in terms of – he basically seems to think you guys are headed for bankruptcy."*

On the law, Defendants wrongly argue that "California law applies to all disputes between the parties." The Second Circuit disagrees; construing a narrow choice-of-law provision like the one here, it held: "tort claims are outside the scope of the contractual choice-of-law provisions" even if the torts are "incident to the contractual relationship." *Finance One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005). New York courts will also decline to apply California law to E*TRADE's contract claim because doing so would negate Defendants' express agreement to safeguard E*TRADE's proprietary information.

Hoping that the best defense is a good offense, Defendants attack E*TRADE and its representatives, but the facts are clear and well supported:

- Defendants took E*TRADE's trade secret materials to Bank of America ("BOA");
- Defendants used these materials to solicit numerous E*TRADE's clients; and
- Defendants did so by making E*TRADE's clients fear for the safety of their assets.

The Court should order injunctive relief until the FINRA Hearing, which will occur shortly.

## I.    CLIENT TESTIMONY PROVES THAT DEFENDANTS' SWORN STATEMENTS ARE FALSE

Defendants' declarations consistently misrepresent the facts, and hide behind the supposed lack of "competent evidence." Def. Mem. at 9. E*TRADE client testimony proves that Defendants' declarations are false.

### A.    Defendants Solicited Dozens Of E*TRADE's Clients Using A "Hard Sell"

Defendants build their entire Opposition on the claim that they "never actually *solicited* E*TRADE's clients, as opposed to *announcing* their new affiliations" with BOA.  Def. Mem. at 9 (emphasis added).  The evidence below proves that is false.

*Gaffey*:  Gaffey admits he signed a non-solicitation agreement (Gaffey Decl. ¶ 3), but contends that he only "contacted clients to inform them of my change of employment and to provide them with my contact information . . . [i]f *a client* requested a transfer of his or her account, I provided the client with an account transfer form."  (*Id.*).

To the contrary, clients described the strong-arm tactics Gaffey used to solicit E*TRADE's clients.[1]  E*TRADE Client xxxx-2528 was so disturbed by Gaffey's solicitation and defamatory comments that he called E*TRADE to complain:

> *He was calling to basically try to incent me to join – move my accounts to his company*…. And he was pretty hard about it in terms of – *he basically seems to think you guys are heading for bankruptcy* or laying on big numbers around notes coming due and all this – what do you call it – the CDOs and all that.  *I mean, it was really a hard sell*…. And I was actually a little offended."

E*TRADE Client xxxx-2528 Tr. at 2:13-15; 2:21-3:4; 3:6-7 (Miner Ex. 1); Meehan Decl. ¶ 12.

E*TRADE Client xxxx-7400 described Gaffey's solicitation too:

| | |
|---|---|
| **CLIENT xxxx-7400**: | Yeah.  In fact Sean called me.  I don't know if that's legal or not. |
| **E*TRADE REP**: | No, it's not.  When did he call you? |
| **CLIENT xxxx-7400**: | After he left. |
| **E*TRADE REP**: | [Inaudible.] |
| **CLIENT xxxx-7400**: | *Yeah.  He said he was at a new firm and just to let me know that he was there if I had any money I wanted to invest.* |

E*TRADE Client xxxx-7400 Tr. at 6:19-7:7 (Miner Ex. 3); Meehan Decl. ¶ 13.  Another client said:

---

[1]    Outreach calls to clients are preserved on recorded lines or in notes maintained by the company.  Meehan Decl. ¶¶ 4-6.

| | |
|---|---|
| **CLIENT xxxx-3460**: | Well, your guy quit. |
| **E\*TRADE REP**: | So you knew that already? |
| **CLIENT xxxx-3460**: | Yeah.  He called me. |
| **E\*TRADE REP**: | He did? |
| **CLIENT xxxx-3460**: | ***Yeah.  He called me after he was over at Bank of America or wherever the hell he is.*** |
| **E\*TRADE REP**: | Okay.  ***Was he soliciting business with you?  Because that's one of the reasons I was calling you was to find out -- is to give you your new contact here.*** |
| **CLIENT xxxx-3460**: | ***Yeah.  He was -- I mean, obviously.  What do you think he was doing?*** |

E\*TRADE Client xxxx-3460 Tr. at 2:17-3:7 (Miner Ex. 2); Meehan Decl. ¶ 14.  Others Gaffey

successfully solicited include:

- Client xxxx-2017 said that Gaffey called about moving his accounts; this client has since transferred $1.6 million to BOA.  Meehan Decl. ¶ 21.

- Client xxxx-9518 said she was moving her accounts after Gaffey spoke to her about transferring to BOA; she has since transferred $25.8 million to BOA.  *Id.* ¶ 23.

- Client xxxx-2403 was a client formerly assigned to Gaffey; after Gaffey's departure this client transferred $17 million to BOA.  *Id.*  ¶ 20.

Other clients who report being solicited by Gaffey include Clients xxxx-1847, xxxx-1990,

xxxx-6761, xxxx-7070, xxxx-7551, xxxx-9339, and xxxx-9941.  *Id.* ¶¶ 15-19, 22.

   ***Hernandez***:  Parroting Gaffey, Hernandez states that he only "contacted clients to inform

them of my change of employment and to provide them with my contact information . . . [i]f a

client requested a transfer of his or her account, I provided the client with an account transfer

form."  Hernandez Decl. ¶ 3.  He adamantly denies soliciting any E\*TRADE clients.  *Id.*

   The clients disagree.  Numerous clients reported that Hernandez solicited them after he

left E\*TRADE.  For example:

- Client xxxx-6453 said Hernandez called him from BOA "trying to talk me into moving all my money over there."  E\*TRADE Client xxxx-6453 Tr. at 21:7-8 (Miner Ex. 5); Meehan Decl. ¶ 25.  Hernandez tried to frighten this client into leaving E\*TRADE by ***"telling him how unsafe E\*TRADE is."***  (*Id.* at 21:9).

- Client xxxx-0977 described how Hernandez called him, predicting E*TRADE's demise and urging the client to transfer his investment portfolio to BOA. "Marcus was candid about his concerns about, you know, E*TRADE as an entity. You know, just being able to stay afloat was probably his biggest concern." E*TRADE Client xxxx-0977 Tr. at 3:10-13 (Miner Ex. 4); Meehan Decl. ¶ 26.

- Client xxxx-7845 said he was transferring his accounts to BOA after being solicited by Hernandez; he has since transferred $2.5 million to BOA. Meehan Decl. ¶ 33.

- Client xxxx-1295 said he had been contacted by Hernandez who encouraged the client to move his assets to BOA; Hernandez specifically offered certain high-interest money market rates for the client's IRA. *Id.* ¶ 34.

- Client xxxx-9661 is a former account assigned to Hernandez; he has since transferred $1.8 million to BOA. *Id.* ¶ 32.

Other E*TRADE clients who reported being solicited by Hernandez include Clients xxxx-5045, xxxx-5830, xxxx-7114, xxxx-7167, xxxx-7520, and xxxx-7713. *Id.* ¶¶ 27-31, 35.

### B.  Hernandez Took Proprietary Information In Blatant Violation Of E*TRADE Policies

E*TRADE retrieved an email Hernandez sent to his home computer attaching voluminous proprietary client contact and financial information. After being caught with his hand in the cookie jar, Hernandez professes an innocent explanation – he did so to "perform his job duties" – and claims that this did "not [violate] any firm policy to email such material to a personal email account for work purposes." Def. Mem. at 17 n.6 and Hernandez Decl. ¶ 6.

