UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
E*TRADE FINANCIAL CORPORATION and  :
E*TRADE SECURITIES LLC,            :
                                   :
              Plaintiffs,            :
                                   :
        v.                 :      No. 08 CV 2993 (RJH)
                                   :
MARCUS J. HERNANDEZ,               :
SEAN J. GAFFEY, and                :
BANC OF AMERICA                    :
INVESTMENT SERVICES, INC.          :
                                   :
              Defendants.            :
-------------------------------------------------------------- x

## DECLARATION OF PAUL MEEHAN
## IN SUPPORT OF E*TRADE'S REPLY MEMORANDUM

     PAUL MEEHAN declares as follows pursuant to 28 U.S.C. § 1746:

     1.     I am employed by E*TRADE Securities LLC ("E*TRADE") as Senior Manager in the Relationship Management Oversight and Supervision Department, located at Harborside Financial Center, 501 Plaza 2, 34 Exchange Place, Jersey City, New Jersey 07311.

     2.     As an Oversight Manager, my duties include reviewing interactions between E*TRADE employees and clients for compliance with company policies and industry regulations. From time to time, I review reports of former employees who have contacted E*TRADE clients, and I arrange to have them tracked.

**E*TRADE's Process When Financial Advisors Leave**

     3.     E*TRADE has a team of Financial Advisors who work directly with clients to advise them about different investments.

     4.     When a Financial Advisor leaves E*TRADE, E*TRADE representatives routinely contact certain clients of that Financial Advisor. This is done to provide the client with

359988 v2/RE

- 2 -

the name of his or her new Financial Advisor and to discuss whether the client has any immediate needs or concerns.

5. On occasion, during these telephone calls, an E*TRADE representative will ask, or a client will comment, about communications that the departing Financial Advisor had with E*TRADE clients after the Financial Advisor left E*TRADE.

6. These conversations with E*TRADE representatives are automatically recorded as digital audio files stored on E*TRADE's computer servers and also noted in contemporaneous client records by E*TRADE employees, following a company policy to enter notes about interactions with clients.

7. Following Marcus J. Hernandez ("Hernandez") and Sean J. Gaffey's ("Gaffey") departures from E*TRADE, the Relationship Management Oversight and Supervision Department instructed E*TRADE representatives, when performing these outreach calls to Hernandez and Gaffey's former clients, to ask if Hernandez and Gaffey had contacted them, and if so, to collect as much information about the contact as possible, such as details of what was discussed and the time, date, and manner of contact.

8. I instructed my staff in the Relationship Management Oversight and Supervision Department to compile records created by E*TRADE representatives during their outreach telephone conversations with E*TRADE clients regarding contacts by Hernandez or Gaffey.

9. E*TRADE's legal counsel subsequently directed my department to search for and retrieve the recordings of these outreach telephone conversations between E*TRADE representatives and clients.

10. I state the following based on my review of client account information stored on E*TRADE's computer system:

- 3 -

**Contacts With Clients Of Former E*TRADE Financial Advisor Sean J. Gaffey**

11. E*TRADE's records indicate that Gaffey solicited numerous E*TRADE clients after his employment with E*TRADE ended. Clients reporting being called directly by Gaffey include Clients xxxx-1847, xxxx-1990, xxxx-2017, xxxx-2403, xxxx-2528, xxxx-3460, xxxx-7070, xxxx-7400, xxxx-7551, xxxx-9339, xxxx-9518, and xxxx-9941.

12. E*TRADE employee Steven Zieba reported that Client xxxx-2528 complained that Gaffey called him and said that he was no longer employed by E*TRADE. On the call, Client xxxx-2528 states that Gaffey encouraged the client to move his account to Banc of America Investment Services, Inc. ("BOA"), and that Gaffey was "pretty hard about it . . . he basically seems to think you [E*TRADE] are heading for bankruptcy . . . it was a really a hard sell . . . I was actually a little offended." E*TRADE Client xxxx-2528 Tr. at 2:7-3:7 (*see* Ex. 1 to Miner Decl.).

13. E*TRADE employee Howard Rudolf reported that Client xxxx-7400 complained that Gaffey called him after he joined BOA, told him he had left E*TRADE, and asked him if he had any funds he would like to invest. E*TRADE Client xxxx-7400 Tr. at 6:11-7:7 (*see* Ex. 3 to Miner Decl.).

14. E*TRADE employee Richard Gilbert reported that Client xxxx-3460 said that Gaffey had solicited the client to move to BOA. On the call, Richard Gilbert asked Client xxxx-3460 if Gaffey was trying to solicit his business. Client xxxx-3460 laughed and replied, "Yeah, obviously, what do you think he was doing?" E*TRADE Client xxxx-3460 Tr. at 2:8-3:7 (*see* Ex. 2 to Miner Decl.).

15. E*TRADE employee Russell Hamilton reported that Client xxxx-7070 said he had been solicited by Gaffey to move his accounts to BOA on Saturday February 23, 2008.

