UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
E*TRADE FINANCIAL CORPORATION and        :
E*TRADE SECURITIES LLC,                           :
                                                                    :
                        Plaintiffs,                             :
                                                                    :
            v.                                                       :        No. 08 CV 2993 (RJH)
                                                                    :
MARCUS J. HERNANDEZ,                              :
SEAN J. GAFFEY, and                                    :
BANC OF AMERICA                                      :
INVESTMENT SERVICES, INC.                      :
                                                                    :
                        Defendants.                          :
------------------------------------------------------------ x


### E*TRADE'S RESPONSE TO DEFENDANTS' ORDER TO SHOW CAUSE


COOLEY GODWARD KRONISH LLP
Douglas P. Lobel (DL-3894)
Robert T. Cahill
David Vogel
11951 Freedom Drive
Reston, Virginia 20190
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100

Laura Grossfield Birger (LB-3031)
1114 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**

RELEVANT FACTS ................................................................................................ 4

I.    E*TRADE'S FINRA ARBITRATION INVOLVES AN ADDITIONAL
RESPONDENT, SCOTT REILLY................................................................. 4

II.   E*TRADE FILED A SEPARATE FEDERAL ACTION AGAINST REILLY
BECAUSE HE IS NOT SUBJECT TO JURISDICTION IN NEW YORK .................... 8

III.  E*TRADE CONTACTED FINRA TO DETERMINE HOW IT WILL RESOLVE
THE DILEMMA CREATED BY THE DIFFERENT SCHEDULES ............................ 9

IV.  FINRA WILL DECIDE WHETHER TO HOLD ONE OR TWO HEARINGS
AND, IF ONE HEARING, WHEN TO HOLD IT............................................. 9

V.   E*TRADE'S INFORMATION DEFENDANTS' RECENTLY RETURNED
PROVES THEY STOLE LARGE AMOUNTS OF E*TRADE'S HIGHLY
CONFIDENTIAL INFORMATION .............................................................. 10

ARGUMENT ...................................................................................................... 12

I.    E*TRADE DID NOT ENGAGE IN "*EX PARTE*" COMMUNICATIONS ................... 12

II.   E*TRADE WAS ATTEMPTING TO DETERMINE HOW FINRA WILL
RESOLVE THE DILEMMA CREATED BY COMPETING FINRA RULES............. 13

III.  E*TRADE HAS NOT TRIED TO "DELAY AS LONG AS POSSIBLE" THE
UPCOMING ARBITRATION HEARING ..................................................... 14

IV.  E*TRADE DID NOT MAKE MISREPRESENTATIONS TO THE COURT ............... 16

V.   E*TRADE DILIGENTLY OBTAINED AND FILED A BOND ................................. 18

CONCLUSION .................................................................................................... 19

No reason exists to modify or vacate the Court's April 16th Order (the "Order"). Defendants suggest that E*TRADE (1) made misrepresentations to the Court about a 15 day hearing; and (2) had a master plan to move the hearing to a much later date through "*ex parte*" communications with FINRA because E*TRADE fears it will lose the FINRA hearing. The Court should reject these suggestions because Defendants omit critical facts regarding scheduling, misstate FINRA rules, and presume without basis that E*TRADE is reluctant to go forward with an expedited hearing that assuredly will be successful for E*TRADE. Defendants' motion is really a thinly-veiled Motion to Reconsider the Court's ruling that E*TRADE is likely to succeed on its claims.

Defendants barely discuss the critical fact that E*TRADE's Statement of Claim at FINRA names an additional defendant – another former E*TRADE Financial Advisor who now lives and works in California, Scott Reilly ("Reilly"). Reilly, with whom they worked closely for years at E*TRADE, participated in their scheme to steal E*TRADE's information, and also joined them at BOA. However, no federal court had personal jurisdiction over all three Defendants. Thus, E*TRADE was forced to file a separate federal lawsuit in California against Reilly, seeking a preliminary injunction against him for exactly the same reasons this Court enjoined the Defendants. Because FINRA is not limited by geographic restrictions on personal jurisdiction, there should be just *one* arbitration at FINRA against *all* Respondents.

The California court is on a slower track than this Court, and thus the parallel California lawsuit has created a scheduling dilemma for FINRA. Although E*TRADE filed the two federal lawsuits on the same day, the California court scheduled the hearing on E*TRADE's injunction motion against Reilly for May 5, 2008. When this Court issued its Order on April 16, application of the 15-day rule for a FINRA arbitration created uncertainty. Reilly may have no

obligation to attend an expedited FINRA arbitration before a court enters an injunction against him; but E*TRADE will be forced to sever Respondent Reilly if the arbitration is held before the May 5th hearing date.

