UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YOR
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E*TRADE FINANCIAL CORPORATION and    :
E*TRADE SECURITIES LLC,               :
                                      :
            Plaintiffs,               :
                                      :
      v.                              :        No. 08 CV 2993 (RJH)
                                      :
MARCUS J. HERNANDEZ,                  :
SEAN J. GAFFEY and BANC OF            :
AMERICA INVESTMENT                    :
SERVICES, INC.,                       :
                                      :
            Defendants.               :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DOUGLAS P. LOBEL
### IN OPPOSITION TO DEFENDANTS' ORDER TO SHOW CAUSE

1.      I am a partner at Cooley Godward Kronish LLP, counsel of record in this

action for Plaintiffs E*TRADE Financial Corporation and E*TRADE Securities LLC (together,

"E*TRADE").  I am admitted to practice before the United States District Court for the Southern

District of New York.

2.      I respectfully submit this declaration to transmit to the Court certain

documents in support of E*TRADE's Response to Defendants' Order to Show Cause.

3.      Attached to this declaration as **Exhibit 1** is a true and correct copy of

E*TRADE's **Statement Of Claim** filed on March 24, 2008, in the matter styled *E*TRADE*

*Securities LLC v. Marcus J. Hernandez, Joseph S. Reilly, Sean J. Gaffey, and Banc of America*

*Investment Services, Inc.*, FINRA Dispute Resolution Arbitration No. 08-00871.

4.      Attached to this declaration as **Exhibit 2** is a true and correct copy of a

spreadsheet consisting of a compilation of E*TRADE's internal Instant Message logs for Marcus

Hernandez, Scott Reilly and Sean Gaffey.  At the request of my office, Richard Busby, E*TRADE's Manager of Security in the Corporate Information Security Department, retrieved the Instant Message records for Hernandez, Gaffey, and Reilly, and provided these records to my office.

5.      Under my supervision, an associate from our office calculated the percentage of internal communications between Hernandez and Reilly using E*TRADE's record of Instant Messages for Hernandez.

6.      Attached to this declaration as **Exhibit 3** is a true and correct copy of E*TRADE's **Memorandum Of Points And Authorities In Support of Plaintiffs' Motion For Preliminary Injunction In Aid Of Arbitration** filed on March 27, 2008, in the matter styled *E*TRADE Financial Corporation and E*TRADE Securities LLC v. Joseph S. Reilly and Banc of America Investment Services, Inc.*, Case No. 08-cv-1963-AHM, Docket No. 8, in the United States District Court for the Central District of California.

7.      Attached to this declaration as **Exhibit 4** is a true and correct copy of **Declaration of Curt B. Radetich** In Support Of E*TRADE's Memorandum Of Points And Authorities In Support of Plaintiffs' Motion For Preliminary Injunction In Aid Of Arbitration filed on March 27, 2008, in the matter styled *E*TRADE Financial Corporation and E*TRADE Securities LLC v. Joseph S. Reilly and Banc of America Investment Services*, Case No. 08-cv-1963 (AHM), Docket No. 7-7, in the United States District Court for the Central District of California.

8.      Attached to this declaration as **Exhibit 5** is a true and correct copy of **Exhibits 7 and 8 to Declaration of Curt B. Radetich** In Support Of E*TRADE's Memorandum Of Points And Authorities In Support of Plaintiffs' Motion For Preliminary

Injunction In Aid Of Arbitration filed on March 27, 2008, in the matter styled *E\*TRADE Financial Corporation and E\*TRADE Securities LLC v. Joseph S. Reilly and Banc of America Investment Services, Inc.*, Case No. 08-cv-1963 (AHM), Docket Nos. 7-14 and 7-15, in the United States District Court for the Central District of California.

9.     Attached to this declaration as **Exhibit 6** is a true and correct copy of Letter from Douglas P. Lobel to Vanier Martin (FINRA Case Administrator) sent on April 17, 2008, in the matter styled *E\*TRADE Securities LLC v. Marcus J. Hernandez, Joseph S. Reilly, Sean J. Gaffey, and Banc of America Investment Services, Inc.*, FINRA Dispute Resolution Arbitration No. 08-00871.

10.     Attached to this declaration as **Exhibit 7** are true and correct copies of Letters from Thomas J. Momjian to Douglas P. Lobel sent on April 17 and 18, 2008 transmitting **spreadsheets with handwritten notes returned by Marcus Hernandez**, in the matter styled *E\*TRADE Financial Corporation and E\*TRADE Securities LLC v. Marcus J. Hernandez, Sean J. Gaffey, and Banc of America Investment Services, Inc.*, No. 08-cv-2993 (RJH), in the United States District Court for the Southern District of New York.

11.     Attached to this declaration as **Exhibit 8** is a true and correct copy of **FINRA Rule 13210. Ex Parte Communications** found at FINRA's websites:

http://finra.complinet.com/finra/display/display.html?rbid=1189&record_id=1159007753&element_id=1159006815&highlight=13210#r1159007753.

12.     Attached to this declaration as **Exhibit 9** is a true and correct copy of **FINRA Rule 13313. Multiple Respondents** found at FINRA's website:

http://finra.complinet.com/finra/display/display.html?rbid=1189&record_id=1159007771&element_id=1159006833&highlight=13313#r1159007771.

13.    Attached to this declaration as **Exhibit 10** is a true and correct copy of

**FINRA Rule 13207. Extension of Deadlines** found at FINRA's website:

http://finra.complinet.com/finra/display/display.html?rbid=1189&record_id=1159007759&element_id=1159006821&highlight=13207#r1159007759.

14.    Attached to this declaration as **Exhibit 11** is a true and correct copy of the

**Preliminary Injunction Hearing Transcript** (relevant excerpts attached), heard on April 16,

2008, in the matter styled *E*TRADE Financial Corporation and E*TRADE Securities LLC v.

Marcus J. Hernandez, Sean J. Gaffey, and Banc of America Investment Services, Inc.*, No. 08-cv-

2993 (RJH), in the United States District Court for the Southern District of New York.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed this 24th day of April, 2008, in Reston, Virginia.


/s/ Douglas P. Lobel
Douglas P. Lobel

## **CERTIFICATE OF SERVICE**

I, Douglas P. Lobel, hereby certify that on the 24th day of April, 2008, Declaration Of Douglas P. Lobel In Support Of E*TRADE's Response To Defendants' Order To Show Cause was filed through the ECF system and will be sent electronically, via the ECF system, to the following registered participants, as also identified on the Notice of Electronic Filing (NEF). There are no non-registered participants in this case to my knowledge and belief.

Paul A. Saso, Esq.
GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
Tel:  (212) 613-2000

and

Christopher C. Coss, Esq.
Thomas J. Momjian, Esq.
COSS & MOMJIAN, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, Pennsylvania 19004
Tel:  (610) 667-6800

*Counsel for Marcus J. Hernandez and Sean J. Gaffey*

William E. Goydan, Esq.
WOLFF & SAMSON PC
140 Broadway, 46th Floor
New York, New York 10005
Tel:  (212) 973-0572

*Counsel for Banc of America Investment Services, Inc.*

/s/ Douglas P. Lobel
Douglas P. Lobel

# EXHIBIT 1



Douglas P. Lobel

T: (703) 456-8019
dlobel@cooley.com

March 24, 2008

Director of Arbitration
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006

Re:     **STATEMENT OF CLAIM**
        *E\*TRADE Securities LLC v. Marcus J. Hernandez; Joseph S. Reilly;*
        *Sean J. Gaffey; and Banc of America Investment Services, Inc.*

To the Director of Arbitration:

E\*TRADE Securities LLC ("E\*TRADE") files this Statement of Claim to obtain

permanent injunctive relief, and to recover damages, resulting from (1) the theft of confidential

customer information; (2) the unlawful solicitation of customers using that information; and

(3) the use of false and defamatory scare tactics to coerce clients to transfer their accounts from

E\*TRADE.

Respondents Marcus J. Hernandez ("Hernandez"), Joseph S. Reilly ("Reilly"), and Sean

J. Gaffey ("Gaffey") are former E\*TRADE financial advisors who are now employed by Banc of

America Investment Services, Inc. ("BOA"). Jointly, they engaged in a campaign to smear

E\*TRADE and create panic among its customers using E\*TRADE's confidential customer

information. Respondents used illegal and unethical means to gain a competitive advantage over

E\*TRADE in breach of their employment agreements and in violation of federal and state law.

All parties are FINRA Members or Associated Persons, and thus arbitration is required

under Rule 13200, FINRA Code of Arbitration Procedure for Industry Disputes (hereafter

"FINRA Rule").

# Cooley
### GODWARD KRONISH LLP

## I.    THE PARTIES

E*TRADE is a Delaware limited liability company whose parent is E*TRADE Financial Corporation, a publicly traded company. All employees of E*TRADE are subject to the policies of the parent company. E*TRADE provides a full range of nationwide retail and institutional brokerage services, including online brokerage services and investment counseling services. E*TRADE is registered with FINRA, CRD No. 29106.

Hernandez is a former E*TRADE Financial Advisor and is currently employed by BOA. He is registered with FINRA, CRD No. 4218478.

Reilly is a former E*TRADE Financial Advisor and is currently employed by BOA. He is registered with FINRA, CRD No. 3115010.

Gaffey is a former E*TRADE Financial Advisor and is currently employed by BOA. He is registered with FINRA, CRD No. 4284044.

BOA is a Florida corporation with its principal place of business in Boston, Massachusetts. BOA provides financial services nationally and competes directly with E*TRADE's brokerage and investment counseling services. BOA is registered with FINRA, CRD No. 16361.

## II.    RELEVANT FACTS

### A.    E*TRADE's Confidential Information

E*TRADE's proprietary customer information and trade secrets (hereafter called "Confidential Information") are critical to its business operations. This information includes E*TRADE's customer and prospect lists; customer account and personal financial information; and internal strategic business, marketing, and financial information and plans.



To cultivate and maintain its customers, E*TRADE engages in extensive and costly advertising campaigns in various media. As a direct result of E*TRADE's significant expenditures, it has developed extensive customer lists that contain detailed financial information about its most profitable customers.

E*TRADE's Confidential Information also contains extensive detail about its internal business plans and practices. This Confidential Information, including the customer list, is not disseminated outside E*TRADE and is not available (by lawful means) to non-E*TRADE persons or entities.

E*TRADE takes substantial precautions to protect the secrecy of its Confidential Information. For example, E*TRADE maintains a proprietary computer network where the Confidential Information is secured by password-protected access and active system checks to prevent unauthorized access. E*TRADE limits access to those employees having a "need to know" and requires these employees to sign agreements protecting the confidentiality of the Confidential Information. E*TRADE also maintains a written Code of Professional Conduct, which contains extensive restrictions on employees' use of E*TRADE's Confidential Information.

**B.    Respondents All Worked Together In E*TRADE's New York Office**

E*TRADE's business model is different from many "full service" brokerage firms, where normally financial advisors have a "book" of business, and they are expected to recruit or solicit new customers. Instead, E*TRADE typically obtains its customers through its marketing efforts and cross-selling from its other business lines; the financial advisors are not expected to recruit customers, and the customers are not considered the financial advisor's customers. E*TRADE assigns a financial advisor to a customer, providing that customer with a point of contact at the



company. However, E*TRADE can, and does, reassign customers to financial advisors from time to time.

The three individual Respondents worked together as financial advisors for years in E*TRADE's New York office. Hernandez started working at E*TRADE in October 2003; Reilly in December 2003; and Gaffey in October 2004. They worked together closely until May 2006, when Reilly relocated to an E*TRADE office in California. Hernandez and Gaffey remained together in New York until November 2007, when Hernandez moved to E*TRADE's office in Blue Bell, Pennsylvania.

As financial advisors, Hernandez, Reilly and Gaffey all provided personalized investment strategies and advice to E*TRADE customers.

**C.    E*TRADE Restricted Their Use Of E*TRADE's Confidential Information**

Hernandez, Reilly and Gaffey all had access to, and regularly used, E*TRADE's Confidential Information in the course of their work for E*TRADE. All three Respondents were subject to E*TRADE's restrictions on the use of that information. Hernandez entered into the "Employment Agreement, Proprietary Information and Inventions and Arbitration of Employment Disputes" with E*TRADE on October 7, 2003. (Exhibit 1). Reilly entered into the "Agreement Regarding Employment and Proprietary Information and Inventions" with E*TRADE on January 5, 2004. (Exhibit 2). Gaffey entered into the "Agreement Regarding Employment and Proprietary Information and Inventions" with E*TRADE on October 26, 2004. (Exhibit 3). E*TRADE will refer to these three contracts as the "Employment Agreements."

In addition to agreeing to the specific terms listed in the Employment Agreement, Hernandez, Reilly, and Gaffey all expressly agreed, through their Employment Agreements and



in separately executed statements, that they had read and would comply with E*TRADE's Code of Professional Conduct. (Exhibit 4).

The Employment Agreements expressly, and by incorporation of E*TRADE's Code of Professional Conduct, imposed numerous obligations on Hernandez, Reilly, and Gaffey to protect E*TRADE's Confidential Information, and prohibited them from using it inconsistently with E*TRADE's interests.

### 1.    *Respondents' Employment Agreements*

All three Employment Agreements contained express restrictions on Respondents' access to and use of E*TRADE's Confidential Information. E*TRADE describes Hernandez's Employment Agreement below. *See* Exhibit 1. The other two Employment Agreements contain essentially identical provisions. *See* Exhibits 2 & 3.

First, Hernandez expressly acknowledged that he understood "that [E*TRADE] possesses and will possess Proprietary Information which is important to its business." Proprietary Information is "information that was developed, created, or discovered by or on behalf of [E*TRADE], . . . which has commercial value in [E*TRADE's] business." This definition includes, but is not limited to, customer lists and other information that concern E*TRADE's actual or anticipated business (customer lists are types of E*TRADE proprietary information). Exhibit 1, Paragraph A.2.

Hernandez expressly agreed not to remove any Company Documents and Materials from E*TRADE:

> All Company Documents and Materials are and shall be the sole property of the Company. *I agree that during my employment by the Company, I will not remove any Company Documents and Materials from the business premises of the Company* or deliver any Company



Documents and Materials to any person or entity outside
the Company . . . . (Emphasis added.)

Exhibit 1, Paragraph C. In the same provision, Hernandez expressly agreed to return all

Company Documents and Materials to E*TRADE upon termination of his employment:

> I further agree that, immediately upon the termination of
> my employment by me or by the Company for any reason,
> or during my employment if so requested by the Company,
> I will return all Company Documents and Materials,
> apparatus, equipment and other physical property, or any
> reproduction of such property . . . .

These same restrictions appear in Reilly's (Exhibit 2, Paragraph C) and Gaffey's (Exhibit 3,

Paragraph D) agreements.

2.    *Gaffey's Non-Solicitation Agreement*

In addition, Gaffey's agreement prohibited him from soliciting E*TRADE's customers

for two years after termination of this employment – a "non-solicitation" provision:

> During the term of my employment and for two (2) years
> thereafter, *I will not, on behalf of myself or anyone else,*
> *directly or indirectly encourage or solicit or attempt to*
> *encourage or solicit any customers, clients, partners or*
> *affiliates of [E\*TRADE] to terminate or diminish their*
> *relationship with [E\*TRADE].* I understand that I have an
> obligation not to use any customer lists or information from
> customer lists (which are included in the definition of
> Proprietary Information above) to directly or indirectly
> solicit business from any [E*TRADE] customer, whether
> for myself or anyone else.