Hernandez is again not candid with the Court. Hernandez violated E*TRADE's *Corporate Information Security: Information Security ALL USERS' Policy* ("Computer Policy") merely by storing E*TRADE's financial information and spreadsheets on his desktop. All such information can only be stored on E*TRADE's network, not on an individual computer.[2] Wimer Decl. ¶ 7. Hernandez's Employment Agreements required that all E*TRADE policies (including

---

[2]    The Computer Policy states: "All E*TRADE FINANCIAL critical information or data classified information as Customer Confidential or Corporate Sensitive information created or maintained on an individual workstation must be backed up or saved to a Local Area Network (LAN) server directory. This information must not be maintained on the workstation "C" drive." (Wimer Ex. 1 at 19 & 22).

its Computer Policy) be followed.  *Id.* ¶ 9.  Hernandez was well aware of this because he was regularly trained on E*TRADE's Computer Policy.[3]

Hernandez concocts another tale in claiming that he wanted to be certain he had computer access and could retrieve E*TRADE's information once he transferred to his new office in Pennsylvania.  Def. Mem. at 4-5 and Hernandez Decl. ¶ 6.  Hernandez knew he could log into any E*TRADE computer at any office.  Wimer Decl. ¶ 12.  If Hernandez had stored the information on E*TRADE's network (where E*TRADE files are required to be stored), that information would have been accessible to him at any E*TRADE office computer terminal.  *Id.* It defies belief that Hernandez would blatantly violate E*TRADE's Computer Policy because he feared he would not have computer access at work.  And whatever his reasons, his actions were a clear violation of his agreements.

Hernandez's lack of candor discredits his other claim that he never used this massive and highly confidential information to contact customers after he left E*TRADE.  Def. Mem. at 5 and Hernandez Decl. ¶ 6.

### C.    Defendants Disparaged E*TRADE And Falsely Stated That Clients' Assets Were At Risk

Defendants also contend they never disparaged E*TRADE by stoking fears of bankruptcy, nor told clients that their assets were at risk.  Def. Mem. at 5.  Again, multiple clients disagree.  While this fear-mongering was sometimes carefully couched as Defendants' personal reasons for leaving E*TRADE, Defendants knew the chilling implications.

For instance, Hernandez attempted to frighten Client xxxx-6453 into leaving E*TRADE by ***"telling him how unsafe E*TRADE is."***  E*TRADE Client xxxx-6453 Tr. at 21:9 (Miner Ex. 5); Meehan Decl. ¶ 25.  Hernandez predicted that trouble "staying afloat" could lead to

---

[3]    E*TRADE records show that Hernandez completed Computer Policy training on 12/10/07, 6/19/06 and 11/2/04.  Wimer Decl. ¶ 10.

E*TRADE's demise.  E*TRADE Client xxxx-0977 Tr. at 3:10-13 (Miner Ex. 4); Meehan Decl.

¶ 26.  He also told Client xxxx-5830 that he was "scared of the state of E*TRADE."  Meehan

Decl. ¶ 27.  After speaking to Hernandez, Client xxxx-5045 became "afraid" to keep his assets at

E*TRADE.  *Id.* ¶ 28.  Finally, Client xxxx-7114 transferred his assets to BOA after speaking to

Hernandez because of concerns about E*TRADE's "liquidity."  *Id.* ¶ 29.

Similarly, Gaffey told Client xxxx-2528 that E*TRADE was "heading for bankruptcy."

E*TRADE Client xxxx-2528 Tr. at 2:21-3:7 (Miner Ex. 1); Meehan Decl. ¶ 12.  Client xxxx-

2403, formerly assigned to Gaffey, transferred his accounts to BOA based on concerns over

E*TRADE's "financial condition."  Meehan Decl. ¶ 20.

Client statements confirm the falsity of Defendants' denials.  Moreover, Defendants not

only defamed E*TRADE in an effort to steal its customers, but also violated New York criminal

law by "circulating" false "rumors" about "insolvency."[4]

## II.    DEFENDANTS MISSTATE THE APPLICABLE LAW

Defendants' legal arguments are as misleading as their factual assertions.  The heart of

their argument is that California law applies to all of E*TRADE's claims, and that California law

permits them to take E*TRADE's proprietary client lists to "announce" their new jobs to clients.

This brazen argument is entirely wrong legally and factually.

### A.    California Law Does Not Apply

Defendants argue that "this dispute" (meaning all causes of action) is governed

exclusively by California law.  Def. Mem. at 2-4, 8-12.  They repeatedly chastise E*TRADE for

not discussing California law.  The issue is critical for Defendants because California, unlike

---

[4]    "Any person who willfully and knowingly makes, circulates or transmits to another or others any statement
or rumor, written, printed, or by word of mouth, which is untrue in fact and is directly or by inference derogatory to
the financial condition or [a]ffects the solvency or financial standing of any bank . . . doing business in this state . . .
is guilty of a misdemeanor."  N.Y. Banking Law § 671.  Defendants disparagement of E*TRADE includes its
affiliate E*TRADE Bank, whose accounts are linked to all E*TRADE brokerage accounts.

New York, allows employees to "announce" their job change to clients using proprietary contact information.  *Id.* at 9-12.  Defendants are wrong for *two* separate reasons:

1.     General governing law provisions in Defendants' Employment Agreements do not negate express, bargained-for duties in those agreements.  Defendants do not dispute, as they cannot, that the Employment Agreements **expressly** bar them from using E*TRADE's proprietary information, defined to include "client lists," for **any** purpose other than E*TRADE's business.  (E*TRADE briefed this at length, but Defendants' brief ignores this point.  *See* Pl. Mem. at 5-8).  Thus, Defendants must argue that California law permits them to do something their agreements expressly bar – in other words, California law invalidates their agreements.

This is not allowed by New York law.  Parties cannot select a state's law that would invalidate a portion of their contract.  Restatement (Second) of Conflict of Laws § 187, Comment *e*, specifically provides:

> On occasion, the parties may choose a law that would declare the contract invalid.  In such situations, the chosen law will not be applied by reason of the parties' choice.  To do so would defeat the expectations of the parties which it is the purpose of the present rule to protect.  The parties can be assumed to have intended that the provisions of the contract would be binding upon them….

New York courts have adopted this rule.  *Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006).  "[T]his doctrine applies to situations in which the selected law would invalidate an express provision of a contract as well as to situations in which the entire contract would be invalidated."  *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 495 (6th Cir. 1999) (cited with approval in *Eli Lilly v. Fed. Express Corp.*, 503 F.3d 78, 82 (2d Cir. 2007)).  This rule recognizes the fundamental principles of contract interpretation that (1) a contract must be read to give meaning to each provision; and (2) a general provision (such as the selection-of-

law clause) cannot supersede specific provisions (such as the prohibition on misuse of E*TRADE information). *Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 142 (S.D.N.Y. 2006).

Instead, New York choice-of-law principles apply the law of the state with the greatest nexus to the dispute. *In re Allstate Ins. Co.*, 613 N.E.2d 936, 939 (N.Y. 1993). Here, New York law would select itself because E*TRADE is a New York-based company, and the Defendants worked for years in E*TRADE's New York office; California has no nexus to the case.[5]

2.      Even if California law applied to E*TRADE's breach of contract claims, Defendants read the choice of law too expansively in seeking to apply California law to E*TRADE's other tort claims. The agreement selects California law only for the "interpretation and enforcement" of the contract. Def. Mem. at 8. This is a narrow provision that applies only to breach of contract claims – it does ***not*** apply to tort claims between the parties. *See Finance One*, 414 F.3d at 334-35.

Nonetheless, as shown below, E*TRADE prevails on its claims even if California law applied to each of them.