359988 v2/RE

16. E*TRADE employee Tony Basinger reported that Client xxxx-7551 said that Gaffey had called the client to solicit him about moving his accounts to BOA.

17. E*TRADE employee Tony Basinger reported that Client xxxx-9941 said that Gaffey had called the client on Saturday February 23, 2008, to solicit him to transfer his accounts to BOA, but the client declined.

18. E*TRADE employee Timothy Shaw reported that Client xxxx-1990 said that Gaffey had "reached out" to the client about moving his accounts.

19. E*TRADE employee Jonathan Larson reported that Client xxxx-1847 said that Gaffey had contacted the client to move his accounts.

20. E*TRADE employee Hugh Flanigan reported that Client xxxx-2403 transferred his accounts to BOA on March 26, 2008, citing concerns over E*TRADE's "financial condition." Gaffey had been assigned to Client xxxx-2403 at the time of his resignation. Client xxxx-2403 has since transferred $17 million from his E*TRADE account to BOA.

21. E*TRADE employee Tony Basinger reported that Client xxxx-2017 said that Gaffey had called the client about moving his accounts. Client xxxx-2017 has since transferred $1.6 million from his E*TRADE account to BOA.

22. E*TRADE employee Jared McKinney reported that Client xxxx-9339 said that Gaffey had called the client "asking him to come over" to BOA.

23. E*TRADE employee Hugh Flanigan reported that Client xxxx-9518 said she was moving her accounts after Gaffey spoke to her about transferring to BOA. Client xxxx-9518 has since transferred $25.8 million from her E*TRADE account to BOA.

- 5 -

**Contacts With Clients Of Former E*TRADE Financial Advisor Marcus J. Hernandez**

24.     E*TRADE's records indicate that Marcus J. Hernandez ("Hernandez") solicited numerous E*TRADE clients after his employment with E*TRADE ended.  E*TRADE clients who reported being called directly by Hernandez include Clients xxxx-1295, xxxx-5045, xxxx-5830, xxxx-6453, xxxx-7113, xxxx-7114, xxxx-7167, xxxx-7520, xxxx-7845, xxxx-9661, and xxxx-0977.

25.     E*TRADE employee Chris Erlewine reported that Client xxxx-6453 said he had been contacted by his "former advisor."  I verified through E*TRADE's account records that Hernandez had been assigned to Client xxxx-6453.  The client said that Hernandez had tried to talk the client into moving his assets to BOA and told the client "how unsafe E*TRADE is."  The conversation between Chris Erlewine and Client xxxx-6453 was recorded on E*TRADE's telephone recording system on January 29, 2008.  E*TRADE Client xxxx-6453 Tr. at 21:3-10 (*see* Ex. 5 to Miner Decl.).

26.     E*TRADE employee D. Alan Casebolt reported that when he called Client xxxx-0977 to tell him that Hernandez had left and to put the client in contact with a new E*TRADE Financial Advisor, the client already knew that Hernandez had resigned.  Hernandez painted a bleak picture about E*TRADE's financial situation, and the client raised these concerns to the E*TRADE employee.  The conversation between D. Alan Casebolt and Client xxxx-0977 was recorded on E*TRADE's telephone recording system.  E*TRADE Client xxxx-0977 Tr. at 2:9-21, 3:10 (*see* Ex. 4 to Miner Decl.).

27.     E*TRADE employee Jared McKinney reported that Client xxxx-5830 had received information in the mail from Hernandez and also been called by Hernandez on

January 30, 2008, and that the client stated that Hernandez was "scared of the state of E*TRADE."

28.    E*TRADE employee Eugene Geibig reported that Client xxxx-5045 said he was "afraid" to keep his assets at E*TRADE after Hernandez called and "solicited" him to move his accounts to BOA.

29.    E*TRADE employee Lyn Zingale reported that Client xxxx-7114 stated on February 7, 2008, that after being contacted by Hernandez, he was moving his assets to BOA because of concerns about E*TRADE's "liquidity." Client xxxx-7114 later transferred $1.8 million from his E*TRADE account to BOA.

30.    E*TRADE employee Lyn Zingale also reported that Client xxxx-7713 had been contacted by Hernandez, and that the client stated that Hernandez had been trying to "recruit" the client.

31.    E*TRADE employee Steven Christensen reported that Client xxxx-7167 received a card in the mail from Bank of America, and then was contacted by Hernandez, who said he was working on a "proposal" for him.

32.    E*TRADE employee Ricardo Gutierrez reported that Client xxxx-9661 was moving his assets to BOA. This account was previously assigned to Hernandez. Client xxxx-9661 has since transferred $1.8 million from his E*TRADE account to BOA.

33.    E*TRADE employee Michael Genthe reported that Client xxxx-7845 said he was transferring his accounts to BOA after being solicited by Hernandez on January 30, 2008. Client xxxx-7845 has since transferred $2.5 million from his E*TRADE account to BOA.