This scheduling dilemma is the source of all of the issues raised in Defendants' arguments. None of Defendants' contentions merit the Court's vacatur of the Order:

**E*TRADE Did Not Engage In "Ex Parte" Communications With FINRA.** FINRA rules forbid "*ex parte*" communications with **arbitrators**; but FINRA expressly encourages "questions" to be asked of FINRA **staff**. The opening letter from the FINRA Case Administrator assigned to E*TRADE's case expressly instructed E*TRADE to "call . . . if you have any questions." E*TRADE did just that; the day after the court hearing here, E*TRADE counsel's mid-level associate called FINRA staff to ask how FINRA would or might address the scheduling dilemma. This young lawyer did not argue with or lobby FINRA staff (although FINRA rules would not prohibit that). E*TRADE certainly did not communicate with arbitrators, because none have been appointed yet.

**FINRA Rules Do Not Inflexibly Mandate A Hearing In 15 Days.** Defendants wrongly argue that their arbitration must occur in 15 days, without any possibility of a change. FINRA's governing rules allow FINRA to modify any rule for "**good cause**," and the scheduling dilemma here certainly presents a valid reason. Defendants are assuming, contrary to the current posture of the FINRA proceeding, that there will be **two** FINRA arbitrations. Defendants filed a motion to sever E*TRADE's claims into multiple arbitrations, separately against Hernandez, Gaffey and Reilly. Defendants are prejudging that they will prevail on that motion, and that their arbitration therefore can and should be done by May 1. However, FINRA has not ruled on that motion, and

E*TRADE will oppose it because E*TRADE is entitled to a single arbitration. If severance is not granted, a single arbitration cannot occur by May 1.

***E*TRADE Is Not Trying To Delay The Arbitration "As Long As Possible."*** E*TRADE is trying to accommodate all of the parties' interests – E*TRADE's, Defendants' and Reilly's – through a single expedited FINRA hearing after completion of all of the Court proceedings. E*TRADE is proposing a single arbitration on May 7, only ***four business days*** later than Defendants demand under FINRA rules.

***E*TRADE Is Not Trying To Delay The Arbitration Out Of Fear.*** Defendants' entire argument is premised on the notion that E*TRADE knows it will lose the arbitration, so E*TRADE has a motive to stretch out the date of the arbitration. Not so. Now that Defendants have returned the materials they pilfered, the evidence against Defendants is even stronger than when the parties were last before the Court. In addition, FINRA panels have in fact awarded relief that Defendants proclaim never happens. E*TRADE welcomes an expedited hearing as soon as practicable.

***E*TRADE Made No Misrepresentations To The Court.*** Ultimately, Defendants argue that E*TRADE tried to mislead the Court into granting the preliminary injunction by saying that arbitration of the permanent injunction will occur at FINRA in 15 days. But at oral argument E*TRADE's counsel expressly noted that "[t]here can be some minor modification" to FINRA's 15-day rule. Counsel had in mind that no FINRA deadline is set in stone; for example, perhaps all of the arbitrators are not available that day. But what no counsel for ***any*** party (E*TRADE or Defendants) contemplated at the hearing was the dilemma created by the mismatched schedules of the two federal courts. E*TRADE sought to investigate that issue the following morning by

calling FINRA staff.  Defendants realized the problem too, filing their severance motion at

FINRA two days later on Friday, April 18.

The worst case that can be painted here is that E*TRADE's counsel should bear the full

burden for not realizing the scheduling dilemma during the oral argument, and not describing to

the Court at that time all of the facts about the parallel California case and a hypothetical

Defendants' severance motion (not yet filed as of the hearing), to see if any of these facts would

have changed the Court's mind about the preliminary injunction against the Defendants.

E*TRADE respectfully submits that this "worst case" does not accurately describe the situation;

to the contrary, Defendants' failure to mention any of these facts in their request for the OSC

suggests that Defendants might not believe these facts justify the extreme relief they seek.  But if

the Court disagrees and believes E*TRADE's counsel erred, E*TRADE respectfully submits that

counsel's error of omission would not justify the Court's vacatur of the preliminary injunction

that would allow Defendants to continue misusing the proprietary information they stole from

E*TRADE.

Finally, Defendants' arguments about the bond are now moot; E*TRADE did diligently

obtain one immediately and already posted it.  Nor does any reason exist to modify the amount

of the bond.

For these reasons, the Court should not disturb the Order in any respect.