Exhibit 3, Paragraph H (emphasis added).

3.    *E\*TRADE's Code of Professional Conduct*

In addition to the express provisions of the Employment Agreements, each Respondent

agreed to abide by additional restrictions described in E*TRADE's Code of Professional

Conduct (the "Code"). Relevant portions of the Code are attached as Exhibit 5.



The Code was part of the terms and conditions of Respondents' terms of employment. *See* Code, p. 4 ("The policies and procedures of the Code form part of the terms and conditions of your employment"). When they were hired, each individual Respondent signed a written statement acknowledging that he had reviewed the Code and agreed to comply with its terms. Additional acknowledgements were signed as the Code was updated. *See* Exhibit 4.

The Code forcefully requires employees to maintain the confidentiality of E*TRADE's proprietary information. That information expressly includes customer lists. *See* Code, pp. 24, 33. The Code bluntly states, "E*TRADE FINANCIAL employees are required *as a term of their employment* to agree to maintain the confidentiality of sensitive nonpublic customer . . . information." *Id.*, p. 14 (emphasis added). The Code also expressly forbids employees for using E*TRADE's Confidential Information for any purposes other than company business:

> In general, you must use E*TRADE FINANCIAL's assets *solely for the benefit of E*TRADE FINANCIAL or its customers.*
>
> . . . .
>
> Any systems to which you are provided access are to be used for Company business purposes. You must adhere to all Company policies and any policies that your business unit or department may set governing such usage. Generally, you should use E*TRADE FINANCIAL's systems only for Company business. You may use the systems for limited personal use in accordance with E*TRADE FINANCIAL policies governing communications and conduct generally. However, *any use for personal profit or contrary to law or Company policies is prohibited.*
>
> . . . .
>
> Use proprietary or confidential information *solely to perform your duties for E*TRADE FINANCIAL and not for your own personal benefit.*

*Id.* pp. 24, 24-25 & 35 (emphases added).



The Code also repeatedly requires employees not to remove E*TRADE's Confidential

Information from E*TRADE's premises, nor to disclose it to third parties:

> Do not remove proprietary or confidential information from
> Company premises unless absolutely necessary. . . . If you take
> such information out of the office for business purposes, keep it on
> your person or in a secure place at all times and return it promptly
> to Company premises.

> Do not disclose proprietary or confidential information to any
> person outside E*TRADE FINANCIAL (including family
> members), or use it or permit any third party to use it without first
> obtaining Legal and Compliance approval.

*Id.* pp. 36, 37.

Finally, the Code explains that these restrictions continue *after termination of*

*employment*:

> You must continue after the end of your employment to abide by
> E*TRADE FINANCIAL's policies concerning the handling of
> proprietary and confidential information, the treatment of inside
> information and the handling of privileged materials, as outlined in
> this Code and in any specific policies of your business unit or
> department. If you have downloaded such information onto any
> personal computer equipment, including a personal digital
> assistant, you are required to delete that information permanently
> from the equipment.

> You may not disclose proprietary or confidential information of
> E*TRADE FINANCIAL or any third party outside of the
> Company at any time, including after termination of employment.
> You may not take such proprietary or confidential information
> when leaving E*TRADE FINANCIAL or use or disclose such
> information for your own personal benefit or for the benefit of
> your new employer or prospective new employer. You may not
> permit its disclosure or use by any third party.

*Id.* at 27, 38.

# Cooley
GODWARD KRONISH LLP

**D.    Hernandez, Reilly, And Gaffey Breach Their Employment Agreements**

In clear coordination, the three individual Respondents all abruptly resigned from E*TRADE within a short time early this year. All three of them immediately went to work for the same employer, Respondent BOA. All three of them took E*TRADE's customer lists, and then all three of them immediately began inundating E*TRADE's customers on those lists with solicitations to transfer their E*TRADE accounts to BOA. All three of them induced fear in E*TRADE's customers by making false statements about E*TRADE's solvency and the security of customers' deposits. These events are hardly a coincidence.

- Hernandez left first. On January 18, 2008, Hernandez abruptly resigned from E*TRADE without warning and effective immediately. (Exhibit 6). That very same day, Hernandez became an employee of E*TRADE's competitor -- BOA.

- One week later, on January 25, 2008, Reilly abruptly resigned from E*TRADE without warning and effective immediately. (Exhibit 7). Like Hernandez, Reilly also became an employee of BOA the very same day he resigned.

- Shortly thereafter, on February 22, 2008, Gaffey abruptly resigned from E*TRADE without warning and effective immediately. (Exhibit 8). Like Hernandez and Reilly, Gaffey became an employee of BOA on the day he resigned.

None of the three left E*TRADE empty-handed. E*TRADE has evidence -- including "smoking guns" -- that they stole E*TRADE's confidential customer lists and used them at BOA to steal E*TRADE's customers.

*Hernandez.* After Hernandez resigned, E*TRADE contacted customers whom Hernandez had previously serviced. Many of them reported to E*TRADE that Hernandez had contacted them to solicit their business for BOA. When E*TRADE checked its records, it discovered that Hernandez *had forwarded to his home email* a series of computer files from E*TRADE's computer systems. These files included:



- A client list containing personal information for 257 E*TRADE clients, including their names, addresses, telephone numbers, and account numbers.

- For 2006, a monthly and quarterly breakdown of the gross monetary production report for all E*TRADE financial advisors, including a detailed breakdown of how much each financial advisor sold of each type of financial product (such as mutual funds, CDs, and bonds).

- For 2003-2006, a monthly breakdown of sales transactions categorized by date of transaction, type of investment sold, buy/sell information, and account information, including monthly summaries regarding gross/net sales figures.

- A spreadsheet called Bond Clients which appears to contain account numbers and other information regarding E*TRADE clients for other E*TRADE financial advisors.

(Exhibit 9). These confidential files enabled Hernandez to contact E*TRADE customers and solicit them to transfer their accounts to BOA.

*Reilly*. The evidence against Reilly is just as damning. Reilly left E*TRADE's offices so abruptly that he forgot to clean up his work papers. Among his working files were notebooks in his own handwriting. In these notebooks, he described that he *copied E*TRADE customer lists and customer data*. He also described how he called these customers to solicit them to transfer their accounts to BOA *while still employed at E*TRADE*, using his cell phone to evade detection. Reilly's own words and handwriting speak for themselves:





"Transition To Do[:]  Copy As Many Names #'s As Possible"

"Leaving To Do
(2) Call Clients Using Cell To Determine Their Interest In Coming w/ Me
(3) Print Out All Key Client Data"

These documents are attached as Exhibit 10.

E*TRADE determined that Reilly did exactly what his notes describe.  E*TRADE

contacted numerous other customers after Reilly left, who stated that Reilly called them and

solicited them to transfer their accounts to BOA.

*Gaffey.*  Gaffey engaged in exactly the same behavior.  While he was careful not to leave

direct evidence that he stole E*TRADE's Confidential Information, his behavior left its own

trail.  Again, E*TRADE contacted customers after Gaffey left and discovered that -- despite his

non-solicitation agreement -- Gaffey was calling E*TRADE customers to solicit them to transfer



their accounts to BOA. In these calls, Gaffey used account-specific customer information, proving that he took not just confidential customer contact information, but also proprietary account details with him.

These activities breached the express restrictions in their respective Employment Agreements, as well as the Professional Code of Conduct which they agreed to obey.

**E.    Respondents' Defamation of E\*TRADE To Customers**

Respondents did not merely steal customer information to call the customers. They also engaged in a campaign of scare tactics to coerce customers to transfer their business from E\*TRADE to BOA.

As discussed above, customers open E\*TRADE accounts because they wish to utilize E\*TRADE's services; customers are generated by E\*TRADE, not by the financial advisors. Respondents service the accounts once the firm generates them, but the customers are E\*TRADE's customers. Thus, when the individual Respondents left E\*TRADE, it was far from certain that any of the customers would follow them to BOA.

Consequently, the individual Respondents knew they needed leverage to persuade E\*TRADE's customers to leave E\*TRADE for BOA. As a result, they engaged in a coordinated campaign of fear, telling E\*TRADE's customers that E\*TRADE was possibly insolvent. Worse, they outright lied to the customers by claiming that, in the event of insolvency, their assets were at risk. Respondents knew this was false because E\*TRADE has multiple layers of insurance to protect their customers' assets. However, Respondents misrepresented the safety of customer accounts because they needed to create anxiety in these customers to pry them away from E\*TRADE.



### F.    Respondents' Damage To E*TRADE's Business

Unfortunately, Respondents' illegal and unethical conduct was successful in siphoning off certain high-worth customers from E*TRADE to BOA. E*TRADE contacted some of these customers and determined that they had been solicited and scared away from E*TRADE by Respondents' defamatory claims about E*TRADE's solvency and the security of the customers' assets. E*TRADE has likely lost many of these customers for good, despite concerted efforts to woo them back.

Other customers whom Respondents contacted remain at E*TRADE, but their loyalty has been shaken. Some have lost confidence and trust in E*TRADE; some were distressed that non-E*TRADE personnel possessed personal financial information about their E*TRADE accounts; some were alarmed by what they viewed as a breach of security; and others had their confidence in E*TRADE shaken by the scare tactics and fear-mongering about solvency and protection of assets. These concerns have caused, and will continue to cause, loss of business, either by making these customers more likely to leave E*TRADE in the future, or by causing them to do less business with E*TRADE.

### III.    E*TRADE'S CLAIMS AGAINST RESPONDENTS

Respondents' unlawful conduct gives rise to numerous claims under federal and state statutes and common law, and FINRA Rules.

*1.    Breach Of Contract.* Hernandez, Reilly and Gaffey all materially breached their Employment Agreements with E*TRADE. In violation of various provisions of those Agreements, as well as the requirements in the Code of Professional Conduct, they:



- Disclosed Confidential Information outside of E*TRADE;

- Used Confidential Information for personal benefit and to compete with E*TRADE;

- Removed Confidential Information from E*TRADE's premises while employed at E*TRADE, and did not destroy or return it after termination of employment;

- Used and disclosed Confidential Information after the termination of their employment at E*TRADE; and

- Removed and used E*TRADE's corporate property, including E*TRADE's business information, files, client lists, and e-mail, after the termination of their employment at E*TRADE.

Gaffey also breached his contractual obligations not to solicit E*TRADE's customers for two years after leaving E*TRADE. E*TRADE is entitled to be compensated for Respondents' breaches of their Agreements.

2. **Breach Of Fiduciary Duty Of Loyalty.** The law imposes on financial advisors a "fiduciary duty" (meaning, a special duty of care requiring strict compliance) not to take actions during their employment contrary to the interests of their employer. Sometimes this is called a "duty of loyalty." The duty exists even if it is not expressly written in a contract; it is imposed by law from the nature of the relationship. Hernandez, Reilly and Gaffey breached their duty of loyalty to E*TRADE by stealing E*TRADE's proprietary information in order to poach its customers, and by soliciting E*TRADE's customers *while* they were employed at E*TRADE.

3. **Misappropriation Of Trade Secrets.** E*TRADE has a valid, enforceable right to protect the secrecy of internal business information it develops and holds in confidence. There is no question that E*TRADE's customer lists and the customer account information constitutes "trade secrets" – E*TRADE expended enormous resources to develop this information and to protect it from misuse by competitors like BOA. There is also no question that all four



Respondents willfully and maliciously misappropriated E*TRADE's trade secrets. The three

individual Respondents, acting on their own behalf and as agents of BOA, took the information

from E*TRADE and used it while employed at BOA to benefit themselves and BOA. All four

Respondents are liable to E*TRADE for this misappropriation of E*TRADE's trade secrets, for

not only damages, but for attorneys' fees under state law.

    **4.**   ***Conversion.***  "Conversion" is the common-law cause of action for, simply, theft.

Respondents stole E*TRADE's property. Without authorization, they took E*TRADE's

Confidential Information and used it contrary to E*TRADE's interest. In particular, E*TRADE

had a protectable interest in the secrecy of its Confidential Information. Respondents destroyed

the value of this secrecy by taking the information and using it for their own benefit.

    **5.**   ***Defamation (Sometimes Called "Libel" (For Written Statements) And***

***"Slander" (For Spoken Statements)).***  Respondents defamed E*TRADE by lying to customers

about E*TRADE's financial solvency and the security of its customers' deposits. Respondents

knew that they were making statements to customers that were false, such as that E*TRADE's

bankruptcy was imminent (obviously, it was not) and that customers' assets would be lost if

E*TRADE were to go bankrupt (which was entirely false because customers' accounts were

always fully insured). Respondents spread these false statements to benefit BOA and to harm

E*TRADE. BOA is responsible for its employees' actions. E*TRADE is entitled to be

compensated for the loss of business that resulted from these false statements.

    **6.**   ***Unfair Competition.***  BOA and its employees are not allowed to achieve an

"unfair" advantage over competitors like E*TRADE. Respondents cannot steal property, breach

contracts, or spread false statements about E*TRADE in order to compete illegally for the

business of E*TRADE's customers. E*TRADE is entitled to be compensated for the loss of



business (and/or the gain of business by BOA) resulting from the unfair methods that Respondents employed.

7.    *Tortious Interference With Prospective Advantage.*  Respondents are liable for interfering with E*TRADE's profitable relationships with its customers. E*TRADE expected to enjoy profitable relationships with its customers, with which Respondents interfered by causing the customers to leave E*TRADE. While free and fair competition is entirely permitted, the law prohibits Respondents from using "wrongful" or improper acts to impair E*TRADE's relationships with its customers – such as by stealing E*TRADE's Confidential Information or scaring customers to leave E*TRADE using false statements. Under a cause of action known as "tortious interference with prospective advantage," Respondents are liable to E*TRADE for the loss of business that E*TRADE suffered for Respondents' actions.

8.    *Violation Of The Computer Fraud And Abuse Act, 18 U.S.C. § 1030 ("CFAA").*  The CFAA is a federal law that criminalizes unauthorized access to computer systems for the purpose of stealing information. Congress amended the law a few years ago to permit private persons or companies, injured by unauthorized access to their computers, to sue for damages. The three individual Respondents, on their own behalf and as agents of BOA, violated CFAA by accessing E*TRADE's Confidential Information through E*TRADE's computer systems without authorization, or in excess of the authorization E*TRADE gave them. Respondents then used this information to perpetrate "fraud" on E*TRADE -- which means, basically, an improper scheme to deprive E*TRADE of something valuable, like E*TRADE's Confidential Information and its relationships with its customers. Thus, Respondents are liable to E*TRADE under the provisions of the CFAA.



**9.** ***Violation Of Standards Of Commercial Honor And Principles Of Trade, NASD***
***Conduct Rule 2210.*** Finally, NASD Conduct Rule 2210 requires that members (and associated persons) "observe high standards of commercial honor and just and equitable principles of trade." Stealing customer lists and terrorizing the public about the safety of its assets is the furthest thing from the conduct the NASD/FINRA demands through this Rule. Respondents are liable to E*TRADE for violating this fundamental principal in the securities industry.