**B.      E*TRADE's Client Information Constitutes Protected Trade Secrets**

Defendants meekly argue that E*TRADE's client information is not a protected trade secret. Def. Mem. at 10-12. Ignoring New York law completely, they make the bald assertion that such client names and phone numbers are not recognized as trade secrets in California. *Id.* After repeatedly chastising E*TRADE for not citing California authorities, *e.g.*, *id.* at 9,

---

[5]      Indeed, the Court can disregard the selection of California law entirely. *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("New York law allows a court to disregard the parties' choice when the 'most significant contacts' with the matter in dispute are in another state.") (citation omitted); *see also Estee Lauder*, 430 F. Supp. 2d at 170 ("freedom of choice" to select governing law "is not absolute").

Defendants cite to only one "authority" – a FINRA arbitration award "in California." *Id.* at 12 & Def. Ex. B.

California law unequivocally recognizes that client lists are protected trade secrets. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (Cal. Ct. App. 1997); *American Credit Indem. Co. v. Sacks*, 213 Cal. App. 3d 622, 630-32 (Cal. Ct. App. 1989).

Defendants' sole reliance on a FINRA arbitration award is fatal to their argument. First, FINRA awards are never binding precedent and should certainly not guide a federal court. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 543 (7th Cir. 1998) (Posner, J.). Second, FINRA arbitrators (including two of the three in the *A.G. Edwards* case) are not required to be lawyers or to strictly apply case law. *Id; Question And Answer: Understanding And Applying The Law In A Case*, The Neutral Corner, Apr. 2005, at 5-6 (NASD Dispute Resolution newsletter); *The Arbitrator's Manual* p. 30 (2007)[6] (relevant excerpts attached hereto as Exhibits 1 and 2). Most importantly, in the ***very case*** Defendants cite, the District Judge in the Northern District of California ***entered a preliminary injunction prohibiting defendants from misusing plaintiff's client lists***. *See* Order at 2, *A.G. Edwards & Sons v. Slayden*, No. C 07-5154 (N.D. Cal. Oct. 15, 2007) attached hereto as Exhibit 3. The federal court's Order, not the FINRA arbitration award, is precedent for the rule that California law absolutely protects E*TRADE's client lists as proprietary trade secrets.[7]

---

[6]    "Arbitrators are not strictly bound by case precedent or statutory law. Rather, they are guided in their analysis by the underlying policies of the law and are given wide latitude in their interpretation of legal concepts."

[7]    It is worth noting that this case is not exclusively about client contact information. Some of Defendants' contacts with clients indicate that Defendants possess confidential information about the clients' particular accounts. For example, Hernandez specifically solicited one client with the promises of better returns on the client's IRAs – he would not have known of the client's IRAs without having that client's account information. *See* Meehan Decl. ¶ 34.

### C.    Defendants Solicited E*TRADE Clients In Violation Of The Law

The Defendants' breaches of their contractual agreements and fiduciary obligations, and violations of trade-secret law is well established by the facts and law.

1.    Defendants never actually deny that they used E*TRADE's proprietary information to contact clients.  Conspicuously absent from their 24-page brief is any affirmative statement that they never took information from E*TRADE, or anything to that effect.  Given Defendants' rhetoric on every other aspect of E*TRADE's claims, the absence of any denial of their use of E*TRADE information is telling.  Indeed, with dozens of client contacts about which E*TRADE already knows – and that is likely the tip of the iceberg, Meehan Decl. ¶¶ 40 & 41 – it is unfathomable that Defendants were able to reach out to so many clients without using E*TRADE's customer contact information.  *Id.* ¶ 38.

2.    Instead of denying that they used E*TRADE's proprietary information, which they clearly did, Defendants argue they were permitted by California law to "announce" their departures to BOA.  Def. Mem. at 9-10.  This rule is irrelevant, as demonstrated above, because Defendants repeatedly solicited clients using a "hard sell."  California law (even if it applies) very narrowly construes permissible "announcements;" *any* aspect of an announcement seeking business from the client constitutes an impermissible "solicitation."  *Reeves v. Hanlon*, 95 P.3d 513, 522 (Cal. 2004); *Aetna Bldg. Maint. Co. v. West*, 246 P.2d 11, 14-15 (Cal. 1952). Defendants' numerous requests to E*TRADE's clients asking for money to invest or trades to make, or offering that BOA's products are "better," easily cross the line into forbidden "solicitations."  *E.g.*, *Morlife*, 56 Cal. App. 4th at 1527 ("general pattern of solicitation" established by defendant calling clients and describing his ability to provide services to them); *Sacks*, 213 Cal. App. 3d at 636 (defendant "solicited" when she "petition[ed], importune[d] and

entreat[ed] ACI's customers to call her at any time for information about the better policies F&D can provide and for assistance").[8]

Given the clear evidence of solicitation, E*TRADE is certain to prevail on the merits. Gaffey had a non-solicitation provision in his agreement; New York law (as E*TRADE explained earlier and Defendants ignored) and California law (even if it applied) enforce this provision, and Gaffey clearly breached it.

Hernandez argues that he never signed a non-solicitation provision, so he is free to solicit E*TRADE clients.[9] Def. Mem. at 10. That is highly misleading: he may be free to solicit E*TRADE clients *so long as he does not use E*TRADE's proprietary information to contact them*. *E.g.*, *Reeves,* 33 Cal. 4th at 1156. Hernandez's agreements strictly forbid him from soliciting E*TRADE clients using clients' contact or account information, and New York and California trade secret laws impose the same obligations. Pl. Mem. at 18-19. As discussed above, he used E*TRADE's information. E*TRADE will prevail on its claims against him.

3.     Finally, E*TRADE must dismiss the preposterous argument that Defendants were authorized to breach their contracts, fiduciary duties, and trade secret obligations based on a single, unproduced, alleged "text message" (cell phone-to-cell phone message) from Wimer to Gaffey. Def. Mem. at 3-4, 18. Wimer denies he authorized Gaffey to steal E*TRADE clients.

---

[8]    *See also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*, No. 01-00659, 2001 WL 283083, at *4 (C.D. Cal. Feb. 2, 2001) ("Defendants did solicit Merrill Lynch clients by placing direct and personal follow-up calls to Merrill Lynch customers," which "most likely stepped over the line between an announcement of new employment and solicitation."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Garcia*, 127 F. Supp. 2d 1305, 1306 (C.D. Cal. 2000) (providing customers with documentation to assist transfer of their accounts constituted solicitation); *United Ribbon Co. v. Coast to Coast Computer Prods.*, No. 149562, 2002 WL 922940, at *4 (Cal. Ct. App. May 8, 2002) (defendants "contacted the customers telephonically and attempted to generate sales for Coast. This conduct in itself was improper."); *Luce v. Hanrahan*, No. 104153, 2005 WL 705380, at *9 (Cal. Ct. App. Mar. 29, 2005) ("While [Defendant] had the right to market his skills generally to consumers . . . he did not have the right to solicit the specific clients of his former employer simply because he personally serviced those customers.").

[9]    Hernandez claims that California courts have never issued an injunction where a defendant lacked a non-solicitation clause. Def. Mem. at 3. This is false. *See Luce*, 2005 WL 705380, at *9 & n.2; *Sacks*, 213 Cal. App. 3d at 631 & n.6.

Wimer Decl. ¶ 17.  Instead, the full context of his communications was that if Gaffey solicited E*TRADE clients, there would be serious legal consequences.  *Id.* ¶ 18.