- 7 -

34. E*TRADE employee Scott Sundberg reported that Client xxxx-1295 said he had been contacted by Hernandez, who encouraged the client to move his assets to BOA. Hernandez offered certain high-interest money market rates in the client's IRA.

35. E*TRADE employee Michael Cunningham reported that Client xxxx-7520 said he had been called by Hernandez from his new job at BOA.

**Aggregate Impact To E*TRADE**

36. In my experience working as a Manager in the Relationship Manager Oversight and Supervision Department, only a small percentage of clients inform a brokerage firm when a former broker solicits them. Based on this experience, it is impossible to know the total number of E*TRADE clients who were contacted by Hernandez or Gaffey after they resigned from E*TRADE. It is also impossible to know how many E*TRADE's clients feared for E*TRADE's financial solvency or the safety of their accounts due to statements made by Hernandez or Gaffey. Our research indicates that Hernandez and Gaffey created turmoil among E*TRADE's clients, fostered fears of insolvency, and caused many accounts to be transferred.

37. The aggregate assets transferred from E*TRADE accounts to BOA on accounts formerly associated with Hernandez or Gaffey since their resignations now exceeds $51 million.

38. I do not believe that Hernandez and Gaffey could have contacted all E*TRADE clients without having specific client information, including, at a minimum, names, addresses, accounts numbers, and (in some cases) kinds of accounts and account holdings.

39. This information is proprietary to E*TRADE and highly sensitive. It is never allowed to be taken by employees leaving the firm.

40. As of April 11, 2008, Gaffey has solicited at least twelve E*TRADE clients, and at least three clients have moved over $44 million to BOA in response to Gaffey's solicitations.

E*TRADE has identified at least eleven E*TRADE clients who have been called or otherwise solicited by Hernandez to transfer their accounts to BOA. In response to Hernandez's improper actions, at least four clients have transferred more than $7 million to BOA.

41.     E*TRADE is continuing to receive reports of additional solicitations and transfers to BOA by clients linked to Hernandez or Gaffey.

**Timing And Knowledge Of Client Solicitations**

42.     I know Hernandez personally from working at E*TRADE, and we have spoken many times. On the evening of Friday, January 18, Hernandez called me on my cell phone to tell me that he had resigned that day from E*TRADE. Hernandez assured me unprompted that he would not contact any E*TRADE clients or do anything improper. I thought this was an odd remark as I did not expect Hernandez to contact E*TRADE's clients or do anything to violate his employment agreement.

43.     Based on Hernandez's assurances and my expectation that he would refrain from acting improperly, I did not direct an immediate review of clients who had been working with Hernandez.

44.     Only after receiving multiple reports that Hernandez was contacting clients did I think it necessary to direct employees to collect feedback from clients formerly assigned to Hernandez. Thus, on January 29, I directed E*TRADE Branch Managers to begin a concerted effort to track Hernandez's efforts to contact E*TRADE's clients. Because Hernandez had worked with clients spread across the entire country, collecting this information required coordination with more than 100 Relationship Managers. Compiling and analyzing the reports from Clients took concerted and time-consuming efforts, in addition to the Relationship Management Oversight and Supervision Department's numerous other compliance and risk

- 9 -

management responsibilities.  During this process, we also started receiving reports that Gaffey was contacting E*TRADE's clients.

45.    Besides the time-consuming logistics of collecting information, E*TRADE's only sources of information about such contacts are clients who choose to tell us they had been contacted.  Client reports therefore arrive only gradually and haphazardly.  For example, Clients xxxx-7845 and xxxx-7114 did not report being contacted by Hernandez until February 6 and February 7, respectively, but it was unclear when they had been contacted.  Client xxxx-3460 mentioned on February 27 that Gaffey had solicited him.  Client xxxx-7400 mentioned being contacted by Gaffey several weeks later on March 14.  Reports continued to filter in over the weeks.

46.    It is not uncommon for clients to report being contacted, and then only later decide to transfer their accounts.  This made it difficult to track which accounts were lost due to the activities of Hernandez and Gaffey.  For example, Client xxxx-2017 stated on February 26 that he had been solicited by Gaffey, but did not give any indication of actually leaving.  But then on April 2, over five weeks later, that same client transferred his $1.6 million account to BOA and stated he was doing so because of Gaffey.

47.    As the previous example demonstrates, evidence of the harm to E*TRADE has not only developed slowly, but also continued after the lawsuit was filed on March 24.  Other examples include March 26, when Client xxxx-9518 transferred $25 million from E*TRADE to BOA because of solicitation from Gaffey.  Also on March 26, former Gaffey Client xxxx-2403 transferred $4 million from E*TRADE to BOA; that client has since moved an additional $13 million to BOA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of April, 2008, at New York, NY.

PAUL MEEHAN
E*TRADE Senior Manager