## RELEVANT FACTS

**I.    E*TRADE'S FINRA ARBITRATION INVOLVES AN ADDITIONAL RESPONDENT, SCOTT REILLY**

On the day E*TRADE filed this lawsuit, it also initiated a FINRA arbitration against

Hernandez, Gaffey, BOA **and** a third former E*TRADE Financial Advisor named Scott Reilly

("Reilly") – jointly the "Respondents" in the FINRA arbitration.  *See* E\*TRADE's Statement of
Claim, filed Mar. 24, 2008, attached as Exhibit 1 to the Declaration of Douglas P. Lobel ("Lobel
Decl.") filed concurrently herewith.

The three individuals worked in unison to steal E\*TRADE's proprietary information for
BOA's benefit.  In its FINRA claim, E\*TRADE alleged that all three had worked closely
together for years while employed at E\*TRADE:

> The three individual Respondents worked together as financial
> advisors for years in E\*TRADE's New York office.  Hernandez
> started working at E\*TRADE in October 2003; Reilly in
> December 2003; and Gaffey in October 2004.  They worked
> together closely until May 2006, when Reilly relocated to an
> E\*TRADE office in California.  Hernandez and Gaffey remained
> together in New York until November 2007, when Hernandez
> moved to E\*TRADE's office in Blue Bell, Pennsylvania.

Lobel Decl. Ex. 1 at 4.  Even with Reilly's transfer to California, all three individuals
communicated constantly, sometimes hourly or more frequently, exchanging multiple cell phone
conversations, e-mails, and instant messages ("IMs") nearly every day.  The evidence at trial will
show that approximately twenty-two percent of Hernandez's IM messages from December 2007
through January 2008 were with Reilly in California – a much higher percentage than his
communications with any other E\*TRADE employee.  Hernandez communicated with
approximately 60 different E\*TRADE employees over IM, yet nearly a quarter of the
communications were with Reilly.  Despite the time difference between their offices, the two
friends managed to chat online daily, and often for hours at a time.  *See* Lobel Decl. ¶ 5.

The FINRA Claim alleged that all three then left for BOA at about the same time, and
under identical circumstances – without any word of warning or advance notice:

> In clear coordination, the three individual Respondents all abruptly
> resigned from E\*TRADE within a short time early this year.  All

- 5 -

> three of them immediately went to work for the same employer,
> Respondent BOA.  All three of them took E*TRADE's customer
> lists, and then all three of them immediately began inundating
> E*TRADE's customers on those lists with solicitations to transfer
> their E*TRADE accounts to BOA.

Lobel Decl. Ex. 1 at 9.  E*TRADE has records of IMs between Hernandez and Reilly and

Gaffey, in which they plotted together their plans to leave E*TRADE and discussed how they

could accomplish them.  For example, as early as December 2007, Reilly wanted to call Gaffey

on a cell phone because "we need to talk about the non-compe" (translated:  talk about non-

compete prohibitions if they leave E*TRADE).  *See* Lobel Decl. Ex. 2.  In early January 2008,

just days before Hernandez and Reilly both left E*TRADE, they giddily discussed their plans to

leave E*TRADE.  Reilly proclaimed, "got to be an exodus soon," and he said it was "time to

parlay it" (translated:  take advantage of their opportunity to move their business to another

firm).  Hernandez ominously agreed, "if things go our way it can work out perfectly actually."

*See id.*

Hernandez also actively assisted Reilly by identifying BOA individuals with whom

Reilly would interview in California.  On January 9, Hernandez informed Reilly that "my guy [at

BOA] emailed me; [he] has a different guy for you to call; his boy in Newport [where BOA's

California office is located]; call that guy now."  *See id.*  Hernandez also assisted Gaffey in

coming to BOA; Gaffey at one point beseeched for Hernandez to "hook me up" with a contact at

BOA, to which Hernandez responded, "i did; i have the contact; sent," and Gaffey thanked him,

"i owe you one."  *See id.*

Just like Hernandez and Gaffey, Reilly stole E*TRADE's proprietary customer

information when he left.  E*TRADE even has a "smoking gun" showing this theft.  In his haste

to leave, Reilly left behind workbooks with his "to do" lists that *in his own handwriting remind himself to steal E\*TRADE's proprietary information*:

"Transition To Do[:]  Copy As Many Names #'s As Possible"

"Leaving To Do
(2) Call Clients Using Cell To Determine Their Interest In Coming w/ Me
(3) Print Out All Key Client Data"