**IV.    E*TRADE HAS SOUGHT PRELIMINARY**
**       INJUNCTIVE RELIEF FROM FEDERAL COURT**

As permitted under FINRA Rule 13804(a)(1), concurrent with the filing of this Statement of Claim, E*TRADE has sued Respondents in federal court, solely seeking preliminary injunctions to prohibit Respondents' misuse of E*TRADE's Confidential Information while this arbitration is pending: *E*TRADE Financial Corp., et al. v. Reilly and BOA* (C.D. Cal.) and *E*TRADE Financial Corp., et al. v. Hernandez, Gaffey and BOA* (S.D.N.Y.).

**V.    RELIEF REQUESTED**

Through this Statement of Claim, Claimants seek:

**1.    *Expedited Arbitration Hearing*:** An expedited arbitration hearing seeking a permanent injunction, to be held within 15 days of the issuance by a court of a preliminary injunction, pursuant to FINRA Rule 13804(b)(1);

**2.    *Permanent Injunction*:** A permanent injunction barring all four Respondents from:

      a.    Soliciting the business of an E*TRADE customer whom Respondents serviced, or whose name became known to Respondents through E*TRADE's records;

      b.    Using, disclosing or transmitting for any purpose, including the solicitation of business, the information contained in the records of E*TRADE, including but not limited to, the names, addresses, financial



information, investment objectives and account information of any E*TRADE's customer;

    c.    Publishing or speaking false and/or misleading information about E*TRADE; and

    d.    Aiding, abetting, or encouraging any other persons or entities to do any of the aforementioned acts;

    3.    ***Separate Damages Hearing***:  Compensatory damages in an amount to be determined at a subsequently scheduled hearing, pursuant to FINRA Rule 13804(c);

    4.    Punitive damages in an amount to be determined at the damages hearing;

    5.    Award of all costs of arbitration, including forum fees;

    6.    ***Attorneys' Fees:***  Reasonable attorneys' fees and costs pursuant to the Panel's equitable power arising from Respondents' egregious conduct in breaching their Agreements, engaging in unfair competition, and in manipulating the fears of the public for their own benefit; and

    7.    All other relief the Panel deems appropriate.

Sincerely,

Douglas P. Lobel, Esq.
COOLEY GODWARD KRONISH LLP
One Freedom Square
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone:  (703) 456-8000
Facsimile:  (703) 456-8100

*Counsel for E\*TRADE Securities LLC*

357869 v1/RE

# EXHIBIT 2

Compilation of Instant Message Logs for Marcus Hernandez, Scott Reilly and Sean Gaffey

| Sender Name | Sender IM | Recipient Name | Recipient IM | Message Date | Content | Host Name |
|---|---|---|---|---|---|---|
| Reilly, Scott | scott.reilly@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 12/4/2007 18:42 | call my cell later | dca1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 12/4/2007 18:42 | done deal | atl1vmexim1.corp.etradegrp.com |
| Reilly, Scott | scott.reilly@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 12/4/2007 21:35 | we need to talk about the non-compe | dca1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 12/4/2007 21:35 | definitely | atl1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 12/4/2007 21:35 | call me | atl1vmexim1.corp.etradegrp.com |

| Sender Name | Sender IM | Recipient Name | Recipient IM | Message Date | Content | Host Name |
|---|---|---|---|---|---|---|
| Reilly, Scott | scott.reilly@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 21:49 | got to be an exodus soon | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/8/2008 21:50 | i honestly would be very upset to leave this place | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/8/2008 21:50 | as sad and soft as it seems | atl1vmexim1.corp.etradegrp.com |
| Reilly, Scott | scott.reilly@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 21:50 | of course, me too | atl1vmexim1.corp.etradegrp.com |
| Reilly, Scott | scott.reilly@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 21:50 | was a great start for us | atl1vmexim1.corp.etradegrp.com |
| Reilly, Scott | scott.reilly@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 21:50 | time to parlay it before we go bk | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/8/2008 21:50 | if things go our way it can work out perfectly actually | atl1vmexim1.corp.etradegrp.com |

| Sender Name | Sender IM | Recipient Name | Recipient IM | Message Date | Content | Host Name |
|---|---|---|---|---|---|---|
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/9/2008 21:17 | my guy emailed me | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/9/2008 21:17 | hsa a different guy for you to call | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/9/2008 21:17 | his boy in newport | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Reilly, Scott | scott.reilly@im.corp.etradegrp.com | 1/9/2008 21:21 | call that guy now | atl1vmexim1.corp.etradegrp.com |

**Compilation of Instant Message Logs for Marcus Hernandez, Scott Reilly and Sean Gaffey**

| Sender Name | Sender IM | Recipient Name | Recipient IM | Message Date | Content | Host Name |
|---|---|---|---|---|---|---|
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:08 | i wonder how much time we have | atl1vmexim2.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:10 | I've never been really sacred before | atl1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:10 | like sick to my stomach scared | atl1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:10 | I am now | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:10 | i dont know how to handle it | atl1vmexim2.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:10 | I'm all f'ed up | atl1vmexim1.corp.etradegrp.com |

| Sender Name | Sender IM | Recipient Name | Recipient IM | Message Date | Content | Host Name |
|---|---|---|---|---|---|---|
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:26 | hook me up | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:26 | i did | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:26 | i have the contact | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:31 | sent | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:54 | text | atl1vmexim2.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:54 | got it | atl1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:54 | wonder if that would be a better option than NJ? | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:54 | the other i owe you tonmight | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:54 | not sure | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:55 | this guy said that guy is one of the top guys | atl1vmexim2.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:56 | text me that guys name so I can reference him | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:58 | done | atl1vmexim2.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:58 | thx | atl1vmexim1.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:58 | i owe you one | atl1vmexim1.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:58 | no worries man | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:58 | ill get you the other guy | atl1vmexim2.corp.etradegrp.com |
| Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | 1/8/2008 17:58 | talked you up a little bit | atl1vmexim2.corp.etradegrp.com |
| Gaffey, Sean | sean.gaffey@im.corp.etradegrp.com | Hernandez, Marcus | marcus.hernandez@im.corp.etradegrp.com | 1/8/2008 17:58 | ok, thx | atl1vmexim1.corp.etradegrp.com |

# EXHIBIT 3

1  COOLEY GODWARD KRONISH LLP
   MICHELLE C. DOOLIN (179445)
2  (doolinmc@cooley.com)
   DARCIE A. TILLY (239715)
3  (dtilly@cooley.com)
   4401 Eastgate Mall
4  San Diego, California 92121
   Telephone:  (858) 550-6000
5  Facsimile:   (858) 550-6420

6  Attorneys for Plaintiffs
   E*TRADE FINANCIAL CORPORATION
7  E*TRADE SECURITIES LLC

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12

13  E*TRADE FINANCIAL              Case No. CV08-1963 AHM (FMOx)
    CORPORATION and
14  E*TRADE SECURITIES LLC         **MEMORANDUM OF POINTS**
                                   **AND AUTHORITIES IN SUPPORT**
15            Plaintiffs,          **OF PLAINTIFFS' MOTION FOR**
                                   **PRELIMINARY INJUNCTION**
16       v.                        **IN AID OF ARBITRATION**

17  JOSEPH S. REILLY and
    BANC OF AMERICA
18  INVESTMENT SERVICES, INC.,

19            Defendants.

20

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1

## TABLE OF CONTENTS

2   I.   INTRODUCTION ............................................................................... 1

3   II.  STATEMENT OF FACTS.................................................................. 2

4        A.   E*TRADE Has Valuable Trade Secrets And Confidential
5             Information That It Protects Through Extensive Efforts ..................... 3

6        B.   Reilly Agreed To Protect And Not Misuse E*TRADE's Trade
              Secrets.................................................................................................. 4

7             1.   The Employment Agreement .................................................... 5

8             2.   Code Of Professional Conduct................................................. 5

9        C.   Reilly Took E*TRADE's Confidential Information And Used It
10            To Solicit Customers For BOA ............................................................ 7

11       D.   Reilly Intentionally Misrepresented E*TRADE's Financial
              Viability And The Safety Of E*TRADE's Customer Accounts
12            To Steal Those Customers For BOA..................................................... 9

13       E.   E*TRADE Will Continue To Suffer Irreparable Harm If
              Defendants' Wrongful Conduct Continues Unabated.......................... 10

14  III. PROCEDURAL POSTURE................................................................ 10

15  IV.  ARGUMENT...................................................................................... 11

16       A.   The Standard For Issuing A Preliminary Injunction ........................... 11

17       B.   E*TRADE Is Likely To Be Successful On The Merits ....................... 12

18            1.   Reilly Breached His Employment Agreement........................... 12

19            2.   Reilly Breached His Fiduciary Duty Of Loyalty ..................... 12

20            3.   Reilly And BOA Misappropriated E*TRADE's Secrets.......... 13

21            4.   Reilly And BOA Engaged In Unfair Competition.................... 14

22            5.   Reilly And BOA Tortiously Interfered With E*TRADE's
23                 Contractual Relations And Prospective Advantages................. 15

24            6.   Reilly And BOA Violated The Federal Computer Fraud
                   And Abuse Act (18 U.S.C. § 1030)........................................ 17

25       C.   E*TRADE Faces Continuing Irreparable Harm Absent
26            Preliminary Relief ............................................................................. 18

27       D.   The Balance Of Hardships Weighs Heavily In E*TRADE's
              Favor.................................................................................................. 20

28       E.   The Public Interest Favors An Injunction ........................................... 21

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- i -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

F.    The Alternative Formulation Supports An Injunction ........................ 21

V.    CONCLUSION ............................................................................. 22

- ii -

1  TABLE OF AUTHORITIES

2  **CASES**

3  *American Credit Indem. Co. v. Sacks* (1989) 213 Cal. App. 3d 622 ................... 14

4  *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.* (1999)
   20 Cal. 4th 163............................................................................................... 15

5
   *Cf. Rigging Int'l. Maint. Co. v. Gwin* (1982) 128 Cal. App. 3d 594.................... 15
6

7  *Corporate Express Office Prods., Inc. v. Martinez*, No. 02-87, 2002
   WL 31961458,  (C.D. Cal. Mar. 8, 2002) ................................................... 19

8  *Credit Suisse Sec. (USA) LLC v. Ebling*, No 06-11339, 2006 WL
   3457693, (S.D.N.Y. Nov. 27, 2006) ........................................................... 11
9

10 *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995)
   11 Cal. 4th 376............................................................................................... 16

11 *First Empire Secs., Inc. v. Miele*, No. 20247-2007, 2007 WL 2894245
   (N.Y. Sup. Ct. Aug. 10, 2007) ...................................................................... 11
12

13 *Fowler v. Varian Assocs., Inc.* (1987) 196 Cal. App. 3d 34  ............................. 13

14 *Gable-Leigh, Inc. v. N. Am. Miss*, No. 01-01019, 2001 WL 521695
   (C.D. Cal. Apr. 13, 2001) ............................................................................. 21

15 *George S. May Intern. Co. v. Hostetler*, No. 04-1606, 2004 WL
   1197395(N.D. Ill. May 28, 2004).................................................................. 17
16

17 *Global Horizons, Inc. v. U.S. Dept. of Labor*, 510 F.3d 1054
   (9th Cir. 2007) ............................................................................................... 12

18 *Gonzales v. Raich*, 545 U.S. 1 (2005) ................................................................. 21

19 *Huong Que, Inc. v. Luu* (2007) 150 Cal. App. 4th 400 .............................. 12, 13

20 *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214 (S.D. Cal. 1986) ........................ 18

21 *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427
   (9th Cir. 1995) ............................................................................................... 12
22

23 *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974)..................................... 21

24 *Knudsen Corp. v. Ever-Fresh Foods, Inc.*, 336 F. Supp. 241
   (C.D. Cal. 1971) ............................................................................................ 18

25 *Korea Supply Co. v. Lockheed Martin Corp.* (2003)
   29 Cal. 4th 1134................................................................................... 14, 16, 19
26

27 *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung*, No. 01-00659,
   2001 WL 283083 (C.D. Cal. Feb. 2, 2001)........................................ 18, 19, 20, 21

28 *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Garcia*,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- iii -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

127 F.Supp.2d 1305 (C.D. Cal. 2000) ........................................................ 19, 20, 21

*Morlife, Inc. v. Perry* (1997) 56 Cal. App. 4th 1514 ............................................ 14

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365
(9th Cir. 1984) ........................................................................................................ 21

*P.C. Yonkers, Inc. v. Celebrations The Party & Seasonal Superstore,
LLC*, 428 F.3d 504 (3d Cir. 2005) ......................................................................... 17

*Pacific Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188
(E.D. Wash. 2003) ................................................................................................... 17

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.* (1990) 50 Cal. 3d 1118 ................. 15

*Peerless Oakland Laundry Co. v. Hickman* (1962)
205 Cal. App. 2d 556 ......................................................................................... 14, 15

*Raich v. Ashcroft*, 352 F.3d 1222 (9th Cir. 2003) ............................................... 21

*Saunders v. Superior Ct.* (1994) 27 Cal. App. 4th 832 ....................................... 15

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*,
119 F. Supp. 2d 1121, (W.D. Wash. 2000) ............................................................ 17

*Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750
(9th Cir. 1982) ........................................................................................................ 22

*Stokes v. Dole Nut Co.* (1995) 41 Cal. App. 4th 285 ........................................... 12

*Vacco Indus., Inc. v. Van Den Berg* (1992) 5 Cal. App. 4th 34 .......................... 14

**STATUTES**

Cal. Civ. Code § 3426.1(d) ..................................................................................... 13

Cal. Civ. Code § 3426.2 .......................................................................................... 14

California Business and Professions Code § 17200 ............................................... 14

18 U.S.C. § 1030 .............................................................................................. i, 17

**RULES**

FINRA Procedural Rule 13200 ................................................................................ 10

FINRA Procedural Rule 13804(a)(1) ...................................................................... 11

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- iv -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

# I.    INTRODUCTION

Plaintiffs E*TRADE Financial Corporation and its wholly owned subsidiary E*TRADE Securities LLC (jointly "E*TRADE") move pursuant to Fed. R. Civ. P. 65(a) for a preliminary injunction against Defendant Joseph S. Reilly ("Reilly") and his current employer, Banc of America Investment Services, Inc. ("BOA").

Until recently, Reilly was a long-time employee of E*TRADE, subject to an employment agreement forbidding using or taking proprietary information for personal use.  Before he resigned, he took E*TRADE's confidential and trade secret customer information, and then he used this information to solicit E*TRADE's customers for BOA, his new employer.  Reilly coerced E*TRADE customers to transfer their accounts using fear tactics, telling them that E*TRADE was failing and that their assets were at risk.

E*TRADE has direct evidence of Reilly and BOA's theft of E*TRADE's trade secrets.  Reilly resigned from E*TRADE in such haste that he failed to clean up his work papers from his office.  He left behind two handwritten notes describing what he needed to accomplish before he left:

"*Copy As Many [Customer] Names [and Numbers] As Possible*"

and

"*Call Clients Using Cell To Determine Their Interest In Coming w/ Me*"

and

"*Print Out All Key Client Data*"

After Reilly resigned from E*TRADE, he used this information to systematically contact E*TRADE's customers and solicit their business for BOA, using false statements to instill fear in E*TRADE's customers.