Even if Wimer sent such a cryptic text message, it does not free Gaffey of his contractual obligations.  Wimer's text message could only "bind" E*TRADE if it were ***reasonable*** for Gaffey to believe that Wimer had authority to waive the extensive requirements imposed by Gaffey's Employment Agreements, including E*TRADE's Code of Professional Conduct.  *See Marfia v. T.C. Ziraat Bankasi*, 100 F.3d 243, 252 (2d Cir. 1996).  Gaffey, of course, makes no such argument; Gaffey should have immediately perceived such statements by Wimer as something that E*TRADE management would never have authorized.[10]  Defendants cannot seriously expect their entire defense to rest on a cryptic "text message" that they never produced, which supposedly relieved Gaffey of all his legal obligations.

4.      Having demonstrated the validity of E*TRADE's claims for breach of contract, breach of fiduciary duty, and trade secret violations, it is not necessary to trudge through all of E*TRADE's other causes of action in detail.  Defendants make no arguments about them under New York law, and since New York law applies to the non-contract torts, *see* Part II.A, *supra*, no argument exists to rebut them.[11]  As to E*TRADE's claim under the federal Computer Fraud and Abuse Act, Hernandez protests that he had an innocent explanation for sending confidential information to his house – but that excuse is demonstrably false and illogical.  *See* Part I.B, *supra*.  Finally, Defendants spend much time discussing E*TRADE's defamation claim.  Def. Mem. at 15.  E*TRADE did not seek injunctive relief arising from this claim, *see* Pl. Mem. at 16-21, and did not even discuss the cause of action in its brief.

---

[10]     Indeed, Gaffey's employment contract expressly states that any waivers must be in writing.  *See* E*TRADE Employment Agreement at 5 (Wimer 3/25/2008 Decl. ¶ 37 & Ex. 13).

[11]     Defendants argue that the Uniform Trade Secret Act ("UTSA") preempts E*TRADE's other torts.  Def. Mem. at 13.  However, New York has not adopted the UTSA.  *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 47 (N.D.N.Y. 2005) (in New York misappropriation of trade secrets is a common-law claim).

III.    **DEFENDANTS FALSELY ARGUE THAT E*TRADE "DELAYED" THIS LAWSUIT**

Defendants make no effort to rebut the overwhelming authorities – including BOA's arguments in virtually identical cases – that their misuse of E*TRADE's proprietary information to solicit clients constitutes "irreparable harm." Pl. Mem. at 12-16. Instead, Defendants contend that E*TRADE "delayed" filing its case "nearly 10 weeks," which they believe is a reason alone to deny E*TRADE's motion. Def. Mem. at 16-19.

As an initial matter, consider this argument's brazen conclusion. Defendants have breached their contracts and violated the law, have taken over $51 million in E*TRADE's assets, and the evidence shows that this conduct is continuing. Meehan Decl. ¶¶ 37, 47. Yet the Court cannot stop this because Defendants have been doing it successfully for over two months.

Besides being illogical, Defendants' argument is wrong both legally and factually. Legally, Defendants state incorrectly that the passage of 10 weeks – even assuming that occurred – negates E*TRADE's showing of irreparable harm. In authority more recent than what Defendants cite, *see* Def. Mem. at 16, courts in this Circuit have granted injunctive relief where a lawsuit was filed well more than 10 weeks after the defendant left the plaintiff's employment. *See North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 42 (2d Cir. 1999) (affirming grant of preliminary injunction where case was filed more than three months after the employee began calling clients); *Prudential Ins. Co. v. Barone*, No. 98-0272, 1998 WL 269065, at *1-2 (W.D.N.Y. May 19, 1998) (granting preliminary injunction where the plaintiff waited more than six months to file); *see also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) (upholding District Court's grant of injunctive relief where complaint was filed approximately six months after employee began working for a competitor); *Charles Schwab & Co. v. Karpiak*,

No. 06-4010, 2007 WL 136743, at *16 & n.9 (E.D. Pa. Jan. 12, 2007) (Schwab filed lawsuit approximately four months after broker began soliciting customers).

Defendants would have the Court believe that E*TRADE should have filed its lawsuit the moment E*TRADE realized Hernandez sent confidential information to his home account, Def. Mem. at 17, or when Gaffey was asking other E*TRADE employees to join him, *id.* at 18. But E*TRADE needed to assure itself, before assuring the Court, that it was being harmed by Defendants' activities. If E*TRADE had rushed into court, Defendants no doubt would have argued that E*TRADE lacked the evidence of consistent wrongdoing to justify an injunction.

Instead, E*TRADE needed to devote substantial time to determine the extent to which Defendants were contacting its clients and the nature of the communications. Meehan Decl. ¶ 44. This did not and could not happen overnight. Hernandez initially threw E*TRADE off the trail by assuring E*TRADE he would never solicit clients. *Id.* ¶¶ 42-43. It took several weeks for E*TRADE to realize that Defendants were soliciting clients, and even more time to realize the financial impact from client defections. *Id.* ¶¶ 45-46. Only within days of filing the lawsuit, did major accounts leave E*TRADE for BOA. *Id.* ¶ 47. Indeed, the conduct is continuing because Defendants continue to siphon off large clients from E*TRADE. *Id.* ¶ 46.

The Circuit will not penalize E*TRADE for the time required to investigate this matter. *See Nicholson v. Scoppeta*, 344 F.3d 154, 167 n.6 (2d Cir. 2003) (irreparable harm not negated by "strategic decisions of plaintiff's counsel to delay seeing relief until such time as the plaintiffs can actually demonstrate that relief is warranted"). The law did not require E*TRADE to file suit as soon as Defendants departed. Instead, E*TRADE did what any reasonable business should do – it warned Defendants not to breach their obligations in a letter dated February 1,

Def. Mem. at 17, and promptly began contacting clients.  Once E*TRADE concluded that

Defendants had violated the law and their agreements, it promptly filed suit.

## IV.    DEFENDANTS' OTHER EXCUSES TO AVOID INJUNCTIVE RELIEF ARE WITHOUT MERIT

Defendants' final flurry of arguments on "waiver, equitable estoppel, and unclean hands"

are baseless.  Def. Mem. at 20-21.  E*TRADE did not "waive" its claims against Gaffey through

a text message, *see* Part II.C.3, *supra*, and did not "waive" its claims against Hernandez through

"delay," *see* Part III, *supra*.  Defendants' minimal pleas about "unclean hands" are even less

credible.  Hernandez *was* improperly contacting E*TRADE's clients to solicit them using

E*TRADE's proprietary information; Gaffey had no reasonable basis to believe that Wimer was

waiving Gaffey's substantial employment restrictions; and the makeweight contention about

some kind of compensation dispute is illusory, given that nothing has prevented Gaffey or

Hernandez from pursuing a claim against E*TRADE for allegedly unpaid compensation (which,

for the record, they have not initiated).

Dated:  April 14, 2008                      Respectfully submitted,

                                            COOLEY GODWARD KRONISH LLP

                                            /s/ Douglas P. Lobel
                                            Douglas P. Lobel (DL-3894)
                                            11951 Freedom Drive
                                            Reston, Virginia 20190-5655
                                            Telephone:  (703) 456-8000
                                            Facsimile:  (703) 456-8100

                                            *Counsel for Plaintiffs E*TRADE Financial*
                                            *Corporation and E*TRADE Securities LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas P. Lobel, hereby certify that on the 14th day of April, 2008, E*TRADE's Reply Memorandum of Law in Support of Its Motion for Preliminary Injunctive Relief in Aid of Arbitration and supporting papers were filed through the ECF system and will be sent electronically, via the ECF system, to the following registered participants, as also identified on the Notice of Electronic Filing (NEF).  There are no non-registered participants in this case to my knowledge and belief.