Lobel Decl. Ex. 1 at 10-11 (showing electronic images of Reilly's actual notes).  And, just like with Hernandez and Reilly, E\*TRADE received a trail of calls from customers who reported that Reilly was soliciting their business to move to BOA.  *See* E\*TRADE's Mem. Of P&A in Support of Pl's Mot. For Preliminary Injunction, at 7-9, *E\*TRADE Financial Corp., et al. v. Reilly, et al.*, No. 08-cv-1963 (Lobel Decl. Ex. 3), describing Reilly taking confidential E\*TRADE information and using it to solicit E\*TRADE customers.  *See also* Declaration of Curt B. Radetich in Support of E\*TRADE's Mem. Of P&A, at ¶¶ 35-44, *E\*TRADE Financial Corp., et al. v. Reilly, et al.*, No. 08-cv-1963 (Lobel Decl. Ex. 4), describing specific E\*TRADE client contacts and comments regarding Reilly's solicitation after leaving E\*TRADE for BOA. E\*TRADE found evidence that both Hernandez and Reilly contacted some of the same E\*TRADE customers upon their arrival at BOA.

Not surprisingly, E\*TRADE's claims against Reilly are indistinguishable from its claims against Hernandez and Gaffey.  Reilly's employment agreement was virtually identical to Hernandez's; thus his theft of E\*TRADE's proprietary information to solicit clients breached the same contractual provisions as Hernandez's did.

E\*TRADE's claim against Reilly therefore is not a separate event that happens to be similar; it is in fact the same claim arising out of the same transactions.

## II.    E*TRADE FILED A SEPARATE FEDERAL ACTION AGAINST REILLY BECAUSE HE IS NOT SUBJECT TO JURISDICTION IN NEW YORK

E*TRADE reluctantly concluded that it could not sue all three defendants in the same federal lawsuit because the New York court did not have jurisdiction over Reilly. Consequently, on the same day that E*TRADE filed this lawsuit against Hernandez and Gaffey, E*TRADE also filed a separate federal lawsuit to obtain a preliminary injunction against Reilly for his participation in the theft of E*TRADE's proprietary information. *E*TRADE Financial Corp. v. Reilly*, No. 08-cv-1963 (C.D. Cal.). E*TRADE concurrently filed a motion for a preliminary injunction against Reilly.

The California court is on a slower timetable than this Court. Although filed simultaneously, the California court scheduled the Reilly hearing for May 5, 2008.

Once this Court entered its Order on the day of the argument, April 16, the different schedule in California presented a dilemma for FINRA. Applying the FINRA rule that a FINRA permanent injunction hearing occurs within 15 days after a court enters a preliminary injunction, Hernandez and Gaffey would appear to be headed for a FINRA hearing ***before the Reilly motion is even argued*** to the California court:

| *Defendants* | *Order Date* | *15-Day Period* |
|---|---|---|
| Hernandez/Gaffey | April 16 | April 17 through **May 1** |
| Reilly | No earlier than **May 5** | May 6 through May 20 |

This dilemma creates competing interests. E*TRADE has a right to have all its claims heard in one arbitration, against all of the FINRA respondents who acted jointly to harm E*TRADE. Reilly may not be required to have an expedited FINRA arbitration hearing if no court has yet entered a preliminary injunction against him. And Hernandez and Reilly are demanding a FINRA arbitration within 15 days of this Court's Order.

### III.    E*TRADE CONTACTED FINRA TO DETERMINE HOW IT WILL RESOLVE THE DILEMMA CREATED BY THE DIFFERENT SCHEDULES

FINRA's rules do not provide guidance on how FINRA will handle the dilemma created by the different schedules of two federal courts, where both affect the same FINRA arbitration.

Consequently, after the Court issued its Injunction, E*TRADE sought guidance from FINRA.  Last Thursday (the day after the Court entered the Order), a mid-level associate at the firm representing E*TRADE placed calls to FINRA's administrative staff in a fact-finding mission to determine if FINRA has a practice or past history with this kind of dilemma.  *See* Declaration of Hans H. Chen ("Chen Decl."), ¶¶ 8-9, filed concurrently herewith.  Taking up the offer in Ms. Martin's letter to "call . . . if you have any questions," he contacted her staff and was told that FINRA would measure the 15-day period from the date of the ***last*** injunction, which here means whenever the California court enjoins Reilly.  *Id.*; Chen Decl. Ex. A.  Ms. Martin later told Mr. Chen to put that in a letter.  Chen Decl. ¶ 10.  In his communications with FINRA, at no time did E*TRADE's counsel argue or lobby for any particular outcome.  *Id.* ¶ 12.  The communications were purely to gather information.  *Id.*

E*TRADE did not attempt to hide its calls to FINRA staff.  In an April 17, 2008 letter to Ms. Vanier Martin (FINRA Case Administrator) and copying Defendants' counsels, E*TRADE's counsel stated that, "[o]ur understanding from conversations with your office is that the 15-day period for the expedited arbitration will not begin running until the final motion involving Mr. Reilly is resolved on May 5th."  *See* Lobel Decl. Ex. 6.