Reilly's conduct breached his written employment agreement with E*TRADE, as well as federal and state laws.  While E*TRADE believes it will clearly prevail on its numerous claims for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, etc., the merits of E*TRADE's suit (and

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

-1-

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1  E*TRADE's right to a permanent injunction) must be resolved in an arbitration
2  before the Financial Industry Regulatory Authority ("FINRA").  Concurrent with
3  filing this lawsuit, E*TRADE filed a Statement of Claim against Defendants at
4  FINRA.  Consequently, in this action E*TRADE only seeks a preliminary
5  injunction prohibiting Defendants from using E*TRADE's proprietary information
6  pending the outcome of the arbitration Hearing.

7  Without a preliminary injunction, E*TRADE will continue to suffer
8  irreparable harm because competitor BOA will continue using E*TRADE's
9  confidential information to solicit E*TRADE's customers, causing loss of assets
10 and goodwill.  Conversely, an injunction will impose no burdens on Defendants,
11 who remain free to market their services, but without using the information they
12 wrongfully took from E*TRADE.  Finally, any injunction would be short lived --
13 industry rules specify that an expedited arbitration at FINRA must begin within 15
14 days after the Court issues a preliminary injunction.

15 BOA is in no position to disagree.  BOA has filed almost 20 substantively
16 identical lawsuits in the last five years seeking exactly this kind of relief.  In these
17 cases, BOA, like E*TRADE here, sought preliminary injunctions pending FINRA
18 arbitrations against former employees who allegedly stole BOA's customer
19 information and trade secrets, then used it to compete with BOA.

20 This Motion is straightforward, and the evidence is clear.  The Court should
21 enter the preliminary injunctive relief requested in E*TRADE's complaint.

22 **II.    STATEMENT OF FACTS**

23 E*TRADE is a leading online brokerage firm that also provides financial and
24 investment counseling services to individual investors.  Reilly was a "financial
25 advisor" who provided investment advice to E*TRADE's customers.  In January
26 2008, he abruptly resigned and immediately started working at BOA.  The evidence
27 proves that he took E*TRADE's proprietary customer information to BOA and has

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 2 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1  used it to poach E*TRADE's customers.  *See generally* Declaration of Curt

2  Radetich ("Radetich Decl."), ¶¶ 31-44.[1]

3  **A.  E*TRADE Has Valuable Trade Secrets And Confidential**
   **Information That It Protects Through Extensive Efforts**

4

5  A critical part of E*TRADE's business is its customer financial information

6  and trade secrets ("Confidential Information").  This information includes:

7  E*TRADE's customer prospect lists; customer account and personal financial

8  information; and internal strategic business, marketing, and financial plans.  *Id.*

9  ¶ 13.  To cultivate and maintain its customer base, E*TRADE engages in extensive

10 and costly advertising in various media.  As a direct result of E*TRADE's

11 marketing efforts, it has developed extensive customer lists that contain detailed

12 personal financial information about its customers.  *Id.* ¶¶ 13-14.

13 E*TRADE vigorously maintains the secrecy of its Confidential Information.

14 E*TRADE maintains its Confidential Information on its internal, proprietary

15 E*TRADE computer databases.  *Id.* ¶ 16.  E*TRADE prohibits non-E*TRADE

16 individuals from accessing the information.  *Id.*  All access to the information

17 requires specific user passwords, and E*TRADE constantly monitors these

18 networks for unauthorized access.  *Id.*  E*TRADE instructs its employees not to

19 release Confidential Information outside of E*TRADE.  *Id.* ¶ 17.

20 E*TRADE restricts access to its Confidential Information to those employees

21 having a "need to know," and it requires these employees to sign agreements

22 protecting the confidentiality of this information.  *Id.* ¶¶ 16-19.  Furthermore,

23 E*TRADE maintains an internal written policy regarding employee access to and

24 use of E*TRADE's confidential customer and account information, called the

25 "Code of Professional Conduct."  *Id.* ¶ 18 & *Ex.* 2.

26

27

28 [1]    Exhibits to the Radetich Declaration are cited as "*Ex.* ___."

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 3 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1   When a financial advisor's employment with E*TRADE ends, regardless of

2   the reason, E*TRADE follows certain procedures to secure and guard its

3   Confidential Information.  Before leaving the building on the last day of

4   employment, a financial advisor must submit to a reasonable search to verify that

5   he or she is not removing Confidential Information.  *Id.* ¶ 20.

6   E*TRADE's Confidential Information would be extremely valuable to

7   competitors like BOA, and would provide E*TRADE's competitors with an unfair

8   commercial advantage.  The Confidential Information reflects each customer's

9   unique situation, financial needs, and account history, so that competitors in

10  possession of the information could solicit E*TRADE's customers using a "sales

11  pitch" specifically tailored to that customer.  *Id.* ¶ 15.

12  **B.      Reilly Agreed To Protect And Not Misuse E*TRADE's Trade
            Secrets**

13
    As an E*TRADE employee, Reilly had access to E*TRADE's Confidential

14  Information, and thus was subject to procedures and obligations to protect and not

15  misuse it, as described below.

16
    Reilly started working for E*TRADE as a Financial Advisor in December

17  2003.  *Id.* ¶ 22.[2]  Shortly after he started, Reilly and E*TRADE entered into

18  "Agreement Regarding Employment and Proprietary Information and Inventions"

19  (the "Employment Agreement").  *Id.* ¶ 24 & *Ex.* 4.  The Employment Agreement

20

21  ───────────────

22  [2]     Reilly provided personalized investment strategies and advice to E*TRADE
    customers, but they were ***E*TRADE's*** customers, not ***his*** customers.  E*TRADE's

23  business model is different from most brokerage firms'.  Typically in the large
    brokerage firms like Merrill Lynch, financial advisors are expected to bring in new

24  customers and then retain the customers as their own personal clients throughout
    their career at the firm, and the customers traditionally follow the advisors when

25  they change firms.  *Id.* ¶ 11.  E*TRADE obtains new customers through marketing

26  and cross-selling in its other business lines; the financial advisors ***are not*** expected
    to bring in customers.  *Id.*  E*TRADE assigns each customer a financial advisor so

27  that the customer has a consistent point of contact with E*TRADE.  *Id.* ¶ 12.

28  E*TRADE can, and does move customers to different financial advisors.  *Id.*

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 4 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

expressly, and by incorporation of E*TRADE's Code of Professional Conduct, imposed numerous obligations on Reilly to protect E*TRADE's Confidential Information and not to use it against E*TRADE's interests.

### 1. The Employment Agreement

The Employment Agreement contained express restrictions on Reilly's access to and use of E*TRADE's Confidential Information. Reilly expressly acknowledged that he understood "that [E*TRADE] possesses and will possess Proprietary Information which is important to its business." Proprietary Information is "information that was developed, created, or discovered by or on behalf of E*TRADE, which has commercial value in E*TRADE's business." This definition includes, but is not limited to, customer lists and other information that concern E*TRADE's actual or anticipated business. *Ex.* 4, ¶ A.

Reilly expressly agreed not to remove any Company Documents and Materials from E*TRADE:

> **I agree that during my employment by the Company, I will not remove any Company Documents and Materials from the business premises of the Company** or deliver any Company Documents and Materials to any person or entity outside the Company . . . .

*Ex.* 4, ¶ C (emphasis added). In the same provision, Reilly expressly agreed to return all Company Documents and Materials to E*TRADE upon termination of his employment:

> I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or during my employment if so requested by the Company, I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property . . . .

*Id.*

### 2. Code Of Professional Conduct

In addition to the express provisions of the Employment Agreement, Reilly agreed to abide by additional restrictions described in E*TRADE's Code of

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 5 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

Professional Conduct (the "Code"). *Id.* ¶ 25 & *Ex.* 5.  The Code was part of the

terms and conditions of Reilly's terms of employment.  *Ex.* 2 at p. 4.

The Code forcefully required Reilly to maintain the confidentiality of

E*TRADE's proprietary information.  That information includes customer lists.  *Id.*

at 24, 33.  The Code bluntly states that E*TRADE's "employees are required as a

term of their employment to agree to maintain the confidentiality of sensitive

nonpublic customer."  *Id.* at 14.  The Code also forbids Reilly from using

E*TRADE's Confidential Information for any purposes other than company

business:

> In general, you must use [E*TRADE] assets solely for the benefit of [E*TRADE] or its customers.
>
> * * *
>
> Any systems to which you are provided access are to be used for Company business purposes. You must adhere to all Company policies and any policies that your business unit or department may set governing such usage. Generally, you should use [E*TRADE's] systems only for Company business. You may use the systems for limited personal use in accordance with [E*TRADE] policies governing communications and conduct generally. However, any use for personal profit or contrary to law or Company policies is prohibited.
>
> * * *
>
> Use proprietary or confidential information solely to perform your duties for [E*TRADE] and not for your own personal benefit.

*Id*. at 24-25 & 35.

The Code also requires Reilly not to remove E*TRADE's Confidential

Information from E*TRADE's premises, nor to disclose it to third parties:

> Do not remove proprietary or confidential information from Company premises unless absolutely necessary. . . . If you take such information out of the office for business purposes, keep it on your person or in a secure place at all times and return it promptly to Company premises.
>
> Do not disclose proprietary or confidential information to any person outside [E*TRADE] (including family

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 6 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

members), or use it or permit any third party to use it without first obtaining Legal and Compliance approval.

*Id.* at 36, 37.

Finally, the Code explains that these restrictions continue ***after Reilly's employment terminates:***

> You must continue after the end of your employment to abide by [E*TRADE's] policies concerning the handling of proprietary and confidential information, the treatment of inside information and the handling of privileged materials, as outlined in this Code and in any specific policies of your business unit or department. If you have downloaded such information onto any personal computer equipment, including a personal digital assistant, you are required to delete that information permanently from the equipment.

> You may not disclose proprietary or confidential information of [E*TRADE] or any third party outside of [E*TRADE] at any time, including after termination of employment. You may not take such proprietary or confidential information when leaving [E*TRADE] or use or disclose such information for your own personal benefit or for the benefit of your new employer or prospective new employer. You may not permit its disclosure or use by any third party.

*Id.* at 27, 38.

### C. Reilly Took E*TRADE's Confidential Information And Used It To Solicit Customers For BOA

On January 25, 2008, Reilly resigned from E*TRADE without warning, effective immediately. Radetich Decl. ¶ 28. That same day, Reilly became a BOA employee. *Id.* ¶ 37.

In his haste to leave, he left behind direct evidence of his violations of the Employment Agreement and the Code. Reilly left E*TRADE's offices so abruptly that he failed to remove his work papers. Among his work files were notebooks in his own handwriting. In these notebooks, he stated that he had ***copied E*TRADE customer lists and customer data*** so that he could use this Confidential Information to solicit E*TRADE's customers to transfer their accounts to BOA. He also described how he solicited these customers for BOA ***while still employed at***

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 7 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

*E\*TRADE*, using his cell phone to evade detection.  Reilly's own words and handwriting speak for themselves:



"Transition To Do[:]  Copy As Many Names #s' As Possible"

"Leaving To Do
(2) Call Clients Using Cell To Determine Their Interest In Coming w/ Me
(3) Print Out All Key Client Data"

*Id.* ¶¶ 32-33 & *Exs.* 7, 8.

Other evidence proves that Reilly did exactly what his notes describe. Numerous E\*TRADE customers stated that Reilly called them after he resigned, and solicited them to transfer their accounts to BOA.  *Id.* ¶¶ 36-37, 41-43.

BOA directly benefited from Reilly's wrongful conduct because some E\*TRADE customers whom Reilly solicited transferred their accounts to BOA. BOA obtained relationships with prospective customers at E\*TRADE's expense. Because Reilly knew he was going to be a BOA employee and he was soliciting

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 8 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1  business for BOA, he acted as BOA's agent and all of his conduct is directly

2  attributable to BOA as well.

3     **D.    Reilly Intentionally Misrepresented E\*TRADE's Financial
           Viability And The Safety Of E\*TRADE's Customer Accounts To
4          Steal Those Customers For BOA**

5          Reilly did not merely steal Confidential Information to solicit E\*TRADE's

6  customers; he also coerced customers to transfer their accounts by instilling fears

7  about the safety of their assets.

8          As discussed above, customers open E\*TRADE accounts because they wish

9  to utilize E\*TRADE's services; customers are generated by E\*TRADE, not by the

10 financial advisors.  Financial advisors service the accounts once the firm generates

11 them, but the customers are E\*TRADE's customers.  Thus, when Reilly left

12 E\*TRADE, it was far from certain that any E\*TRADE customer would follow him

13 to BOA.  Radetich Decl., ¶ 11.

14         Consequently, Reilly knew he needed leverage to persuade E\*TRADE's

15 customers to leave E\*TRADE for BOA.  As a result, he engaged in a coordinated

16 campaign of fear, telling E\*TRADE's customers that E\*TRADE was possibly

17 insolvent.  Worse, he outright lied to customers by claiming that, in the event of

18 insolvency, their assets were at risk.  Reilly knew this was false because E\*TRADE

19 has multiple layers of insurance to protect its customers' assets.  However, Reilly

20 misrepresented the safety of customer accounts because he needed to create anxiety

21 in these customers to pry them away from E\*TRADE.  *Id.* at ¶¶ 38, 41-42.

22         After joining BOA, Reilly called numerous E\*TRADE customers and tried

23 to scare them into transferring their accounts to BOA.  For example, Reilly called

24 E\*TRADE customer Max W. (with whom he had not spoken in almost two years)

25 and told this customer that he should transfer his accounts to BOA because

26 E\*TRADE was a "sinking ship."  Reilly told E\*TRADE customer Dan J. that he

27 should transfer his accounts to E\*TRADE because E\*TRADE was having financial

28 problems.  *Id.* ¶¶ 41-42.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 9 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1    **E.    E*TRADE Will Continue To Suffer Irreparable**
2         **Harm If Defendants' Wrongful Conduct Continues**
           **Unabated**

3         As a result of Reilly and BOA's wrongful conduct, some E*TRADE

4    customers have unfortunately transferred their accounts to BOA. *Id.* ¶ 39.  The

5    resulting damages are unascertainable at this time, and E*TRADE's future loss is

6    incalculable.  Other E*TRADE customers that Reilly solicited might not have

7    transferred their accounts to BOA, but their wrongful conduct has had serious, far-

8    reaching effects on E*TRADE that cannot be measured monetarily:

9        • Loss of confidentiality of customer information, loss
           of confidentiality of customers' dealings with
10         E*TRADE, loss of confidence and trust of customers;
           and
11
         • Loss of valuable existing and prospective customer
12         relationships, destruction of E*TRADE's goodwill,
           and loss of business reputation.
13

14   *Id.* at ¶¶ 45-47.

15        If the Court does not grant a preliminary injunction, Defendants' wrongful

16   actions will continue:

17       • Defendants will continue to have possession or control
           of E*TRADE's Confidential Information,
18         E*TRADE's proprietary information, and E*TRADE
           trade secrets;
19
         • Defendants will continue to use confidential customer
20         information to solicit E*TRADE accounts to divert the
           business of E*TRADE customers from E*TRADE to
21         BOA; and

22       • Defendants will otherwise continue to engage in acts
           constituting a breach of the terms of the their
23         employment agreements; breaches of their fiduciary
           duty; and other tortious conduct, including
24         misappropriation of trade secrets, and tortious
           interference with business relations.

25   **III.   PROCEDURAL POSTURE**

26        Because all the parties in this case are FINRA members, E*TRADE must

27   obtain a permanent injunction and damages through mandatory arbitration.