Paul A. Saso, Esq.
GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
Tel:  (212) 613-2000

and

Christopher C. Coss, Esq.
Thomas J. Momjian, Esq.
COSS & MOMJIAN, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, Pennsylvania 19004
Tel:  (610) 667-6800

*Counsel for Marcus J. Hernandez and Sean J. Gaffey*

William E. Goydan, Esq.
WOLFF & SAMSON PC
140 Broadway, 46th Floor
New York, New York 10005
Tel:  (212) 973-0572

*Counsel for Banc of America Investment Services, Inc.*

/s/ Douglas P. Lobel
Douglas P. Lobel

# EXHIBIT 1

# The Neutral Corner - April 2005



## Handling Motions Filed Before the IPHC
### By Valerie Bailey Johnston
### Associate Director of Case Administration, NASD Dispute Resolution

### Overview

NASD Dispute Resolution implemented new procedures to handle motions that parties file before an Initial Pre-hearing Conference (IPHC) that require a panel's consideration. As part of these procedures, NASD Dispute Resolution revised its letters to notify parties what to expect in the pre-hearing process. These procedures, however, do not affect motions that are submitted as attachments to parties' answers. This article is designed to alert arbitrators about these new procedures and what they can expect from the parties.

### Motions Filed before the IPHC

The revised letters advise parties that NASD Dispute Resolution will not solicit a response to a motion that a party files before the IPHC. Nevertheless, the opposing party may expedite this process by filing a response at least ten days before the IPHC. If the opposing party files a submission, staff members will transmit the motion and response(s) to the panel so that the panel may review them and render a decision at the IPHC.

If NASD Dispute Resolution does not receive a response to the motion at least 10 days before the IPHC, staff members may not be able to deliver the motion and response to the panel in time for the IPHC. The 10-day period is intended only as a guide to ensure that staff has sufficient time to transmit a motion and response(s) to the panel before the IPHC. Staff members will send all motions to the panel when they receive responses to these motions.

### Opposing Party Responds to the Motion

If staff members receive any responses to a motion at least ten days before the IPHC, they will send the motion and response(s) to the arbitrators so that the panel may determine whether to address the motion at the IPHC. If a motion concerns discovery issues, staff members will send the motion and response(s) to the chairperson or other designated panelist. If a motion relates to any other issue, staff members will send the motion and response(s) to the entire panel. Staff members will also notify the parties that NASD Dispute Resolution sent the motion and response(s) to the chairperson or the panel.

### Opposing Party Does Not Respond to the Motion

If the opposing party does not respond to the motion prior to the IPHC, staff members will not forward the motion to the chairperson or the panel. If the moving party inquires about the status of the motion, staff members will remind the party about the procedures outlined in the letters.

### Panel's Role

When the chairperson or panel receives a motion and response(s), the panel may take any number of the following steps:

1. Advise staff members to alert the parties that they should be prepared to argue the motion at the IPHC. In this case, the panel may decide to rule on the motion at the IPHC after hearing arguments or to issue a ruling after the conclusion of the IPHC as part of the IPHC Scheduling Order.
2. Advise the parties at the IPHC that the panel will schedule a pre-hearing conference to hear arguments on the motion. The panel should then include the date and time of the pre-hearing conference in the IPHC Scheduling Order.
3. Advise the parties at the IPHC that the panel will rule on the motion based solely upon the papers submitted by the parties.

The panel may also determine that it needs additional submissions from the parties before it can make a ruling. In this case, the panel should give the parties clear instructions concerning the additional submissions and include such instructions in the IPHC Scheduling Order.

Staff members will not submit a motion to the panel prior to the IPHC if they do not receive a response. In this situation, the moving party may raise the issue at the IPHC. The panel should be prepared to establish a schedule for responding to the motion and issuing a ruling.

Case 1:08-cv-02993-RJH     Document 20-2     Filed 04/14/2008     Page 3 of 8

**Conclusion**

NASD Dispute Resolution believes these new procedures will streamline the motion process for parties, arbitrators, and staff. As part of our ongoing commitment to improve the arbitration process, we will continue to alert arbitrators about any changes to our procedures.

## Dispute Resolution News

### Mark Your Calendars: Phone-In Workshop

NASD is hosting a phone-in workshop for arbitrators on June 28, 2005 from 12:00 p.m. to 1:00 p.m., Eastern Daylight Time. Linda Fienberg, President of NASD Dispute Resolution, will conduct the workshop. NASD will send announcements to arbitrators in advance of the workshop that will specify the topics and provide instructions on how to enroll for the call.

### Case Filings

Arbitration case filings from January 1 through March 31, 2005 reflect a 25% decrease compared to cases filed during the same time in 2004. NASD Dispute Resolution experienced a decrease in case filings during this three-month period from 2,070 in 2004 to 1,560 in 2005. In a major effort to reduce the existing caseload, NASD Dispute Resolution increased by 11% the number of cases closed between January 1 through March 31, 2005 compared to the same period in 2004.

### Expansion of Hearing Locations

NASD Dispute Resolution is pleased to announce that we now have arbitration and mediation hearing services available in all 50 states.

Recently, we opened 10 new hearing locations in: Montpelier, Vermont; Augusta, Maine; Manchester, New Hampshire; Charleston, West Virginia; Helena, Montana; Cheyenne, Wyoming; Boise, Idaho; Bismarck, North Dakota; Rapid City, South Dakota; and Jackson, Mississippi. In 2004, NASD added hearing locations in Wilmington, Delaware; Wichita, Kansas; Birmingham, Alabama; Columbia, South Carolina; Des Moines, Iowa; Providence, Rhode Island; and Hartford, Connecticut. At the end of 2003, we added Newark, New Jersey.

Parties now have access to NASD arbitration and mediation services in a total of 68 locations, including London and Puerto Rico. To achieve this goal, we established rosters of arbitrators and arranged for facilities to conduct hearings in these new hearing locations. For a complete list, see NASD Dispute Resolution's map of regional offices and hearing locations. This expansion enables our forum to provide investors with greater access to arbitration and mediation services nationwide.

## Unsolicited Mass Emails to Arbitrators

We understand that an individual has been sending a series of unsolicited emails to many arbitrators on NASD's neutral roster. Several of you have asked about the origin of these emails, since the author purports to interpret and explain various NASD policies and the name "NASD Dispute Resolution" appears in the Subject line. These emails have not been sent or authorized by NASD Dispute Resolution. We have been unable to determine with certainty how this individual obtained so many email addresses, since he has refused our request for that information.

We want you to know that NASD Dispute Resolution does not give out your email addresses to any person or organization. We did not release your email addresses to this email writer; nor is he authorized to represent the views or to interpret the policies of NASD or NASD Dispute Resolution. If you would like to stop receiving this individual's emails, please contact the sender directly.

NASD Dispute Resolution communicates with its arbitrators in many ways, including *The Neutral Corner*, postings on NASD's Web site, arbitrator in-person and Web-based training, telephone workshops, regular mail, and by emails that are clearly identified as being sent by NASD.

If you have any questions about NASD Dispute Resolution rules or practices, please feel free to contact any of the staff members listed in this newsletter and on NASD's Web site.

## Arbitrator Disclosure Tips

### Tip #1

Although arbitrators are encouraged to make disclosures early in the process, arbitrators will occasionally make a disclosure at a pre-hearing conference or at a hearing.  Often these disclosures require an update of the arbitrator's Disclosure Report.  Unfortunately, arbitrators may erroneously believe that they have made an adequate disclosure to NASD since the disclosure was presented during a pre-hearing conference or a hearing.

Arbitrators should not assume that a disclosure presented during a pre-hearing conference or a hearing will be captured by NASD and recorded in the arbitrator's Disclosure Report. Accordingly, please make certain that your disclosure is repeated directly to NASD. You can accomplish this in one of three ways:

- Share your disclosure with the staff person assigned to the case.
- Call the Department of Neutral Management at (212) 858-4339.
- Advise us of your update via our Web site, on "Update Your Arbitrator Profile."