### IV.    FINRA WILL DECIDE WHETHER TO HOLD ONE OR TWO HEARINGS AND, IF ONE HEARING, WHEN TO HOLD IT

Defendants, for their part, recognized the dilemma – but carefully avoided mentioning it in their request for a show-cause order.  On Friday, April 18, Defendants filed a motion with

FINRA to sever E*TRADE's claim into two hearings – one on the East Coast for Hernandez and

Gaffey, and a second one in California for Reilly.  If FINRA grants the motion, then obviously

FINRA can conduct the Hernandez/Gaffey hearing by May 1.  However, if FINRA denies the

motion, then the scheduling dilemma will still exist.

      E*TRADE will be responding to Defendants' severance motion shortly.  E*TRADE will

argue that FINRA Rules require a single arbitration because the respondents acted in concert and

E*TRADE's claims against them are joint.  Holding two hearings will needlessly double the

costs and efforts.  E*TRADE will also propose a solution to FINRA that will serve all parties'

interests.  E*TRADE will request FINRA to schedule a single hearing as early as May 7 – which

is two days after the preliminary injunction hearing in California.  (E*TRADE fully expects the

California court to enter an injunction, just as this Court did.)  If FINRA agrees, this would

extend the preliminary injunction only *four extra business days* beyond the May 1 date

Hernandez and Gaffey want; it will protect E*TRADE's right to a single hearing; and it will

expedite the matter as quickly as possible.

## V.    E*TRADE'S INFORMATION DEFENDANTS' RECENTLY RETURNED PROVES THEY STOLE LARGE AMOUNTS OF E*TRADE'S HIGHLY CONFIDENTIAL INFORMATION

      One other development last week bears on Defendants' arguments to vacate the Order.

After the Court ordered Defendants to return E*TRADE's proprietary information, Defendants

produced an enormous quantity of E*TRADE's client financial information that they improperly

took from E*TRADE.[1]  The Court will recall that Defendants testified they took only

---

[1]    On April 21, Defendants proclaimed that they had returned the full amount of information they possessed and thus had "fully complied" with the injunction.  Def. Mem. at 4.  Despite this pledge, Defendants sent E*TRADE an additional 110 pages of required materials three days later.  In addition, Defendants have yet to return any electronic records, which also suggests that Defendants are not in full compliance.  That issue is not before the Court here.

information necessary to contact clients to "announce" their new jobs at BOA – so one would expect client names, addresses and phone numbers. The information they recently returned puts their testimony to shame. They actually stole client financial information that went far beyond clients' contact information. *See* Exhibit 9 to the Declaration of Jeffrey Wimer, filed on March 28, 2008 [Docket No. 5-10] attaching a small portion of the total information the Defendants stole from E*TRADE, which includes:

- Clients' account numbers, meticulously recorded;
- Client deposits in accounts; and
- Nature of various clients' assets (e.g., IRAs, etc.).

None of this information had any relevance to "announcements." The information is useful only for soliciting clients' business.

But the information Defendants returned goes beyond that. Defendants took copious notes of their solicitations with these clients. As the Court will see from the spreadsheets in Lobel Decl. Ex. 7, Defendants kept track of their solicitations with customers that included statements about the sales packages they sent to customers and their repeated attempts to convince customers to "move" to BOA. Examples:

Client EA

- Spoke on 1-24
- "gave direct line, too old to move, accounts are going to charity"

Client J&MH

- They were "on fence" on 1-19
- Followed up with them/left messages on 1-28, 2-3, and 2-28

Client EJ

- "On fence" on 1-19
- Followed up on 1-29 and 1-30

Client DS

- 1-20:  Left message
- 1-29:  Got fed ex
- 2-7:  Had "decent conversation" but client was "on fence sounds luke warm"
- Then left message 2-26
- 2-27:  Spoke, but client was still thinking

Defendants did not reveal any of these facts to the Court in their declarations in opposition to E*TRADE's motion for a preliminary injunction.  Indeed, Defendants denied – under oath – that they solicited E*TRADE's clients or had any desire to do so.