28   FINRA Procedural Rule 13200.  However, only this Court can provide preliminary

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 10 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1  injunctive relief.  FINRA Procedural Rule 13804(a)(1).  In these situations, courts

2  routinely enter preliminary injunctions to freeze the *status quo* pending the outcome

3  of FINRA arbitrations.[3]

4    BOA has often used these same procedures to protect its confidential

5  information.  In the last five years, BOA has filed almost 20 actions for preliminary

6  injunctions against former employees whom it accused of stealing confidential

7  information. *See, e.g., Bank of America Investmt. Servs., Inc. v. Ellis*, 05 Civ. 2507

8  (NRB) (S.D.N.Y.), Motion for Preliminary Injunction (filed March 2, 2005)

9  ("*Ellis*"); *Banc of America Investmt. Servs., Inc. v. Harvie*, No. 3:08-cv-97-HEH

10  (E.D. Va.), Motion for Preliminary Injunction (filed Feb. 6, 2008) ("*Harvie*").

11  BOA argued that "injunction relief is authorized pending arbitration";  *Ellis*, BOA

12  Mem. in Supt. of Mo. for Prelim. Inj., at 15-16 ("BOA *Ellis* Mem."), attached

13  hereto as Exh. 2; *Harvie*, BOA Mem. in Supt. of Mo. for Prelim. Inj., at 5-6 ("BOA

14  *Harvie* Mem."), attached hereto as Exh. 4.  In these cases, BOA asked for a

15  preliminary injunction pending BOA's arbitration at FINRA against its former

16  employee.  *See* BOA *Ellis* Mem. at 15-16; BOA *Harvie* Mem. at 5-6.

17  **IV.  ARGUMENT**

18   **A.    The Standard For Issuing A Preliminary Injunction**

19    To obtain a preliminary injunction, a plaintiff must demonstrate:  "(1) a

20  strong likelihood of success on the merits; (2) the possibility of irreparable injury to

---

21  [3]   *See Credit Suisse Sec. (USA) LLC v. Ebling*, No 06-11339, 2006 WL

22  3457693, at *3 (S.D.N.Y. Nov. 27, 2006) ("Without a preliminary injunction, the

    harm that Petitioner seeks to address via arbitration will occur before the arbitrator
23  can render a decision, and Petitioner will lose its right to meaningfully resolve these

24  employment disputes via arbitration."); *First Empire Secs., Inc. v. Miele*,

    No. 20247-2007, 2007 WL 2894245 at *3 (N.Y. Sup. Ct. Aug. 10, 2007) ("The
25  Court is cognizant that this matter will proceed to arbitration, but the rules of

26  FINRA f/k/a NASD (National Association of Securities Dealers) specifically refer

    to the possibility that in an appropriate situation the Court may issue an injunction
27  that could be subsequently addressed in the FINRA/NASD forum by both parties

28  during arbitration.").

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 11 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1  plaintiff if the preliminary relief is not granted; (3) a balance of hardships favoring

2  the plaintiff; and (4) advancement of the public interest (in certain cases)." *Global*

3  *Horizons, Inc. v. U.S. Dept. of Labor*, 510 F.3d 1054, 1057 (9th Cir. 2007) (quoting

4  *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).

5          **B.    E\*TRADE Is Likely To Be Successful On The Merits**

6                ***1.    Reilly Breached His Employment Agreement***

7        E\*TRADE is likely to prevail on its claim against Reilly for breach of

8  contract.  Complaint Count I, ¶¶ 52-58.  As detailed above, Reilly promised not to

9  remove E\*TRADE's Confidential Information from E\*TRADE, not to use

10  E\*TRADE's Confidential Information for "personal" use or in competition against

11  E\*TRADE, and to return or destroy any Confidential Information after he left

12  E\*TRADE.  *See* ¶ II.B *supra*.  His handwritten notes and the trail of calls to

13  E\*TRADE's customers after he left shows that, in fact, he did exactly what his

14  employment contract prohibited.  *See* ¶ II.C *supra*.

15        Under essentially identical facts, BOA recently argued in a Virginia lawsuit

16  that it was "likely to succeed on the merits" of its claims against two former

17  employees.  The employees had similar restrictions as Reilly – commitments not to

18  solicit BOA's customers after they left, and promises not to take customer

19  information from BOA.  BOA *Harvie* Mem. at 10.  BOA showed that both

20  defendants breached these obligations, and argued that this constituted a "likelihood

21  of success on the merits" of BOA's lawsuit authorizing preliminary injunctive

22  relief.  *Id.*

23                ***2.    Reilly Breached His Fiduciary Duty Of Loyalty***

24        Reilly also breached his fiduciary duty of loyalty to E\*TRADE.  *See*

25  Complaint Count II, ¶¶ 59-64.  As an employee, Reilly "owe[d] undivided loyalty

26  to his employer" E\*TRADE.  *Huong Que, Inc. v. Luu* (2007) 150 Cal. App. 4th

27  400, 414; *Stokes v. Dole Nut Co.* (1995) 41 Cal. App. 4th 285, 295 ("[A]n employer

28  has the right to expect the undivided loyalty of its employees. The duty of loyalty is

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 12 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

breached, and may give rise to a cause of action in the employer, when the

employee takes action which is inimical to the best interests of the employer.");

*Fowler v. Varian Assocs., Inc.* (1997) 196 Cal. App. 3d 34, 41 ("California law

does not authorize an employee to transfer his loyalty to a competitor. During the

term of employment, an employer is entitled to its employees' 'undivided

loyalty.'").  This duty encompassed several fiduciary obligations, including:

> [t]he duty "to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors". . . and the duty "not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."

*Huong Que,* 150 Cal. App. at 416 (quoting Rest.3d, Agency, §§ 8.04, 8.05(2)).

Reilly breached both of these duties.  While still employed at E*TRADE he was

already competing with E*TRADE by soliciting customers to transfer their

business to BOA, and he communicated E*TRADE's Confidential Information for

his own purposes as well as those of BOA.  *See* ¶ II.C *supra*.  No question exists

that his actions damaged E*TRADE.  *See* ¶ II.E *supra*.

### 3. Reilly And BOA Misappropriated E*TRADE's Secrets

E*TRADE is also likely to succeed on its claim that Reilly and BOA

misappropriated E*TRADE's trade secrets.  Complaint Count III, ¶¶ 65-71.

The California Civil Code defines "Trade Secret" as "information . . . that

(1) Derives independent economic value, actual or potential, from not being

generally known to the public or to other persons who can obtain economic value

from its disclosure or use; and (2) Is the subject of efforts that are reasonable under

the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

E*TRADE's customer lists and customer account data constitute trade secrets

under this test.  The information is extremely valuable to E*TRADE's business and

provides value to other businesses like BOA.  *See* ¶ II.A *supra*.  E*TRADE makes

extensive efforts to protect the confidentiality of its Confidential Information,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 13 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1   including protecting computer systems and placing contractual restrictions on
2   employees. *Id.*

3   Under similar circumstances, courts agree that customer lists and customer
4   information qualify as "trade secrets" under the Code. *Morlife, Inc. v. Perry* (1997)
5   56 Cal. App. 4th 1514, 1522 (affirming trial court finding that customer list was
6   trade secret); *American Credit Indem. Co. v. Sacks* (1989) 213 Cal. App. 3d 622,
7   630-32 (overturning trial court and finding that customer list constituted a trade
8   secret, while identifying numerous other California court opinions also holding that
9   customer lists can be a trade secret).

10  In California, "[a]ctual or threatened misappropriation may be enjoined."
11  Cal. Civ. Code § 3426.2. Courts ritually enjoin former employees who attempt to
12  steal customers from their former employers. *E.g., Morlife*, 56 Cal. App. 4th at
13  1527-28 (affirming trial court's issuance of preliminary injunction against former
14  employee who was soliciting plaintiff's customers); *Vacco Indus., Inc. v. Van Den*
15  *Berg* (1992) 5 Cal. App. 4th 34, 53-54 (affirming trial court's entry of preliminary
16  injunction "enjoining defendants' further use and enjoyment of [the plaintiff]'s
17  trade secrets"); *Sacks*, 213 Cal. App. 3d at 637 (enjoining defendants' actual and
18  threatened use of the plaintiff's list); *Peerless Oakland Laundry Co. v. Hickman*
19  (1962) 205 Cal. App. 2d 556, 559-61 (preliminary injunction appropriate where
20  defendant was soliciting customers of his former employer).

21  Reilly and BOA are misusing, and will continue misusing, E*TRADE's trade
22  secrets. E*TRADE will prevail on this claim.

23  ### 4.    *Reilly And BOA Engaged In Unfair Competition*

24  E*TRADE also has a valid claim under California Business and Professions
25  Code § 17200, *see* Complaint Count V, ¶¶ 79-83, which prohibits "unfair
26  competition" defined as "unlawful, unfair or fraudulent business act[s] or
27  practice[s]" ("UCL"). A UCL action is equitable in nature and allows injunctive
28  relief. *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal. 4th 1134, 1144.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 14 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1    "The 'unlawful' practices prohibited by section 17200 are any practices

2    forbidden by law, be it civil or criminal, federal, state, or municipal, statutory,

3    regulatory, or court-made." *Saunders v. Super. Ct.* (1994) 27 Cal. App. 4th 832,

4    838-39.  Reilly's and BOA's liability for any of the foregoing causes of action

5    thereby establishes a UCL claim as well.  In addition, "[t]he statutory language

6    referring to 'any unlawful, unfair or fraudulent' practice . . . makes clear that a

7    practice may be deemed unfair even if not specifically proscribed by some other

8    law." *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.

9    4th 163, 180.   Thus, even if E*TRADE does not prevail on any of its other claims,

10   it may still prevail on its UCL claim.  *Cf. Rigging Int'l. Maint. Co. v. Gwin* (1982)

11   128 Cal. App. 3d 594, 606 ("A former employee's use of confidential information

12   obtained from his former employer to compete with his old employer . . . is

13   regarded as unfair competition."); *Peerless Oakland Laundry,* 205 Cal. App. 2d at

14   559-61 ("courts regard as unfair competition, and will enjoin, the use by an

15   employee to the prejudice of his former employer of the confidential information

16   gained by the employee during his prior employment as to the business secrets of

17   such employer").

18
19          ## 5.   *Reilly And BOA Tortiously Interfered With E*TRADE's Contractual Relations And Prospective Advantages*

20          Defendants' conduct also constitutes tortious interference both with

21   E*TRADE's contractual relations as well as E*TRADE's prospective advantages.

22   Complaint Counts VI & VII, ¶¶ 84-97.  These are similar torts.

23          To prove tortious interference with contractual relations, E*TRADE must

24   show (1) valid contracts with third parties; (2) Reilly and BOA's knowledge of

25   these contracts; (3) Reilly and BOA's intentional acts designed to induce a breach

26   or disruption of the contractual relationship; (4) actual breach or disruption of the

27   contractual relationship; and (5) resulting damage.  *See Pac. Gas & Elec. Co. v.*

28   *Bear Stearns & Co.* (1990) 50 Cal. 3d 1118, 1126.  All of these elements are

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 15 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1  present here.  Reilly (and his employer BOA, through *respondeat superior* and

2  agency principles) knew that E*TRADE had contracts with E*TRADE's

3  customers; Reilly and BOA set out to steal these customers and thus cause

4  E*TRADE to lose the contracts; and in some cases Reilly and BOA were

5  successful, thus damaging E*TRADE.

6       But even for those customers whom Reilly and BOA unsuccessfully

7  attempted to steal, E*TRADE can still state a claim for disruption of contractual

8  relations.  "We have recognized that interference with the plaintiff's performance

9  may give rise to a claim for interference with contractual relations if plaintiff's

10  performance is made more costly or more burdensome."  *Id*. at 1129.  Thus,

11  E*TRADE will prevail on this claim merely by showing "disruption" with its

12  customer relationships, such as Reilly and BOA causing customers to have

13  concerns with their E*TRADE accounts or with the fact that non-E*TRADE

14  brokers possessed their E*TRADE information.  *See* ¶ II.E *supra*.

15       Similarly, to prove tortious interference with prospective advantage,

16  E*TRADE must show (1) the existence of an economic relationship between

17  E*TRADE and its customers, containing a "probability of future economic benefit"

18  to E*TRADE; (2) that Reilly and BOA knew of the existence of this relationship;

19  (3) that Reilly and BOA intentionally engaged in wrongful conduct designed to

20  interfere with or disrupt this relationship; (4) actual interference or disruption of the

21  relationship; and (5) causation and damages.  *See Della Penna v. Toyota Motor*

22  *Sales, U.S.A., Inc.* (1995) 11 Cal. 4th 376, 389.  The "wrongful conduct" must be

23  unlawful conduct beyond the fact of the interference itself.  *Id.* at 393; *see also*

24  *Korea Supply Co.*, 29 Cal. 4th at 1159 ("an act is independently wrongful if it is

25  unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory,

26  common law, or other determinable legal standard.").  Reilly and BOA engaged in

27  the "wrongful conduct" of taking E*TRADE's Confidential Information without

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 16 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

authorization and using it contrary to E*TRADE's interest, in violation of the terms under which Reilly was given access to the information.

E*TRADE is likely to prevail on both of these torts.

### 6. Reilly And BOA Violated The Federal Computer Fraud And Abuse Act (18 U.S.C. § 1030)

Finally, E*TRADE is likely to prevail on its claim against defendant Reilly under the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. *See* Complaint Count VIII, ¶¶ 98-104.[4]  A claim exists under the CFAA if:  (1) defendants accessed E*TRADE's "protected computer," (2) without authorization or exceeding their authorization, (3) "knowingly" and with an "intent to defraud," and (4) as a result have "further[ed] the intended fraud and obtain[ed] anything of value."  18 U.S.C. § 1030(a)(4); *P.C. Yonkers, Inc. v. Celebrations The Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).  In the CFAA, "fraud" means "wrongdoing," and "defraud" means "wronging one in his property rights by dishonest methods or schemes."  *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125-26 (W.D. Wash. 2000).

Courts have found former employees liable under the CFAA to their former employers where the employees access computer systems to steal trade secrets, such as customer lists, and use that information in competition against the former employers.  *George S. May Intern. Co. v. Hostetler*, No. 04-1606, 2004 WL 1197395, at *3 (N.D. Ill. May 28, 2004) (valid CFAA claim existed where an employee removed a company's protected materials from the computer system for the benefit of himself and a competitor); *Pacific Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195-96 (E.D. Wash. 2003) (CFAA routinely applied where customer lists are inappropriately taken by former employees); *Shurgard Storage Ctrs., Inc.*, 119 F. Supp. 2d at 1129 (valid CFAA claim stated where an employee e-mailed trade secrets to a competitor).

---

[4]   The CFAA provides for a private right of action.  18 U.S.C. § 1030(g).

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

E*TRADE is likely to prevail on its claim under the CFAA. First, its computer systems are highly protected, and employees are authorized to access the system strictly for purposes of their obligations to E*TRADE. *See* ¶ II.A *supra*. Second, E*TRADE has a "smoking gun" showing that Reilly copied proprietary client "numbers" and "key data" from E*TRADE's system at the time as part of his preparations to leave E*TRADE, which was expressly outside the scope of his authorization. *See* ¶ II.C *supra*. Third, Reilly did so knowingly and with the intention to use the information in competition against E*TRADE. *Id.* Finally, he "obtained something of value" – the profitable relationships with E*TRADE's customers. *See* ¶ II.E *supra*.