### Tip #2

If you possess a professional license (*i.e.*, JD, CPA, etc.), make sure that you update your Disclosure Report if any of your professional licenses expire, are suspended, or become inactive.  For example, an arbitrator who is an attorney may choose a new career path and allow his/her law license to expire or to become inactive. While this would not prohibit an arbitrator from remaining on our roster, such information must be accurately noted on the arbitrator's Disclosure Report.

---

## Regional Updates

### Northeast Regional Update

During the next three months, the Northeast Regional Office will be conducting in-person Basic Panel Member training programs in these cities on the following dates:

**Boston, Massachusetts**
May 11, 2005

**Columbus, Ohio**
May 19, 2005

**Hartford, Connecticut**
June 8, 2005

**Albany, New York**
June 22, 2005

**New York, New York**
July 12, 2005

**Montpelier, Vermont**
July 27, 2005

If you are interested in attending a Basic Panel Member Training program, please contact Cheree White at (212) 858-4063 or by email.

### Mid-Atlantic Regional Update

The Mid-Atlantic Regional Office is pleased to announce the addition in March 2005 of a new hearing location in Charleston, West Virginia. If someone you know is interested in serving as an arbitrator or mediator in Charleston, please contact our Recruitment Supervisor, Neil McCoy, at (212) 858-4283.

During the next two months, the Mid-Atlantic Regional Office will be conducting in-person Basic Panel Member training programs in these cities on the following dates:

**Nashville, Tennessee**
May 5, 2005

**Richmond, Virginia**
June 10, 2005

**Washington, DC**
June 23, 2005

If you are interested in attending a Basic Panel Member training program, please contact Karen Carter at (202) 728-8327 or by email.

**Western Regional Update**

The Western Regional Office is pleased to announce the addition in March 2005 of three new hearing locations in Boise, Idaho; Cheyenne, Wyoming; and Helena, Montana. If someone you know is interested in serving as an arbitrator or mediator in these hearing locations, please contact our Recruitment Supervisor, Neil McCoy, at (212) 858-4283.

During the next three months, the Western Regional Office will be conducting in-person Basic Panel Member training programs in these cities on the following dates:

**Las Vegas, Nevada**
May 10, 2005

**Seattle, Washington**
June 14, 2005

**Los Angeles, California**
July 12, 2005

If you are interested in attending a Basic Panel Member training program, please contact Tiffany Hansmann by telephone at (213) 613-2684 or by email.

**Midwest Regional Update**

During the next three months, the Midwest Regional Office will be conducting in-person Basic Panel Member training programs in these cities on the following dates:

**Louisville, Kentucky**
May 18, 2005

**Chicago, Illinois**
June 8, 2005

**Milwaukee, Wisconsin**
June 9, 2005

**Omaha, Nebraska**
June 15, 2005

**Minneapolis, Minnesota**
July 13, 2005

If you are interested in attending a Basic Panel Member training program, please contact Deborah Woods at (312) 899-4431 or by email.

**Southeast Regional Update**

During the next two months, the Southeast Regional Office will be conducting in-person Basic Panel Member training programs in these cities on the following dates:

**Birmingham, Alabama**
May 11, 2005

**Boca Raton, Florida**
May 18, 2005

**Jackson, Mississippi**
June 1, 2005

If you are interested in attending a Basic Panel Member training program, please contact Lanette Cajigas at (561) 447-4911 or by email.

---

## SEC Approval

### Mediators Serving as Arbitrators

On March 7, 2005, the Securities and Exchange Commission (SEC) approved SR-NASD-2005-007 (Interpretative Material on Mediators Serving as Arbitrators). The proposed rule change adopts new Interpretive Material (IM) 10308 of NASD's *Code of Arbitration Procedure* to clarify that (1) fees for service as a mediator are not included in determining whether an attorney, accountant, or other professional derives 10% of his or her annual revenue from industry-related parties; and (2) service as a mediator is not included in determining whether an attorney, accountant, or other professional devotes 20% or more of his or her professional work to securities industry clients. We will announce more details on the proposal in a *Notice to Members*.

---

## SEC Filing

### Proposal to Compensate Arbitrators for Deciding Discovery-Related Motions Without a Hearing

During the past few years, NASD Dispute Resolution has conducted arbitrator focus groups across the country. One of the concerns consistently raised has been the amount of time and effort invested by chairpersons in reviewing and deciding various discovery motions, especially in situations in which the motions are decided on the papers. Dispute Resolution staff also has heard similar concerns from arbitrators on our roster. In addition, the Neutral Roster Subcommittee, a subcommittee of the National Arbitration and Mediation Committee, has reported that the current lack of compensation for deciding such motions has made it more difficult to recruit chairpersons.

On January 26, 2005, in an effort to address these concerns, the Board of Directors of NASD Dispute Resolution approved a proposal to provide additional honoraria to chairpersons for the time spent reviewing and deciding discovery-related motions on the papers. Subsequently, on April 14, 2005, NASD filed a proposed rule change with the Securities and Exchange Commission to amend Interpretive Material (IM) 10104 of the *Code of Arbitration Procedure* to provide payment to arbitrators for deciding discovery-related motions without a hearing.

NASD believes that the proposed rule change will encourage arbitrators to decide discovery-related motions on the papers without the need for a pre-hearing conference, thereby expediting the pace of arbitrations. This enhancement will benefit investors by reducing the time between the filing of an arbitration claim and the rendering of an award.

View more details on the proposed rule change.

---

## Latest in Arbitrator Training

### NASD Dispute Resolution's Arbitrator Training Programs and Schedules

You can view the arbitrator training programs and schedules for all of 2005 on our Web site.

---

## Question and Answer: Understanding and Applying the Law in a Case

**Question:** What should an arbitrator do when additional information is needed to understand the law

FINRA - Arbitration & Mediation - Neutral Corner - April 2005          Page 6 of 7
Case 1:08-cv-02993-RJH     Document 20-2     Filed 04/14/2008     Page 7 of 8
presented in a case?

**Answer:** Although most arbitration claims present questions of fact that the panel will be able to decide on the proffered evidence, some parties may rely on a specific law or statute. Generally, the party who raised a legal issue will offer the panel a brief that sets forth the law or statute along with an explanation of how it applies to the facts of the case. However, arbitrators may also encourage the party to present the issue orally. In addition, arbitrators may request that parties submit a brief on any issue if the arbitrators believe it would assist them in deciding the case. In any of these situations, the opposing party or parties should be allowed to respond.

*Arbitrators are reminded that they are not to engage in any outside legal research, nor should they ask NASD staff to conduct legal research for the arbitrators. The panel must rely on the parties to provide the research in support of their respective positions.*

Arbitrators are not bound by case precedent or statutory law. Rather, they are guided in their analysis by the underlying policies of the law, and are given wide latitude in their interpretation of legal concepts. If, however, an arbitrator manifestly disregards the law, a court may vacate an award. (See The Arbitrator's Manual).

---

## Message from the Editor

In addition to comments, feedback, and questions regarding the material presented in this publication or other arbitration and mediation issues, *The Neutral Corner* invites readers to submit articles on important issues of law and procedure relating to mediation, arbitration, or other alternative dispute resolution processes. We, of course, reserve the right to determine which articles to publish.

Please send your article to Lisa Angelson, Editor, *The Neutral Corner* at NASD Dispute Resolution, One Liberty Plaza, 165 Broadway, 27th Floor, New York, New York 10006. You may also call the Editor at (212) 858-4392 for editorial guidelines.