## ARGUMENT

Defendants request the Court to lift the Order based on a series of misstatements about E*TRADE's conduct.  With the full facts now before the Court, E*TRADE respectfully submits that the Court will agree that no grounds exist to revisit the Order.

## I.    E*TRADE DID NOT ENGAGE IN "*EX PARTE*" COMMUNICATIONS

Defendants wrongly claim that E*TRADE engaged in what they call an "*ex parte*" communication with FINRA.  Def. Mem. at 2-3.

E*TRADE could not have violated FINRA Rule 13210's bar on "*ex parte*" communications because FINRA has not yet even appointed any arbitrators.  FINRA Rules distinguish between a prohibited "*ex parte*" communication with FINRA **arbitrators** (which is forbidden) and a call to the FINRA administrative staff (which is **encouraged**).  FINRA Rule 13210(a) (*see* Lobel Decl. Ex. 8) states no party "may communicate with any **arbitrator** outside of a scheduled hearing or conference . . . unless all parties or their representatives are present." (Emphasis added.)[2]

---

[2]    Defense counsel (who regularly handle FINRA arbitrations) are well aware of this distinction.

There is no similar rule prohibiting communications with FINRA's case management staff. To the contrary, FINRA Rule 13210's introduction expressly encourages such communications: "Contact your case administrator for details." Consistent with this instruction, the letter from E*TRADE's Case Administrator, Ms. Martin, asked the parties to "call me with any questions." *See* Chen Decl. Ex A.

The calls by E*TRADE's mid-level associate to FINRA staff were exactly the kind of information-gathering communications with FINRA staff that FINRA encourages. E*TRADE made no effort to lobby or argue for any particular result. Chen Decl. ¶ 12. Finally, if E*TRADE were engaged in surreptitious lobbying of FINRA, E*TRADE's counsel would not have informed Defendants of that fact in a letter. *See* Lobel Decl. Ex. 6.

## II.    E*TRADE WAS ATTEMPTING TO DETERMINE HOW FINRA WILL RESOLVE THE DILEMMA CREATED BY COMPETING FINRA RULES

Defendants accuse E*TRADE of trying to violate the FINRA rule that a hearing on a permanent injunction "must be conducted" within 15 days of the entry of this Court's Order. Def. Mem. at 2-4. Several FINRA Rules are implicated by E*TRADE's Statement of Claim, and it is still unclear how FINRA will resolve the conflict arising in this matter.[3]

FINRA Rule 13313(a) permits E*TRADE to conduct a single arbitration against all of the Respondents, including Reilly, because they arise from the same transactions and involve the same issues of law.[4] *See* Lobel Decl. Ex. 9. However, subsection (b) of the same rule provides that FINRA, ***upon a proper motion*** by Respondents, may "sever" E*TRADE's claim into

---

[3]    While FINRA has circulated lists of arbitrators for a Hearing, it has not set a hearing date or severed the claims.

[4]    The full text of the Rule reads: "One or more parties may name one or more respondents in the same arbitration if the claims contain any questions of law or fact common to all respondents and; [t]he claims are asserted against the respondents jointly and severally; or [t]he claims arise out of the same transaction or occurrence, or series of transactions or occurrences."

multiple separate hearings.  Respondents on April 18th filed a Motion to Sever.  If FINRA denies

that motion and allows E*TRADE to conduct a single hearing against all of the Respondents,

then it is almost certain that a consolidated hearing cannot be conducted by May 1st because

Reilly's court hearing is not until May 5th.

The dilemma can be resolved by FINRA Rule 13207(c), which allows FINRA to modify

all rules for "***good cause***."[5]  Thus, if FINRA chooses to, it can modify the 15-day rule to account

for the fact that Reilly's court hearing will occur four days after the 15-day period applicable to

Hernandez and Gaffey.  E*TRADE's position will be that FINRA should conduct a single

hearing as early as May 7, which is still very expedited and is not an interminable "delay" as

proclaimed by the Defendants.

## III.    E*TRADE HAS NOT TRIED TO "DELAY AS LONG AS POSSIBLE" THE UPCOMING ARBITRATION HEARING

Most of Defendants' brief is a re-argument of its case on its merits.  Defendants claim

that E*TRADE is trying to "delay as long as possible" the date of the hearing because its odds of

winning are "negligible."  Def. Mem. at 5.  Defendants suggest that E*TRADE is motivated by

fear that it will assuredly lose the hearing at FINRA.  *Id.* at 6-7.  Defendants argue that

E*TRADE "knows" it will lose, which explains why E*TRADE wants to extend the preliminary

injunction beyond 15 days.  *Id.* at 5.