## C. E*TRADE Faces Continuing Irreparable Harm Absent Preliminary Relief

No question exists that E*TRADE faces irreparable injury as a matter of law. As a general rule, courts frequently find an employer faces irreparable injury when a former employee leaves with trade secrets. *See generally Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214 (S.D. Cal. 1986) (granting preliminary injunction after finding that the plaintiff would be irreparably harmed if former employees and their current employer were allowed to use plaintiff's trade secrets); *Knudsen Corp. v. Ever-Fresh Foods, Inc.*, 336 F. Supp. 241, 244 (C.D. Cal. 1971) ("It is beyond question that the unauthorized use of trade secrets is enjoinable"). Solicitation of a former employer's customers, which is probable without injunctive relief, also causes irreparable injury to the former employer: "California courts have held that the solicitation of a company's clients by one of its former employees causes irreparable harm." *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*, No. 01-00659, 2001 WL 283083, at *5 (C.D. Cal. Feb. 2, 2001) (citing California cases).

Specifically in the financial services industry, this Court has repeatedly recognized brokerage firms suffer irreparable injury if one of its financial advisors

1  brings confidential customer lists to a competing broker. *See Chung*, 2001 WL

2  283083, at *5 (finding irreparable injury after a broker brought customer

3  information to a competing brokerage); *see also Merrill Lynch, Pierce, Fenner &*

4  *Smith Inc. v. Garcia*, 127 F. Supp. 2d 1305, 1306 (C.D. Cal. 2000) (same).

5      The order in the *Chung* case explains the many reasons a firm like

6  E*TRADE faces irreparable harm:  "The Court finds that in the present case Merrill

7  Lynch will suffer irreparable harm as a result of the breach of client confidentiality,

8  conversion of Merrill Lynch's property and information, incalculability of damages,

9  loss of goodwill, and the threat to office stability and procedures caused by

10  Defendants' violations."  *Chung*, 2001 WL 283083, at *5; *see also Corporate*

11  *Express Office Prods., Inc. v. Martinez*, No. 02-87, 2002 WL 31961458, at *5 (C.D.

12  Cal. Mar. 8, 2002) ("If a preliminary injunction is not entered, Corporate Express

13  may suffer continued customer losses, future sales, damage to long-term

14  relationships with its customers, loss of referrals and loss of goodwill in the

15  marketplace. Such damage is difficult to quantify and, in this context, constitutes

16  irreparable harm.").

17      Under virtually identical circumstances, BOA argued that irreparable injury

18  is present as matter of law.  BOA *Ellis* Mem., at 11-14; BOA *Harvie* Mem., at 8.  In

19  *Ellis*, BOA sued a broker who left BOA, allegedly taking BOA's confidential

20  customer information with him.  In seeking a preliminary injunction against their

21  use of that information, BOA identified three separate kinds of irreparable harm:

22  (1) indeterminable damages from the loss of customer relationships that might have

23  been profitable "for years to come" (BOA *Ellis* Mem., at 12); (2) customers' loss of

24  "trust and confidence" when their financial services firm appears to have lost their

25  highly confidential information (*id.* at 13); and (3) the "threat to office stability,"

26  that is, the threat of other firms being encouraged to poach more employees and

27  steal yet more customer information (*id.* at 13-14).  Similarly, BOA argued in the

28  *Harvie* case two months ago – where two employees allegedly left with BOA

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 19 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1   customer information – that irreparable harm is present when a former employee

2   takes "customer data, which includes contact and financial information." BOA

3   *Harvie* Mem. at 8. BOA further stated, "Once a client moves an account, it is

4   extremely difficult to regain it. This is particularly true if the client loses

5   confidence in a company's ability to keep his or her financial and personal

6   information confidential." *Id.* The Court should apply BOA's arguments here too.

7           **D.      The Balance Of Hardships Weighs Heavily In E\*TRADE's Favor**

8           The balance of hardships favors a preliminary injunction. This Court has

9   noted that the burden on the defendant of refraining from using the former-

10  employee's trade secrets is slight and warrants the issuance of a preliminary

11  injunction:

12          [T]he balance of hardships tips heavily in favor of
            granting injunctive relief because an injunction merely
13          prohibits Defendants from misappropriating the trade
            secrets of Merrill Lynch, and requires them to comply
14          with the reasonable terms of their Agreements. An
            injunction will not prevent the Defendants from
15          continuing their employment in the securities industry,
            will not interfere with their ability to acquire even a fairly
16          limited number of clients of the thousands of potential
            clients in the area, or from working for Smith Barney in
17          the community in which Defendants have chosen to work.

18  *Chung*, 2001 WL 283083, at *6; *see also Garcia*, 127 F. Supp. 2d at 1306

19  (concluding that the balance of hardships favored a preliminary injunction where a

20  broker began soliciting his former-employer's customers after leaving the

21  company).

22          BOA made these very same arguments in its recent action against former

23  employees in Virginia. BOA demonstrated that it would face irreparable harm from

24  defendants' continued use of BOA's customer lists and trade secrets, whereas the

25  brief injunction until FINRA resolved BOA's arbitration claim would not stop the

26  defendants from earning their living. As BOA stated, "The 'balance of hardships'

27  is overwhelmingly in favor of [BOA]." BOA *Harvie* Mem., at 8.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 20 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

### E. The Public Interest Favors An Injunction

Finally, the public interest favors injunction relief to protect E*TRADE's trade secrets. *See Gable-Leigh, Inc. v. N. Am. Miss*, No. 01-01019, 2001 WL 521695, at *20 (C.D. Cal. Apr. 13, 2001) ("The issuance of an injunction on Gable-Leigh's trade secrets claim will promote the public interest because it is in the public interest that trade secret customer lists be protected."); *Chung*, 2001 WL 283083, at *6 (finding a public interest in protection of "trade secret client lists and other confidential and trade secret information"); *Garcia*, 127 F.Supp.2d at 1306 (C.D. Cal. 2000) ("The public interest is advanced by granting injunctive relief thus protecting client property and Plaintiff's trade secrets.").

The Supreme Court has even commented that the public interest would ***never*** lie with someone misusing ill-gained customer lists:

> [I]t is hard to see how the public would be benefited by disclosure of customer lists or advertising campaigns; in fact, keeping such items secret encourages businesses to initiate new and individualized plans of operation, and constructive competition results. This, in turn, leads to a greater variety of business methods than would otherwise be the case if privately developed marketing and other data were passed illicitly among firms involved in the same enterprise.

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 483 (1974).

### F. The Alternative Formulation Supports An Injunction

The Ninth Circuit also uses an alternative test requiring a plaintiff to demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or serious questions going to the merits and that the balance of hardships tipping sharply in the plaintiff's favor. *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003), *vacated on other grounds*, *Gonzales v. Raich*, 545 U.S. 1 (2005). These two tests are not inconsistent, but rather represent a continuum of equitable discretion whereby "the greater the relative hardship to the moving party, the less probability of success must be shown." *Id.* (quoting *Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1369 (9th Cir. 1984). Thus,

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 21 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

where the balance of relative hardship tips sharply in the movant's favor, it need only demonstrate "a fair chance of success on the merits." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982).

Under this alternative formulation, preliminary injunctive relief is warranted. E*TRADE has at least raised "serious questions" on the merits of its claims and, as explained above, the balance of hardships tips sharply in his favor.

## V. CONCLUSION

All of the relevant factors lie in favor of the preliminary relief E*TRADE seeks. For those reasons, E*TRADE respectfully requests that this Court issue and grant a preliminarily injunction requested in E*TRADE's Complaint, at p. 18-19.

Dated: March 27, 2008

COOLEY GODWARD KRONISH LLP
MICHELLE C. DOOLIN (179445)
DARCIE A. TILLY (239715)


/s/Michelle C. Doolin
Michelle C. Doolin (179445)
Attorneys for Plaintiffs
E*TRADE FINANCIAL CORPORATION
and E*TRADE SECURITIES LLC


Of Counsel:

Douglas P. Lobel
Robert T. Cahill
David A. Vogel
COOLEY GODWARD KRONISH LLP
One Freedom Square
11951 Freedom Drive
Reston, Virginia 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN DIEGO

- 22 -

MEMO OF POINTS AND AUTHORITIES ISO
PLAINTIFF'S MOT. FOR PRELIM. INJUNCTION
08CV-1963

1

# CERTIFICATE OF SERVICE

2      I, Michelle C. Doolin, state that on the 27th day of March, 2008, I served the
following by FedEx overnight service:  Memorandum of Points and Authorities in
3  Support of Plaintiffs' Motion for Preliminary Injunction in Aid of Arbitration to the
following parties:

4

Banc of America Investment Services, Inc.
5  c/o CT Corporation System, Its Registered Agent
818 West Seventh Street
6  Los Angeles, CA 90017

7  Joseph S. Reilly                          Joseph S. Reilly
3314 Sage Street                          Banc of America Investment Services, Inc.
8  Tustin, CA 92782-1934                     500 Newport Center Drive
Newport Beach, CA 92660
9

10

11                                           /s/ Michelle C. Doolin
12                                           Michelle C. Doolin

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cooley Godward
Kronish LLP
Attorneys At Law
San Diego

- 23 -

Memo of Points and Authorities ISO
Plaintiff's Mot. for Prelim. Injunction
08CV-1963

# EXHIBIT 4

COOLEY GODWARD KRONISH LLP
MICHELLE C. DOOLIN (179445)
(doolinmc@cooley.com)
DARCIE A. TILLY (239715)
(dtilly@cooley.com)
4401 Eastgate Mall
San Diego, California 92121
Telephone:  (858) 550-6000
Facsimile:   (858) 550-6420

Attorneys for Plaintiffs
E*TRADE FINANCIAL CORPORATION
E*TRADE SECURITIES LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| E*TRADE FINANCIAL CORPORATION and E*TRADE SECURITIES LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH S. REILLY and BANC OF AMERICA INVESTMENT SERVICES, INC.,<br><br>Defendants. | Case No. CV08-1963 AHM (FMOx)<br><br>**DECLARATION OF CURT B. RADETICH IN SUPPORT OF E*TRADE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION IN AID OF ARBITRATION** |

**CURT B. RADETICH** declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am employed by E*TRADE Securities LLC ("E*TRADE") as Branch Manager at Costa Mesa Center, 3200 Bristol Street, Suite 120, Costa Mesa, California 92626 ("Costa Mesa Branch").

2. I make this declaration in support of E*TRADE's Motion for Preliminary Injunction in the above-captioned action against Joseph S. Reilly ("Reilly") and Banc Of America Investment Services, Inc. ("BOA").

3. As the Branch Manager of the Costa Mesa Branch, my duties include supervising employees, addressing issues surrounding the departure of E*TRADE employees and compliance with company policies to protect the confidentiality of customer information and E*TRADE proprietary information. As a Branch Manager, I regularly access E*TRADE's databases about customer information, including their contact information and account histories. I also regularly access E*TRADE's employee records.

4. Beginning in June 2007, I supervised Reilly at the Costa Mesa Branch. Reilly was an E*TRADE Financial Advisor.

5. Reilly is a registered member of the Financial Industry Regulatory Agency ("FINRA"). FINRA provides publicly available records of each of its members, called "BrokerCheck Reports." These are available on the Internet. I have reviewed FINRA's BrokerCheck Report for Reilly, and it states that he is currently employed as a financial adviser at BOA. I am attaching a copy of the current BrokerCheck Report for Reilly as Exhibit 1, which I obtained on the Internet at the website listed on the printout.

6. BOA is a direct competitor of E*TRADE in the investment advisory and brokerage asset management business.

## E*TRADE's Customer Relationships

7.     The investment advisory and brokerage asset management industry is highly competitive, and is built on the development of long-term relationships with clients in need of investment advisory and wealth management services.

8.     Because many products and services provided by competing firms offer capabilities and pricing that are similar, client decisions to place their business with a particular firm are often driven by the client's relationship with the firm.

9.     In order to continue to build its business and maintain its reputation as a premier service provider in the industry, E*TRADE has expended substantial time, labor, and money to attract, develop, service and maintain relationships with its clients and to find, train and develop its employees.

10.     E*TRADE's goodwill and business relationships with its customers and employees are one its most valuable assets.  Customers have many options in the industry and E*TRADE's ability to attract and retain customers is primarily dependent on the customers believing they receive superior attention and quality of services from E*TRADE at a competitive price.

11.     E*TRADE employs Financial Advisors ("FAs") to enhance its relationship with many customers, particularly those who have large assets on deposit and generate substantial revenues for E*TRADE (generally known in the industry as "high net worth" individuals).  Unlike other business models where a brokerage firm's FAs recruit customers and consider the customers their own

"clients," E*TRADE's FAs are merely used in a support role and they are not expected to actively solicit business from non-E*TRADE clients. E*TRADE's brokerage customers are recruited not by FAs but by E*TRADE's other business operations, such as marketing and internal referrals from other business lines (for example, E*TRADE Bank or E*TRADE Mortgage).

12. Instead, E*TRADE FAs provide services solely to either existing E*TRADE customers, or customers who contact E*TRADE FAs in response to E*TRADE's corporate marketing and advertising. E*TRADE usually assigns a specific FA to a particular customer, so that the customer has a single point of contact with E*TRADE, which enhances the customer's view of E*TRADE. However, E*TRADE does not consider these customers to be the specific "clients" of the FAs. E*TRADE can and does reassign FAs between customers for a variety of reasons.

**E*TRADE Confidential Information**

13. E*TRADE maintains confidential information about its customers and trade secrets ("Confidential Information") in its databases. The databases include customer contact information, sensitive financial account information, trading histories, and logs of communications between the customers and E*TRADE employees and representatives.

14. E*TRADE has spent enormous resources to compile its Confidential Information. The information reflects years of E*TRADE's efforts to attract and

1   maintain customers, as I explained above. E*TRADE's Confidential Information

2   essentially embodies all of E*TRADE's marketing investments for years, all of

3

4   E*TRADE's personal communications with customers, and E*TRADE's reputation

5   in the industry.

6

7       15.   E*TRADE's Confidential Information would be extremely valuable to

8   E*TRADE's competitors like BOA. Competitors could use the information to

9   contact E*TRADE's customers to solicit their business away from E*TRADE. The

10

11   information also could provide each customer's unique situation, financial needs,

12   and account history that would allow a competitor to tailor a "sales pitch" specific

13   to that customer.

14

15       16.   E*TRADE vigorously maintains the confidence of its databases and

16   the Confidential Information contained therein. E*TRADE has expended

17   enormous resources over many years to build its own internal, proprietary computer

18

19   network. E*TRADE maintains the information only on these internal E*TRADE

20   computer facilities, limiting access to those employees having the need to know of

21   it, and does not make the information accessible to non-E*TRADE individuals. All

22

23   access to the information requires entry of specific user passwords. E*TRADE has

24   a very large computer staff that constantly monitors E*TRADE's computer

25   networks for unauthorized access.

26

27

28

17.     E*TRADE trains all of its employees how to access and use the computer networks and in also trains employees not to release the information outside of E*TRADE.

18.     E*TRADE maintains an internal written policy regarding employee access to and use of E*TRADE's Confidential Information.  This policy is called the "Code of Professional Conduct."  I am attaching some relevant excerpts of the Code of Professional Conduct as Exhibit 2.