---

## Directory

**Linda D. Fienberg**
President
NASD Dispute Resolution

**George H. Friedman**
Executive Vice President &
Director of Arbitration
NASD Dispute Resolution

**Kenneth L. Andrichik**
Senior Vice President &
Director of Mediation & Business
Strategies

**Jean I. Feeney**
Vice President & Chief Counsel

**Dorothy Popp**
Vice President &
Director of Operations

**Richard W. Berry**
Vice President &
Director of Case Administration

**Barbara L. Brady**
Associate Vice President &
Director of Neutral Management

**Elizabeth R. Clancy**
Vice President & Regional Director,

**Judith Hale Norris**
Vice President & Regional Director,
Western Region

**Rose Schindler**
Associate Vice President &
Regional Director, Southeast Region

**Shari Sturm**
Regional Director,
Mid-Atlantic Region

**Scott Carfello**
Regional Director,
Midwest Region

**Lisa Angelson**
Deputy Director of Neutral
Management and Editor of
*The Neutral Corner*

**Editorial Board**

**Nicole Haynes** - Northeast Region
**Heather Herbert** - Mid-Atlantic Region
**Elaine Kohn** - Western Region
**Lisa Lasher** - Southeast Region
**Mignon McLemore** - Office of Chief Counsel
**Patrick Walsh** - Midwest Region

## NASD Dispute Resolution Offices

**Northeast Region**
One Liberty Plaza
165 Broadway
27th Floor
New York, NY 10006
Tele: (212) 858-4400
Fax: (212) 858-4429

**Mid-Atlantic Region**
1735 K Street, NW
Washington, DC 20006
Tele: (202) 728-8958
Fax: (202) 728-6952

**Southeast Region**
Boca Center Tower 1
5200 Town Center Circle
Second Floor
Boca Raton, FL 33486
Tele: (561) 416-0277
Fax: (561) 416-2267

**Western Region**
300 S. Grand Avenue
Suite 900
Los Angeles, CA 90071
Tele: (213) 613-2680
Fax: (213) 613-2677

**Midwest Region**
10 S. LaSalle Street
Suite 1110
Chicago, IL 60603-1002
Tele: (312) 899-4440
Fax: (312) 236-9239

©2008 FINRA. All rights reserved. | Legal Notices and Privacy Policy.
FINRA is a trademark of the Financial Industry Regulatory Authority, Inc.

# EXHIBIT 2

# The Arbitrator's Manual

August 2007

A publication of the Securities
Industry Conference on Arbitration

The Arbitrator's Manual
August 2007

This manual has been compiled by members of the
Securities Industry Conference on Arbitration (SICA) as a
guide for arbitrators. It is designed to supplement and
explain the Uniform Code of Arbitration (UCA or Code) as
developed by SICA. The procedures and policies contained in
this manual may be altered by the arbitrators and should
not be used to restrict a panel's discretion. Significant
differences between the Uniform Code and the procedures
of the SROs will be highlighted in this manual. Arbitrators
should always consult the rules of the arbitration forum in
which they are serving.

# The Arbitrator's Manual

The Changing Role of Arbitration
in Securities Controversies                                1

The Challenge for a Self-Regulatory
Organization Arbitrator                                    1

Duty to Disclose Conflicts                                 2

The Appearance of Bias                                     3

Ethical Responsibilities                                   3

Challenges to an Arbitrator                                4

  Opinion and Bias                                 5

  Business or Personal Relationships               5

  Previous or Current Involvement                  5

  Financial Interest                               6

The Party Who Is Not Represented
by Counsel                                                 6

Representation by Counsel                                  7

Prehearing Motions                                         7

Prehearing Conference                                      11

Discovery                                                  12

Discovery Guide                                            13

Confidentiality Issues                                     15

Encouraging Cooperation                                    17

Arbitrators' Power to Issue Orders                         18

Before the Hearing                                         19

At the Hearing                                             22

Function of the Arbitration Staff                          25

Executive Sessions                                         25

Hints for the Chair                                        26

Admissibility of Evidence                                  27

Attendance of Witnesses at the Hearing                     28

Deliberations                                              29

The Arbitrators' Award                                     33

Post-Award Procedure                                       35

Confidentiality of Arbitration Proceedings                 37

Disciplinary Referrals                                     37

Reference Books and Periodicals                            38

Web Resources                                              39

Appendix A: Code of Ethics for
Arbitrators in Commercial Disputes                         40

consider that expert witnesses often serve an important role in assisting parties and their counsel in the presentation of their cases, and may also be asked to testify about what has been said at the hearing, in addition to facts known to them prior to the hearing. Absent persuasive reasons to the contrary, there is a presumption that expert witnesses, as opposed to fact witnesses, should be permitted to attend the entire proceedings.

Absent persuasive reasons to the contrary, and subject to the discretion of the arbitrators, the investor party should be permitted to designate one individual to attend the hearing, as there are many instances where an investor wishes to have a spouse, son or daughter, accountant, or other fact witness attend. These people can provide added support to the investor party, and can also provide valuable assistance when hearing the testimony of fact witnesses.

Designations should be made before the hearings start.

## Deliberations

Prior to the close of the hearing, the arbitrators may request that the parties state specifically the relief/damages they are seeking if not made clear by the pleadings.

The arbitrators may also request that the parties present specific calculations of the damages to assist them in their deliberations.

Immediately after the close of the hearing, the arbitrators usually remain in the hearing room either to begin deliberations or set a date for deliberation. Unlike jurors, the panel members are not restricted from discussing the case among themselves. Generally, arbitrators do not attempt to judge the dispute until all the evidence is received. All arbitrators should take part in the deliberations.

Usually the Chair asks one member of the panel to begin discussion of the case, expressing his or her individual views. The Chair should ask the panelists first to discuss liability without mentioning specific damages. The panelists should discuss differences openly. The arbitrators may wish to review the transcript or recording of the hearing and their notes as well as the evidence. Arbitrators should keep in mind that the parties expect to be advised of the final decision within thirty (30) business days after the close of the hearing.

The panel may consider breaking the decision into separate awards on each individual claim. Where more than one theory is set forth as a basis for the relief sought, the arbitrators may differ as to these bases for liability. As long as the arbitrators agree on liability, they need not be unanimous on the theory of liability.

Arbitrators are not strictly bound by case precedent or statutory law. Rather, they are guided in their analysis by the underlying policies of the law and are given wide latitude in their interpretation of legal concepts. On the other hand, if an arbitrator manifestly disregards the law, an award may be vacated. (See The Arbitrators' Award, p. 33.)

### A.  Compensatory/Actual Damages

The recovery of compensatory damages is the primary reason a party brings a claim. An award of compensatory damages may include the party's actual dollar loss and any other damages. Claimants will generally state a figure in the statement of claim of what they consider to be actual damages. Claimants have a duty to prove those damages. All claims for damages should be supported by evidence. The arbitrators may consider the concept of mitigation, where appropriate.

B.  **Punitive Damages**

Arbitrators may consider punitive damages as a remedy. Generally, in court proceedings, punitive damages consist of compensation in excess of actual damages and are awarded as a form of punishment against the wrongdoer. If punitive damages are awarded, the arbitrators should clearly specify what portion of the award is intended as punitive damages.

C.  **Injunctive Relief**

Parties may request injunctive relief when they are seeking a specific action or relief from a specific action. For example, an introducing firm may request injunctive relief to enjoin a clearing firm from ceasing to clear its trades. The SROs vary in their approach to injunctive relief issues. Arbitrators should consult the procedures of the SRO in which they are serving.

D.  **Interest**

Arbitrators have the power to award interest and to determine the proper date from which interest is to accrue. Some state statutes specify legal rates of interest that may be used for guidance when awarding interest.