Defendants could not be more wrong on E*TRADE's view of its case.  Far from fearing

a hearing, E*TRADE's case has only gotten stronger since the parties were last before the Court.

---

[5]    "The Director may extend or modify any deadline or time period set by the Code for good cause.  The Director may also extend or modify any deadline or time period set by the panel in extraordinary circumstances." *See* Lobel Decl. Ex. 10.

E*TRADE is ready to go to a FINRA hearing forthwith, but wants a consolidated hearing. The Court should reject Defendants' baseless accusations for numerous reasons:

*First*, E*TRADE's intentions are not devious as Defendants claim. E*TRADE merely wanted to resolve the dilemma created by the different court schedules affecting all of the respondents; will FINRA sever E*TRADE's claims into two hearings, or will it conduct a single hearing after May 5th?

*Second*, E*TRADE does not wish to delay the permanent injunction hearing. The facts could not possibly be stronger for E*TRADE – it has direct proof that Defendants stole highly confidential clients' financial information and used it to solicit the clients.

*Third*, E*TRADE is not motivated by the fears of proceeding that Defendants predict. Defendants wrongly claim that "with virtual unanimity" FINRA has "refused to enjoin" any brokers or financial analysts who lacked a "non-solicitation" clause in their employment agreements. Def. Mem. at 6. First, this is irrelevant for Defendant Gaffey, who *did* have a non-solicitation clause. Second, there are numerous examples of FINRA panels granting permanent injunctions even where a respondent did not have a "non-solicitation" clause:

- *In re Charles Schwab & Co., Inc. v. Citigroup Global Markets, Inc.*, 2004 WL 884573 (N.A.S.D. Apr. 12, 2004) (enjoined former employee from soliciting customers, even though employment agreement did not have a non-solicitation clause);

- *In re Summit Financial Services Group, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2000 WL 1805272 (N.A.S.D. Oct. 26, 2000) (same);

- *In re Smith Barney Shearson, Inc. v. Prudential Securities, Inc.*, 1994 WL 1106843 (N.A.S.D. July 18, 1994) (same).

In short, E*TRADE has not sought – and would not seek – to "delay" the FINRA hearing, and certainly not for "as long as possible." E*TRADE's only goal is to hold *one*

*arbitration*.  If there will be a single hearing, it would have to be after May 1; E*TRADE is

proposing May 7, four business days later.  FINRA will resolve that issue.

## IV.    E*TRADE DID NOT MAKE MISREPRESENTATIONS TO THE COURT

Defendants' most serious contention – and, indeed, the heart of their request for the OSC

– is the claim that E*TRADE's counsel effectively violated Rule 11 by making

misrepresentations to the Court.  E*TRADE and its counsel take this allegation very seriously

and want the record to be clear on this issue.

After devoting pages and pages of argument about the likely outcome of the FINRA

arbitration, Def. Mem. at 5-7, Defendants in a single paragraph argue that the Order should be

lifted because E*TRADE did not represent its true intentions to push the FINRA hearing beyond

15 days, *id.* at 7.  That is simply false.  Colorful comments like E*TRADE' conduct was

"deceitful" and "unconscionable," *id.* at 8, do not make Defendants' argument any more true.

As an initial matter, Defendants claim that E*TRADE guaranteed there would be a

FINRA hearing in 15 days.  *Id.* at 2.  More accurately, E*TRADE told the Court that the Hearing

would be expedited but expressly mentioned the possibility that FINRA might schedule a

hearing at a later time:

> Last point, your Honor, on the FINRA rules, the rule is that the
> Court can enter a preliminary injunction pending an expedited
> hearing.  The FINRA rules require that the hearing be within 15
> business days.  ***There can be some minor modification to that***, of
> course, but this will be an expedited proceeding . . . .

Hearing Tr. 39[5]-40[14] (argument of D. Lobel) (*see* Lobel Decl. Ex. 11).  E*TRADE did not

expound on that statement, but counsel was aware that for many reasons the arbitration may well

not commence exactly within 15 days – for example, if an arbitrator or witness had a conflict, or

for other "good cause."

Standing before the Court, E*TRADE's counsel had not yet contemplated the scheduling dilemma created when the Court entered the injunction at the hearing. E*TRADE's counsel had no past experience with a single FINRA arbitration following multiple court injunctions, and E*TRADE's counsel was not aware of how FINRA intended to handle the situation. E*TRADE's counsel realized the problem after the hearing – which is why E*TRADE's mid-level associate contacted FINRA staff the following morning. Defendants wish to ignore E*TRADE's rights to have a single hearing; E*TRADE is now proposing a hearing on May 7 that would balance all of the parties' various interests.