19.     All of E*TRADE's FAs sign employment agreements and expressly agree to comply with E*TRADE's Code of Conduct.  The employment agreements and E*TRADE's Code of Conduct impose mandatory obligations to guard and maintain the confidentiality of E*TRADE's Confidential Information, including the personal financial information of its customers.

20.     When an FA's employment with E*TRADE ends, regardless of reason, E*TRADE follows certain procedures to secure and guard its Confidential Information.  Before leaving the building on the last day of employment, an FA must submit to a reasonable search to verify that Confidential Information is not being taken.

21.     E*TRADE's Confidential Information is not generally known outside E*TRADE and cannot possibly be compiled without proper access to E*TRADE's confidential records.  I cannot imagine how anyone could determine our lists of customers, short of conducting a house-to-house nationwide survey.  In addition,

1     I cannot imagine how anyone could possibly learn each customer's account history

2

3     and financial information without access to E*TRADE's confidential computer

4     databases.

5     **Reilly's Employment Agreements With E*TRADE**

6

7           22.     In December 2003, E*TRADE offered Reilly employment in the

8     position of Investment Specialist in E*TRADE's offices in New York, NY. The

9     employment letter notified Reilly of E*TRADE's confidentiality policies and

10

11     enclosed a copy of E*TRADE's Proprietary Information Agreement. I obtained

12     from Reilly's E*TRADE employee records Reilly's December 17, 2003 offer letter,

13     and I am attaching as Exhibit 3 a true and correct copy of this letter.

14

15           23.     Reilly's position as Investment Specialist was later renamed to

16     Financial Advisor. As a financial advisor, Reilly provided personalized investment

17     strategies and advice to E*TRADE customers.

18

19           24.     Upon starting employment, Reilly signed an E*TRADE Employment

20     Agreement dated January 5, 2004, which incorporated the Proprietary Information

21     Agreement. I obtained a copy of this from Reilly's E*TRADE employee records

22

23     the "Agreement Regarding Employment and Proprietary Information and

24     Inventions" between E*TRADE and him, and I am attaching as Exhibit 4 a true and

25     correct copy of this.

26

27           25.     Upon starting employment, Reilly also signed an Acknowledgement

28     dated January 5, 2004, stating that he had received a copy of the E*TRADE Code

of Professional Conduct and that he had or would thoroughly review it.  A true and correct copy of Reilly's executed January 5, 2004, Acknowledgement, which I obtained from Reilly's E*TRADE employee records, is attached as Exhibit 5.

26.     In May 2006, at his request Reilly transferred from E*TRADE's branch in New York, NY, to its branch in Costa Mesa, CA.

**Reilly's Access To E*TRADE's Confidential Information**

27.     To perform his job responsibilities and serve the needs of E*TRADE's customers, Reilly was entrusted with E*TRADE's Confidential Information, including customer lists containing customer contact and financial information, as well as E*TRADE marketing strategy, business plans and proprietary data.

**Reilly's Resignation**

28.     Reilly abruptly resigned on January 25, 2008, while I was out of the office at the dentist.  Reilly was absent from the office for what he claimed was "sick leave" for several days before resigning.  He came to the office briefly on January 24, 2008.  The next day, January 25, while I was out of the office, he submitted his resignation.  I was informed that Reilly resigned via a call to my mobile phone while I was sitting in the dentist's chair.  I am attaching a true and correct copy of Reilly's resignation letter as Exhibit 6.

29.     Reilly's resignation and departure was so abrupt that he did not give E*TRADE the opportunity to follow normal termination procedures.  In particular, Reilly did not participate in the procedure I described above where E*TRADE

reminds employees not to take or use E*TRADE's Confidential Information [to] at their new jobs.

30.     After returning from the dentist, I discovered that Reilly had not bothered to clean out his office and had left personal items such as a jacket.  I also discovered that Reilly had not cleaned up several work-related materials such as his professional notebooks in his office containing his notes about communications with customers, task lists, and so forth.  I recognized the handwriting in the notebooks as Reilly's handwriting.

31.     Given his abrupt departure, I was very concerned that our customers might have pending business that they expected Reilly to address, but which only Reilly knew.  I was happy so see that he left his professional notebooks because, I hoped, they would contain references to his active matters for our customers. I therefore began reading these professional notebooks to determine if there was any information about his ongoing work for customers.

32.     In one of these notebooks, a 3" x 5" notepad with Reilly's handwriting, I discovered Reilly's list entitled "Transition To Do" with a single task, "(1) Copy as Many Names #'s As Possible".  I am attaching a true and correct copy of this notebook page as Exhibit 7.

33.     In another notepad, I discovered a list entitled "Leaving To Do" with the following list:

(1) MEET W/ MERRILL, UBS, SMITH BARNEY – START DATE JAN

(2) CALL CLIENTS USING CELL TO DETERMINE

THEIR INTEREST IN COMING W/ ME

(3) PRINT OUT ALL KEY CLIENT DATA

(4) [BLANK]

I am attaching a true and correct copy of this notebook page as Exhibit 8.

34.     On January 28, 2008, E*TRADE sent Reilly a letter re "Change of Employment" which expressly reminded Reilly that he continued to be bound by the confidentiality agreement he signed upon starting employment with E*TRADE. A true and correct copy of the letter sent to Reilly from E*TRADE dated January 28, 2008, is attached as Exhibit 9.

**Customer Contacts After Reilly's Departure**

35.     E*TRADE also has a standard procedure to contact the specific customers whom an FA services, upon that FA's departure.  Consistent with this standard procedure, I directed E*TRADE employees to contact the customers whose accounts were serviced by Reilly.  It is E*TRADE's policy and standard practice that, when making these contacts with customers, E*TRADE representatives must make contemporaneous notes regarding the conversations. These contemporaneous notes are recorded in E*TRADE's confidential customer databases, to which I have access.

36.     I have reviewed the notes made in the ordinary course of business by E*TRADE representatives who contacted the customers previously serviced by

Reilly. These notes indicate that many customers reported that they had been solicited by via telephone and in writing by Reilly after his resignation from E*TRADE. Reilly encouraged high net worth customers to transfer their accounts from E*TRADE to BOA.

37. For example, one customer told E*TRADE that Reilly had contacted the customer by phone and in writing on Saturday January 26, the day immediately after Reilly resigned. Reilly sent this customer Transfer of Account ("TOA") forms to transfer the customer's account from E*TRADE to Banc of America. The customer did not request these forms and Reilly would not have this customer's contact information except by improperly taking such information from E*TRADE.

38. Many other customers complained and expressed outrage that their personal information was in the hands of a former E*TRADE employee without the customers' consent. Customers also stated that Reilly made inflammatory, disparaging and inaccurate remarks about E*TRADE, including questioning the solvency of E*TRADE and falsely stating or implying that the assets of E*TRADE customers were at risk. This last remark is demonstrably false, because E*TRADE maintains numerous types of insurance that fully protect all of the accounts and customer deposits that Reilly serviced.

39. As a result of Reilly's solicitations, some customers have left E*TRADE. Other customers, persuaded by what Reilly told them, have questioned

E*TRADE's solvency, the safety of their assets contained in E*TRADE accounts, and the security of their personal financial information.

**Specific Customer Contacts and Comments**

40. The following are examples of E*TRADE customer solicitations by Reilly based on my review of notes maintained in E*TRADE's records following Reilly's departure:

41. Reilly telephoned E*TRADE customer Max W., whom he had not talked to for almost two years, and told this customer that he should transfer his accounts from E*TRADE to BOA because E*TRADE was "a sinking ship"

42. Reilly telephoned E*TRADE customer Dan J. and told this customer that he should transfer his account from E*TRADE to BOA because E*TRADE was having financial problems.

43. Reilly sent E*TRADE customer Alfred L. numerous TOA forms to enable this customer to easily transfer his E*TRADE accounts to BOA.

44. The above examples and quotations are taken from notes contemporaneously kept in the ordinary course of business by E*TRADE employees memorializing the conversations with these customers.

**Continuing Harm To E*TRADE**

45. E*TRADE has attained, and can only maintain, its present position in the investment advisory and wealth management industry by preserving the confidentiality of its Confidential Information, including but not limited to its

1    business plans and strategies, price lists and sales methods, customer and prospect

2    lists and other customer information.

3         46.    Unless Reilly is enjoined from the conduct described above,

4    E*TRADE will be injured by the loss of confidentiality of customer information,

5    loss of confidentiality of customers' dealings with E*TRADE, loss of confidence

6    and trust of customers, loss of revenue from existing and prospective customer

7    relationships, loss of E*TRADE's goodwill, and loss of business reputation.

8         47.    I cannot estimate the money E*TRADE will lose or has been damaged

9    by Reilly's conduct. I cannot predict how much future revenue E*TRADE would

10   have made from the customers whom Reilly solicited away from E*TRADE. I also

11   cannot predict how much money E*TRADE has lost as a result of other future

12   business from these customers or potential referrals from them. Even for customers

13   who remain with E*TRADE, I cannot calculate how much E*TRADE's

14   relationship has been damages as a result of Reilly shaking their confidence or view

15   of E*TRADE.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this ___25___ day of March, 2008, at Costa Mesa, California.

**CURT B. RADETICH**
E*TRADE Branch Manager

DECLARATION OF CURT B. RADETICH

# CERTIFICATE OF SERVICE

I, Michelle C. Doolin, state that on the 27th day of March, 2008, I served the following by FedEx overnight service:  Declaration of Curt B. Radetich in Support of E*TRADE's Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction in Aid of Arbitration to the following parties:

Banc of America Investment Services, Inc.
c/o CT Corporation System, Its Registered Agent
818 West Seventh Street
Los Angeles, CA 90017

Joseph S. Reilly
3314 Sage Street
Tustin, CA 92782-1934

Joseph S. Reilly
Banc of America Investment Services, Inc.
500 Newport Center Drive
Newport Beach, CA 92660

/s/ Michelle C. Doolin
Michelle C. Doolin

# EXHIBIT 5

1  COOLEY GODWARD KRONISH LLP
   MICHELLE C. DOOLIN (179445)
2  (doolinmc@cooley.com)
   DARCIE A. TILLY (239715)
3  (dtilly@cooley.com)
   4401 Eastgate Mall
4  San Diego, California 92121
   Telephone:  (858) 550-6000
5  Facsimile:   (858) 550-6420

6  Attorneys for Plaintiffs
   E*TRADE FINANCIAL CORPORATION
7  E*TRADE SECURITIES LLC

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12

13  E*TRADE FINANCIAL              Case No. CV08-1963 AHM (FMOx)
    CORPORATION and
14  E*TRADE SECURITIES LLC,

15            Plaintiffs,          **DECLARATION OF CURT B.
                                   RADETICH IN SUPPORT OF
16       v.                        E*TRADE'S MEMORANDUM OF
                                   POINTS AND AUTHORITIES IN
17  JOSEPH S. REILLY and           SUPPORT OF PLAINTIFFS'
    BANC OF AMERICA                MOTION FOR PRELIMINARY
18  INVESTMENT SERVICES, INC.,     INJUNCTION IN AID OF
                                   ARBITRATION**
19            Defendants.

20

21       **CURT B. RADETICH** declares as follows pursuant to 28 U.S.C. § 1746:

22       1.    I am employed by E*TRADE Securities LLC ("E*TRADE") as

23  Branch Manager at Costa Mesa Center, 3200 Bristol Street, Suite 120, Costa Mesa,

24  California 92626 ("Costa Mesa Branch").

25

26

27

28

Cooley Godward
Kronish LLP
Attorneys At Law
San Diego

DECLARATION OF CURT B. RADETICH

# EXHIBIT 7



# EXHIBIT 8



Leader To Do

① Meet W/ Manheim, UBS, Smartbeam - Smart Data Tal

② Call Clients Usable Cfg. To Develope Tiered Threshold To Covert W/ole

③ Roast Out All New Client Data

④

# EXHIBIT 6



Douglas P. Lobel

T: (703) 456-8019
dlobel@cooley.com

April 17, 2008

**_VIA FACSIMILE_**

Vanier Martin, Case Administrator
FINRA DISPUTE RESOLUTION
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1404

**Re:     FINRA Dispute Resolution Arbitration Number 08-00871**
**_E*TRADE Securities LLC vs. Marcus J. Hernandez, Joseph S. Reilly,_**
**_Sean J. Gaffey, and Banc of America Investment Services, Inc._**

Dear Ms. Martin:

We represent E*TRADE Securities LLC ('E*TRADE') in the above-referenced arbitration (the "Arbitration"). Yesterday, the U.S. District Court for the Southern District of New York granted E*TRADE's motion for a preliminary injunction in aid of arbitration against Marcus J. Hernandez, Sean J. Gaffey, and Banc of America Investment Securities, Inc., three of the four respondents in this Arbitration.

Yesterday's Order (which is attached) did not address Mr. Reilly, the fourth respondent in this Arbitration. A separate U.S. District Court will be ruling on E*TRADE's motion to enjoin Mr. Reilly and has scheduled a hearing on E*TRADE's motion for May 5, 2008.

In our Statement of Claim, we have alleged that all the individual defendants were acting in concert. To avoid inefficiencies and possible inconsistent results, we do not wish to bifurcate the Arbitration. Our understanding from conversations with your office is that the 15-day period for the expedited arbitration will not begin running until the final motion involving Mr. Reilly is resolved on May 5th.

Thank you for your attention to this matter.