Unless otherwise specified by the arbitrators in the award, all awards shall bear interest from the date of the award: (i) if not paid within thirty (30) days of receipt, (ii) if the award is the subject of a motion to vacate that is denied.

E.  **Attorneys' Fees**

Attorneys' fees are frequently requested in arbitration. Arbitrators have the authority to consider awarding attorneys' fees, but the procedure varies from state to state. It is appropriate for the arbitrators to request the parties to brief this issue.

F.    Forum Fees

Some SROs subsidize the arbitration forums they sponsor. In order to defray part of the costs, the arbitrators are empowered to assess forum fees as set forth in the rules. When a party files a Claim, Counterclaim, Third-Party Claim, or Cross-Claim, that party is required to remit a nonrefundable filing fee in addition to a hearing session deposit based upon the fee schedule in the Uniform Code. The Director may temporarily waive the fee or deposit. The total fee is determined by the number of hearing sessions. The arbitrator(s) may assess in the final award a fee waived by the Director.

When it is clear that multiple hearing sessions are required, the arbitrator(s) should consider requiring the parties to deposit interim forum fees for additional hearing sessions that have been held or are scheduled.

Forum fees may be assessed for prehearing conferences conducted with the parties and an arbitrator. Should a case settle or withdraw subsequent to the commencement of the first hearing session, including a prehearing conference with an arbitrator, the arbitrator(s) may assess forum fees and costs. The assessment should be based on hearing sessions held or scheduled within eight (8) business days after the sponsoring organization receives notice that the matter has been settled or withdrawn.

The arbitrators may also assess an adjournment fee when a party's request for a postponement has been granted, thereby necessitating rescheduling the hearing.

For all of these issues, the arbitrator(s) should refer to the schedule of fees.

In addition to administrative expenses, the parties may request that the arbitrators direct reimbursement for certain expenses such as:

1.   the expenses of a witness,

2.   the cost associated with producing documents, and

3.   the cost of transcribing the record.

It is within the panel's discretion to decide which party, if any, shall pay these fees and expenses. The panel may use the same basis as it did in determining compensatory damages.

# EXHIBIT 3

Philip McLeod, CASB NO. 101101
philip.mcleod@kyl.com
Cameron Stout, CASB NO. 117373
cameron.stout@kyl.com
KEESAL, YOUNG & LOGAN
A Professional Corporation
Four Embarcadero Center, Suite 1500
San Francisco, California 94111
Telephone: (415) 398-6000
Facsimile: (415) 981-0136

Anthony Paduano
(*Pro Hac Vice*)
ap@pwlawyers.com
PADUANO & WEINTRAUB LLP
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
Telephone: (212) 785-9100
Facsimile: (212) 785-9099

Attorneys for Plaintiff
A.G. EDWARDS & SONS, INC.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.G. EDWARDS & SONS, INC., ) | Case No. C 07-05154-WHA |
| Plaintiff, ) | [PROPOSED] ORDER ON PLAINTIFF A.G. EDWARDS' MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION AND AN ORDER PERMITTING EXPEDITED DISCOVERY |
| vs. ) | |
| SAMUEL SLAYDEN, DENISE GILSETH, ) CATHY MCJILTON, and KELLY STROMGREN, ) | |
| Defendants. ) | |

Pending before the Court is Plaintiff A.G. Edwards & Sons, Inc.'s Motion for Temporary Restraining Order and For a Preliminary Injunction and an Order Permitting Expedited Discovery (Doc. #3). Defendants Samuel Slayden, Denise Gilseth, Cathy McJilton, and Kelly Stromgren (collectively, "Defendants") have filed an

- 1 -

KYL_SF457019

ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. C 07-05154-WHA

Opposition to Plaintiff's Motion.  (Doc. #16.)  On October 10, 2007, the Court held oral argument on Plaintiff's Motion.  Having reviewed the parties' pleadings and heard argument, the Court now rules.

    1.    The Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Temporary Restraining Order as follows:

    a.    With respect to Plaintiff's request that Defendants be enjoined from soliciting A.G. Edwards employees, the Court **DENIES** Plaintiff's request as to Defendants Slayden, Gilseth, and Stromgren **WITHOUT PREJUDICE** to Plaintiff demonstrating that Defendants Slayden, Gilseth, and Stromgren violated their fiduciary duties while they were employed by Plaintiff.

    b.    As to Defendant McJilton, the Court **GRANTS** Plaintiff's request as follows: McJilton is barred from soliciting any employees who work for A.G. Edwards.

    c.    With respect to Plaintiff's request that the Court enjoin Defendants from soliciting A.G. Edwards clients, the Court **GRANTS** Plaintiff's request as follows:

    (i)    Defendants are barred from soliciting or otherwise initiating any contact with any A.G. Edwards clients beginning at 2:00 p.m. on October 10, 2007 until this Court or FINRA modifies this TRO;

    (ii)    Defendants are not prohibited from communicating with or soliciting their clients who initiate contact with Defendants;

    (iii)    if Plaintiff receives calls from clients asking to speak with one of the Defendants, Plaintiff shall inform the client that said Defendant has gone to work for another firm and provide the appropriate phone number.

KYL_SF457019

ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. C 07-05154-WHA

d.   **IT IS FURTHER ORDERED** that Plaintiff shall initiate the FINRA arbitration immediately and take all measures to have the hearing commenced not later than 15 days after the hearing date, or October 25, 2007.

2.   **IT IS FURTHER ORDERED** that Plaintiff's Motion for Expedited Discovery is **GRANTED** as follows:

a.   Plaintiff and Defendants shall be permitted to take two depositions, per side for up to 1 day before the 15 day time period expires.

b.   Plaintiff shall examine Defendant Samuel Slayden on Friday, October 12, 2007, at 9:00 a.m., at Keesal, Young & Logan.  Mr. Slayden is ordered to bring all documents, computer files, and other materials or information he took with him from A.G. Edwards' Santa Rosa office.

c.   Plaintiff shall examine John Lee on Monday, October 15, 2007, at 9:00 a.m., at Mennemeier, Glassman & Stroud.  Lee is ordered to bring any and all documents and other materials he received from Mr. Slayden at or before the time Mr. Slayden resigned from A.G. Edwards.

d.   Defendants shall examine Gene Diederich in St. Louis on Monday, October 22, 2007, or Tuesday, October 23, 2007, ~~Wednesday, October 17, 2007~~, at 9:00 a.m.  By 3:00 p.m. on October 11, 2007, Plaintiff shall confirm to the Court in writing that it will produce Mr. Diederich for examination.

e.   Defendants shall examine William Hatcher on Friday, October 19, 2007, at 9:00 a.m. at Sullwold & Hughes.  Mr. Hatcher is ordered to bring any documents in his possession that support the allegations made in his Declaration in Support of Plaintiff's Motion for TRO.

3.   **IT IS FURTHER ORDERED** that Defendants must preserve any

KYL_SF457019

ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. C 07-05154-WHA

information, including all documents and computer or digital data and materials that Defendants took from A.G. Edwards.  Any acts of destruction of such documents, data, and materials by Defendants will be considered obstruction of justice by the Court and may be referred to the Office of the United States Attorney.

4.    **IT IS FURTHER ORDERED** that Stifel Nicolaus & Company, Inc. is bound by the terms of this Order.

5.    **IT IS FURTHER ORDERED** that this Temporary Restraining Order shall remain in effect until modified by this Court or FINRA.

DATED: October 15, 2007

_____
Judge William Alsup
United States District Court
Northern District of California

KYL_SF457019

**ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**
**Case No. C 07-05154-WHA**