Thus, at most, Defendants' argument to lift the injunction is premised solely on E*TRADE not raising the possible scheduling impact of the California case. Defendants are wrong that E*TRADE had evil intentions. If E*TRADE's counsel was remiss for not predicting the scheduling dilemma in advance, then so are Defendants' counsel too. Indeed, Defendants' counsel have not been completely forthcoming with the Court here. They brush over that the FINRA arbitration includes a third individual respondent, Reilly. They never once mention that Defendants filed a severance motion at FINRA, or that Defendants must prevail on that motion in order to have a hearing within the 15-day period. Through their silence, Defendants implicitly paint all of this as a *fait accompli*, not worthy of the Court knowing.

Finally, Defendants have not made a case that the appropriate sanction should be the lifting of the Order. Such a harsh and ultimate punishment on **E*TRADE** – which is unquestionably the victim of Defendants' thievery – is hardly justified by the failure by counsel to predict and address the scheduling dilemma presented by the separate lawsuit against Reilly.

**V.    E\*TRADE DILIGENTLY OBTAINED AND FILED A BOND**

Finally, Defendants argue that the injunction should be vacated because E\*TRADE failed to post a bond – or, alternatively, the amount of the bond should be increased.  Def. Mem. at 8-9. The issue is now moot because E\*TRADE filed the required bond this past Tuesday morning. [Docket No. 29.]

E\*TRADE obtained the bond expeditiously.  (*See* Chen Decl., ¶ 14.)  The Court entered the injunction near the end of the day Wednesday, April 16.  E\*TRADE's counsel immediately notified his client of the need for a bond.  E\*TRADE's litigation support staff, located in California, obtained a bond from its insurance brokers the very next day, Thursday April 17. E\*TRADE sent the bond on Friday, April 18, to its Virginia counsel by overnight courier. Receiving the bond on Monday, April 21, E\*TRADE's counsel promptly forwarded it to its New York office and the bond was posted on Tuesday, April 22.

Nor do grounds exist to increase the amount of the bond, which already is more than adequate to protect Defendants' interests.  Whether the preliminary injunction extends 15 days or a longer time – which was always a possibility, as the Court recognized – the Defendants do not credibly face lost revenues above $100,000.  Both of them together earned net commissions over the last *year* of $648,505.  If they were enjoined from soliciting any clients nationwide for as long as a month, the maximum reasonable bond would be about $54,000 (one-twelfth of their total annual commissions).  But even that amount is grossly overstated, because the injunction does not deprive Defendants from earning commissions – they can still sell BOA's services to millions upon millions of potential customers, just not the few hundred that have been E\*TRADE customers.  Therefore, the $100,000 bond the Court ordered is easily more than sufficient to protect Defendants' interests.

**CONCLUSION**

E*TRADE respectfully submits that it has shown more than adequate cause as to why the

Court should not lift the Order and should not increase the amount of the bond.

Dated:  April 24, 2008                    Respectfully submitted,

                                          COOLEY GODWARD KRONISH LLP


                                          /s/ Douglas P. Lobel
                                          Douglas P. Lobel (DL-3894)
                                          11951 Freedom Drive
                                          Reston, Virginia 20190-5655
                                          Telephone:  (703) 456-8000
                                          Facsimile:  (703) 456-8100


                                          *Counsel for Plaintiffs E*TRADE Financial*

                                          *Corporation and E*TRADE Securities LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas P. Lobel, hereby certify that on the 24th day of April, 2008, E*TRADE'S RESPONSE TO DEFENDANTS' ORDER TO SHOW CAUSE and supporting papers were filed through the ECF system and will be sent electronically, via the ECF system, to the following registered participants, as also identified on the Notice of Electronic Filing (NEF).  There are no non-registered participants in this case to my knowledge and belief.

Paul A. Saso, Esq.
GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
Telephone (212) 613-2000

and

Christopher C. Coss, Esq.
Thomas J. Momjian, Esq.
COSS & MOMJIAN, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, Pennsylvania 19004
Telephone (610) 667-6800

*Counsel for Marcus J. Hernandez and Sean J. Gaffey*

William E. Goydan, Esq.
WOLFF & SAMSON PC
140 Broadway, 46th Floor
New York, New York 10005
Telephone (212) 973-0572

*Counsel for Banc of America Investment Services, Inc.*

/s/ Douglas P. Lobel
Douglas P. Lobel