Respectfully yours,

Douglas P. Lobel

cc:     John O. Lukanski, Esq. (via email)
        Tom Momjian, Esq. (via email)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/17/08
```

-------------------------------------------------- x
E*TRADE FINANCIAL CORPORATION and    :
E*TRADE SECURITIES LLC,              :
                                     :
              Plaintiffs,            :
                                     :
       v.                            :        No. 08 CV 2993 (RJH)
                                     :
MARCUS J. HERNANDEZ,                 :
SEAN J. GAFFEY, and                  :
BANC OF AMERICA                      :
INVESTMENT SERVICES, INC.            :
                                     :
              Defendants.            :
-------------------------------------------------- x

## [PROPOSED] ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Upon consideration of Plaintiffs' Motion for Preliminary Injunction ("Motion") and other

submissions in support thereof, as well as upon consideration of the Opposition papers, evidence

and argument submitted by Defendants, and having determined that:

1.    Under Rule 13804(a) of the Financial Industry Regulatory Authority ("FINRA")

(formerly NASD) Code of Arbitration Procedure for Industry Disputes, Plaintiffs E*TRADE

Financial Corporation and E*TRADE Securities LLC (jointly "E*TRADE") have the right to

seek preliminary injunctive relief from this Court pending an arbitration hearing before a panel

of duly-appointed arbitrators;

2.    The rights of E*TRADE with respect to its property, proprietary and confidential

Information, competitive interests, and contracts with Defendants Marcus J. Hernandez
                                        (collectively the "Individual Defendants")
("Hernandez") and Sean J. Gaffey ("Gaffey") are being and will continue to be violated by

Defendants unless they are restrained therefrom;

3.      E*TRADE will suffer irreparable harm and loss if Defendants are permitted to (a) misuse E*TRADE's confidential and trade secret customer information to Defendants' own use and benefit; and (b) wrongfully solicit and contact E*TRADE clients to do business with Defendants;

4.      E*TRADE has no adequate remedy at law; and

5.      Greater injury will be inflicted upon E*TRADE by the denial of preliminary injunctive relief than would be inflicted upon Defendants by the granting of such relief, and the public interest will be served by the issuance of injunctive relief.

**IT IS ORDERED THAT:**

1.      E*TRADE's Motion is GRANTED.

2.      Effective immediately, ~~the Individual~~ Defendants, directly or indirectly, and whether alone or in ~~concert with others~~, including any officer, agent, employee and/or representative of Defendant Banc of America Investment Services, Inc. ("BOA") are enjoined and restrained from:

   A.      Soliciting the business of any E*TRADE customer whom Defendants Hernandez and Gaffey served, or whose name became known to the Individual Defendants through E*TRADE's records;

   B.      Using, disclosing, or transmitting for any purpose, including the solicitation of business, the information contained in the records of E*TRADE, including but not limited to, the names, addresses, financial information, investment objectives and account information of any E*TRADE customer;

   C.      Destroying, erasing or otherwise making unavailable for further proceedings in this matter, or in any arbitration proceeding between the

parties, any records or documents (including data or information
maintained in computer media) in Defendants' possession or control
which were obtained from or contain information derived from any
E*TRADE records; and

D.     Aiding, abetting, or encouraging any other person or entity to do any of
the aforementioned acts.

3.     Defendants, and anyone acting in concert or participation with Defendants
(including Defendants' counsel and any agent, employee, officer or representative of BOA or
any of its subsidiaries or affiliates), are further ordered to return to Plaintiffs' counsel any and all
records or information pertaining to E*TRADE clients or business, and/or which were obtained
by Hernandez and Gaffey as a result of their employment with E*TRADE (whether in original,
copied, handwritten or any other form), and to purge any such information from their possession,
custody, or control, within 24 hours of notice to Defendants or their counsel of the terms of the
Court's Order; provided, however, that any information in computerized or electronic form
(including, but not limited to, computers, BlackBerrys, Treos, Palm Pilots, mobile telephones
and any other device in, or on, which data can be electronically stored) shall be provided by
Defendants to their counsel within 24 hours of notice to Defendants or their counsel of the terms
of the Court's Order, and Defendants' counsel shall preserve the integrity of such devices and
data and immediately make any and all such devices and data available for inspection and
duplication by Plaintiffs' counsel and/or computer forensic consultants.

4.     Defendants are directed to identify all E*TRADE customers that they have
solicited since terminating their employment with E*TRADE, or while in possession of
E*TRADE's Confidential Information, or during the course of any wrongdoing set forth herein.

5.    E*TRADE is directed to post a bond of ~~$1,000~~. $100,000.

6.    This Order shall remain in full force and effect ~~until further order of this Court.~~ pending a final determination by the arbitral panel on

7.    Pursuant to the requirements of the Federal Arbitration Act, 9 U.S.C. §§ 3 & 4, the merits of plaintiffs'

the parties are directed to proceed with arbitration before FINRA in accordance with Rule 13804 claims.

of the Code of Arbitration Procedure for Industry Disputes.

IT IS SO ORDERED.

ENTERED this __16__ day of __April__, 2008.

BY THE COURT:

UNITED STATES DISTRICT JUDGE

357787 v2/RE

-4-

# EXHIBIT 7

# Coss & Momjian, LLP

Attorneys at Law

111 Presidential Boulevard, Suite 233
Bala Cynwyd, PA 19004
Telephone: 610-667-6800
Fax: 610-667-6620

<u>VIA FEDERAL EXPRESS</u>

April 17, 2008

Douglas P. Lobel
Cooley Godward Kronish LLP
One Freedom Square
11951 Freedom Drive
Reston, Virginia 20190

Re: <u>Hernandez and Gaffey</u>

Dear Doug:

I returned to my office this morning and received a copy of the Court's Order. Pursuant to the Court's Order, I am enclosing materials returned by Mr. Gaffey and Mr. Hernandez.

Please give me a call if you have any questions.

Very truly yours,

COSS & MOMJIAN, LLP

Thomas J. Momjian

Enclosures

# Coss & Momjian, LLP

Attorneys at Law

111 Presidential Boulevard, Suite 233
Bala Cynwyd, PA 19004
Telephone: 610-667-6800
Fax: 610-667-6620

<u>VIA FEDERAL EXPRESS</u>

April 18, 2008

Douglas P. Lobel
Cooley Godward Kronish LLP
One Freedom Square
11951 Freedom Drive
Reston, Virginia 20190

Re: <u>Hernandez and Gaffey</u>

Dear Doug:

Pursuant to the Court's Order, I am enclosing additional materials returned by Mr. Hernandez and Mr. Gaffey.

Please give me a call if you have any questions.

Very truly yours,

COSS & MOMJIAN, LLP

Thomas J. Momjian

Enclosures

REDACTED

(704)3 - 4 -

Dr. S            A    S
4    W El Campo Grand Ave.
Las Vegas        NV            89149
(702) 3   - 2
Jnt acct - S    +C.    A    S
IRA -S        A    S

1800 Equies, Biotech stocks, Brokerage CDs, Structured notes in IRA-Equity and Currency

B    A
4    C        S
San Diego        CA            92130
(858) 6   -4
(858) 2   - 5
Individual - B        A
Complete Savings account

Huge QCOM position 1Mil plus in XSFRX

E    J. A
5    N. H    St. #
Columbus, OH            43214
(614) 4   -1
Individual account - E        J. A

Short term Agencies, Municipals and Corps 14 years out

R    & D    A
3.    Gallery Lane
Evergreen, CO 80439
(719) 4r   0

ms buy write, loans, son david handles ruthes account, 200k coming in

R    A
2    Partridge Lane
Cherry Hill        NJ   08003
(856) 4   -3
(856) 6   -7
8 different accoounts

GM, NJ Arps, NJ Munis

R    A
2    Gunar Drive

600 MFs

Cooley Godward,
4/24/08

REDACTED

HY Bonds, calpine    Distressed Level 3 ~

(2) U... *...*
2-2-08 tried - No Answer
2-22-08 call ~

xlacx, NC munis, income

LM w/Craig.

500 MF c shares, multi    Ask friends for refs, uncomfortable with markets

1-19-2006    LM OK TRACE
1-23-08 -
2-22-08-LM-follow up -

1400 Steepner, no munis – 1-9-08

LM -X- returned MY call -
LM- X-1-23-08 - Teace
2-19-08 - LM- Regular 3day Defer
TIEES

Cooley Godward
42408

follow 2-3-08

R     H
2    S. Muirfield Place
Urbana, IL 61802
(345)9... 0
R     SH     &P    A H     Jt
R     Sh          - IRA
P     A H          - Roth

P    & C . . H
Jericho Dr or      Jericho *sent out two cards
Tryon, NC 28782
(828) 8  -0
p.   R & C      C. H
C    C - IRA
P    R - IRA

J    & M     H
2    S. Hillcrest Ave
Springfield, MO 65807
(417) 8  -5
J    M. & M     J. H     - Joint
J.   M. H:     - Roth
M    H:     Conv Roth

R     I
4    Gladelynn Way
Waxhaw, NC 28173
(704) 8  -6                   Trust Uas 2/10/1992 R:
R     K I                            Sep
R     K  I

R:   I
4    Windsor Rd
River Edge, NJ 07661

K & J

**REDACTED**

(201) 9  -5

B   B
1.   N Astor 47 w
Chicago, IL 60610
(312)7   6
Rev Trust Uas 6/2/2006 B.   B TTEE
Estate of G   B B   B J

R   J
2   Melendy Dr
San Carlos, CA 94070
(650) 5   6

F   J
Davenport, FL
863-4  -9.

M   J
1   Derrydown Way
San Diego, CA 92130
(619) 8  -5
Individual account

J   W   R
7   Coastal Dr
Harrison, TN 37341
423-3  .2.

Dr. E   J
1   Sycamore Lane
Clarks Summit, PA 18411
(570) 4   2
W. E   J   III&L   A

- Joint

Follow Up.
1-29-08

Cooley Godward
4/24/08

1300 Qcom, Allianz funds, Multi Income, CA munis          PASAX, PIXAX, RGSAX etc

Corp Bonds

1300 Multi Income, XLACX, PA munis, Db carry trade, lehman

REDACTED

L     R    S
L     R S      - Ira
B        t. Si      - Ira

D   S
Box 3    Route 128 South
Cowden, IL 62422
(760) 2  .1
(217) 6   3
(217) 7   2
RR Lafern - S .         Individual

J   S
5.   East 8 th Street Unit
New York, NY 10028
(917)5   5
(212) 6   7
Jr    &L    S      joint

T   S
(804) 6   7    Calpine/AMD converts
Cheyenne WY

T   S
3 .  East 7. th St. Apt
New York, NY 10021
(917) 6   6

G   S
2    Sugarberry Circle
Houston,TX 77024
(281) 5   1
(713) 7   3
G   S        Indiv
G. C S        - Ira

Cooley Godward
4/24/08

1500 Multi income fklnx xlfax, slim, non dollar note,
-LM-1-24-08-

-LM 1-08-

Mfs

4000 Optax, XOSAX, pasax husa
-LM-1-30-0

# EXHIBIT 8

Location: NASD > Manual > Rules of the Association > Procedural Rules (8000–14000) > 13000. NASD Code of Arbitration Procedure for Industry Disputes > Part II General Arbitration Rules > 13210. Ex Parte Communications

<< **Previous**                                                                                                       **Next** >>

## 13210. Ex Parte Communications

The Industry Code will apply to claims filed on or after April 16, 2007. In addition, the list selection provisions of the Industry Code will apply to previously filed claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed under the new Code. Contact your case administrator for details.

**Notices**
(1 link)

    (a) Except as provided in Rule 13211, no party, or anyone acting on behalf of a party, may communicate with any arbitrator outside of a scheduled hearing or conference regarding an arbitration unless all parties or their representatives are present.

    (b) No party, or anyone acting on behalf of a party, may send or give any written motion, request, submission or other materials directly to any arbitrator, unless the arbitrators and the parties agree, or the Code provides otherwise.

Adopted by SR-NASD-2004-011 eff. April 16, 2007.

**Selected Notices:** 07-07

<< **Previous**                                                                                                       **Next** >>

©2008 FINRA. All rights reserved.

# EXHIBIT 9

**Location:** NASD > Manual > Rules of the Association > Procedural Rules (8000–14000) > 13000. NASD Code of Arbitration Procedure for Industry Disputes > Part III Initiating and Responding to Claims > 13313. Multiple Respondents

‹‹ **Previous**                                                                                   **Next** ››

## 13313. Multiple Respondents

**The Industry Code will apply to claims filed on or after April 16, 2007. In addition, the list selection provisions of the Industry Code will apply to previously filed claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed under the new Code. Contact your case administrator for details.**

**Notices**
(1 link)

(a) One or more parties may name one or more respondents in the same arbitration if the claims contain any questions of law or fact common to all respondents and:

The claims are asserted against the respondents jointly and severally; or

The claims arise out of the same transaction or occurrence, or series of transactions or occurrences.

(b) After all responsive pleadings have been served, claims joined together under paragraph (a) of this rule may be separated into two or more arbitrations by the Director before a panel is appointed, or by the panel after the panel is appointed. A party whose claims were separated by the Director may make a motion to the panel in the lowest numbered case to reconsider the Director's decision.

Adopted by SR-NASD-2004-011 eff. April 16, 2007.

**Selected Notices:** 07-07

‹‹ **Previous**                                                                                   **Next** ››

©2008 FINRA. All rights reserved.

# EXHIBIT 10

**Location:** <u>NASD</u> > <u>Manual</u> > <u>Rules of the Association</u> > <u>Procedural Rules (8000–14000)</u> > <u>13000. NASD Code of Arbitration</u>
<u>Procedure for Industry Disputes</u> > <u>Part II General Arbitration Rules</u> > <u>13207. Extension of Deadlines</u>

‹‹ **Previous**                                                                                                          **Next** ››

## 13207. Extension of Deadlines

**Notices**
(1 link)

**The Industry Code will apply to claims filed on or after April 16, 2007. In addition,
the list selection provisions of the Industry Code will apply to previously filed
claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim
will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed
under the new Code. Contact your case administrator for details.**

(a) The parties may agree in writing to extend or modify any deadline for:

Serving an answer;

Returning arbitrator or chairperson lists;

Responding to motions; or

Exchanging documents or witness lists.

If the parties agree to extend or modify a deadline under this rule, they must notify the Director of the new deadline in
writing.

(b) The panel may extend or modify any deadline listed in paragraph (a), or any other deadline set by the panel,
either on its own initiative or upon motion of a party.

(c) The Director may extend or modify any deadline or time period set by the Code for good cause. The Director
may also extend or modify any deadline or time period set by the panel in extraordinary circumstances.

Adopted by SR-NASD-2004-011 eff. April 16, 2007.

**Selected Notices:** <u>07-07</u>

‹‹ **Previous**                                                                                                          **Next** ››

©2008 FINRA. All rights reserved.

# EXHIBIT 11

84g1etrc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    E*TRADE FINANCIAL CORPORATION,
     et al.,
4
                    Plaintiff,
5
6           v.                              08-CV-2993 (RJH)

     MARCUS J. HERNANDEZ, et al.,
7
                    Defendants.             Preliminary Injunction
8                                                    Hearing
     ------------------------------x
9                                           New York, N.Y.
                                            April 16, 2008
10                                          2:36 p.m.

11   Before:

12                    HON. RICHARD J. HOLWELL,

13                                          District Judge

14                    APPEARANCES

15   COOLEY GODWARD KRONISH LLP
          Attorneys for Plaintiffs
16   BY:  DOUGLAS P. LOBEL, ESQ.
          LAURA GROSSFIELD BIRGER, ESQ.
17
     GIBBONS, P.C.
18        Attorneys for Defendants Hernandez and Gaffey
     BY:  PAUL A. SASO, ESQ.
19
     COSS & MOMJIAN, LLP
20        Attorneys for Defendants Hernandez and Gaffey
     BY:  THOMAS J. MOMJIAN, ESQ.
21        CHRISTOPHER C. COSS, ESQ.

22   WOLFF & SAMSON, PC
          Attorneys for Defendant Banc of America
23   BY:  JOHN O. LUKANSKI, ESQ.

24

25

84g1etrc

1    assuredly that if we come up with say 13 examples or 11

2    examples, I mean, there's probably hundreds of examples that we

3    don't know about.  So I think we have to look at it from that

4    perspective.

5         Last point, your Honor, on the FINRA rules, the rule

6    is that the Court can enter a preliminary injunction pending an

7    expedited hearing.  The FINRA rules require that that hearing

8    be within 15 business days.  There can be some minor

9    modifications to that, of course, but this will be an expedited

10   proceeding and the Court's order would be limited to

11   preliminary relief that would stay in effect, and it's up to

12   the arbitrators to alter that relief on the permanent

13   injunction, which they would hear, and then also on the

14   damages, which they would also hear.  So we're only asking the

15   Court to maintain the status quo until that hearing occurs.

16   And so whatever harshness Banc of America thinks they

17   sustained, it's only for a very limited period of time until

18   the arbitrators sort it out.

19         Thank you, your Honor.

20         THE COURT:  Thank you, counsel.

21         MR. MOMJIAN:  May I have two seconds, your Honor?

22         THE COURT:  Sure.

23         MR. MOMJIAN:  Your Honor, the evidence with respect to

24   Mr. Hernandez now seems to boil down to this one Exhibit 5, and

25   I just note, your Honor, that that call occurred on